IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATALE COSENZA, | ) |
| | ) |
|     Plaintiff, | ) |
| v. | ) |
| | ) |
| CITY OF WORCESTER, Massachusetts, | ) |
| KERRY HAZELHURST, JOHN | ) |
| DOHERTY, T.J. COAKLEY, MARK | ) |
| RICHARDSON, ALLAN BURNES, | ) |
| DANIEL BENEDICT, BRIAN | ) |
| DONOHUE, ROBERT TURGEON, and | ) |
| AS-YET UNKNOWN WORCESTER | ) |
| POLICE OFFICERS, | )     **JURY TRIAL DEMANDED** |
| | ) |
|     Defendants. | ) |
| | ) |

## AMENDED COMPLAINT

Now comes Plaintiff, NATALE COSENZA, by his attorneys, LOEVY &

LOEVY and WOOD & NATHANSON, and complaining of Defendants CITY OF

WORCESTER, Massachusetts, KERRY HAZELHURST, JOHN DOHERTY, T.J.

COAKLEY, MARK RICHARDSON, ALLAN BURNES, DANIEL BENEDICT,

BRIAN DONONUE, ROBERT TURGEON, TIMOTHY WATTS, and AS-YET

UNKNOWN WORCESTER POLICE OFFICERS, Defendants, states as follows:

### Introduction

1.    Plaintiff Natale Cosenza was wrongfully convicted of assault and

battery with a dangerous weapon and armed burglary of a woman, M.H.,[1] in 2002.

There was never any legitimate evidence connecting him to the attack on M.H. The

Defendants never made any serious effort to solve the crime.

---

[1] To respect the privacy of the victim in this case, she is referred to in this complaint only by her initials.

2.      On August 14, 2000, M.H. fought off an attacker after a brief encounter in her home in the middle of the night. That day, she gave the police a wholly generic description of her assailant reflecting her limited opportunity to view her assailant.

3.      M.H. also told police that she had never seen her attacker before. But Plaintiff had lived in the same condominium complex as M.H. for some time before the attack and was known to M.H. Everything the police learned during their initial investigation should have pointed the finger away from Plaintiff.

4.      But Defendants knew Plaintiff, and they worked from the day of the crime to implicate him falsely in the attack.

5.      During their investigation, the only piece of evidence that Defendants ever developed connecting Plaintiff to the attack was a fabricated and manipulated "identification" of Plaintiff by M.H., procured after M.H.'s initial interview with police and after her initial description of her attacker. Defendants showed M.H. a grossly suggestive photo array, as part of a process designed to force M.H. to falsely identify Plaintiff, and they ensured that she did so.

6.      Defendants used this false identification to arrest, indict, and convict Plaintiff, and they suppressed the true circumstances by which they procured their false identification of him throughout his wrongful conviction.

7.      Defendants also suppressed exculpatory evidence relating to a pair of men's shorts found in the victim's residence after the attack. Those shorts had semen on them; they had been worn by the true perpetrator on the night of the

crime; and DNA testing of the semen excluded Plaintiff. But because Plaintiff was Defendants' suspect, Defendants suppressed evidence establishing that the shorts had in fact been worn by the true perpetrator on the night of the crime, and in doing so they ensured that Plaintiff could not use the shorts to exonerate himself and to avoid prosecution.

8.     Based on the fabricated witness identification, unduly suggestive identification procedures, and false reports and testimony fabricated by Defendants, Plaintiff was charged, prosecuted, and wrongfully convicted of assault and battery with a dangerous weapon and armed burglary of a woman. He was sentenced to 12 to 20 years in prison.

9.     On May 31, 2016, the Massachusetts courts vacated Plaintiff's conviction and granted him a new trial. On August 28, 2017, following an evidentiary hearing, the Superior Court suppressed M.H.'s identification, ruling that "Detective Hazelhurst's identification procedure was unduly suggestive." On November 14, 2017, the prosecution entered a *nolle prosequi* and finally ended Plaintiff's nightmare.

10.     Plaintiff served almost 16 years in prison for a crime he did not commit, and another eighteen months in an excruciating wait as he prepared for a second trial. He spent the prime years of his life incarcerated in harsh conditions, either in solitary confinement or facing near constant physical attacks as a result of the nature of the crime of which he was wrongly conviction. He lost invaluable time and experience with his daughters as they grew up and with his parents as they

aged. Indeed, shortly after Plaintiff's release from prison, Plaintiff's father, with whom he was extremely close, passed away. Because of Defendants' misconduct, Plaintiff missed a substantial part of relationships that he now cannot regain.

11.    Plaintiff seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## Jurisdiction and Venue

12.    This action is brought pursuant to 42 U.S.C. § 1983 and Massachusetts law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. Upon information and believe, the events and omissions giving rise to Plaintiff's claims in this complaint occurred within this judicial district.

## Parties

15.    Plaintiff Natale Cosenza is 44 years old and a resident of Massachusetts. At the time of his arrest in this case he was 26 years old and the father of two young daughters. He lived in Worcester, Massachusetts.

16.    Defendants Kerry Hazelhurst, John Doherty, T.J. Coakley, Mark Richardson, Allan Burnes, Daniel Benedict, Brian Donohue, Robert Turgeon,

Timothy Watts, and As-Yet-Unknown Worcester Police Officers are current or former officers of the Worcester Police Department. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and for supervising other police officer Defendants. These Defendants committed, facilitated, and approved the constitutional violations at issue in this case. Collectively, these Defendants are referred to in this Complaint as the Individual Defendants.

17.     Defendant City of Worcester, Massachusetts, is a municipality of the State of Massachusetts, which oversees the Worcester Police Department. Each of the Defendants referenced above was employed by the City of Worcester or was acting as an agent of the City of Worcester and the Worcester Police Department while conducting the investigation described in this Complaint. Defendant City of Worcester is therefore liable for all torts committed by these Defendants pursuant to the doctrine of *respondeat superior*. Defendant City of Worcester is additionally responsible for the policies and practices of the Worcester Police Department, which were implemented by Defendants in this case. Finally, Defendant City of Worcester is responsible under Massachusetts law for any judgment entered against Defendants.

18.     At all times relevant to the events described in this Complaint, each of the individual Defendants acted under color of law, within the scope of his employment, and as an investigator. Each of the individual Defendants is sued in his individual capacity, unless otherwise noted.

## FACTS

### The Attack on M.H.

19.    Early in the morning of August 14, 2000, M.H., a 37-year-old woman, woke up in her bedroom in a condominium in Worcester, Massachusetts to find a man crouching at the foot of her bed.

20.    The man was wearing only a t-shirt and underwear.

21.    In her immediate call to emergency dispatch, and in her initial description to responding officers, M.H. was only able to describe the man as a white male, wearing a t-shirt and underwear, with either a white shirt or a scarf or handkerchief around the top of his head. She told dispatch he did not have hair.

22.    Beyond that, she was not able to describe any specific features of her attacker. She could not say if he had facial hair or not. She did not know how old he was. She did not estimate his height or build. She did not mention the color of his eyes. And she repeatedly told the dispatcher that she had never seen this man before.

23.    When M.H. asked the man what he was doing in her residence, he attacked her, beating her on the hands, head and shoulder with a hard, wooden object. The person then climbed on top of her in bed, she began kicking and screaming, and the person fled.

24.    The encounter occurred at 4:00 a.m. in a darkened bedroom with closed blinds. It lasted only seconds, and M.H spent a portion of that time trying to block her face with her hands to avoid her head being badly hurt during the beating. A

cloth hid parts of her attacker's head. At the time, M.H. had just awoken from sleep and she was in a state of fear and shock during the attack. After the intruder left, M.H. called 911. In that call she said she had never seen her attacker before.

25.     In addition, she spoke to Defendants when they arrived at the scene, including Defendant Burnes, Defendant Turgeon, Defendant Benedict, and Defendant Donohue.

26.     In her interview with these officers, M.H. described her assailant as a white male wearing a dark t-shirt, a white shirt around his head, and white briefs.

27.     As with the call to dispatch, M.H. was not able to provide any further description of her attacker or his facial features.

28.     M.H. repeated to Defendants that she had never seen this man before the attack.

29.     On the day of the attack, Defendants recovered part of a chair rung from M.H.'s bedroom. But, according to police, before fingerprint and other forensic evidence could be developed from the chair rung, Defendant Donohue and other Defendants allowed it to be destroyed.

30.     Defendants also found fingerprints that the real attacker had left on a window where he entered the apartment. Those fingerprints, too, would have excluded Plaintiff as a potential perpetrator, but Defendants allowed that evidence to be destroyed as well.

31.     The same morning, Defendants Burnes, Turgeon and Benedict, among others, conducted a canvas of the apartment complex. Defendants found no

witnesses who could identify M.H.'s assailant, but they did learn that Plaintiff lived in the complex.

32.     As a young man, Plaintiff had struggled with addiction, and at the time of Defendants' investigation into the attack on M.H., Plaintiff was on probation. In fact, Worcester police had been trying to find him in connection with a purported probation violation. Defendants had not located Plaintiff, perhaps because he had been in an inpatient treatment program and had not been in contact with the police.

33.     On the day of the attack on M.H., Defendants talked to a neighbor of M.H.'s, who told them falsely that Plaintiff had previously been involved in stealing a motorbike from him. In fact, Plaintiff had helped to return the motorbike to this neighbor after learning that it had been stolen by another person. Plaintiff had asked for reward money promised by the neighbor, and the neighbor had refused to give it to him. That led to a disagreement between Plaintiff and the neighbor, which was ongoing at the time that Defendants performed their canvass. Because of the disagreement, the neighbor told Defendants that Plaintiff lived in the building and that he suspected Plaintiff.

34.     Inexplicably, Defendants cited this story from the neighbor as a reason to suspect Plaintiff in the attack on M.H. But the story was just a pretext. In reality, as soon as Defendants learned Plaintiff lived in the apartment complex, they decided that Plaintiff was their suspect, they stopped looking for M.H.'s

assailant, and they focused their investigation entirely on developing evidence to implicate Plaintiff in the crime.

### Defendants Fabricate an Identification and Statement from M.H.

35.    On August 15, 2000, more than 24 hours after the crime, Defendants Hazelhurst and Doherty met M.H. at her niece's residence. They had decided that Plaintiff was guilty of the crime, and they were there for the sole purpose of getting an identification of Plaintiff from M.H.

36.    Instead of putting together a photo array with pictures of men who fit the description that M.H. had provided to police, Defendants showed her a grossly suggestive photo array that contained 9 photographs of people who looked like Plaintiff, including Plaintiff's photograph. Defendants' designed their photo array so that M.H. would identify Plaintiff.

37.    Defendants did not even attempt to procure a valid identification of the real perpetrator. Instead, they put together a photo array that gave M.H. a choice between Plaintiff, who lived in her apartment complex, and other people who looked like Plaintiff. They used photos of Plaintiff and people who looked like him even though Plaintiff obviously did not match the description of the attacker that M.H. had provided.

38.    In addition, Defendants put together this photo array of individuals who looked like Plaintiff knowing that M.H. had been attacked in a darkened bedroom, with little opportunity to view her attacker, by a person who was wearing something around his head. Defendants knew that M.H., who was unable to provide

anything beyond the most basic description of her attacker, would have great trouble accurately identifying the person who had committed the crime, and they knew that any identification procedure they performed would therefore be highly suggestive.

39.     Moreover, Defendants included Plaintiff—a neighbor of M.H. who she had seen before—in their photo array despite the fact that M.H. had told Defendants repeatedly that she did not know her attacker. Not only did Defendants' decision to do so result in a fabricated identification that directly contradicted what Defendants had learned from M.H. at the start of their investigation, it also ensured that M.H., who thought she was looking at an array of people she did not know, would see a familiar face in the photo array, further heightening the suggestive nature of the identification procedure.

40.     Having assembled this highly suggestive photo array, Defendants then caused M.H. to identify Plaintiff during the identification procedure. Defendants stressed to M.H. before she reviewed the photographs that that she needed to identify someone, saying that without a "positive identification" the case could not go forward. In so doing, Defendants let Plaintiff know that their suspected perpetrator's photograph was among the photos that they were going to show her.

41.     Moreover, during the identification procedure, when conferring with M.H. about Plaintiff's photograph, Defendants Hazelhurst and Doherty told M.H. Plaintiff's name, and they told her that he lived in her complex.

42.     Defendants Hazelhurst and Doherty suggested to M.H. that she should identify Plaintiff as her attacker during the identification procedure, and she did so.

43.     After the selection had been made, Defendants Hazelhurst and Doherty told M.H. that she had correctly identified her attacker. They said this even though they knew that it was not true. In fact, Defendants knew that M.H. made this identification not because she recognized Plaintiff as her attacker, but because of their suggestive identification procedure and their suggestion to M.H. that she should pick Plaintiff.

44.     After fabricating M.H.'s identification, Defendants took a new statement from M.H. In this statement, M.H.'s description of her assailant suddenly became more detailed. M.H. now described her attacker as medium height and build, with clean-cut, dark hair of short to medium length, dark eyes, and having no visible tattoos. This new description was based on the photo of Plaintiff that M.H. had viewed. And Defendants had M.H. provide this description, after causing her to identify Plaintiff, so that the description she was providing of her attacker more closely matched Plaintiff than the initial description that she had provided to police. This further strengthened Defendants' fabricated identification of Plaintiff.

45.     But because M.H. had only identified Plaintiff because she was told to do so, and not because he had anything to do with her assault, even her new, fabricated description of her attacker still did not accurately match Plaintiff—it matched only what she knew from his photograph and what she believed she recalled about Plaintiff from seeing him in her complex. At that time, Plaintiff had

11

tattoos that would have been visible to M.H. if Plaintiff had been the actual attacker. In addition, he was only 5'3", not of medium height. Because Defendants did not know those details, they did not make it into M.H.'s updated description of the perpetrator following the manipulated photo identification.

46.     In addition, according to Defendants, M.H. also updated her account following their suggestive photo array and claimed that her attacker had a "familiar face," which she had seen before, even though, previously she had said the opposite. This updated fact was also fabricated by Defendants.

47.     Unsurprisingly, M.H. became convinced after this unduly suggestive identification procedure, and Defendants' fabrications that Plaintiff was her attacker. Indeed, Defendants had told her that Plaintiff was her attacker. As a result, at Defendants' urging, and with their help preparing her testimony, M.H. repeated the false identification that Defendants had orchestrated throughout Plaintiff's criminal proceedings.

48.     M.H.'s identification fabricated by Defendants was the only evidence implicating Plaintiff in the crime.

49.     To further bolster their false story, Defendants also recorded the false identification of Plaintiff in police reports, which were used in Plaintiff's criminal proceedings and about which Defendants testified. These reports of Defendants' false evidence were used along with M.H.'s testimony to arrest, charge, and convict Plaintiff.

## Defendants Ignore Exculpatory Evidence

50. In addition to the misconduct described above, Defendants ignored, manipulated, suppressed, downplayed, and destroyed exculpatory evidence, throughout their investigation.

51. As discussed above, Defendants worked to hide the fact that Plaintiff did not match M.H.'s descriptions of her attacker.

52. Defendants also manipulated and suppressed exculpatory evidence relating to a key piece of forensic evidence in the case: a pair of men's shorts belonging to the real perpetrator.

53. Forensic testing on the shorts revealed the presence of semen that did not match Plaintiff's genetic profile.

54. Because this evidence plainly exculpated Plaintiff, Defendants suppressed the true circumstances regarding the discovery of that evidence.

55. Specifically, after the attack on M.H., she went to live with family members and did not continue living in her condominium. Among clothes collected from M.H.'s apartment shortly after the attack was a pair of men's shorts that were not M.H.'s and that did not belong to any person who had a lawful reason to have been in M.H.'s apartment.

56. M.H. turned this evidence over to the Defendants.

57. Though Defendants knew these shorts belong to and contained a genetic profile of the real perpetrator, they manipulated the details of when and how the shorts had been collected to make it seem as though this was not physical

13

evidence exonerating Plaintiff. Instead of using this evidence to discover the true identity of M.H.'s attacker, Defendants made it appear that the shorts had been placed in M.H.'s condominium after the attack occurred.

58.     In addition, shortly after the attack, in M.H.'s bedroom, Defendants found a piece of a chair from elsewhere in M.H.'s residence. This piece of chair did not belong in her bedroom and was the weapon that Defendants said was used in the assault, which is why Defendants collected it.

59.     Despite that, Defendants claimed they recovered no fingerprints or other evidence from this piece of wood, and they destroyed it before the prosecution or the defense had a chance to have this item examined.

60.     Moreover, Defendants also suppressed or destroyed evidence relating to fingerprints left in the apartment by the real perpetrator.

61.     All of the suppressed or destroyed evidence was patently exculpatory, and destroyed in bad faith: It was done so that the Defendants could cover up their frame-up of Plaintiff.

## Plaintiff Is Convicted of Assault and Battery

62.     As a result of Defendants' misconduct, Plaintiff was tried by a jury in 2002 and faced charges of armed burglary, assault and battery with a dangerous weapon, and assault with intent to rape. The only evidence of Plaintiff's guilt was M.H.'s fabricated identification of Plaintiff.

63.    Plaintiff was acquitted of assault with intent to rape, but convicted of assault and battery with a dangerous weapon and of armed burglary. He was sentenced to 12 to 20 years in prison.

64.    Absent the fabricated identification of Plaintiff by M.H., Plaintiff would never have been convicted, much less arrested or charged. And had Defendants not withheld the exculpatory evidence described in this Complaint, the jury would have acquitted Plaintiff.

## Plaintiff's Exoneration

65.    On May 31, 2016, the Superior Court of the Commonwealth of Massachusetts concluded that Plaintiff's conviction could not stand and that he was entitled to a new trial.

66.    Following the grant of a new trial, Plaintiff filed a renewed motion to suppress M.H.'s confession. On August 28, 2017, following an evidentiary hearing, the Superior Court suppressed M.H.'s identification, ruling that "Detective Hazelhurst's identification procedure was unduly suggestive."

67.    On November 14, 2017, the Commonwealth of Massachusetts entered a *nolle prosequi*, dropping all charges against Plaintiff.

68.    At age 43, Plaintiff finally became a free man for the first time in nearly 16 years.

## Plaintiff's Damages

69.    Although he is now free, the damages to Plaintiff from his wrongful conviction are tremendous.

70.     Plaintiff was taken into custody at age 26. As a result of his conviction, he spent nearly 16 years in harsh and dangerous prison conditions. Given the nature of the crime of which he was wrongly convicted, Plaintiff was branded a pervert and a rapist in prison, and he suffered severe physical abuse and other harm as a result of that stigma. In addition, he experienced loneliness and extreme emotional and physical harm during his incarceration. He also spent many years in in solitary confinement.

71.     Plaintiff spent 16 years of the prime of his life in prison as a result of Defendants' misconduct. During this time, his daughters grew up, raised by his parents. He missed out on the opportunity to raise them and be a meaningful part of their lives. His parents aged, and his father was diagnosed with cancer. Shortly after Plaintiff's release, his father passed away. Plaintiff missed out on their lives and the lives of other family and friends.

72.     In addition, Plaintiff was deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions.

73.     Because of Defendants' misconduct, Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

74.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Defendants' misconduct continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear,

anxiety, inability to sleep, deep depression, despair, rage, and other physical and psychological effects.

## COUNT I—42 U.S.C. § 1983
### Due Process

75.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

76.    In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

77.    Defendants deliberately suppressed exculpatory evidence, hiding it from Plaintiff, his attorneys, and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

78.    Defendants also destroyed evidence that Plaintiff could have used to further prove his innocence. The exculpatory value of that evidence was apparent to the Defendants or the evidence was potentially exculpatory, and the Defendants knew that. Nonetheless, the Defendants destroyed the evidence. In the alternative, Defendants acted in bad faith in destroying the evidence.

79.    In addition, Defendants fabricated and solicited evidence that they knew to be false, including but not limited to witness identifications, statements, and testimony that they knew to be false, which implicated Plaintiff in the crime, and they obtained Plaintiff's arrest, prosecution, and conviction using that false

evidence. Defendants failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff in criminal proceedings.

80.     Moreover, Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated and that Defendants knew to be false. Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

81.     Defendants also obtained false eyewitnesses identifications of Plaintiff, implicating him in the crime, by fabricating those identifications and by using unduly suggestive identification techniques during photo identifications. These identifications were completely unreliable and Defendants knew that they were false. Defendants used the resulting false identifications to taint Plaintiff's criminal trial. Without Defendants' illegally suggestive identification procedures and the resulting identifications, Plaintiff would never have been arrested, charged, prosecuted, or convicted.

82.     In addition, Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

83.     Defendants who were supervisors charged with overseeing the investigation into M.H.'s attack and the other individual Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the fabrication of a

false case against Plaintiff. These supervisors nevertheless intentionally ignored Defendants' misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to identify M.H's true attacker

84.     Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

85.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

86.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

87.     Plaintiff's injuries were caused by the official policies of Defendant City of Worcester and the Worcester Police Department, by the practices and customs of Defendant City of Worcester and the Worcester Police Department, as well as by the actions of final policymaking officials for Defendant City of Worcester and the Worcester Police Department.

88.     At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Worcester promulgated rules, regulations, policies, and procedures governing witness interviews, photo and live

19

lineups, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the City of Worcester, including employees and agents of the Worcester Police Department.

89.     These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Worcester, including the individual Defendants, who were responsible for conducting investigations of crimes in and around Worcester, Massachusetts.

90.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Worcester had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Plaintiff, were routinely subject to manipulated and distorted lineup procedures, deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

91.     These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Worcester directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers,

agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

92.     The above-described widespread practices, which were so well settled as to constitute the de facto policy of the City of Worcester, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

93.     The misconduct described in this Count was undertaken pursuant to the policy and practices of Defendant City of Worcester in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Worcester and the Worcester Police Department, or were actually committed by persons with such final policymaking authority.

94.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

95.     Plaintiff's injuries were caused by officers, agents, and employees of the City of Worcester and the Worcester Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II
### 42 U.S.C. § 1983 – Federal Malicious Prosecution

96.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

97.    In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

98.    In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments. The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

99.    Defendants also deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Massachusetts law does not provide an adequate state-law tort remedy to redress that harm.

100.  In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence and their use of unduly suggestive identification procedures.

22

101.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

102.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

103.   On November 14, 2017, the judicial proceedings against Plaintiff were terminated in his favor, in a manner indicative of his innocence, when the Commonwealth of Massachusetts entered a *nolle prosequi*.

104.   Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

### COUNT III
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

105.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

106.   After the attack on M.H., Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for this attack, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

23

107.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

108.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

109.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

110.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

111.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendants who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

## COUNT IV
### 42 U.S.C. § 1983 – Failure to Intervene

112.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

113.    In the manner described above, during the constitutional violations described herein, one or more of Defendants stood by without intervening to prevent

24

the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

114.    As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

115.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

116.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

117.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Worcester, and by Defendant who were final policymakers for Defendant City of Worcester, in the manner more fully described above.

WHEREFORE, Plaintiff, NATALE COSENZA, respectfully requests that this Court enter a judgment in his favor and against Defendants CITY OF WORCESTER, Massachusetts, KERRY HAZELHURST, JOHN DOHERTY, T.J. COAKLEY, MARK RICHARDSON, ALLAN BURNES, DANIEL BENEDICT,

BRIAN DONONUE, ROBERT TURGEON, TIMOTHY WATTS, and AS-YET UNKNOWN WORCESTER POLICE OFFICERS, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, NATALE COSENZA, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/      Debra Loevy
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Gayle Horn
Tara Thompson
Steve Art
Debra Loevy
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
O: 312.243.5900
F: 312.243.5902

Chauncey Wood
Wood & Nathanson, LLP
50 Congress Street
Suite 600
Boston, MA  02109
O:  617.248.1806
F: 866.807.4618
cwoodesq@gmail.com