Case 4:18-cv-10936-TSH    Document 136    Filed 09/03/21    Page 1 of 62
Deposition of NATALE COSENZA taken on MARCH 23, 2021
Sheet 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO.: 4:18-CV-10936-TSH

NATALE COSENZA,
          Plaintiff

  VS.

CITY OF WORCESTER,
MASSACHUSETTS; KERRY
HAZELHURST; JOHN DOHERTY;
T.J. COAKLEY; MARK RICHARDSON;
ALLAN BURNES; DANIEL BENEDICT;
BRIAN DONOHUE; ROBERT TURGEON;
DAVID GRADY; DARLENE
ROCHEFORD and AS-YET UNKNOWN
WORCESTER POLICE OFFICERS,
          Defendants.

        DEPOSITION OF NATALE COSENZA, taken
at the request of the Defendants pursuant to
Federal Rules of Civil Procedure before
Julie A. Zaveloff, a Notary Public in and for
the Commonwealth of Massachusetts, on
March 23, 2021, at 10:00 a.m.,  at the offices
of City of Worcester, 455 Main Street,
Worcester, MA.

          BAY STATE REPORTING AGENCY
69 BRAEBURN LANE, ASHLAND, MASSACHUSETTS  01721
               (508) 753-4121

---

**A P P E A R A N C E S:**

FOR THE PLAINTIFF:
LOEVY & LOEVY
311 North Aberdeen Street, 3rd Floor
Chicago, IL 50607
(312) 243-5900
tara@loevy.com
  BY: TARA THOMPSON, ESQ.
      IMANI FANKLIN, ESQ. (Via Zoom)
      STEVE ART, ESQ. (Via Zoom)

FOR THE DEFENDANTS:
CITY OF WORCESTER
455 Main Street
Worcester MA 01608
(508) 799-1161
quinnwl@worcesterma.gov
  BY: WENDY QUINN, ESQ.
      KEVIN GOULD, ESQ.

---

                    I N D E X
                                          PAGE
DEPONENT:  NATALE COSENZA

EXAMINATION BY MS. QUINN                    4

                    EXHIBITS
NUMBER                              PAGE
1    Aerial Photograph                85
2    Aerial Photograph               105
4    Photograph                      159
5    Photograph                      161
6    Photograph                      162
7    Photograph                      162
8    Photograph                      163
11   Answers to Interrogatories      174
12   Second Amended Complaint        212


Certificate of Court Reporter        246

---

                    S T I P U L A T I O N S
          MS. QUINN:  Usual stipulations,
Tara?
          MS. THOMPSON:  That's fine.

          The parties stipulate that the
sealing, certification and filing of the
deposition are waived, and that all objections
except as to the form of the question and all
motions to strike are reserved until the time
of trial.  The reading and signing will take
place within thirty days of receipt of the
transcript.  Notarization is waived.
          Per Superior Judicial Court Order
144, I have confirmed the witness's identity by
his Massachusetts driver's license and am
authorized to administer the oath at this time.
          **NATALE COSENZA**, was duly sworn, was
examined and testified as follows:

EXAMINATION BY MS. QUINN:
    Q.    Good morning.
    A.    Morning.
    Q.    Can you state your name for the

5

1   record, please?
2     A.   Natale Cosenza.
3     Q.   Mr. Cosenza, as you probably know
4   already, my name is Wendy Quinn.  I represent
5   the Defendants in this lawsuit and with me is
6   Attorney Kevin Gould.  We represent the police
7   officers and the City of Worcester who are
8   named Defendants.
9        What is your date of birth?
10     A.   ███████████
11     Q.   How old are you today?
12     A.   47.  I think.
13     Q.   And is it true that you were 26 when
14   you were arrested on August 29th, 2000?
15     A.   Yes.
16     Q.   Since --
17     A.   I think it was -- actually, I can't
18   say yes to that because I honestly don't
19   remember.  What was the date?  August --
20     Q.   August 29th, 2000.
21     A.   To the best of my recollection, yes.
22     Q.   I know you've sat in on several of
23   these depositions and you've been deposed
24   before; is that right?

6

1     A.   Once before.
2     Q.   Okay.  So you are probably familiar
3   with this process, but let me just briefly
4   explain that obviously the court reporter's
5   taking down a written transcript, so we just
6   have to make sure that our answers are verbal.
7   You can't shake or nod your head yes or no.
8   Please make sure that you listen to my question
9   careful before answering and try to avoid us
10   talking over each other.  If at any point you
11   can't understand me or you can't hear me,
12   please ask or please let me know and I'll
13   explain or speak louder.
14        And if at any time you need a break,
15   please let me know that as well, okay?
16     A.   Yes.
17     Q.   I just, of course, ask that you
18   finish answering the question that's before you
19   before you take a break.
20     A.   Okay.
21     Q.   And I know today it's a little more
22   uncomfortable because we have to wear these
23   face masks.  Is there anything that would
24   prevent you from testifying accurately today?

7

1     A.   No.
2     Q.   Is there anything about this set-up
3   and wearing your mask that would prevent you
4   from feeling comfortable to testify today?
5     A.   I don't think so.
6     Q.   Okay.  Did you review any documents
7   in preparation for today's deposition?
8     A.   My deposition.
9     Q.   And that's the deposition in the
10   Commonwealth case?
11     A.   Yes.
12     Q.   Did you review any other documents?
13     A.   I didn't read any other documents.
14     Q.   Did you speak with anyone other than
15   your attorney in preparation for today?
16     A.   In preparation?  No.
17     Q.   Did you speak with anyone about this
18   deposition other than your attorney?
19     A.   Family members.
20     Q.   And who did you speak with?
21     A.   I don't know.  My mother, my
22   brother, my sister, daughters.  Various family
23   members.
24     Q.   What was your conversation with your

8

1   mother?
2     A.   The same with them all, I just
3   basically told them that I was getting deposed
4   today.
5     Q.   Did you discuss the substance of
6   your testimony with them at all?
7     A.   Just that it had to do with the
8   lawsuit.
9     Q.   Did you tell them what you planned
10   to say during the deposition?
11     A.   No.
12     Q.   Did they offer any advice with
13   regard to the deposition?
14     A.   Nothing but good luck.
15     Q.   Are you taking any medications that
16   would have any impact on your ability to
17   testify accurately today?
18     A.   No.
19     Q.   Are you prescribed any medications
20   that you are not taking?
21     A.   That I'm not taking?  I just got
22   Albuterol that I haven't picked up yet,
23   inhaler.
24     Q.   And what condition is that Albuterol

9

1  for?
2      A.    I have -- I've had mild asthma my
3  whole life but I never really used an inhaler
4  and I think we informed you that I got sick
5  over the weekend and when I went to the doctors
6  to get a shot, they told me to start using an
7  inhaler for awhile.
8      Q.    Do you have any aliases or
9  nicknames?
10     A.    No.
11     Q.    What's your current address?
12     A.    ████████████████████████████
   ██ ██████████████████████████
14     Q.    Do you live there by yourself?
15     A.    No.
16     Q.    Who do you live there with?
17     A.    My girlfriend and her kids.
18     Q.    What's your girlfriend's name?
19     A.    Amanda Caruso.
20     Q.    How many kids does she have?
21     A.    Four, but three living with her.
22     Q.    What are their ages?
23     A.    Two twins that are 13; one
24  15-year-old that's about to turn 16 and I think

10

1  her oldest is, I want to say, 25 or 26.  I'm
2  not exactly sure.
3      Q.    Is it the older child who doesn't
4  live with her?
5      A.    Yes.
6      Q.    And how long have you lived at that
7  address?
8      A.    I think I moved in, I don't know,
9  before last year.  Before the end of the year.
10  Maybe five months, six months.  I'm not exactly
11  sure.
12     Q.    And where did you live before
13  158 Beechwood Road?
14     A.    ████████████████
15     Q.    And that's in Worcester?
16     A.    Yes.
17     Q.    How long have you lived with your
18  girlfriend?
19     A.    You just -- I just answered that.
20     Q.    Has it just been at the Beechwood
21  Road address?
22     A.    Yeah.  Yes.
23     Q.    ████████████ who did you live
24  with?

11

1      A.    My brother and his wife.
2      Q.    Does your brother own that house?
3      A.    Yes.
4      Q.    And his name is Peter Junior?
5      A.    Yes.
6      Q.    How long did you live at 85 Locust
7  Ave. before Beechwood Road?
8      A.    Exact time, I honestly don't know.
9  I've been different places over the past few
10  years.
11     Q.    It looks like you were living at
12  85 Locust Ave. at the time of your last
13  deposition; is that right?
14     A.    That was September, I think it was?
15  Yeah.  I moved in with my girlfriend right
16  after that.
17     Q.    And who did you live at ████████
   ██ ████████████
19     A.    I just answered that.
20     Q.    I think we talked about who owned
21  the house.
22     A.    My brother and his wife, I said.
23     Q.    Okay.  And how long had he owned the
24  house?

12

1      A.    I -- I have no clue.
2      Q.    It's a two-family house?
3      A.    Yes.
4      Q.    And you lived in the portion of the
5  house with your brother and his wife and there
6  was a separate tenant in the other part?
7      A.    Yes.
8      Q.    And your parents owned that house
9  prior to your brother owning it; is that right?
10     A.    Yes.
11     Q.    Do you know when they transferred
12  ownership?
13     A.    No.
14     Q.    Your address at the time of the
15  arrest was what?
16     A.    1195 -- 1195 Grafton Street.
17     Q.    And what unit was the -- what number
18  unit?
19     A.    I don't remember.
20     Q.    Was it 6 or 6A?
21     A.    I can't remember.
22     Q.    What floor in that was that unit
23  located in the building?
24     A.    Depends on which side you're looking

13

1 at the building, I guess, because there's a
2 floor below me.  But if you go into the back
3 parking lot, it's on that floor.  So I guess
4 the first or second -- it could be the second.
5 Q.     Was there a floor beneath that unit?
6 A.     Yes.
7 Q.     And how many units on that floor?
8 A.     On my floor?
9 Q.     Yes.
10 A.     Four, I think.
11 Q.     Were there four floors to that
12 building?
13 A.     Yes.
14 Q.     And four units per floor?
15 A.     Yes.
16 Q.     That unit was owned by your father?
17 A.     Yes.
18 Q.     Did you pay him rent?
19 A.     Yes.  Periodically.
20 Q.     How much was the rent that you paid
21 him?
22 A.     Random, whatever I could pay at the
23 time.  Never had a fixed rent.
24 Q.     How much was his mortgage?  Do you

14

1 know?
2 A.     Nope.
3 Q.     In August of 2000 had your father
4 asked you to leave that unit?
5 A.     Never asked me to leave.
6 Q.     Was he moving you out at one point?
7 A.     No.  I mean, when I went away, he
8 sold it.
9 Q.     Do you know when that was?
10 A.     When I got arrested.
11 Q.     Do you know when he sold it?
12 A.     No.
13 Q.     Were you aware of any complaints by
14 other neighbors at the time in August of 2000?
15 A.     No.
16 Q.     Where were you born?
17 A.     Worcester.
18 Q.     How long did you live at home with
19 your parents?
20 A.     I don't know the exact time I moved
21 out.  Maybe around 21 years of age, somewhere
22 around there.  I'm not exactly sure.  Maybe --
23 actually, it was sometime after my first
24 daughter was born.

15

1 Q.     And where did you move after your
2 first daughter was born?
3 A.     1195 Grafton Street.
4 Q.     When was she born?
5 A.     1995.
6 Q.     Are 85 Locust Ave. and 1195 Grafton
7 Street the only two addresses you've lived at
8 in Worcester?
9 A.     At any time period?
10 Q.     Up until the point of your arrest.
11 A.     As far as I know, yes.
12 Q.     And after your release where did you
13 move?
14 A.     When I first got released, after my
15 exoneration?
16 Q.     After the nolle pros was filed and
17 you were released from incarceration.
18 A.     After my exoneration I moved in with
19 my parents down the Cape.
20 Q.     And what was that address?
21 A.     1████████████████████████████
22 ██
23 Q.     Does your mom still live there
24 today?

16

1 A.     She still owns the house.  That's
2 her technical address, but she lives more with
3 my sister right now.
4 Q.     And where does your sister live?
5 A.     ████████████████████████████
6 Q.     And your sister's name is Theresa
7 Trotto?
8 A.     Yes.
9 Q.     How long did you live with your
10 parents after your release?
11 A.     I think under a year.  I'm not
12 exactly sure.
13 Q.     And where did you go after that?
14 A.     With my sister.
15 Q.     Why did you move in with your sister
16 at that point?
17 A.     Work mostly.  I needed a change from
18 living with my parents.  Numerous reasons.
19 Q.     I'm sorry, what was that last part?
20 A.     Numerous reasons.
21 Q.     Did they ask you to leave?
22 A.     No.  They didn't want me to leave.
23 Q.     Where were you working at the time?
24 A.     I just got a job at the Boston --

17

1   with the Boston Local 7 Iron Workers Union.
2       Q.      Did your sister Theresa's house make
3   getting to your work more convenient?
4       A.      Less travel time.
5       Q.      How long did you live with your
6   sister in Millbury?
7       A.      Exact time, I don't know.  Honestly
8   don't know.  Around a year maybe.  Maybe a
9   little longer, maybe a little less.
10      Q.      Where did you move next?
11      A.      Like I said, I moved in different
12  areas, so exact -- I think I moved in with my
13  brother at that point again or -- I either
14  moved in with my brother or I got my own
15  apartment at that point.  I don't recall.
16      Q.      Did you live at ██████████████
    ██ ███████
18      A.      Yes.  That was my other -- my
19  apartment.
20      Q.      And that was in Worcester?
21      A.      Yes.
22      Q.      How long did you live there?
23      A.      Under two years.  I don't know
24  exactly.

18

1       Q.      Why did you move there?
2       A.      I -- why did I move there?
3       Q.      Yes.
4       A.      To go on my own.
5       Q.      After living at Ingleside Avenue,
6   did you at some point move back in with your
7   sister?
8       A.      Either my sister or my brother.  One
9   of them.
10      Q.      You don't recall?
11      A.      I went back and forth.
12      Q.      Okay.  And why was that?
13      A.      Convenience.
14      Q.      How was it convenient?
15      A.      Financially -- more financially than
16  anything else.
17      Q.      Did you ever pay them any rent?
18      A.      No, not -- never paid rent.
19      Q.      What are your parents' names?
20      A.      Peter Joseph Cosenza, Senior, and
21  Catherine Cosenza.
22      Q.      And your father's passed away?
23      A.      Yes.
24      Q.      When did he pass away?

19

1       A.      February 27th, 2018.
2       Q.      So you have the two siblings, Peter
3   Junior and Theresa Trotto?
4       A.      Yes.
5       Q.      Have you ever been married?
6       A.      No.
7       Q.      And you have two daughters?
8       A.      Yes.
9       Q.      What are their names?
10      A.      Alisia Cosenza and Bianca Joseph, I
11  think her last name is still.
12      Q.      What is Alisia's date of birth?
13      A.      ████████████████████
14      Q.      And where does she live today?
15      A.      Colorado.
16      Q.      How long has she lived in Colorado?
17      A.      About a year.
18      Q.      Is she married?
19      A.      No.
20      Q.      And your daughter Bianca, is
21  married?
22      A.      No.  She's a widow.
23      Q.      And what is Bianca's date of birth?
24      A.      ███████████.

20

1       Q.      Where does she live today?
2       A.      Florida.
3       Q.      And what were their ages at the time
4   of your arrest in August of 2000?
5       A.      Best of my recollection is five and
6   three, I think.
7       Q.      Do you see your daughters regularly?
8       A.      They live out of state.
9       Q.      So the answer is no?
10      A.      Seeing -- visually seeing them?  I
11  don't see them -- I mean, what's considered
12  "regularly"?
13      Q.      When was the last time you saw
14  Alisia?
15      A.      Yesterday.
16      Q.      Did you see her in person?
17      A.      Yes.
18      Q.      Is she here visiting?
19      A.      Yes.
20      Q.      Before that when was the last time
21  you saw her?
22      A.      I went to Colorado to visit her.
23  Don't remember exactly how long ago.
24      Q.      Do you talk with her regularly on

Case 4:18-cv-10936-TSH    Document 136    Filed 09/03/21    Page 6 of 62
Deposition of NATALE COSENZA taken on MARCH 23, 2021
Sheet 6

21

1 the phone?

2     A.    Define "regularly".

3     Q.    How often do you talk with her on

4 the phone?

5     A.    Maybe a couple times a week.  Maybe

6 less.  It varies.

7     Q.    Do you talk to Bianca regularly on

8 the phone?

9     A.    Just as much as I talk to Alisia.

10     Q.    When was the last time you saw

11 Bianca in person?

12     A.    Before she moved to Florida.  I'm

13 going to say around a year ago.

14     Q.    And who is their mother?

15     A.    Samantha Sorenson.

16     Q.    And you and Samantha Sorenson were

17 not together on August 14th, 2000; is that

18 right?

19     A.    We were not in a relationship, no.

20     Q.    When was the last time you were in a

21 relationship with her prior to that time in

22 August of 2000?

23     MS. THOMPSON:  Object to form.  You

24 can answer.

22

1     A.    Can you redefine that?  Like re-ask

2 that a different way?

3     Q.    (By Ms. Quinn)  Prior to

4 August 14th, 2000, when was the last time that

5 you were in a relationship with Ms. Sorenson?

6     A.    I don't know.  We were basically off

7 and on the time we were together.  And then

8 around that time, we were still associated with

9 each other, but we weren't in a relationship.

10 I can't recall when that stopped.

11     Q.    When did you first start a

12 relationship with her?

13     A.    When my first daughter was born, a

14 little bit before.

15     Q.    So sometime in 1995?

16     A.    Yes.

17     Q.    And have you ever lived with her?

18     A.    Yes.

19     Q.    When did you live with her?

20     A.    When my daughter -- my daughter was

21 born, she moved in with me with my parents and

22 then we moved into 1195 Grafton Street.

23     Q.    How long did you live with her at

24 1195 Grafton Street?

23

1     A.    Off and on since 2000.

2     Q.    And she passed away in late 2019?

3     A.    Yes.  I think it was late 2019.

4 Somewhere around there.

5     Q.    When was the last time you had seen

6 her?

7     A.    Oh, God.  Probably before my arrest.

8     Q.    In 2000?

9     A.    Uh-huh (affirmative response).

10     Q.    That's yes?

11     A.    Yes.

12     Q.    And how did you hear of her passing?

13     A.    My daughters.

14     Q.    Had they been in contact with her at

15 the time?

16     A.    Off and on.

17     Q.    Where was she living at the time of

18 her passing?

19     A.    I don't know.  And I did actually,

20 just to re -- I did see her before she died,

21 but she was in -- she was brain dead basically.

22 So I don't know if that constitutes as visiting

23 with her or --

24     Q.    Was she in the hospital at the time?

24

1     A.    Yes.

2     Q.    And why was she in the hospital?

3     A.    I don't know.  I just knew that she

4 was basically brain dead and my daughters had

5 to make a decision on pulling the plug.

6     Q.    Had she had an accident?

7     A.    I don't know.

8     Q.    Had she overdosed?

9     A.    I don't -- I don't know.  She was

10 heavily in drug at the time, and -- I think she

11 did overdose, but I'm not sure.

12     Q.    And when was that that you visited

13 her in the hospital?

14     A.    Right before they pulled the plug,

15 so...

16     Q.    And that led to her passing in late

17 2019?

18     A.    Like I said, she was brain dead at

19 that point, so...

20     Q.    Did Alisia and Samantha live

21 separately from you from 1995 to 1997?

22     A.    What do you mean?  I don't

23 understand what you mean by "live separately".

24     Q.    You just testified, I think, that

25

1  they lived with you at your parents' house and
2  then you moved into 1195 Grafton together.
3  Were there periods of time between 1995 and
4  1997, though, that you did not live together?
5      A.    Like I said, we were off and on,
6  so -- I mean, we always kind of lived together.
7  I mean, she would go back to her mother's house
8  sometimes or I would go back to my parents'
9  house sometimes.
10     Q.    I think you testified in your
11 earlier deposition that you only started living
12 with her about the time your second daughter
13 was born, August 1997?  That's not correct?
14           MS. THOMPSON:  Object to form.  You
15 can answer.
16     A.    '95 my daughter was born -- I think
17 you are correct on that, actually.  I thought
18 it was when my first daughter was born at
19 first.  But you could be correct on that.  I
20 don't -- I think you are correct on that.
21     Q.    (By Ms. Quinn)  That's what your
22 earlier testimony was.  Was that the correct
23 testimony?
24     A.    I'm not exactly sure.  Like I said,

26

1  it's over 20 something years ago, so -- best of
2  my recollection, I was pretty sure it was when
3  my first daughter was born.  But now that I'm
4  thinking about it more, I think it was -- I
5  think she was living with her mother when my
6  first daughter was born and then when my second
7  daughter was born we did move in together.  I
8  think that is correct.
9      Q.    And then that is the point that you
10 moved into 1195 Grafton Street?
11     A.    Yes.
12     Q.    And so you lived at that address at
13 1195 Grafton Street off and on up until the
14 point of your arrest in 2000?
15     A.    Yes.
16     Q.    And at times did the -- your
17 daughters and their mother live separate from
18 you during that period?
19     A.    I -- I would say yeah, at some
20 points.  Like I said, we were off and on.
21     Q.    And when your daughters were four
22 and two, did your father find them abandoned in
23 a trailer park at some point?
24     A.    I don't remember the age, but, yeah.

27

1      Q.    Where were you at the time?
2      A.    Incarcerated.
3      Q.    When they were four and two?
4      A.    Uh-huh (affirmative response).
5      Q.    And on what charge were you
6  incarcerated?
7      A.    I don't recall.
8      Q.    Where was their mother at the time?
9      A.    Nobody knew.
10     Q.    So at the time of your arrest in
11 August of 2000, you were not living with your
12 daughters and Samantha?
13     A.    No.  I'm -- I was in and out of
14 rehab at the time, so I think my parents had
15 them mostly.
16     Q.    And where were you attending rehab?
17     A.    Spectrum.  Off and on.
18     Q.    Where is Spectrum located?
19     A.    Westboro, Mass.
20     Q.    And for what conditions were you in
21 rehab for?
22     A.    I was doing heroin at the time.
23     Q.    When did you first go into rehab for
24 heroin?

28

1      A.    I don't -- I don't recall.
2      Q.    Were you in rehab in the middle of
3  July of 2000?
4      A.    To my personal recollection, I don't
5  exactly know the exact dates.
6      Q.    And how long did you -- how long did
7  you spend in rehab?
8      A.    To my personal knowledge, I don't
9  know.  Like I said, I was in and out of there.
10 I was just trying to get myself together and
11 back and forth basically.
12     Q.    How many times did you go?
13     A.    I don't recall.
14     Q.    More than three times?
15     A.    I don't recall.
16     Q.    More than five times?
17     A.    I do not recall.
18     Q.    At some point after your arrest in
19 August of 2000, you testified there was a child
20 support order in place?
21     A.    What year?
22     Q.    And what was that order?
23     A.    What year was that?
24     Q.    What was that order?  How much did

**29**

1  you have to pay for child support?
2      A.    Can you repeat the question, please?
3      Q.    After your arrest in August of 2000,
4  how much did you have to pay for child support
5  for a court order?
6      A.    After my arrest?
7      Q.    Right.
8      A.    I don't know if I did have child
9  support in August.  I don't remember when the
10  order went into place.
11      Q.    Did you ever have a child support
12  order before August of 2000?
13      A.    I don't -- like I said, I don't
14  remember when it went into place.
15      Q.    And who did you pay child support
16  to?
17      A.    I would say the whole time that I
18  was wrongfully convicted I didn't pay child
19  support at all.
20      Q.    Are you saying during your
21  incarceration you didn't pay child support?
22      A.    During my wrongful conviction, yes.
23      Q.    Well, I don't understand what you
24  mean by that time period.  During your wrongful

**30**

1  conviction?  Do you mean during the time you
2  were incarcerated?
3      A.    During the time I was falsely
4  incarcerated, yes.
5      Q.    So did you ever face any
6  ramifications for not complying with a court
7  order?
8      A.    I didn't -- when I got out of --
9  when I was exonerated, I didn't have a driver's
10  license, I didn't have anything and I owed a
11  lot of money.
12      Q.    Who did you owe money to?
13      A.    I don't know.  I just dealt with the
14  agency.  I would say the State of
15  Massachusetts.
16      Q.    Were you employed while you were
17  incarcerated?
18      A.    Define "employed".
19      Q.    Did you work at the prison at any
20  point in time?
21      A.    I mean work -- what do you mean by
22  "work at the prison"?
23      Q.    Are you unable to answer the
24  question as I've asked it?

**31**

1      A.    No.  I just don't understand it.
2      Q.    Did you ever have any sort of
3  position at the prison where you earned any
4  sort of money?
5      A.    I worked in the kitchen at multiple
6  times, various whatever I could do just to stay
7  busy.
8      Q.    Did you earn a certain amount of
9  money for that position?
10      A.    Yeah.  I think it was like -- I
11  think at the most, $7 a week, if I was lucky.
12      Q.    Did you ever get any of that money
13  taken out of your account to pay child support?
14      A.    I don't recall.
15      Q.    Did you have any non-legitimate
16  sources of income while you were in prison?
17      A.    No.
18      Q.    Did you ever deal drugs while you
19  were in prison?
20      A.    No.
21      Q.    So if another inmate reported that
22  you dealt drugs, that person would be
23  incorrect?
24      A.    Yes.

**32**

1      Q.    Are you aware that someone reported
2  that you were dealing drugs and selling drugs
3  to him?
4      A.    No.
5      Q.    Did you have any court ordered
6  visitation in place with your daughters at any
7  point in time?
8      A.    Not that I know of.
9      Q.    After your arrest, where did your
10  daughters live?
11      A.    They lived with my parents.
12      Q.    And why did they live with your
13  parents?
14      A.    Because the mother was not around.
15      Q.    And did your parents get custody of
16  your daughters?
17      A.    Yes.  I signed over custody to them.
18      Q.    And that was after your arrest in
19  August of 2000?
20      A.    Yes.
21      Q.    Did Ms. Sorenson go to prison
22  shortly after your arrest?
23      A.    I don't know.
24      Q.    Are you aware that at any point in

Case 4:18-cv-10936-TSH   Document 136   Filed 09/03/21   Page 9 of 62
Deposition of NATALE COSENZA taken on MARCH 23, 2021
Sheet 9

33

1  time where she was incarcerated?
2      A.   She was incarcerated multiple times.
3      Q.   And for what offenses?
4      A.   I don't know.
5      Q.   Did she tell you that or did you
6  hear that from somebody else?
7      A.   I don't recall.  I don't think she
8  told me because I wasn't in contact with her.
9      Q.   Did Ms. Sorenson have substance
10  abuse, drug addiction issues in August of 2000?
11      A.   I can't answer yes or no because I
12  wasn't around her.  But I would assume yes.
13  But --
14      Q.   Why would you assume yes?
15      A.   She always did.  She had a very bad
16  drug problem.
17      Q.   And with what drugs?
18      A.   Whatever she could get her hands on.
19      Q.   Was she also addicted to heroin?
20      A.   Yes.
21      Q.   And did she consume heroin while you
22  were living together?
23      A.   Yes.
24      Q.   When did you first start using

34

1  heroin?
2      A.   Exact time, I don't know.  Somewhere
3  around 18.
4      Q.   And in August of 2000, how much did
5  you consume of heroin?
6      A.   I don't -- I don't recall.
7      Q.   Did you have a -- how much was your
8  habit per week?
9      A.   When?
10      Q.   In August of 2000.
11      A.   I don't recall.  That was a time
12  when I was trying to -- in and out of rehab,
13  so...
14      Q.   And was your heroin addiction what
15  prompted you to go into rehab?
16      A.   I mean, I did have an issue --
17  problem.  I guess you could say yes.
18      Q.   Did you have any addictions to any
19  other controlled substances?
20      A.   No.
21      Q.   And prior to your arrest in August
22  of 2000 did you use cocaine?
23      A.   Prior?  You mean in the years
24  before?

35

1      Q.   Yes.
2      A.   Probably.
3      Q.   Did you use cocaine on a regular
4  basis?
5      A.   No.
6      Q.   Did you have an addiction to
7  cocaine?
8      A.   No.
9      Q.   When was the last time you used
10  heroin?
11      A.   Before my arrest -- no.  When was
12  the last time...
13           At some point in my incarceration.
14      Q.   Where were you incarcerated when you
15  used heroin?
16           MS. THOMPSON:  Object to form.  You
17  can answer.
18      A.   I was in multiple prisons.
19      Q.   (By Ms. Quinn)  Did you use heroin
20  at multiple prisons?
21      A.   More than one, yeah -- yes.
22      Q.   And how did you obtain heroin while
23  you were incarcerated?
24      A.   Other inmates.

36

1      Q.   How many times did you use heroin
2  while in prison?
3      A.   Exact number, I don't know.  But not
4  that many.  Not that many.
5      Q.   Have you ever been addicted to
6  alcohol?
7      A.   No.
8      Q.   Did you use alcohol in prison as
9  well?
10      A.   I don't know if it's called alcohol
11  in prison, but I drank.
12      Q.   Did you make some fermented beverage
13  from fruit juice while in prison?
14      A.   Yes.
15      Q.   And how many times?
16      A.   I have no clue.
17      Q.   And you were disciplined a number of
18  times for making fermented drink out of juice
19  in prison, right?
20      A.   Yes.
21      Q.   How many times were you disciplined
22  for that?
23      A.   I have no clue.
24      Q.   Did you become intoxicated from

37

1  making that fermented drink?
2      A.    Yes.
3      Q.    And how often would you be
4  intoxicated from that type of drink?
5      A.    Probably whenever I made it or had
6  it. And can you define intoxicated? Because
7  there's various levels of intoxication.
8      Q.    Okay. How intoxicated were you when
9  you took it?
10     A.    At which point?
11     Q.    You tell me.
12         MS. THOMPSON:  Object to form. You
13  can answer.
14     A.    Are you asking a specific question?
15  Because I'm not understanding like --
16     Q.    (By Ms. Quinn) Okay. How often did
17  you become intoxicated to the point of blacking
18  out while you -- after making that drink?
19     A.    Never.
20     Q.    Okay. So how often did you become
21  so intoxicated that people could observe your
22  actions and tell that you were affected by
23  alcohol?
24         MS. THOMPSON:  Object to form. You

38

1  can answer.
2      A.    What do you mean by observe my
3  actions?
4      Q.    (By Ms. Quinn)  Well, were you --
5  did you become woozy, did your balance get
6  thrown off?
7          MS. THOMPSON:  Object to form. You
8  can answer.
9          MS. QUINN:  I do presume that if
10  you're objecting, it is to form. So you can
11  just say, "Objection." That would --
12         MS. THOMPSON:  You're saying object
13  to form is an improper objection? I'm just
14  trying to understand what your basis --
15         MS. QUINN:  I'm just trying to
16  understand. You waived all objections except
17  to the form of the question?
18         MS. THOMPSON:  That I've waived all
19  objections except to form?
20         MS. QUINN:  Right. That's the usual
21  stipulations we agreed to at the start of this
22  deposition.
23         MS. THOMPSON:  I guess my question
24  is are you objecting -- are you objecting to me

39

1  saying "Objection to form"?
2          MS. QUINN:  Yes, because it
3  increases the word count and lengthens the
4  deposition. So I'm just saying it's not needed
5  unless you have an objection other than to
6  form. It's assumed that it's for form.
7          MS. THOMPSON:  All right. I object
8  then. You can answer.
9      A.    Repeat the question, please?
10     Q.    (By Ms. Quinn)  I'll move on. Did
11  you use marijuana?
12     A.    Yes.
13     Q.    And how often did you use marijuana?
14     A.    At which time period?
15     Q.    Throughout your lifetime?
16     A.    Well, I have no clue.
17     Q.    Prior to your arrest in August of
18  2000 how often did you use marijuana?
19     A.    I used it. No -- as far as how
20  often, I -- I did smoke it.
21     Q.    Did you use marijuana on a regular
22  basis prior to your arrest in August of 2000?
23     A.    When you say "Regular," you mean
24  like --

40

1      Q.    Did you use it on a weekly basis?
2      A.    Not every single week, but there was
3  times when I did smoke it weekly.
4      Q.    Did you use it on a daily basis?
5      A.    At different points in my -- in that
6  time frame -- actually at different points of
7  all of the time frames, off and on I would
8  smoke and there was long periods when I
9  wouldn't.
10     Q.    So at present do you use marijuana?
11     A.    Yes.
12     Q.    How often do you use marijuana?
13     A.    I don't know, maybe a couple times a
14  month. I haven't used it in a couple months,
15  so -- it varies.
16     Q.    Are you prohibited at your work from
17  using marijuana?
18     A.    What do you mean "prohibited"?
19     Q.    Do they drug test you regularly at
20  work?
21     A.    Yes, they drug test us.
22     Q.    And is marijuana one of the
23  prohibited substances?
24     A.    It's not prohibited. I cannot work

41

1   on a jobsite if I'm smoking.  But as far as --
2   what do you mean by "prohibited"?  There's
3   different variations of that.
4       Q.    Do you face employment ramifications
5   if you test positive for marijuana use with
6   your job?
7       A.    What do you mean by "employment"?
8       Q.    Is there any sort of discipline as a
9   result if you tested positive?
10      A.    No.
11      Q.    Are you prohibited from working if
12  you test positive at work?
13      A.    If I test positive at work?
14      Q.    From your work drug test.
15      A.    Well, the only time I get urined is
16  when I start a job.  To start a new job -- it's
17  difficult to explain and you're not really
18  asking the right questions, so I don't know how
19  to answer it honestly.
20      Q.    Okay.  So you say you get a urine
21  analysis when you start a new construction site
22  job?
23      A.    Yes.
24      Q.    And is there any sort of substance

42

1   that test would -- if you tested positive for a
2   substance that you would be prohibited from
3   then working on that jobsite?
4       A.    Repeat that again?  I didn't
5   understand the beginning of it.
6       Q.    Is there any sort of substance that
7   if you tested positive will prohibit you from
8   working on that jobsite?
9       A.    When you say "substance," are you
10  still talking about marijuana?  Or anything?
11      Q.    What are they testing you for when
12  they do that drug test?
13      A.    I don't actually know.  I know it's
14  illegal drugs and marijuana.
15      Q.    Have you ever tested positive --
16      A.    No.
17      Q.    Have you ever been told that you
18  couldn't work at a jobsite because of that
19  urinalysis?
20      A.    No.
21      Q.    Prior to August of 2000 did you
22  consume any other controlled substances or
23  narcotics?
24      A.    Before 2000?

43

1       Q.    Yes.
2       A.    Probably.  I don't remember.
3       Q.    Did you have any other addictions
4   besides heroin?
5       A.    No.
6       Q.    Have you ever overdosed on any sort
7   of controlled substance?
8       A.    No.
9       Q.    Have you ever been hospitalized for
10  controlled substances?
11      A.    Define hospitalization.
12      Q.    Have you ever been in-patient in
13  rehabilitation because of controlled
14  substances?
15      A.    In-patient in rehab?  Yes.
16      Q.    And the times you were in Spectrum
17  in Westboro, was that an in-patient treatment?
18      A.    Yes.  To the best of my
19  recollection, yes.
20      Q.    Have you ever been in-patient at any
21  other point in time other than in 2000, in the
22  summer of 2000?
23      A.    Before the summer of 2000?
24      Q.    Right.

44

1       A.    Any particular time frame or just in
2   that --
3       Q.    Prior to the summer --
4       A.    -- all the years prior to that?
5       Q.    Right.  Prior to the summer of --
6       A.    Yeah, I think I was.
7       Q.    And what years were you in-patient
8   for substance abuse?
9       A.    I don't remember.
10      Q.    Were you ever at anywhere else
11  besides Spectrum?
12      A.    I think so, but I don't recall
13  where.
14      Q.    Were you in Worcester?
15      A.    I think there's a couple facilities
16  in Worcester I was in.
17      Q.    And what facilities?
18      A.    I think AdCare at one point -- I'm
19  not a hundred percent sure.  I can't recall
20  what the other ones are called.  I don't even
21  know if they are still around.
22      Q.    When were you in AdCare?
23      A.    I don't -- sometime before 2000.
24      Q.    How long did you spend at AdCare?

Case 4:18-cv-10936-TSH    Document 136    Filed 09/03/21    Page 12 of 62
Deposition of NATALE COSENZA taken on MARCH 23, 2021
Sheet 12

45

1    A.    I don't -- I don't recall.  I don't
2  remember how long the program was and I don't
3  remember if I finished it.
4    Q.    During the summer of 2000 did you
5  finish any program at Spectrum in Westboro?
6    A.    I don't recall.
7    Q.    And in the summer of 2000 you don't
8  exactly recall when you were at Spectrum in
9  Westboro?
10    A.    Exact dates, no.  I know I was in
11  there at some points, I just don't remember the
12  dates.
13    Q.    It appeared from your -- the trial
14  proceedings or the court proceedings in your
15  criminal matter that your attorney was
16  representing to the Court that you were in
17  Spectrum on July 15th of 2000.  Does that
18  refresh your memory?
19    A.    Like I said, I don't remember the
20  dates.  But if that's what the record shows...
21    Q.    Have you ever been in possession of
22  your records from Spectrum?
23    A.    When I was being -- I think
24  during -- I think before -- I think during the

46

1  trial.  I'm not exactly sure if I got them
2  before that or leading up to the trial.
3    Q.    It appeared from Robert Payton's
4  testimony, though, that you were not at
5  Spectrum at the end of July when you visited
6  him at his apartment.  Is that right?
7    A.    If I visited at his apartment, I
8  would say no, I was not in Spectrum.
9    Q.    Did you ever do any outpatient
10  programs at Spectrum?
11    A.    At any time period?
12    Q.    Right.
13    A.    I think so.
14    Q.    In the summer of 2000 did you do any
15  outpatient programs in Spectrum?
16    A.    Not that I know of.  I don't recall.
17  I don't think I did any -- I don't know if I
18  did any in 2000, actually.  I might have.
19    Q.    Since your release from prison, have
20  you received any substance abuse counselling?
21    A.    No.
22    Q.    Do you consider yourself recovered
23  from substance abuse issues today?
24    A.    I think it's everybody's personal

47

1  opinion what they define recovery as.
2    Q.    Do you define yourself as recovered
3  today?
4    A.    I define myself as no longer an
5  addict.
6    Q.    And when did you first consider
7  yourself no longer an addict?
8    A.    I never really thought about it, to
9  be honest with you.  I just have no desire, I
10  have no thoughts on it.
11    Q.    Do you own any real estate at
12  present?
13    A.    No.
14    Q.    Have you ever owned any real estate?
15    A.    Not that I know of.
16    Q.    Where did you attend high school?
17    A.    I went to Holy Name High school for
18  a couple months.  I went to North High School
19  for a couple months and I went to
20  St. Casimir's for a little while.
21    Q.    Why did you leave Holy Name?
22    A.    Disciplinary.
23    Q.    What was the discipline?
24    A.    I think I got caught smoking walking

48

1  by the principal's office.  I think I was --
2  didn't get along with the nuns too great
3  either.
4    Q.    Did you start there as a freshman?
5    A.    Yes.
6    Q.    So from Holy Name did you go to
7  North High?
8    A.    Yes.
9    Q.    And why did you leave North High?
10    A.    Disciplinary, I guess.
11    Q.    What was the incident that caused
12  you to leave?
13    A.    I -- I don't recall.  I know I
14  didn't get along with some of my teachers.
15    Q.    And St. Casimir's is an alternative
16  school?
17    A.    Yes.
18    Q.    And that was within the Worcester
19  Public School System, though, right?
20    A.    Yes.  It was still part of whatever
21  school you went to.  So technically, I was
22  technically still in North, I think.
23    Q.    Where did you physically attend
24  school at that time when you went to

49

1  St. Casimir's?
2      A.    I think it's Catharine Street, but
3  I'm not sure.  I don't -- I don't remember the
4  exact name of the street.  But Catherine is
5  coming to mind.
6      Q.    And how long were you there?
7      A.    Over a year, I think.  I finished --
8  I think I finished -- I think I did finish one
9  year and I started a second year.
10     Q.    Did you start there in your freshman
11 year of high school?
12     A.    Yes.
13     Q.    What caused you to leave in your
14 second year?
15     A.    I think I was only in there for a
16 couple months and the principal told my father
17 it probably would be best if I dropped out of
18 school.
19     Q.    Did you have discipline issues at
20 St. Casimir's?
21     A.    Yes.  Everybody did.
22     Q.    Did you have any particular incident
23 that caused you to leave?
24     A.    Not in particular.  Like I said, I

50

1  was called in the principal's office with my
2  father and she told my dad that it would be
3  better off if I just dropped out.
4      Q.    And at what -- how old were you at
5  that time?
6      A.    16, I think.
7      Q.    And you received your GED at some
8  point?
9      A.    Yes.
10     Q.    And where did you receive that?
11     A.    I know I started it in Worcester and
12 I think I finished it -- I think I finished it
13 in Worcester County House of Corrections or I
14 did some of it in Worcester County House of
15 Corrections and finished it afterwards.  I
16 don't recall exactly where I got the GED, but I
17 did it in two different -- two different places
18 basically.
19     Q.    What year did you get that
20 certificate?
21     A.    I don't know.  I don't remember.
22     Q.    Have you attended any other
23 educational institutions after receiving your
24 GED?

51

1      A.    Does that include trades?
2      Q.    Have you received some training in
3  the trades?
4      A.    Yes.
5      Q.    And in what trades?
6      A.    Welding.
7      Q.    Did you receive a certificate?
8      A.    Yes.
9      Q.    And when did you receive that
10 certificate?
11     A.    Sometime in my wrongful
12 incarceration.
13     Q.    Did you participate in a certain
14 program at a particular institution for that
15 welding certificate?
16     A.    Welding classes at Norfolk State
17 Prison.
18     Q.    Have you gotten any other
19 certificates or trade licenses?
20     A.    No other trade licenses.
21     Q.    Do you have any plans for furthering
22 your education?
23     A.    I already have.
24     Q.    Do you speak any languages other

52

1  than English?
2      A.    No.
3      Q.    Are you right or left-handed?
4      A.    Right.
5      Q.    Do you have a current driver's
6  license?
7      A.    Yes.
8      Q.    Has it ever been revoked or
9  suspended for any reason?
10     A.    In my entire lifetime?
11     Q.    Yes.
12     A.    Yes.
13     Q.    How many times?
14     A.    I don't remember.  I don't know.
15     Q.    You testified earlier that you
16 didn't have a driver's license when you got out
17 of prison.  Was that because of something that
18 happened while you were in prison?
19     A.    No.  That's because the State
20 charged me child support while I was in prison
21 for something I didn't do.
22     Q.    What didn't you do that they charged
23 you child support for?
24     A.    I didn't do the charges that were

53

1  filed against me.

2  Q.    What were those charges?

3  A.    Burglary, assault and battery with a

4  dangerous weapon, assault with an intent to

5  rape.

6  Q.    Okay.  So your driver's license was

7  suspended because of your arrest and charges in

8  this case?

9  A.    Ultimately I would say yes because I

10 went to prison for, like I said, a crime I

11 didn't commit and I was charged child support

12 for all them years.  And because I couldn't pay

13 it, they took my license.

14 Q.    Have you ever been the member of any

15 gang?

16 A.    Define "Member".  Was I ever

17 associated with any gangs?  Or was I a member?

18 Q.    Sure.  Were you ever associated with

19 any gangs?

20 A.    I know a lot of people in gangs that

21 I'm friends with and I was deemed at one point

22 to be with them.  But I was never actually in a

23 gang, a member.  I was accused of being part of

24 Latin Kings.  I think -- I can't remember what

54

1  the other names were.

2  Q.    Who accused you of being a member of

3  the Latin Kings?

4  A.    The prison.  The Worcester County

5  House of Correction.

6  Q.    But you deny that you were

7  associated with the Latin Kings?

8  A.    I was -- I mean, I was friends with

9  them.  Did I hang around with them?  Did I --

10 things like that.  So I guess I was kind of

11 associated with them, but I was never a member.

12 Q.    And was that only while you were

13 incarcerated that you were associated with

14 members?

15 A.    I knew some of them from being on

16 the streets, some people I grew up with joined

17 them.

18 Q.    Were your friends members of any

19 other gangs besides the Latin Kings?

20 A.    Oh, I mean, from being

21 incarcerated, I ended up being friends with

22 multiple people that were in multiple different

23 gangs or groups or whatever.

24 Q.    What other gangs?

55

1  A.    Some kids were in the bomb squad,

2  some kids were in -- oh, my God.  Whatever

3  gangs were in prison, basically.  I mean, you

4  end up associating with everybody.  I think

5  there was one called the Four Horsemen.  I

6  don't know.  There's -- like I said, it's

7  prison or House of Correction and there's tons

8  of gangs.

9  Q.    Did law enforcement or the

10 correctional facilities accuse you of being

11 with any other gangs besides the Latin Kings?

12 A.    Not that I know of.  I don't recall.

13 Q.    Have you ever served in the

14 military?

15 A.    No.

16 Q.    What is your current employment?

17 A.    Boston Local 7 ironworker.

18 Q.    And when did you first get that

19 position?

20 A.    September 2016.

21 Q.    And what do you do in that work?

22 A.    I build all the skyscrapers,

23 bridges, parking garages, anything to do with

24 construction of steel structures in the city of

56

1  Boston and state of Massachusetts or actually

2  any other state because it's an international.

3  So...

4  Q.    Have you ever worked outside

5  Massachusetts?

6  A.    No.

7  Q.    Have you ever worked on any projects

8  outside of Boston?

9  A.    Yes.

10 Q.    And do you work with any particular

11 construction company or does it change

12 depending on the job?

13 A.    I work for the union.  So it depends

14 on -- depends on what jobs are available,

15 depends on -- there's numerous companies that

16 work with our union.  I've probably worked

17 for -- oh, God -- I don't know the exact number

18 of companies -- numerous, numerous different

19 companies over the years.

20 Q.    And who is your current supervisor?

21 A.    Supervisor?

22 Q.    Yep.

23 A.    Gary -- I think it's Metallic

24 (phonetic) or something like that.  I know it

57

1  starts with an M.
2      Q.    And is that just for the particular
3  job you're working on right now?
4      A.    Yes.
5      Q.    And where is that job?
6      A.    Boston.
7      Q.    Where -- are you building -- working
8  on a certain construction project?
9      A.    Excuse me?
10     Q.    What's the address of the
11  construction project?
12     A.    1 Congress Street, Government
13  Center.
14     Q.    Is that a skyscraper or what is the
15  project?
16     A.    I would consider it a skyscraper. I
17  mean, people classify skyscrapers as different
18  things, so -- but I would say it is.
19     Q.    What are you doing on that project?
20     A.    Structural erecting.
21     Q.    How long have you worked on that
22  project?
23     A.    Couple months.
24     Q.    So does your supervisor change

58

1  depending on the jobsite then?
2      A.    No. It changes depending on the
3  supervisor, I guess. They could leave the job,
4  they could stay on the job, they could get laid
5  off, they could get fired.
6      Q.    Is your supervisor, then, generally
7  also a member of the ironworker union?
8      A.    Yes.
9      Q.    Have you ever faced any discipline
10  or employment reprimands in your position?
11     A.    Define what you mean, please.
12     Q.    Have you ever been disciplined on
13  the job?
14     A.    On the job? No.
15     Q.    Have you ever been reprimanded?
16     A.    On the job? No.
17     Q.    What's your hourly wage?
18     A.    I'm not going to answer any
19  questions of my financial status.
20     Q.    Do you have a claim of lost wages in
21  this case?
22     A.    You would have to consult my
23  attorneys.
24          MS. THOMPSON: Let's take a short

59

1  break.
2          I just want to confer about the
3  basis for your objection about that. So let's
4  just take a short break. We've been going
5  about an hour anyway. So...
6          MS. QUINN: Okay.
7          (A brief recess was taken.)
8      Q.    (By Ms. Quinn) Mr. Cosenza, before
9  we took a break, I'd asked you what your hourly
10  rate is right now. How much do you make per
11  hour?
12     A.    Currently I'm making 53 something an
13  hour.
14     Q.    And how many hours per week do you
15  work?
16     A.    It varies.
17     Q.    On average how many hours per week?
18     A.    Like I said, it varies depending on
19  what's going on. There's a lot of overtime.
20  Past couple weeks I think I worked over 40 and
21  then my pay differential changes. My standard
22  pay is -- on regular eight-hour days is -- if
23  I'm working during the day, it's 48 something
24  an hour. If I'm working on the shift I'm

60

1  working on right now, it's -- you get a
2  differential for different time slots during
3  the day. Like first, second, third shift. I'm
4  on, I guess, the second shift. I work from 5
5  to 1:00 a.m. and we get a difference for that
6  which is a $5 an hour raise. And if we do any
7  overtime, that varies also. Anything past
8  eight hours we get time and a half for those
9  hours, which would be 53 would be 26 something
10  extra an hour. So 50, 60, 70 --
11     Q.    What was your income in 2020?
12     A.    Well, I took a lot of time off, but
13  my income even with the time off was over
14  70,000.
15     Q.    Why did you take time off?
16     A.    Family issues. Deaths in the
17  family. Did you say 2000? I'm sorry.
18     Q.    2020.
19     A.    The year that just passed? I
20  haven't done my taxes yet. I'm sorry, I
21  thought you meant the year before.
22     Q.    Okay. So 2019 was what you said
23  your income was?
24     A.    Last year taxes, yes. Somewhere

61

1 over 70. I can't remember the exact number.
2      Q.      Did you have some deaths in the
3 family in the past year?
4      A.      I've had several deaths in my family
5 in the past three, four years.
6      Q.      And who has passed away in the last
7 three to four years?
8      A.      My dad, my son-in-law, my cousin, my
9 grandparents, my grandmother and grandfather,
10 my brother-in-law's nephew which is I guess
11 kind of family. I don't know how to classify
12 that. We're all very close. Just numerous --
13 a lot. It's been a lot.
14      Q.      When did your son-in-law pass away?
15      A.      I think December 2019 I want to say.
16 I'm not exactly sure of the date.
17      Q.      And did he take his own life?
18      A.      Yes, he did.
19      Q.      When did your grandparents pass
20 away?
21      A.      Within the past two years, to be
22 honest with you. I think my grandmother was
23 two years ago and I think my grandfather was
24 within the last year. I think I'm at the point

62

1 where it's just so many, it's just...
2      Q.      Did those deaths in your family
3 prompt you to take time off of work?
4      A.      Yes.
5      Q.      How much time did you take off of
6 work for the passing of your father?
7      A.      My father?
8      Q.      Yes.
9      A.      Several months. I don't remember
10 exactly. Anywhere from two to three,
11 somewhere -- I don't know.
12      Q.      And for your son-in-law, how much
13 time did you take off of work?
14      A.      I don't know. Could have been a few
15 weeks.
16      Q.      And the passing of your grandmother,
17 how much time did you take off?
18      A.      Again, could be a couple or a few
19 weeks. I don't know. I don't know exact times
20 of time I've took off. I can -- I would have
21 to go back to my work record.
22      Q.      Did you take time off for the
23 passing of your cousin as well?
24      A.      My immediate cousin? I think I took

63

1 a couple days off. I think I was numb at that
2 point.
3      Q.      What was the date of your release
4 from incarceration?
5      A.      Exact date? I don't recall. I
6 think it was June of 2016.
7      Q.      And then you first started working
8 for Boston Local 7 Ironworkers in September of
9 2016?
10      A.      Yes.
11      Q.      Did you hold any other positions in
12 between the time of your release and that
13 position with the Boston local?
14      A.      No. I didn't have the right mind
15 frame.
16      Q.      Why do you say that?
17      A.      Because 16 years of the wrongful
18 incarceration and the things I've been through
19 there, my head was really messed up.
20      Q.      You had already obtained your
21 welding certificate in prison, though, right?
22      A.      Yes.
23      Q.      And in your current position do you
24 climb on structures high above the ground?

64

1      A.      Yes.
2      Q.      So you don't have a fear of heights,
3 safe to say?
4      A.      I think it's more as time goes on
5 you get more comfortable with it, I guess. I'm
6 still -- I still have a fear of heights. I
7 don't think anybody can say they don't. I --
8 it would come down to what you're doing and how
9 high you are and what's going on around you.
10 Sometimes you get stuck in -- stuck on a
11 certain spot when you've been fine for the past
12 three months. The fear just grabs you
13 sometimes.
14           It's a very, very, very dangerous
15 job and it's just hard to explain, to be honest
16 with you. There's different points and
17 different things you've got to do that are --
18 the danger level increases or decreases
19 depending on what you're doing. Sometimes
20 you're literally 30 stories in the air hanging
21 off a side of a building and the wind grabs
22 you. So it varies.
23      Q.      And you've said a number of times
24 today "to be honest with you". I think you're

65

1 not even realizing you're doing that, but you
2 understand that you're under oath to testify
3 truthfully today; is that right?
4     A.    Yes.
5     Q.    Okay.  So everything you're telling
6 me is honest, isn't it?
7     A.    To the best of my knowledge, yes.
8     Q.    Okay.  Have you ever gotten hurt on
9 the job?
10     A.    Several times, but I think only one
11 was reported.
12     Q.    And what one was reported?
13     A.    I hurt my back.  I can't recall how
14 I did it, but I hurt my back where I had to go
15 to -- they sent me to one of their medical
16 places and I got liquid Motrin shot in my back.
17     Q.    Were you out of work for a period of
18 time because of that injury?
19     A.    No.  Once I got the liquid Motrin
20 shot, it -- I don't know, it just felt better
21 and I went right back to work.
22     Q.    Have you ever gotten a negative
23 performance review in your position?
24     A.    I don't think we get reviews.  I

66

1 don't -- so I don't recall -- I would say no
2 because I've been continuously working every
3 time I'm working.  So I always get another job
4 right away.
5     Q.    Have you ever attended Grafton Job
6 Corps?
7     A.    No.
8     Q.    When was your last employment before
9 your arrest in August of 2000?
10     A.    Oh, that's -- I don't recall.  I was
11 working whatever I could do back then.  So it
12 would vary.
13     Q.    And in answer to an interrogatory, I
14 believe you said that you were a sprinkler
15 fitter?
16     A.    I did several jobs.  I did some
17 sprinkler fitting; I did some plumbing; I did
18 some building maintenance; I did flooring;
19 Sheetrocking.  I mean, I've -- I did whatever I
20 could to work.  Whatever people needed.
21     Q.    Were you a member of the sprinkler
22 union?
23     A.    No.
24     Q.    In August of 2000 did you have any

67

1 regular source of income?
2     A.    I don't recall.
3     Q.    Did you file any taxes for 2000 --
4 well, it would have been 1999?
5     A.    I don't recall.
6     Q.    Were you receiving public assistance
7 during that time in August of 2000?
8     A.    I don't recall.  I don't know if
9 I -- I think we did have something for my kids,
10 but I don't remember the year or when we had
11 it.  So if you're asking particular year, I
12 honestly don't recall.  But I think at some
13 point when we were living together, my
14 girlfriend had something from the State.  I
15 don't know what it was.
16     Q.    Did you personally receive any
17 public assistance for -- on your own?
18     A.    I don't recall.  Like I said.
19     Q.    Was it for your kids that you
20 received public assistance?
21     A.    I don't recall if I did receive
22 public assistance.  But if I did, it would be
23 for my children, it would not be for me.  And
24 like I said, I think it was my -- the kids'

68

1 mother at the time.  I don't recall if I had
2 it -- if I did -- went with her or -- I don't
3 recall.  I had no control over it if we did get
4 it.
5     Q.    In August of 2000 were you dealing
6 any drugs?
7     A.    No.
8     Q.    At any point in 2000 did you sell
9 drugs?
10     A.    No.
11     Q.    Have you ever owned a business or
12 had any ownership stake in any business?
13     A.    No.
14     Q.    Have you ever declared bankruptcy?
15     A.    No.
16     Q.    And when you went into
17 rehabilitation at Spectrum, was that voluntary?
18     A.    Yes.
19     Q.    Did you ever go into rehab
20 involuntarily?
21     A.    No.  It's always voluntary to get
22 into a rehab.
23     Q.    That's been your experience?
24     A.    I mean, what do you consider

69

1  voluntary and involuntary?
2      Q.    If you can't understand the -- or
3  answer the question as I've asked it, you can
4  just let me know that.
5      A.    I don't understand that question.
6      Q.    Okay.
7      A.    I don't understand what you mean by
8  voluntary or involuntary.
9      Q.    In your experience, though, your
10  testimony is that you've only gone to rehab on
11  a voluntary basis.
12      A.    Are you asking if Court ever asked
13  me to go to -- or ordered me to go to rehab?
14      Q.    Were you ever ordered by Court to go
15  into rehab?
16      A.    Yes.  But I would still have to be
17  voluntary to go in there.
18      Q.    And at what point were you ordered
19  by Courts to go into rehab?
20      A.    I don't recall.  I don't -- I
21  think -- I mean, like I said, I don't remember
22  if it was once, twice, or how many times it
23  was.  I know I went to the Courts and told them
24  I want to go into rehab or I spoke with my

70

1  probation officer and they brought me in front
2  of the Court and they told them that and that's
3  when they ordered it.  So...
4      Q.    And for what offenses were you in
5  court for that they ordered you that?
6      A.    At which time?
7      Q.    Well, that's my question.
8      A.    Excuse me?
9      Q.    Were there multiple times when the
10  Court ordered you into rehab?
11      A.    Like I said, I'm not sure if it was
12  once, twice, or more times.  I think it was
13  more times but I'm not sure.
14      Q.    Because you understand this is a
15  process where I ask you the questions.  So if
16  you can't understand the question as I've asked
17  it you can just let me know that.
18      A.    Okay.
19      Q.    And as far as the records that you
20  remember seeing from Spectrum, do you know if
21  they still exist?
22      A.    I think they do.  I mean, it would
23  be in the court documents.
24      Q.    Have you ever had them in your

71

1  possession?
2      A.    During my -- I think during the --
3  either during the trial or during the leading
4  up for the trial.
5      Q.    The criminal trial is what you're
6  referring to for this incident?
7      A.    Yeah, the wrongful allegations, yes.
8      Q.    And do you take any Methadone or any
9  other maintenance drugs for your heroin
10  addiction?
11      A.    Do I?  No.
12      Q.    Have you ever taken Methadone or
13  other maintenance drugs for heroin addiction?
14      A.    Ever?  Yes.
15      Q.    And what period of time did you take
16  those drugs?
17      A.    I don't recall.  Numerous times.
18      Q.    Did you take them while in prison?
19      A.    No.
20      Q.    So it was prior to going to -- prior
21  to being arrested in August of 2000 that you
22  took maintenance drugs for your heroin
23  addiction?
24      A.    Prior to my false arrest, yes.

72

1      Q.    And then prior to your arrest in
2  2000, were you in arrears on child support at
3  all?
4      A.    Prior to my false arrest, I don't
5  recall if -- about child support.  I don't
6  remember when it started.
7      Q.    And prior to your arrest in 2000,
8  were your kids staying with your parents at all
9  during that time?
10      A.    Prior to my false arrest,
11  periodically, off and on.
12      Q.    Did they have custody of your kids
13  prior to 2000?
14      A.    I don't recall when they had
15  custody, when I signed them over.  I honestly
16  don't recall.
17      Q.    And how frequently prior to August
18  of 2000 did your children stay with your
19  parents?
20      A.    When they needed to.  If I was --
21  couldn't be around or if they had to watch them
22  or -- I don't -- random times.  I don't know
23  how frequently.  It would happen off and on.
24      Q.    Have you ever used methamphetamines?

73

1    A.    I don't know what -- what is a
2  methamphetamine?
3    Q.    So to your knowledge you haven't
4  used a methamphetamine?
5       MS. THOMPSON:  Objection.  You can
6  answer.
7    A.    To the best of my knowledge, I don't
8  know.  I don't know what's classified a
9  methamphetamine.
10   Q.    (By Ms. Quinn)  Does Amanda Caruso
11  own the house you're living in currently?
12   A.    Yes.
13   Q.    Is that a single-family house?
14   A.    Yes.
15   Q.    When you were living at 1195 Grafton
16  Street, are you aware of violations from the
17  condo complex that were issued to your father
18  when you were a tenant?
19   A.    When I was living there was I aware?
20  I don't think so.
21       THE WITNESS:  Can I take a brief
22  break real quick?
23       MS. QUINN:  Sure.
24       (A brief recess was taken.)

74

1       THE WITNESS:  Thank you.  Sorry
2  about that.
3    Q.    (By Ms. Quinn)  What does Amanda
4  Caruso do for work?
5    A.    Currently?  Right now she's
6  unemployed -- well, she's not working right
7  now.  She's dealing with breast cancer.
8    Q.    How long has she been sick?
9    A.    Going on a year now.  We've still
10  got months to go.
11   Q.    And before you took a break I think
12  I asked you are you aware of the violations
13  from the condo complex that were issued to your
14  father while you were a tenant.
15   A.    While I was a tenant there, best of
16  my knowledge, I don't think I did.  I don't
17  remember when I heard about them.  I don't
18  remember if it's from disclosure from the false
19  arrest.
20   Q.    You don't remember or what was
21  your --
22   A.    I don't remember when I heard of
23  them.
24   Q.    Okay.

75

1    A.    I do recall hearing something about
2  it and I just don't recall if it was during
3  discovery phases during this false accusations.
4    Q.    Did your father ever tell you that
5  he was getting violations from the condo
6  complex or --
7    A.    I don't recall how I heard of it.
8  Like I said, it could have been from him, it
9  could have been from disclosure, reading the
10  paperwork, things like that.  This is over 20
11  years ago, so...
12   Q.    And have you been involved in any
13  other civil lawsuits as a Plaintiff or a
14  Defendant?
15   A.    Besides this particular one?
16   Q.    Right.
17   A.    Just the one against the State.  And
18  when I say, "the one against the State," that
19  was for my exoneration.
20   Q.    And that one was filed in June of
21  2018 against the Commonwealth and alleging
22  wrongful conviction, right?
23   A.    Exact date it was filed, I'm not
24  sure of the exact date.

76

1    Q.    Did you recently settle that
2  lawsuit?
3    A.    Yes.
4    Q.    And how much did you receive?
5    A.    The settlement was for 750,000.
6    Q.    Did you drop the lawsuit, then, in
7  consideration of the settlement payment?
8    A.    Did I --
9       MS. THOMPSON:  Objection.  You can
10  answer.
11   Q.    (By Ms. Quinn)  Did you agree to
12  dismiss the lawsuit --
13   A.    I'm pretty sure that's what
14  happened.
15   Q.    Okay.  Have you filed any other
16  lawsuits in relation to your arrest and
17  incarceration in August of 2000?
18   A.    Say that again, please?
19   Q.    Have you filed a lawsuit in relation
20  to your -- have you filed any other lawsuit
21  besides this one and besides the one against
22  the Commonwealth in relation to your arrest in
23  August of 2000?
24   A.    In regards to my wrongful conviction

**77**

1 and exoneration, I think these are the only
2 two.
3    Q.    Okay.  And that's the only lawsuit
4 that you recall that you filed as a Plaintiff?
5    A.    For this?  For this particular
6 exoneration.
7    Q.    I think when I first asked you, I
8 asked if you were involved in any other civil
9 lawsuits as a Plaintiff or a Defendant.  And
10 that was the only one you mentioned.
11    A.    To the best of my knowledge, the
12 only lawsuits I've ever been involved in is, is
13 for the exoneration for the State for wrongful
14 conviction that I ended up settling and winning
15 and the one we are currently dealing with.
16    Q.    In May of 2002 you alleged staff at
17 Worcester County House of Corrections injured
18 you and you filed a lawsuit, right?
19    A.    Yes, yes, you're correct on that.  I
20 didn't recall that.
21    Q.    And was that lawsuit dismissed
22 because you were unable to serve the
23 Defendants?
24    A.    No.  It was dismissed because they

**78**

1 settled with me.
2    Q.    Did you receive some sort of
3 monetary compensation for that lawsuit?
4    A.    With the -- the deal with the
5 Department of Correction, I can't remember
6 exactly what I received from them.  I know it
7 was a move to a lower security prison which is
8 what I needed and a couple other items.  I
9 don't remember if they gave me anything
10 financially.
11        And with the Defendant, Robert Reese
12 (phonetic) I think his name was, I think I
13 settled out for some monetary damages.  I can't
14 remember exactly how much.  And that was for
15 him assaulting me in the back stairway while I
16 was cuffed and shackled during my wrongful
17 conviction.
18    Q.    Was that a second lawsuit that you
19 filed?
20    A.    What do you mean "a second lawsuit"?
21    Q.    Or was that --
22    A.    I think that was the only one.
23    Q.    Okay.
24    A.    And I did -- but during that one, I

**79**

1 think he filed for bankruptcy, so I had to go
2 through bankruptcy court in Rhode Island.  And
3 so I don't know if that constitutes -- I
4 basically had to re-file with them, so I don't
5 know if that would be considered more than one
6 lawsuit.
7    Q.    So it's your memory, though, as a
8 result of the lawsuit filed against members of
9 the Worcester County House of Corrections in
10 May of 2002 that you received a settlement?
11    A.    Yeah.  We -- I dismissed the case
12 due to a bargain we made.
13    Q.    So this answer to interrogatory that
14 says on October 9th, 2003, the lawsuit was
15 dismissed because Plaintiff was unable, as a
16 pro se Plaintiff, to serve all Defendants, is
17 that not correct?
18    A.    I think I did serve them all.  They
19 all worked for the Department of Corrections.
20 I don't recall.  I mean, best of my
21 recollection, I think I went back and forth in
22 Federal Court for about a year off and on.  I'm
23 pretty sure I served all the Defendants.
24        Like I said, the Department of

**80**

1 Corrections settled with me and gave me a
2 lateral move -- or I don't know if it's
3 lateral, it's a lower security, move to a lower
4 security with a couple other things.  And the
5 main Defendant in that, Robert Reese, ended up
6 settling and gave me some money and I dismissed
7 the whole case.
8    Q.    Did you also file a lawsuit in
9 February of 2008 in Federal Court alleging
10 excessive force by a corrections officer?
11    A.    I don't know if that would -- the
12 one -- there's -- I know the one with Robert
13 Reese is the one -- I don't know the
14 Defendants.  If you could give me the
15 Defendants' names, I can probably help my
16 memory.  I think there was one that I filed
17 that I think that one I might not have been
18 able to serve or -- like I said, if I could
19 have the Defendants' names.
20    Q.    You also filed a suit in May of 2009
21 related to the conditions of your confinement;
22 is that right?
23    A.    I don't recall.  I don't think that
24 one went anywhere either.

81

1    Q.    And then in December of 2011 you
2  filed another lawsuit related to your
3  conditions of confinement?
4    A.    Again, I don't remember and I don't
5  think that went anywhere.  So I think I tried
6  to file it and it didn't go through.
7    Q.    Did you receive any monetary
8  compensation from any of these lawsuits?
9    A.    As I stated, the one with Robert
10 Reese.
11   Q.    And how much did you receive?
12   A.    Not much.  Maybe a couple thousand,
13 at the most.  I'm not sure.  Even under 2,000.
14   Q.    In all -- in the various lawsuits
15 that you filed regarding conditions of
16 confinement, were you represented by an
17 attorney?
18   A.    I was never represented by an
19 attorney to the best of my knowledge.
20   Q.    You've said a number of times that
21 you were exonerated from the offense that you
22 were convicted of as a result of your arrest in
23 August of 2000; is that right?
24   A.    Uh-huh (affirmative response).

82

1    Q.    That's yes?
2    A.    Yes.
3    Q.    What do you understand the word
4  exonerated to mean?
5    A.    That I proved that I didn't do a
6  crime or that the State basically agrees with
7  me and dismisses the case.
8    Q.    Do you understand that the
9  Commonwealth filed a nolle prosequi in this
10 case?
11   A.    Yes.
12   Q.    And do you understand what the
13 meaning of that word is, those words?
14   A.    Yeah.  That they no longer wished to
15 go forward with the case.  Exact meaning, I
16 don't recall what it -- I used to know what it
17 meant.  Do you have a definition?
18   Q.    That's your understanding of the
19 definition of nolle prosequi?
20   A.    Basically, that they don't have
21 enough evidence to go forward or they cannot go
22 forward at this time or -- I know there is a
23 clause in there where they do have an option to
24 bring the case back up.

83

1    Q.    And it's fair to say that the case
2  wasn't resolved on the merits; isn't that
3  right?
4        MS. THOMPSON:  Objection.  You can
5  answer.
6    A.    My personal opinion?  My personal
7  opinion is that it was resolved on the merits
8  and that's why it didn't go forward.
9    Q.    (By Ms. Quinn)  But as you said, if
10 the case is nolle prossed, the Commonwealth can
11 bring charges at some point; isn't that true?
12   A.    Yes.  But I've never heard of them
13 going forward at a nolle pros.  It's basically
14 the State's way of dismissing a case without
15 admitting they did anything.
16   Q.    So in your mind a nolle pros being
17 filed is the same as being exonerated?
18   A.    In my mind, the overturning of my
19 case, the attempt at being re-tried and the
20 eventual nolle pros filing is, yeah, my
21 exoneration, yes.  Especially when you have a
22 case where everything says I didn't do it.
23 So...
24   Q.    Well, that's not true that

84

1  everything says you didn't do it, though, is
2  it?
3    A.    In my opinion, yes.
4    Q.    And a jury convicted you of the
5  offenses; isn't that right?
6    A.    Yes, they did.
7    Q.    And you have not been acquitted of
8  those offenses; isn't that right?
9    A.    Well, I mean, if you want to get
10 technical, I was never really charged with
11 it -- found guilty of it either.
12   Q.    Okay.
13   A.    Because once a case got overturned,
14 it's no longer -- that case is invalid now.
15   Q.    Well, in filing the nolle pros, the
16 Court and the District Attorney never issued a
17 ruling saying that you did not commit the crime
18 on August 14th, 2000; isn't that right?
19   A.    Yes.  And that's the purpose of
20 filing the nolle pros, so a ruling can't be
21 made.  In my personal opinion --
22   Q.    I didn't ask for your personal
23 opinion.
24       THE WITNESS:  Am I not allowed to

85

1  speak?

2      Q.    (By Ms. Quinn)  Only in response to

3  questions that I ask.

4      A.    I was still responding to that

5  question.

6      Q.    Okay.  Well, I'm moving on.  Where

7  was your personal -- or was your apartment

8  building at 1195 Grafton Street located within

9  the complex?

10     A.    What do you mean by where was it

11  located?  I mean, there's five -- do you want

12  me to give you an outline of the apartment

13  complex?

14          (Exhibit No. 1, Aerial Photograph;

15  premarked.)

16     Q.    I'll show you what's been marked as

17  Exhibit 1.  Perhaps that can help you.

18          MS. THOMPSON:  Have you produced

19  this in discovery yet?

20          MS. QUINN:  No.  It's a map I just

21  created.

22          MS. THOMPSON:  Okay.

23          MS. QUINN:  It's a GIS photograph.

24          MS. THOMPSON:  Okay.

86

1      Q.    (By Ms. Quinn)  Do you see the

2  1195 Grafton Street depicted in this GIS

3  photograph?

4      A.    Yes, I do.

5      Q.    And can you point out where that is?

6      A.    Would you like me to mark it?

7      Q.    I asked you to point it out, please.

8      A.    (Witness indicated.)

9      Q.    And is that -- so coming from

10  Grafton Street and if you are travelling south

11  on Grafton Street and turning right into the

12  complex, is it the first building on the left?

13     A.    I mean, travelling either way on

14  Grafton Street and turning into the complex it

15  would be the first building on the left.

16     Q.    Okay.  And where was the apartment

17  unit located in which you lived?

18     A.    It's hard to explain looking at this

19  picture because it's a top view.

20     Q.    Are you able to mark with an X over

21  the area of the building in which the unit was

22  located?

23     A.    It might not be exact, but I could

24  give you a general idea.

87

1      Q.    Okay.  Why don't you mark it with an

2  X then.

3      A.    (Witness complied.)  Somewhere

4  around there (indicating).

5      Q.    And you've put a red X in the center

6  of the building?

7      A.    Just off to the center.

8      Q.    Are there four units on a floor that

9  run front-to-back essentially?

10     A.    Side-to-side.

11     Q.    Okay.  As I'm looking at this

12  picture, it appears that there are four

13  balconies right here on the drive side of the

14  building?

15     A.    On that particular building, yes.

16     Q.    And so do each of the units on each

17  floor run side-to-side as you said from the

18  balcony to the other side of the building?

19     A.    Each unit runs front-to-back, but

20  that's not what you asked me last time.  You

21  asked me if there was four units running

22  front-to-back.  But the four units that are

23  interacted -- connected together on that floor

24  run side-to-side.

88

1      Q.    Okay.  So my question is, though, it

2  appears that there are four balconies that are

3  visible on the drive side of the building.  Is

4  that right?

5      A.    On the drive -- the main driveway

6  side, yes.

7      Q.    And do the units on each floor run

8  from that balcony to the back side of the

9  building?

10     A.    Depends on what you say the back or

11  front, but yeah.  Yes, basically yes.  I don't

12  know what you consider the back of the building

13  or the front of the building, but that's a side

14  that could be either be the back or front

15  depending on how you're -- but they do run that

16  way, back-to-front or front-to-back, individual

17  units.

18     Q.    Okay.  And are there balconies on

19  both sides of the building?

20     A.    Yes.

21     Q.    And on one side of the building was

22  there a common balcony through which you could

23  access multiple units?

24     A.    Yes.

89

1    Q.    Was your apartment up a set of
2    stairs?
3    A.    Technically, yes.
4    Q.    So did that unit have balconies on
5    either side of it?
6    A.    My particular unit?
7    Q.    Yes.
8    A.    Yes.
9    Q.    And those balconies were a level up
10   from the ground?
11   A.    Basically, yeah.  Depending on what
12   side you're on.  If you're on the driveway
13   side, it would be -- ground floor would be
14   apartments, and then first floor mine, I guess.
15   So -- I don't know if it would be ground floor,
16   first floor, I don't know how they numerized
17   them.
18         But if you're coming on this side of
19   the building (indicating), that would be one
20   floor up for the balcony.  If you're on the
21   other side, it would be like a half a floor
22   because the grade level changes.
23   Q.    Okay.  And on this drive side of the
24   building, is that a private balcony or is that

90

1    the balcony that you can access other units?
2    A.    Those are private.
3    Q.    Did you climb up to -- could you
4    climb up to the other floors of your building
5    through the balconies?
6    A.    Yes.
7    Q.    Once you were on the first floor
8    balcony, was there a way to get on to the upper
9    floors?
10   A.    Depending on what balconies you're
11   talking about.
12   Q.    Was there only access to the upper
13   floors through the common balcony?
14   A.    Public access?  Yes.
15   Q.    Did you ever visit the other floors
16   of your building when you lived there at --
17   A.    Never visited, but I've been there.
18   I don't know what you classify as "Visiting".
19   Did I go over somebody's house for coffee or
20   something?  I think the unit below me I had
21   some drinks with them down there at one point.
22   The people upstairs from me, which was an older
23   couple, I used to help them carry groceries or
24   furniture or whatever they needed whenever they

91

1    needed help because they were old.
2    Q.    So could you access -- once you were
3    on -- in your unit, could you access other
4    floors of the apartment building?
5    A.    Inside my unit?
6    Q.    Well, how would you access other
7    floors of the building?  Let's --
8    A.    Through the common balcony.  Through
9    the stairwell.
10   Q.    So the common balconies were
11   connected by stairwells?
12   A.    There was stairwells on each side
13   and the common balconies were outside.  And
14   there was a doorway on each common balcony that
15   was just a swinging door.
16   Q.    And that common balcony gave you
17   access to all four units on that particular
18   floor, right?
19   A.    The common balcony gave -- yeah.  So
20   them particular units on that floor, yes.
21   Q.    So in your particular unit, on the
22   common balcony side what rooms were connected
23   to that common balcony?  Did you have windows
24   to particular rooms?

92

1    A.    I mean, I'm not -- I don't know if
2    every -- I know they were all basically similar
3    as far as design, but I don't know if they all
4    are all two bedrooms or one bedroom or three
5    bedroom.  But I know my particular apartment,
6    the second bedroom was -- window was on that
7    balcony, the common balcony.
8    Q.    Okay.  So typically you would have
9    to access the building at 1195 with a key,
10   right, the outdoor --
11   A.    I mean, that's how it's supposed to
12   work, yes.
13   Q.    So the outside doors were secured
14   typically.
15   A.    Typically, but not all the time.
16   Q.    Were there times when those doors
17   were broken?
18   A.    Yes.
19   Q.    And would that same key that you'd
20   use to access the exterior door allow you
21   access to your apartment?
22   A.    No.  It would be -- everybody in
23   their condo would have a key for that door.
24   Q.    So you'd have two keys.

93

1    A.    Yes.
2    Q.    One for the exterior door and one
3 for your apartment door?
4    A.    Yes.
5    Q.    If you were to allow a visitor to
6 come and visit you at your apartment, how would
7 you let them in typically?
8    A.    I mean, if I knew they were coming
9 or didn't know they were coming?
10   Q.    Was there a phone that they'd call
11 you from at the door, for instance?
12   A.    A buzzer.
13   Q.    Would they call you first when they
14 arrived from a phone on the exterior?
15   A.    I mean, like I said, if I knew they
16 were coming or didn't know they were coming.
17 If I knew they were coming, I would be sitting
18 on my balcony waiting for them to drive by.
19 So --
20   Q.    But there was a way to buzz people
21 into that door?
22   A.    Yes.
23   Q.    And how would that happen?
24   A.    They would dial in my apartment.

94

1    Q.    Was there a phone or some sort of
2 speaker on the exterior of the apartment
3 building?
4    A.    There was a key pad with a speaker.
5    Q.    Did you only have one key for the
6 apartment at the time?
7    A.    Yes.
8    Q.    So I think you testified in your
9 earlier deposition that there were times when
10 your girlfriend had the key and you would get
11 inside building by climbing on top
12 of a nearby transformer box?
13   A.    Uh-huh (affirmative response).  Yes.
14   Q.    And you would climb up on to the
15 balcony then?
16   A.    Yes.
17   Q.    Was that transformer box on the
18 common access balcony?
19   A.    Yes.
20   Q.    And so that was the side of the
21 building that's not facing the driveway here,
22 but on the other side of the building?
23   A.    The back part -- parking lot of that
24 building, yes.

95

1    Q.    And would you also use patio
2 furniture from the ground floor unit below
3 yours to access your balcony?
4    A.    Repeat that, please?
5    Q.    Would you also use patio furniture,
6 would you climb on patio furniture, from the
7 ground floor unit below yours to access your
8 balcony?
9    A.    To access the common balcony?  No.
10   Q.    But use it to access a private
11 balcony?
12   A.    Yes.
13   Q.    So that would be on the drive side
14 of the building, the driveway side?
15   A.    The entrance to the complex, yes.
16   Q.    And who lived in the unit below
17 yours?
18   A.    I think it was Curt Therrien.
19       THE STENOGRAPHER:  Curt, excuse me?
20       THE WITNESS:  Curt Therrien.
21 C-U-R-T, I think it is.  I'm not sure.
22       MS. QUINN:  T-H-E-R-R-I-E-N.
23       THE STENOGRAPHER:  Thank you.
24   Q.    (By Ms. Quinn)  And did you also

96

1 access the building at 1197, next door, by
2 standing on the transformer and climbing up on
3 to the balcony?
4    A.    I think I just went in the doorway.
5    Q.    So the times you visited 1197 you
6 just went in --
7    A.    I never visited.  I went over there
8 to speak with an individual that lived there.
9    Q.    And that was Robert Payton?
10   A.    Yes.
11   Q.    And you were there on more than one
12 occasion to speak with him; isn't that right?
13   A.    Yes.
14   Q.    Each time you went over there to
15 speak with him, did you just walk through the
16 door?
17   A.    Best of my recollection, I think one
18 time the door wasn't locked and I walked in.
19 Another time another tenant was walking in and
20 I went in with them.
21   Q.    Did you ever climb on the
22 transformer to access the balcony at 1197?
23   A.    I don't recall.  I don't think so,
24 but I -- I don't recall.

97

1    Q.    And you had been in that building
2    multiple times; isn't that right?
3    A.    More than once, yes.
4    Q.    Did you know anyone else besides
5    Mr. Payton who lived in that building?
6    A.    Yes.
7    Q.    Who else did you know?
8    A.    Guy named Barry.
9    Q.    What unit did Barry live in?
10   A.    I don't know the exact unit.
11   Q.    What floor?
12   A.    Like I said, it depends on how they
13   numerize the floor.  So if I'm going in through
14   the common sides, I think to the best of my
15   knowledge, I'd have to go up two or maybe --
16   either top or the one below the top.  I'm not
17   sure.  I don't remember.  I was only in there
18   like once or twice.
19   Q.    So was he a friend of yours?
20   A.    He was somebody I knew.  I wouldn't
21   consider a friend.
22   Q.    You went over to speak with him once
23   or twice?
24   A.    I ran into him in the parking lot

98

1    and he remembered me from when we were younger
2    and we started talking and he invited me in for
3    a beer.
4    Q.    What's Barry's last name?
5    A.    I don't recall.
6    Q.    And when was this that you went
7    inside for the beer?
8    A.    I -- I don't -- I don't recall.
9    Sometime when I was living there.
10   Q.    You knew him from your childhood?
11   A.    Vaguely.  I mean, I don't think we
12   ever hung out or anything, I just think we were
13   just kids growing up and maybe at some parties
14   or something.
15   Q.    So you think you might have gone
16   there another time other than the time you had
17   drinks -- a beer with him that time?
18   A.    Excuse me?
19   Q.    Did you visit him on more than one
20   occasion?
21   A.    To the best of my recollection, I
22   remember two times.  I don't know if there was
23   more than that.  I don't think there was, but I
24   don't recall.

99

1    Q.    And did you go to that building at
2    1197 in the summer of 2000 and knock on doors
3    and ask people for money?
4    A.    Never.
5    Q.    How did you support your heroin
6    habit at the time?
7    A.    Like I said, I was working random
8    jobs.  And -- I mean, when you say, "that
9    time," what time are you talking about?
10   Q.    In the summer of 2000.
11   A.    I think I was in rehab most of the
12   time that summer.
13   Q.    How many weeks did you spend in
14   rehab?
15   A.    I don't recall.  I know the majority
16   of the summer I was in rehab.
17   Q.    You went to Robert Payton's
18   apartment in 1197 Grafton Street, right?
19   A.    Say that again?  I went to where?
20   Q.    You went to Robert Payton's
21   apartment in 1197 Grafton Street?
22   A.    Yes.
23   Q.    And how did you know him?
24   A.    I didn't know him.

100

1    Q.    Did you steal his motorbike?
2    A.    No.
3    Q.    You became aware at some point,
4    though, that Mr. Payton thought you did.
5    A.    Yes.
6    Q.    How did you hear that?
7    A.    Through my kids' mother.
8    Q.    Had she spoken to him?
9    A.    I don't know how she found out.
10   Q.    Did Mr. Payton say anything directly
11   to you?
12   A.    At which point?
13   Q.    That made you think he thought you
14   stole his motorbike?
15   A.    I found out through my girlfriend --
16   well not my girlfriend, my kids' mother at the
17   time -- that he was telling everybody I stole
18   his dirt bike.
19   Q.    And you thought someone else named
20   Mike stole his dirt bike?
21   A.    Yeah.
22   Q.    What was Mike's last name?
23   A.    Starts with an I.
24   Q.    How did you know Mike?

101

1        A.      It was just somebody that lived --
2   grew up on Grafton Street.  We hung around with
3   him sometimes.
4        Q.      Growing up?
5        A.      No.  I just think in that time
6   frame.
7        Q.      Did you use drugs with him?
8        A.      Yes.
9        Q.      Did you buy drugs from him?
10       A.      I don't think so.
11       Q.      Did he buy drugs from you?
12       A.      No.
13       Q.      Had you been to his residence?
14       A.      Yes.
15       Q.      And where was his residence located?
16       A.      I don't know the exact street.  It
17  was off of Grafton Street.
18       Q.      Was he at another apartment complex?
19       A.      No.  He lived with his mother, I
20  think.
21       Q.      Was it a single-family house, then,
22  on Grafton Street?
23       A.      I think so.  It was off of Grafton
24  Street.

102

1        Q.      And what street was it located on?
2        A.      I don't recall the name of the
3   street.
4        Q.      How did you come to suspect that he
5   had taken the motorbike?
6        A.      Because around that time I -- like I
7   said, I don't remember exact timing of it.  We
8   were in my parking lot or something and he
9   mentioned something about the dirt bike and
10  that he should take it.  And I told him no and
11  then this happened.
12       Q.      And next you heard, it was -- it had
13  been stolen?
14       A.      Yes.  From my kids' mother.
15       Q.      So had he visited you, then, at your
16  apartment building?
17       A.      We were in the parking lot of my
18  apartment complex.
19       Q.      And you only met him in the parking
20  lot?
21       A.      When we were talking about the dirt
22  bike, when he was telling me about the dirt
23  bike, yeah, we were in the parking lot.
24       Q.      Had he ever been to your apartment?

103

1        A.      Inside my apartment?
2        Q.      Yes.
3        A.      You mean "ever" like --
4        Q.      Had he ever been inside your
5   apartment?
6        A.      Yes.
7        Q.      On how many occasions?
8        A.      Oh, I don't know.  Several.
9        Q.      And each time he visited would you
10  do drugs with him?
11       A.      I don't know if it was every time.
12  We have done drugs together.
13       Q.      And would it be heroin?
14       A.      Yeah.  That's basically all I did --
15  oh, occasionally sometimes smoke some pot.
16       Q.      But he said something to you about
17  the dirt bike when you were standing with him
18  in the parking lot?
19       A.      Yes.
20       Q.      Could you see the dirt bike where
21  you were standing?
22       A.      He must have.  I don't recall if I
23  seen it.  I've never seen it before until he
24  mentioned it.  To the best of my recollection,

104

1   I think he pointed it out and it was, I think,
2   the first time I seen it.
3        Q.      And why did you tell him no?
4        A.      Because I live there.
5        Q.      What did it matter that you lived
6   there?
7        A.      I don't want people stealing in an
8   area I live.
9        Q.      Did you expect that someone would
10  think that you took it?
11       A.      No.  I didn't expect it to be
12  stolen.
13       Q.      So when you suspected that he might
14  have taken the bike, did you talk to him?
15       A.      I think I went over his house.  I
16  left rehab.  As soon as I found out, I left
17  rehab, I went to his house, I think I -- I'm
18  almost positive I had a brief conversation with
19  him about it and he told me it was in the woods
20  behind his house.  Either that or -- I can't
21  remember if I spoke with him and he told me
22  that or I just looked in the back of the woods
23  in his house and just found it.  I can't
24  recall.  I did discover it in the back of -- in

105

1  the woods behind his house.
2      Q.    And from what you said, it -- did
3  you leave rehab because you heard the bike was
4  stolen?
5      A.    Yeah.  That was the main reason why
6  I left.
7      Q.    And what about the bike being stolen
8  made you leave rehab?
9      A.    Because my girlfriend -- well, my
10 girlfriend -- I keep saying girlfriend.  My
11 kids' mother told me over the phone call that
12 he was running around the apartment complex
13 telling everybody in the complex that I stole
14 his bike.
15          (Exhibit No. 2, Aerial Photograph;
16 premarked.)
17     Q.    I'm going to show you what's been
18 marked as Exhibit 2.
19          MS. THOMPSON:  Exhibit 2 also hasn't
20 been produced in this discovery yet, correct?
21 Just asking.  There's no Bates for this, right?
22          MS. QUINN:  Right.
23          MS. THOMPSON:  Okay.
24          MS. QUINN:  It's attorney work

106

1  product that I just created.
2      Q.    (By Ms. Quinn)  Do you recognize
3  the area of Grafton Street as depicted in that
4  picture?
5          (The witness reviewed the
6  documents.)
7      A.    Yes.
8      Q.    Do you see the apartment complex at
9  1195 Grafton Street depicted with the yellow
10 triangle around it -- or rectangle?
11     A.    Yeah.  It's outlined by a yellow
12 outline.
13     Q.    Do you see the area where Mike's
14 house -- mother's house is located in this
15 picture?
16     A.    I don't think it is in here, no.
17     Q.    Okay.
18     A.    I think it was further down.
19     Q.    Further --
20     A.    Down Grafton Street.
21     Q.    Do you mean closer to downtown or
22 closer to the highway?
23     A.    Well, Grafton -- town of Grafton
24 would be down here somewhere (indicating) in

107

1  this area.  With the highway, you mean the Mass
2  Pike?  Is that what you're talking about?
3      Q.    Yeah.
4      A.    Or Route 20?  I mean, there's --
5      Q.    Is his mother's house located closer
6  to downtown?
7      A.    Coming from my apartment complex?
8      Q.    Yeah.
9      A.    Yes.
10     Q.    Okay.
11     A.    I know it was past that school.
12     Q.    What school are you referring to?
13     A.    (Witness indicated.)
14     Q.    And that would be Roosevelt
15 Elementary on Sunderland Road?
16     A.    I don't remember what -- I don't
17 know what it's called.  I know it's a school.
18     Q.    Okay.  So at that -- at some point,
19 though, you went and found the bike in the
20 woods; is that right?
21     A.    Yes.
22     Q.    And then you brought Mr. Payton to
23 the bike in the woods?
24     A.    Yes.

108

1      Q.    Why didn't you bring the bike to
2  him?
3      A.    I couldn't get it out.  It was in
4  the woods.
5      Q.    So had you first located the bike
6  before you brought Mr. Payton to it?
7      A.    Yeah.  Yes.
8      Q.    Did you have a vehicle of your own
9  at the time?
10     A.    No.
11     Q.    How did you get around in August of
12 2000?
13     A.    Parents, friends, cabs.
14     Q.    Did you have a bicycle?
15     A.    Bus.  Bike.
16     Q.    What kind of bike did you have at
17 the time?
18     A.    Mountain bike.
19          THE WITNESS:  Can I go to the
20 bathroom real quick?
21          MS. QUINN:  Yeah.  We can take a
22 break.
23          (A lunch recess was taken.  Attorney
24 Steve Art returned on Zoom.)

Case 4:18-cv-10936-TSH   Document 136   Filed 09/03/21   Page 28 of 62
Deposition of NATALE COSENZA taken on MARCH 23, 2021
Sheet 28

109

1    Q.    (By Ms. Quinn)  I think before we
2  took the break, Mr. Cosenza, we were talking
3  about how you had mentioned that you left rehab
4  as soon as you heard of the allegations
5  Mr. Payton had that you had stolen his
6  motorbike.
7    A.    Yes.
8    Q.    And that was the main reason for you
9  leaving rehab?
10   A.    Uh-huh (affirmative response).  Yes.
11   Q.    And why, again, did you leave rehab
12  as soon as you heard that?
13   A.    Because he was running around my
14  apartment complex that I lived in for several
15  years and had a pretty good relationship with a
16  lot of the neighbors telling people that I
17  stole his dirt bike.
18   Q.    And do you recall the date of when
19  you first went to Mr. Payton's apartment to
20  tell him you knew where the bike was located?
21   A.    No, I do not.
22   Q.    If he testified at the criminal
23  trial that it was on July 29th, 2000, does that
24  sound right to you?

110

1    A.    I don't know.
2    Q.    And on that date you knocked on his
3  apartment door and asked to speak with him; is
4  that right?
5    A.    Yes.
6    Q.    What did you say?
7    A.    At first I knocked on the wrong
8  door.  Somebody answered with the door closed,
9  asked me who I was.  I said, I'm looking for
10  Mr. Pay -- Robert Payton -- or I don't remember
11  exactly how I said it.
12         They said, "Next door over."
13         I knock on that door, his wife
14  answered or his girlfriend, wife, I don't even
15  know what she was, and I introduced myself and
16  I said, "I'm looking for Robert about his dirt
17  bike."  And she went and got him.
18   Q.    And when you first knocked on the
19  door, whose door did you knock on?  Which unit?
20   A.    I have no clue.  The one next to
21  his.
22   Q.    Did you speak to someone then in
23  that unit?
24   A.    Behind the door.  They never opened

111

1  the door.
2    Q.    Was it a female or a male?
3    A.    I think it was a female going by the
4  voice, but I never seen 'em.
5    Q.    And what did you say to her and what
6  did she say to you?
7    A.    I just answered that.  I said.  "I'm
8  looking for Robert Payton."  And I was told
9  it's the wrong door, it's the next one over.
10   Q.    Okay.  Was Mr. Payton just getting
11  out of the shower when you first saw him?
12   A.    I don't know if he was or not.  I
13  wasn't in the apartment, but he did have a
14  towel on.
15   Q.    Did he look surprised to see you?
16   A.    I don't know.  He just -- I don't
17  know if he was surprised or not, he...
18   Q.    Did he appear angry that you were at
19  his door?
20   A.    No.
21   Q.    How did you get into the building at
22  1197 that day?
23   A.    I don't recall.  Like I say, the
24  only times I went in there was either the door

112

1  was not locked or one of the neighbors let me
2  in.
3    Q.    And had you also climbed into that
4  building by standing on the transformer?
5    A.    I don't think I did, but I don't
6  recall.
7    Q.    So did Mr. Payton then go to put on
8  some clothes and you and he drove in his truck
9  to the location of the bike?
10   A.    What's the question you're asking
11  me?  That was like three questions.
12   Q.    Did Mr. Payton put on some clothes
13  and drive in the truck with you to the location
14  of the bike?
15   A.    At some point he put on some clothes
16  and yeah, we did go in the truck to go over to
17  the bike.
18   Q.    What was -- what, if anything, did
19  you say to him when you first saw him at the
20  door?
21   A.    I introduced myself and -- I don't
22  remember the exact wording of what was said.
23  Basically it was You're telling people I stole
24  your dirt bike.  I'm here to tell you I didn't.

---

113

1  I know where it is and I'll help you go get it.
2  Somewhere -- something like that.
3      Q.    So where was that bike located when
4  you drove over to find it?
5      A.    Where I stated before.  In the
6  woods.
7      Q.    Was it near a condo complex off of
8  Sunderland Road?
9      A.    There's a couple apartment complexes
10  on Sunderland, so it could have been in between
11  complexes or next to one of them or...
12      Q.    And were you aware that Mr. Payton
13  was offering reward money for the bike?
14      A.    Yes.
15      Q.    Had you seen any of -- any posters
16  or any sort of papers that indicated that there
17  was a reward?
18      A.    Have I seen them recently or ever?
19      Q.    Had you seen them at the time?
20      A.    At the time, no.
21      Q.    How did you know that there was
22  reward money offered?
23      A.    He told me.
24      Q.    And what was your response?

---

114

1      A.    I was like -- I can't remember how
2  much it was.  I was like "Listen, I really
3  don't care about the reward.  Give me like half
4  or something like that and we're good."
5      Q.    When did you say --
6      A.    He said, "Okay."
7      Q.    -- say that?  When did you say that?
8      A.    I don't recall.  It might have been
9  in his truck when we were driving there.  I
10  don't recall when.
11      Q.    So do you dispute his testimony that
12  you told him twice that you want the reward
13  money?
14      A.    I never said I didn't want the
15  money.  I told him he doesn't have to give it
16  all to me.  I just want my name cleared.
17      MS. THOMPSON:  I'm sorry.
18      (Attorney Imani Franklin joined the
19  Zoom meeting.)
20      Q.    But you still wanted the reward
21  money.
22      A.    Well, yeah.  He posted a reward and
23  I was hoping to get his bike back and he was
24  running around telling everybody I was stealing

---

115

1  when I wasn't.
2      Q.    And you returned to his apartment a
3  couple of times asking for the reward money,
4  didn't you?
5      A.    I mean, yes, I did, basically.  He
6  told me he didn't have any money on him at the
7  time, meet him at his apartment and I went back
8  to his apartment.  I think it was in the
9  parking lot the first time I seen him and he
10  told me hold on, he'll go get it and went up to
11  his apartment.
12      Q.    When was that that you saw him in
13  the parking lot?
14      A.    Date?  I don't know.
15      Q.    Didn't you actually return to his
16  apartment the day after, on Sunday, July 30th,
17  2000, and knock on his door and he didn't
18  answer?
19      A.    I don't recall.  I think every time
20  I -- I think I went to his apartment once or
21  twice and he answered -- did he answer every
22  time?  I don't recall.
23      Q.    And on that Sunday, July 30th, did
24  you say something in the hallway at the time

---

116

1  that you needed the money?
2      A.    I never said anything about needing
3  money.
4      Q.    Do you recall going back the next
5  night and again knocking on his apartment door?
6      A.    I don't recall when I did it.  I
7  think I did it a couple of times and seen him
8  in the parking lot a couple times.
9      Q.    It's your memory you saw him in the
10  parking lot more than once?
11      A.    Yes.
12      Q.    Was one time with -- was he with a
13  boy?
14      A.    Yeah.  I thought it was his son at
15  the time.
16      Q.    What did you say to him in the
17  parking lot?
18      A.    I said, "Hey what's up, man?  Did
19  you get that money together yet?"  Or something
20  like that.
21      He said, "Hold on.  I'll -- let me
22  run up to my apartment and get it."
23      I don't remember the exact wording
24  of what was said.  I know I asked him about the

---

117

1  money and he said he'll go up to the apartment
2  and get it.
3      Q.    And you at no time said you didn't
4  want the money.
5      A.    No.
6      Q.    Did you ever knock on other doors in
7  that apartment building asking for money?
8      A.    Never.
9      Q.    So when you lived in 1195 Grafton,
10 you knew Curt Therrien?
11     A.    He was my downstairs neighbor.
12     Q.    So your apartment was right above
13 his?
14     A.    Yes.
15     Q.    Are you aware of him complaining
16 about the noise from your apartment?
17     A.    Yes, I am.
18     Q.    Did you and your girlfriend at the
19 time fight and yell?
20     A.    We had arguments.
21     Q.    Was it your belief that he called
22 DSS about your fighting?
23     A.    I mean, he probably did. I don't
24 know. I think he did.

119

1          I had some arguments with him on the
2  balcony of him partying with his friends at
3  like 2, 3 in the morning during the week while
4  I'm trying to sleep going to work and just
5  issues like that basically.
6          So he had a lot of resentment
7  towards me.
8      Q.    Why did he have resentment towards
9  you?
10     A.    I would say because his wife or
11 girlfriend or whatever she was at the time used
12 to come running to my apartment all the time.
13 And I used to stick up for her, try to protect
14 her or whatever.
15     Q.    Did you ever call the police to
16 report any problems with their apartment?
17     A.    I think I did on that night I just
18 described when -- I don't -- I don't recall if
19 I did. I think I might have on that night when
20 him and his friends were outside partying. And
21 that wasn't the only time they did it. But I
22 think on one of them nights I did. I don't
23 remember. They used to do it a lot.
24     Q.    Did you, in fact, go down to his

118

1      Q.    Did you confront him with a knife in
2  your hand?
3      A.    A knife?
4      Q.    Yes.
5      A.    No.
6      Q.    And did you tell him that "If they
7  take my kids away, I'm going to put you in the
8  ground"?
9      A.    No.
10     Q.    That's funny to you?
11     A.    I just -- because I recall several
12 arguments with him. He used to beat his wife
13 all the time. Like at first we -- when I first
14 met him, we were friends kind of, not really,
15 just neighbors getting acquainted. I'd have
16 him in my apartment a couple times; I was in
17 his a couple times.
18         And then him and his girlfriend
19 starting getting into some serious fights and
20 she used to run up to my apartment asking for
21 help all the time and she'd have black eyes and
22 that, like, killed whatever friendship was
23 bonding, I guess, with him. And I looked at
24 him differently.

120

1  apartment one night, the same night that he
2  said that you threatened him with a knife, did
3  you go down to his apartment with Samantha and
4  complain about the noise from their apartment?
5      A.    Yes. But I did not have a knife.
6      Q.    What did you hear coming from their
7  apartment that night?
8      A.    Loud music, sounded like a party, I
9  guess. I don't remember everything. I think
10 there was some arguing. I think I spoke to him
11 a couple times on the balcony before I went
12 down there.
13     Q.    Were you standing on the balcony and
14 he was on the patio below?
15     A.    Yeah, the ground floor. I don't
16 know if it's a patio. I don't remember. I
17 know it's right where their slider is, goes
18 right to the graded level, I guess, of the
19 ground.
20     Q.    When you walked down to that
21 apartment with Ms. Sorenson, though, did you
22 have a baseball bat with you and stand behind
23 her while she talked to them?
24     A.    I think I did.

---

121

1    Q.    Why did you have a baseball bat with
2  you?
3    A.    Because she wanted to go down there
4  after we got into a big verbal altercation with
5  him and his friends and I knew he had several
6  friends down there and I didn't want her to go
7  down there but she was demanding to still go
8  down there and confront them.  And I wasn't
9  comfortable going down there just by myself
10  with like four or five of his friends there
11  that were all bigger than me.
12    Q.    Did anything further happen that
13  night with them?
14    A.    No.
15    Q.    So at that time in the summer of
16  2000 was DSS involved with your kids?
17    A.    I don't recall.
18    Q.    So prior to August 29th, 2000, had
19  DSS been involved with your kids?
20    A.    Repeat that, please?
21    Q.    So prior to August of 2000, had DSS
22  ever been involved with your kids?
23    A.    Prior to August?
24    Q.    Of 2000, yes.

---

122

1    A.    I mean, I thought you already said I
2  turned myself in in August of 2000.
3    Q.    Was DSS --
4    A.    So before you mean?
5    Q.    Right.
6    A.    I thought you meant after.  I
7  apologize.  I honestly don't recall when they
8  got involved.  But I know they came and
9  interviewed us at one point and determined
10  there was nothing wrong.
11    Q.    Did they come to your apartment at
12  1195 Grafton?
13    A.    Yes.
14    Q.    And did they speak with both you and
15  Samantha Sorenson at that time?
16    A.    Yes.
17    Q.    Was that in response to a complaint
18  by someone, do you know?
19    A.    I would imagine so.  I don't see why
20  else they would be there.
21    Q.    Did they tell you why they were
22  there?
23    A.    I don't recall why.  I can't see
24  them just showing up on their own, though.

---

123

1    Q.    Was that the only time you recall
2  them visiting your apartment?
3    A.    I don't remember.
4    Q.    Did you have regular meetings
5  scheduled with them at any point in time?
6    A.    Not that I recall.  I don't -- I
7  don't remember.  I mean, I think there might
8  have been a follow up.  I don't recall.
9    Q.    Did Mr. Therrien call police to
10  report you fighting with Ms. Sorenson on other
11  occasions?
12    A.    I don't -- I don't know if he did or
13  not.  I wasn't on the phone.
14    Q.    So if he testified that he called
15  police about twelve times to report fighting
16  with your girlfriend, were you aware of that at
17  any point?
18    A.    I -- I don't know.  I know I had
19  numerous visits from the police department at
20  my apartment when I was sitting down eating
21  dinner numerous times.
22    Q.    The police responded multiple times
23  when you were sitting down eating dinner?
24    A.    There were several times, yeah.  I

---

124

1  don't know how many times.
2    Q.    Did you hit Samantha when you were
3  living together?
4    A.    Nope.
5    Q.    You never did?
6    A.    Nope.
7    Q.    Did you yell from your balcony to
8  Mr. Therrien, "You'll never get rid of me"?
9    A.    I don't recall.
10    Q.    Did you ever meet Kevin Bonville?
11    A.    I think he owned the apartment next
12  to me, but I don't -- I don't recall.
13    Q.    And did he find you inside of unit
14  5A one day?
15    A.    Oh, yes, if that's the same person
16  I'm thinking of.  That's the unit right next to
17  mine.
18    Q.    And you were trying to take a large
19  mirror off the wall on that day?
20    A.    Yes.  The neighbors that were living
21  there moved out and told me I could have the
22  mirrors.  And I came home one day, the door was
23  open and all their stuff was gone, so I was
24  trying to take the mirrors off the wall.  I had

---

125

1 permission.
2     Q.    Did -- what did he say to you about
3 that?
4     A.    He said -- like he came in, says,
5 "Hey, what's up?"  And I told him what was up.
6 And he said, "No.  I own the place.  We're
7 keeping the mirrors."
8         I said, "All right.  No problem."
9 And I left.
10     Q.    He testified that you said that the
11 door was open.
12     A.    I just said that to you.
13     Q.    Okay.  And you didn't explain
14 anything -- he didn't mention that you
15 explained anything regarding a promise to have
16 the mirrors from the prior tenants.
17     A.    I did say that to him.  I mean, he
18 asked me what I was doing, and -- I think the
19 neighbors were Spanish.  I can't think of their
20 names right now.  I can't think of their names,
21 but -- I got along with them great and we used
22 to -- his wife used to cook food all the time
23 and bring it over my apartment, and I'd go over
24 his house to watch football games, the whole

126

1 time they were living there.
2         And when they were leaving, they
3 knocked on my door.  Yeah, we're moving out.
4 If you want these mirrors -- and like I said, I
5 came home from work one day, I seen the door
6 open and everything was gone except the
7 mirrors.  So I was like, oh, let me grab the
8 mirrors.
9         And then Kevin walked in, asked me
10 what I was doing.  I told him I was grabbing
11 the mirrors, they said I could have them.  He
12 told me, no, I own -- I don't remember exactly
13 what he said, but he said something like the
14 mirrors -- basically the mirrors are staying
15 with the apartment, that he's the owner.
16         I said, "No problem."
17     Q.    Did you take a toolbox from the
18 prior tenants who lived in 5A?
19     A.    No.  Toolbox?
20     Q.    Yep.
21     A.    No.  Never even heard of that one.
22     Q.    And when you lived in that apartment
23 in -- on 1195 Grafton Street, did you have
24 pornographic magazines in your apartment?

127

1     A.    Probably.
2     Q.    And did those magazines have ads for
3 1-900 numbers and sex line numbers in them?
4     A.    I mean, I think they all did back
5 then.  I mean, it was the '90s or 2000,
6 whatever.
7     Q.    Did you call sex lines from your
8 apartment in 2000?
9     A.    No.
10     Q.    Did you call sex hotlines from any
11 other apartment in 2000?
12     A.    No.  Never called sex lines before.
13 And the magazines I had at my apartment were
14 collectibles, actually.  One of them had Farrah
15 Fawcett when she posed in gold.  I can't
16 remember what the other ones were.  I think
17 there was only three or four maybe.  If that.
18     Q.    Did you collect them?
19     A.    No, I just -- I don't know.  Just it
20 was an iconic thing, I guess.
21     Q.    So had you been arrested prior to
22 August 29th, 2014?
23     A.    Have I ever been arrested before?
24     Q.    Had you been arrested prior to

128

1 August 29th, 2014?
2     A.    At any time in my life before that?
3     Q.    Yes.
4     A.    Yes.
5     Q.    When were you first arrested?
6     A.    I have -- I have no clue.
7     Q.    Were you first arrested in 1991 as a
8 17-year-old?
9     A.    I could have been.  I don't know.
10     Q.    And that was for disorderly person,
11 assault and battery charge, aggravated?
12     A.    I have no clue.  I think my record
13 will reflect all my arrests.
14     Q.    What did that incident involve in
15 December of 1991?
16         MS. THOMPSON:  Objection.  You can
17 answer.
18     A.    I don't recall.  I don't recall.
19     Q.    (By Ms. Quinn)  Do you recall what
20 the results of that charge -- those charges
21 were?
22     A.    I don't even know what the charges
23 were.
24     Q.    Disorderly person and aggravated

129

1  assault and battery.
2      A.    I have no clue.  Was that the
3  charges or was that the final results?
4      Q.    That's what I'm asking you.  How did
5  that case resolve?
6      A.    I don't have my -- I don't have my
7  criminal record in front of me, so I can't
8  answer.
9      Q.    Okay.  And in May of 1993 you were
10 arrested on charges of being a disorderly
11 person?
12     A.    Could have been.
13     Q.    Do you recall the --
14     A.    I don't recall.
15     Q.    Do you recall the basis of that
16 charge?
17     A.    No.
18           MS. THOMPSON:  Objection.  You can
19 answer.
20     A.    It's almost 30 years ago.  No.
21     Q.    (By Ms. Quinn)  Do you know how that
22 case resolved?
23     A.    Nope.
24     Q.    In June of 1994 it appears that you

130

1  fought an assault and battery dangerous weapon
2  charge in East Brookfield.  Do you remember
3  that incident?
4      A.    I think I do recall that one.
5      Q.    And what was -- what did that
6  incident involve?
7      A.    There was a verbal argument at a
8  drive-in movie theater that ended up in a
9  confrontation where I was outside of their car
10 and they were yelling at me threatening me and
11 I was threatening them back, whatever, verbal
12 altercation.  And one of the doors opened up
13 and I realized the guy that was getting out was
14 a lot bigger than me so I tried to kick the
15 door shut to keep it shut so they couldn't get
16 out and they drove away and I drove away.
17     Q.    And you admitted to sufficient facts
18 to support that assault and battery with a
19 dangerous weapon charge?
20           MS. THOMPSON:  Objection.  You can
21 answer.
22     A.    I admitted to what I just said.  I
23 mean, I did kick the door and -- I admit
24 everything I do wrong.

131

1      Q.    And in July -- on July 15th, 1994,
2  it looks from Worcester Police Department
3  records that you called police to turn yourself
4  in.  Do you recall doing that?
5      A.    I think so.  Vaguely.
6      Q.    You were aware that you had a
7  warrant out of Dudley for breaking and entering
8  in the nighttime and larceny of a firearm?
9      A.    Yes.
10     Q.    Did you end up contesting those
11 charges?
12     A.    Define "contesting".
13     Q.    Did you go through a court process
14 for those charges?
15     A.    I got arraigned.  Let's see.  I got
16 arraigned, I think there was a couple court
17 hearings that I ended up in a six-man jury.
18 So -- I guess you can request a jury trial.  So
19 whatever processes led up to that.  I didn't go
20 to the trial because I ended up going to rehab
21 at the time and I told my lawyers I was going
22 to rehab at the time and the witness that filed
23 the charges admitted that I didn't have
24 anything to do with it, I didn't have any

132

1  knowledge of it.  So my lawyer didn't see a
2  problem with me just going to rehab.
3            But when I went to rehab and I
4  didn't show up to trial, all the other
5  Defendants got on the stand and said they
6  didn't do it and I did it regardless -- I think
7  she testified on the stand, too, saying it
8  wasn't me.  But the courts dismissed their case
9  and kept my charges.
10           So when I got out of rehab, I turned
11 myself in and basically got threatened by the
12 judge that if I brought it back to trial, he'll
13 give me the maximum sentence.  He went on this
14 conversation or rant or whatever you want to
15 call it about, you know, this was a four-day
16 trial or something, he kept everybody there
17 till late Friday night.  If I have to bring
18 them back to trial again and he's going to max
19 me out no matter what.  So I should -- he
20 strongly advised me to take the plea or he was
21 going to give me the maximum of everything.
22 So --
23     Q.    Did you plead guilty to some
24 offenses, then, related to that incident?

133

1    A.    I kind of had no choice.
2    Q.    Were you sentenced to an amount in
3  jail?
4    A.    Excuse me?
5    Q.    Were you sentenced to jail then?
6    A.    Yeah.
7    Q.    How long?
8    A.    County House of Correction.  I was
9  in for -- I don't recall.
10   Q.    Was that the first time that you
11 visited -- that you stayed at the Worcester
12 County Jail?
13   A.    That I was incarcerated in there?
14   Q.    Yes.
15   A.    I don't recall.
16   Q.    And what did that incident involve?
17   A.    I --
18   Q.    You said you didn't do whatever it
19 was, but what -- who did whatever it was?  And
20 please describe what the basis of those charges
21 were.
22        MS. THOMPSON:  Objection.  You can
23 answer.
24   A.    Which question are you asking?  I'm

134

1  sorry.
2    Q.    (By Ms. Quinn)  Can you please
3  describe the basis of those charges out of
4  Dudley?
5        MS. THOMPSON:  Objection.  You can
6  answer.
7    A.    I think the charges were B&E.
8    Q.    (By Ms. Quinn)  What did the
9  incident involve?
10   A.    The kids stole stuff out of her
11 house.
12   Q.    Including a firearm?
13   A.    I think there was more than one
14 firearm they stole.  I don't recall though.
15   Q.    And you say you didn't participate
16 in that?
17   A.    I had no clue what was going on.  I
18 was in the kitchen eating a bagel with the
19 girl.  I think she testified to that.
20   Q.    And it looks like the next day after
21 you had called the Worcester police to turn
22 yourself in for those Dudley charges, so on
23 July 16th, 1994, in the early morning hours
24 police were dispatched to 85 Locust Ave.

135

1        Do you remember that incident?
2    A.    No.
3    Q.    Your brother Peter approached the
4  police and said, "Please hurry up, my brother
5  Nat is destroying the place."  And police
6  reported that you had appeared to be
7  intoxicated, yelling obscenities, throwing
8  clothes, and you were arrested by the police on
9  that day for disturbing?  Do you recall that
10 incident?
11   A.    I don't remember.  Like I said, it's
12 almost 30 years ago.
13   Q.    Do you know what the results of
14 those charges were?
15   A.    No.
16   Q.    Do you recall when you were next
17 arrested?
18   A.    No.
19   Q.    It looks like on June 8th, 1995, at
20 1:45 a.m. a man said that he saw you and a
21 female arguing at Hamilton at Almont Ave. and
22 he approached and you punched him in the left
23 side of the mouth knocking out his rear teeth.
24 Do you recall that incident?

136

1    A.    No.
2    Q.    When police located you, you
3  admitted to punching the man?
4    A.    Well, if I admitted it, then I must
5  have done it.
6    Q.    Did you serve some jail time on
7  these charges?
8    A.    I don't recall.
9        MS. THOMPSON:  Can I just -- wait
10 till she's finished asking the question.
11       THE WITNESS:  Oh, okay.  Sorry.
12 Sorry about that.
13   Q.    (By Ms. Quinn)  Do you recall when
14 you were next arrested?
15   A.    No.
16   Q.    Police reported on October 6th,
17 1997, at 9 o'clock p.m. they with dispatched to
18 85 Locust Avenue for a domestic dispute.  Do
19 you recall that incident?
20   A.    No, I do not.
21   Q.    When the police approached the
22 residence, there was a car driving past,
23 Samantha was driving and you were in the
24 passenger seat and the kids were in the back.

137

1  Do you remember police stopping you as you were
2  leaving 85 Locust Ave.?
3      A.    No.
4      Q.    Do you remember having a fight with
5  your father that night?
6      A.    No.
7      Q.    And your father had a cut on his
8  nose and a large bruise under his left eye from
9  you hitting him?
10     A.    I don't know.  I don't remember.
11     Q.    You were charged with assault --
12  domestic assault and battery from that
13  incident.  You don't recall that?
14     A.    No.
15     Q.    Do you remember what the result of
16  that case was?
17     A.    I don't recall the case.
18     Q.    Do you recall police next responding
19  to your residence at 1195 for a domestic
20  situation in January of 1998?
21     A.    Like I told you earlier, they were
22  at my apartment several times.  So -- I don't
23  recall the date.
24     Q.    Who's Mark Wright?

138

1      A.    I have no clue.
2      Q.    Did you call him and leave harassing
3  messages?
4      A.    I don't know who that is.
5      Q.    Did police ever speak to you about
6  that?
7      A.    I don't recall.
8      Q.    On January 20th, 1998, do you recall
9  police responding to a domestic dispute again
10  with Samantha Sorenson at 1195 Grafton Street?
11     A.    As I stated previously, they were
12  there several times for some type of alleged
13  domestic dispute.  I don't remember the dates
14  or times.
15     Q.    And they responded again for a
16  domestic dispute on February 1st, 1998?
17     A.    I don't recall.
18     Q.    During that incident you struggled
19  with police and you were arrested for
20  disorderly behavior, assault and battery on a
21  police officer, disturbing the peace and
22  resisting arrest?
23     A.    I do recall that.
24     Q.    Do you know what the result of those

139

1  charges were?
2      A.    Do I know the results of the charges
3  or what happened?
4      Q.    What was the result of the charges?
5      A.    I don't recall what the results was.
6  I just recall the incident of when they knocked
7  on my door, I was sitting down having dinner
8  with my daughter -- I mean, my daughter --
9  actually my two daughters and my girlfriend at
10  the time, we were together at that point.
11  Knocked on the door and I answered through the
12  door closed, and they told me it was Worcester
13  Police Department.
14         I asked them what they want.  They
15  demanded the door being opened.  I asked them
16  why.  They demanded the door being open.
17         I said, "I'm not opening the door
18  unless you have a reason for me to open the
19  door.  Why are you here?"
20         And they just kept threatening me,
21  telling me they were going to kick in the door.
22  I said, "What is this referring to?"  Grounds
23  like that basically I was saying.  I don't
24  remember exact conversation.

140

1         Then they finally said, "It's for a
2  disturbance call."
3         I said, "I'm sitting down having
4  dinner with my girlfriend and my kids.  What
5  are you talking about?"  They said, "Well, it's
6  a disturbance call.  You need to open the
7  door."
8         I said, "Okay.  I'll open the door
9  but you're not allowed in the house."  I opened
10  the door, they stormed in, hit me with the
11  door.  When I opened it, they just forced their
12  way in and hit me with the door.  And one of
13  the cops ran into me and slammed me to the
14  ground and said I assaulted him.
15     Q.    So it's your position that you and
16  Samantha weren't fighting prior to the police
17  arriving?
18     A.    I think we did have an argument
19  probably about, I'm going to say, an hour or so
20  before dinner.  I wouldn't say we were
21  fighting.  It was a verbal argument.
22     Q.    Would it surprise you that several
23  residents were outside when police arrived and
24  told police that you were inside fighting?

141

1         MS. THOMPSON:  Object to form.
2    Objection.  You can answer.
3         A.    How do they know what I was doing
4    inside my apartment?
5         Q.    (By Ms. Quinn)  Well, they reported
6    that they could hear you fighting with your --
7         A.    There was a verbal argument.  I did
8    say that.
9         Q.    Okay.
10        A.    And then when you say the word
11   "fighting," that's physical.  So there was no
12   physical altercation.
13        Q.    Okay.  Was there a physical
14   altercation on February 24th, 1998, when police
15   responded to a call from a neighbor that said
16   it sounded like you were hitting Samantha?
17        A.    I've never hit her.  So -- I don't
18   recall the date you're talking about.
19        Q.    You have been charged with hitting
20   her, haven't you?
21        A.    And what was the result of that
22   charge?
23        Q.    Do you recall being charged with
24   hitting her?

142

1         A.    No, I don't, but I know I never did.
2    Was I found guilty on that charge?
3         Q.    On April 6th, 1998, another neighbor
4    called in a domestic dispute.  Police responded
5    and spoke to Samantha.  It appears that at that
6    time Ms. Sorenson reported that you had pushed
7    her up against the wall when she requested you
8    return her car and apartment keys, punched her
9    in the face and she had a cut inside her lip
10   that was starting to swell and about the body
11   several times, you kicked her when she was
12   curled up on the floor in the back and the
13   side, her forearms were bruised, and then you
14   threw the phone and it broke.  You had a knife
15   and cut a two-foot hole in a mattress.  And
16   this occurred when your kids ages 2 and
17   6 months were inside the apartment.
18        Do you recall that incident?
19        MS. THOMPSON:  Objection.  You can
20   answer.
21        A.    No.
22        Q.    (By Ms. Quinn)  She told police at
23   that time that she had been with you for four
24   years and during that time you had abused her

143

1    physically and mentally.  Do you dispute that
2    allegation?
3         A.    Absolutely.
4         Q.    She also told police that you -- she
5    had three phones and you had broken all three,
6    ripped her jacket and pulled her hair.  Do you
7    deny that that happened?
8         A.    Yes.
9         Q.    So as a result of that incident, it
10   appears that you were charged with assault and
11   battery with a dangerous weapon, domestic
12   assault and battery and two counts of malicious
13   destruction of property.
14        Do you recall what the resolution of
15   those charges were?
16        A.    No, I do not.
17        Q.    Do you recall the neighbor calling
18   police again the next day reporting arguing and
19   your children crying at least once per week and
20   twice that day for several hours?
21        A.    Repeat that again?
22        Q.    Do you recall your neighbor
23   reporting again that she had heard your -- you
24   arguing and your children crying at least once

144

1    per week and twice that day for several hours?
2    This is on April 7th, 1998.
3         A.    So just to understand the question,
4    my kids were crying once a week and twice a
5    day?  Is that correct?
6         Q.    Arguing -- well, at the same time
7    that arguing was happening between you and
8    Ms. Sorenson.
9         A.    I just don't understand the
10   narrative.
11        Q.    Do you recall police responding?
12        A.    No, I don't.
13        Q.    Were you ever contacted by police
14   about tools stolen from a Dodge van owned by
15   Data Communications in January of 1999?
16        A.    Well, I vaguely do, but not really.
17   I think I -- there was something about I was
18   asked about tools from a van.  I do recall
19   that, but I can't recall the substance or the
20   conversation.
21        Q.    Well, the stolen tools were
22   apparently found at a pawnshop and had been
23   sold by Ms. Sorenson who said that you asked
24   her to sell them.  Do you recall telling her to

145

1  sell tools or asking her --
2  A.    No, I do not.
3  Q.    Did you ever get charged with any
4  crime related to the tools?
5  A.    I don't recall.
6  Q.    Do you recall police responding to
7  your apartment on Grafton Street on March 4th,
8  1999, because of an incident with Ms. Sorenson
9  and a yellow cab?
10  A.    Yeah.  I think I broke the cab
11  window, if that's what you're talking about.
12  Q.    Was that a dispute involving
13  Ms. Sorenson where you tried to get her out of
14  the yellow cab and when she refused, you broke
15  the passenger rear window?
16  A.    I think I broke the window after she
17  was out, if I recall correctly.
18  Q.    That's your memory?
19  A.    I think so.
20  Q.    Instead didn't the glass from the
21  broken window when you broke it hit Sorenson in
22  the face?
23  A.    No.  Landed on her foot.  There was
24  one piece of glass in her shoe.

146

1  Q.    Did you face assault with dangerous
2  weapon, disorderly person and malicious
3  mischief charges as a result of that incident?
4  A.    I don't recall what I was charged
5  with.
6  Q.    What was the result of those
7  charges?
8  A.    I don't recall.  I know I had to pay
9  for the window.
10  Q.    During the discussion with police,
11  Ms. Sorenson said she had already signed
12  custody of your daughters ages 3 and 1 over to
13  your parents.  Do you recall signing custody
14  over to your parents at that time?
15  A.    When was this?
16  Q.    It was in March of 1999.
17  A.    Yeah.  But what was the question you
18  asked?  I'm sorry.
19  Q.    She told police that she had already
20  signed custody of your daughters over to your
21  parents.  Do you recall that?
22  A.    I know she did.  I don't remember
23  when she did it.
24  Q.    Did you also sign custody of your

147

1  daughters over to your parents at that time?
2  A.    I already testified that I did.  I
3  don't remember the time.
4  Q.    I think you were unsure of what the
5  time period was.
6  A.    I don't remember the -- I don't
7  remember the time.
8  Q.    Okay.
9  A.    But I know I did do it.
10  Q.    Was it when they were 3 and 1?
11  A.    I don't recall.
12  Q.    Were the girls with you during that
13  incident in March of 1999, though, because your
14  parents were on vacation for two weeks?
15  A.    During what incident?
16  Q.    The assault with a dangerous weapon,
17  disorderly person and malicious mischief charge
18  incident with the yellow cab.
19  A.    I don't recall.
20  Q.    Were you later arrested on a warrant
21  as a result of that March 4th, 1999, incident?
22  A.    I don't recall.
23  Q.    When police went to 1195 Grafton
24  Street you jumped from a second floor porch and

148

1  tried to run.  Do you recall them chasing you
2  and putting you under arrest at that time?
3  A.    I remember that happening.  I don't
4  remember when that was, though.
5  Q.    Do you recall fleeing from police on
6  that day?
7  A.    I don't remember if that was the --
8  I don't remember the date.  I do remember that
9  incident happening where I did jump off my
10  balcony and they arrested me.  But I don't
11  remember the exact date.
12  Q.    Do you recall a disorderly person
13  charge from an incident on April 3rd, 1999,
14  when you were fighting with a woman in front of
15  Santiago's Market over a bag of dope?
16  A.    No, I don't -- I don't even know
17  where Santiago's Market is.
18  Q.    So you don't recall any criminal
19  process resulting from that incident?
20  A.    No.  I don't remember the incident.
21  Q.    Were you arrested again on
22  April 30th, 1999, for illegal possession of
23  class A and trespass of land or dwelling and
24  you were seen on a bike in Great Brook Valley

149

1 and found with two bags of heroin in your
2 pocket?
3     A.    I remember being arrested on my bike
4 with heroin.  I don't recall when it was.
5     Q.    Had you just purchased that heroin
6 from someone in Great Brook Valley?
7     A.    Probably.
8     Q.    Or were you selling that heroin?
9     A.    I never sold drugs.
10     Q.    What was the result of that -- those
11 charges?
12     A.    I don't recall.
13     Q.    That Trek mountain bike that you
14 mentioned having, was that a bike that was
15 taken from your father's house?
16     A.    I never said what kind of bike it
17 was.
18     Q.    Okay.  Did you have a Trek mountain
19 bike that you took from your father's house?
20     A.    That I took from my father's house?
21     Q.    Yep.
22     A.    I never took a bike from my father's
23 house.  I had my own bike.
24     Q.    What kind of mountain bike was it?

150

1     A.    I don't recall what kind it was.  It
2 was over 20 years ago.
3     Q.    Did your father ever tell you that
4 he reported a Trek mountain bike stolen as well
5 as camera equipment on September 20th, 1999,
6 from his house at 85 Locust Street?
7     A.    No, I don't recall.
8     Q.    You don't recall him discussing
9 where those -- the camera equipment and bike
10 were?
11     A.    No, I don't recall.
12     Q.    Did any other family members tell
13 you that they bought back the items from the
14 pawnshop?
15     A.    I don't recall.  I don't remember.
16     Q.    Were you arrested on two warrants on
17 June 15th, 2000?
18     A.    I don't remember.
19     Q.    What were the two warrants for?
20     A.    I just told you I don't remember.
21     Q.    Have you been arrested since you
22 were released from incarceration for this
23 incident at issue in this case?
24     A.    Since my wrongful conviction?

151

1     Q.    Since the time you were
2 incarcerated, yes.
3     A.    No, I don't think so.  I don't -- as
4 far as I know, no.  I don't think so.
5     Q.    So turning your attention back to
6 the day of Sunday, August 13th, 2000, you were
7 living at 1195 Grafton Street; is that right?
8     A.    What date?
9     Q.    August 13th, 2000.
10     A.    Was I living there?
11     Q.    Yes.
12     A.    I don't remember the exact date.
13 I'm pretty sure I was still living there.
14 I'm -- I mean, I think I was living there
15 before I got arrested, so...
16     Q.    So just --
17     A.    I don't know if I was in rehab at
18 the time or not.
19     Q.    Do you remember ever challenging the
20 charges as a result of the incident on
21 August 14th, 2000, arguing that you were in
22 rehab and couldn't have committed the incident
23 in question?
24     A.    Repeat that, please?  I didn't

152

1 understand what you said.
2     Q.    You just wondered whether you had
3 been -- you were in rehab on that day.
4     A.    On -- in August 14th?
5     Q.    August -- right.
6     A.    I don't know if I was or not.
7     Q.    Did you ever challenge the charges
8 in this case arguing that you were in rehab and
9 couldn't have committed the incident?
10     A.    I don't think so.  Not on
11 August 14th.  I don't think that was my
12 argument.
13     Q.    So you were likely not in rehab on
14 the -- on August 14th, 2000; isn't that right?
15     A.    I don't recall.  I don't know what I
16 was doing August 14th.
17     Q.    Okay.  Were you living with anyone
18 on that day?
19     A.    I -- you're asking specific date.  I
20 honestly can't answer.  It's 20 years ago.  So
21 I don't know what I was doing on that date.
22     Q.    Were you working during that time
23 period?
24     A.    What -- during August 14th or --

153

1    Q.    Yes.  August 14th, 2000.
2    A.    I don't know if I was working on
3  that exact date.  And I apologize for answering
4  before you were done.
5    Q.    Okay.  In August of 2000, did you
6  have any steady employment around that time?
7    A.    I wouldn't say "steady".  In that
8  time frame from -- particularly that whole year
9  until I went away I was off and on working
10  various different jobs or odds and ends.
11    Q.    Do you recall leaving your apartment
12  at any time during the early morning hours of
13  August 14th, 2000?
14    A.    I don't recall what I did on any of
15  those dates.
16    Q.    Was there anywhere else you were
17  living on August 14th and 15th, 2000?
18    A.    Like I said, I couldn't -- I don't
19  know the dates I was in rehab and the dates I
20  wasn't.  If I wasn't in rehab, I was in my
21  apartment.  And if I wasn't in my apartment, I
22  was in rehab.  So I don't know exactly what I
23  did on that particular day.
24    Q.    Did you see detectives come to your

154

1  apartment building on August 15, 2000?
2    A.    I -- I don't know.  I don't
3  remember.
4    Q.    Were you riding your bike in the
5  area of Grafton Street in the afternoon of
6  August 15th?
7    A.    I rode my bike at numerous times in
8  that time.  On that particular day and time you
9  just said, I have no clue.
10    Q.    Did you ride away from detectives on
11  that date and turn on to Short Street?
12    A.    On that particular date?
13    Q.    Yes.
14    A.    I don't recall what I -- I don't
15  recall.
16    Q.    Had you run from detectives on your
17  bike on other occasions?
18    A.    Several times.
19    Q.    What other occasions did you ride
20  away from detectives on your bike?
21    A.    Whenever I would see -- I don't know
22  about detectives or just regular police.  Just
23  whenever I seen a police officer, I just took
24  off.

155

1    Q.    How many times did that happen
2  prior -- that you can recall?
3    A.    In my whole life?
4    Q.    Yep.
5    A.    Oh, God.  I have no clue.  A lot.
6    Q.    Do you recall abandoning your bike
7  and running into the woods to avoid the police
8  on that date, August 15th, 2000?
9    A.    No.
10    Q.    At some point did you learn that
11  police were looking for you?
12    A.    Yes.
13    Q.    And how did you learn that?
14    A.    I mean, are you talking specific
15  dates or my entire life?  Because --
16    Q.    Yes.  I'm still talking about
17  August 15th, 2000.
18    A.    Can I ask my question?  Okay.
19  Please re-ask.
20    Q.    At some point did you learn that
21  police were looking for you as a result of an
22  incident on August 14th, 2000?
23    A.    Yes.
24    Q.    And when did you learn that?

156

1    A.    I don't know the exact date or time
2  I learnt it.
3    Q.    From who did you learn that?
4    A.    My father.
5    Q.    What did he say to you?
6    A.    He just asked why the cops were
7  looking for me.
8    Q.    And what did you say to him?
9    A.    I had -- I told him, honestly, I
10  told him, my warrants, my probation warrants.
11  He said, "No."
12    I said, "What are you talking
13  about?"  He said that the detectives were at
14  his house and said I -- they were looking for
15  me for a B&E.
16    Q.    And what was your response?
17    A.    Kind of shocked because I didn't
18  know what he was talking about.
19    Q.    Did you say anything to him?
20    A.    Basically like, "What are you
21  talking about?  I didn't do a B&E.  What are
22  you talking about?"
23    Q.    Did you tell him of any plans to
24  turn yourself in?

157

1    A.    When?  At that particular phone
2  call?
3    Q.    Yes.
4    A.    I don't recall.
5    Q.    You were arrested at the courthouse
6  on August 29, 2000; is that right?
7    A.    I turned myself in on that -- I
8  don't know if it was that date so I can't say
9  that, but I do recall going to the courthouse
10 for -- to turn myself in for my probation
11 warrants.
12   Q.    What did you have warrants for?
13   A.    Violating probation.
14   Q.    How did you violate your probation?
15   A.    I think I left rehab.
16   Q.    You had multiple warrants as a
17 result of leaving rehab?
18   A.    I just had my probation violation.
19   Q.    Just one warrant --
20   A.    As far as I know.
21   Q.    -- or multiple?
22   A.    I mean, I didn't do anything else.
23 I was on probation.  I don't know if they can
24 issue multiple warrants on probation

158

1  violations.  I don't know how it works.
2    Q.    So why were you in the courthouse
3  that day?
4    A.    I just answered.  To turn myself in
5  for my probation warrants.
6    Q.    Why would you turn yourself in at
7  the courthouse?
8    A.    For probation?  Why wouldn't I?
9    Q.    Do you know who arrested you?
10   A.    Police officers.  Worcester police
11 officers.
12   Q.    And to your memory there were
13 multiple police officers who arrested you at
14 that time?
15   A.    Yeah.  They surrounded me in the
16 clerk's office.
17   Q.    Did you speak to probation and tell
18 them that you were there to turn yourself in?
19   A.    I was walking into the clerk's
20 office to talk to them about turning myself in
21 for that and they surrounded me.
22   Q.    So you didn't get a chance to say
23 you were turning yourself in.
24   A.    I didn't have a chance to do

159

1  anything.  I was literally opening the door for
2  the clerk's office.
3    Q.    Were you questioned by members of
4  the Worcester Police Department when you were
5  taken back to the police department?
6    A.    Define "questioned"?  Was I -- I
7  don't -- please define "questioned"?  Because I
8  was processed, so was it -- can you define what
9  you mean by questioning?
10   Q.    Did detectives take you up to any
11 other area of the police department and ask you
12 questions?
13   A.    The detectives did not take me to
14 another area and ask me questions.
15   Q.    Have you seen the photo array used
16 for the witness identification in this case?
17   A.    Yes, I have.
18         (Exhibit No. 4, Photograph;
19 premarked.)
20   Q.    I'm showing you what's been marked
21 as Exhibit 4.  Do you recognize that to be the
22 photo that was used in the photo array in this
23 case?
24   A.    I have no clue.  I don't remember

160

1  and that is kind of a small picture, but...
2    Q.    When did you first see that picture?
3    A.    That picture?  Just now.  I don't
4  recall --
5    Q.    The pictures from the photo array?
6    A.    The picture from -- I don't know if
7  this is the picture from the photo array, to be
8  honest with you.  I haven't seen it recently.
9  Actually, I did see the photo array during one
10 of the depositions, but I didn't look at it.  I
11 just seen a bunch of photos, so I didn't look
12 at all the pictures.  So I don't recall if that
13 was used in the photo array --
14   Q.    Is that photo marked as Exhibit 4
15 representative of how you looked in August of
16 2000?
17   A.    I have no clue.  The best
18 representative of what I would look like at
19 that time would be when I turned myself in and
20 they took a mugshot.
21   Q.    Well --
22   A.    I don't know if that's from --
23   Q.    Is it your position that the photo
24 used in the photo array is not representative

161

1 of how you looked in August of 2000?
2          MS. THOMPSON:  Objection.  You can
3 answer.
4     A.    I don't recall.  I think -- I think
5 I had short hair at that point, but I don't
6 recall.  I had different hair styles over the
7 years and there's multiple mugshots of me, so I
8 don't know which one they used or what date it
9 was of the one they used.
10          (Exhibit No. 5, Photograph;
11 premarked.)
12     Q.    (By Ms. Quinn)  I'm going to show
13 you what's been marked as Exhibit 5.  Is that a
14 picture of you on a "Wanted" poster?
15     A.    I mean, it's very grainy, but it
16 does look similar to me.
17     Q.    And is that picture representative
18 of how you looked in August of 2000?
19     A.    I don't think so.  I don't think I
20 had hair like that back then.  But I don't
21 recall.  I mean, it says the date on it, but I
22 don't know -- like I said, I've had multiple
23 mugshot pictures over the years and I think
24 they vary in hair styles and everything else so

162

1 I don't know which one they used for the photo
2 array or this poster or...
3     Q.    Okay.
4          (Exhibit No. 6, Photograph;
5 premarked.)
6     Q.    I'm showing you what's been marked
7 as Exhibit 6.  Do you recognize the photo?
8     A.    Yeah.  It's a very young version of
9 me.
10     Q.    Do you know at what time that photo
11 was taken?
12     A.    I have no clue.
13     Q.    If I was to tell you it's from
14 March 10th, 1999, does that sound right?
15     A.    I would have to believe what you
16 say.  I don't know.
17          (Exhibit No. 7, Photograph;
18 premarked.)
19     Q.    I'm showing you what's been marked
20 as Exhibit 7.  Do you recognize that photo?
21     A.    Just that it's another mugshot of
22 me.
23     Q.    Do you know what time that mugshot
24 was taken?

163

1     A.    I have no clue.  Like I said, every
2 one of these are all mugshots and they are all
3 very different, variants of hair styles and
4 what I looked like.
5     Q.    And if I was to tell you that that
6 was taken on the date you were arrested for
7 this incident, August 29th, 2000, does that
8 sound right?
9     A.    I don't know.  I know -- I thought
10 you said this one was that -- from that date,
11 but I think I said I had shorter hair at that
12 point.  And if you're saying this is that date,
13 I mean, it is shorter hair, more cleaned up,
14 so...
15          I couldn't contest you on that
16 because I don't know.
17          (Exhibit No. 8, Photograph; so
18 marked.)
19     Q.    I'm showing you what's been marked
20 as Exhibit 8.  Does this appear to be the same
21 mugshot that's used in the wanted poster what
22 I've marked as Exhibit 5?
23     A.    Yeah, it looks like it.  But like I
24 said, that one's grainy so -- but the hair -- I

164

1 mean, kinda.
2     Q.    And it -- would it surprise you to
3 learn that that photo was taken just a couple
4 of months before in June of 2000?
5     A.    Like I said, I had different
6 hairstyles over the course of my life.  So...
7          You're saying this was June of 2000?
8     Q.    Yep.  June 15th of 2000?
9     A.    I mean, if that's what it says, I
10 can't dispute it because I don't remember.
11     Q.    And after you were arrested on
12 August 29th, 2000, were you arraigned in
13 District Court the next day?
14     A.    I don't -- like I don't remember the
15 exact date.  Are we talking about when I turned
16 myself in and got arrested at the courthouse?
17     Q.    When you were arrested on the
18 courthouse -- at the courthouse --
19     A.    Okay.
20     Q.    -- on August 29th, 2000, were you
21 arraigned in District Court the next day?
22     A.    I'm just going to contest that I
23 don't recall the day, but if we're talking
24 about when I went into the courthouse and

165

1 turned myself in and got arrested there, I
2 think I was arraigned the same day.
3    Q.    Well, you just testified that you
4 never were able to tell them that you were
5 turning yourself in; is that right?
6    A.    I didn't talk to -- I mean, they
7 just surrounded me.
8    Q.    Okay.
9    A.    But I did go there to turn myself
10 in.  Why else would I be in the courthouse?  To
11 go visit the clerk or something?  I mean...
12    Q.    So you don't recall whether you were
13 arraigned in District Court the next day?
14    A.    I'm pretty sure I was arraigned the
15 same day that I turned myself in.
16    Q.    And were you ever released on bail?
17    A.    No.  I got indicted the same day.
18    Q.    Weren't you actually indicted in
19 Superior Court in October of 2000?
20    A.    Nope.  I went into the court -- from
21 my best of my recollection, I went into the
22 courthouse to turn myself in, got surrounded,
23 got booked, got brought back to the courthouse
24 the same day to get arraigned and they brought

166

1 me immediately downstairs and got indicted.
2    Q.    You mentioned in your other
3 deposition that you had a conversation with
4 personnel at Worcester County House of
5 Corrections while being booked on that date?
6    A.    I had a conversation, yes.
7    Q.    And what was the conversation?
8    A.    I mean, like I said, are we talking
9 about with a detective or the police officers
10 or my bookings or --
11    Q.    You were processed and had a
12 conversation, you testified, with personnel at
13 Worcester County House of Corrections.
14    A.    Repeat that again?  I had a
15 conversation where?
16    Q.    At Worcester County House of
17 Corrections with personnel there while you were
18 being booked there at that jail.  Do you
19 recall --
20    A.    See I --
21        MS. THOMPSON:  Hold on.  She wasn't
22 finished asking.
23        THE WITNESS:  I'm sorry.
24    Q.    (By Ms. Quinn)  Do you recall having

167

1 that conversation?
2    A.    I thought you were talking about the
3 booking of the day I turned myself in.  That's
4 why I'm confused.  I apologize for that.  What
5 was the date again?  October you said?  I
6 apologize.
7    Q.    You mentioned in your prior
8 testimony that there might be video of a
9 conversation you had with Worcester County
10 House of Corrections.  Have you ever seen a
11 video of that conversation?
12    A.    I don't know -- I mean, there's
13 cameras in Worcester County House of
14 Corrections.  I don't know what substance
15 you're talking about or what conversation or
16 what the purpose of the conversation was.  I
17 mean, I've spoke with numerous correctional
18 officers.  I just -- I just don't understand
19 your question as far as is there video of me
20 talking to a correctional officer?  Probably.
21 I mean, there's cameras all over that place.
22    Q.    Well, have you ever seen a
23 videotaped conversation with personnel at
24 Worcester County House of Corrections during

168

1 your processing there?
2    A.    I don't recall.  I don't think I
3 have, but I don't recall.
4    Q.    So as a result of this incident, you
5 were charged with assault with intent to rape,
6 assault and battery with a dangerous weapon and
7 armed burglary; is that right?
8    A.    For my indictment or my dis --
9 district (verbatim) for which one?
10    Q.    When you were indicted in Superior
11 Court.
12    A.    For indictment, yes.
13    Q.    And you were originally assigned
14 Attorney Michael Hussey?
15    A.    Yes.
16    Q.    And at that time you pled not guilty
17 to all three charges?
18    A.    Yes.
19    Q.    Your bail was set at $75,000 with
20 surety or $7,500 in cash.  Do you recall that?
21    A.    I don't recall what the bail was.
22    Q.    Did you ever get released at any
23 time pretrial?
24    A.    No.

169

1      Q.      And who was your attorney for the
2   jury trial?
3      A.      For what we're discussing?  Matthew
4   Rabinowitz I think it was.
5      Q.      And on June 28th, 2002, you were
6   found guilty of the assault and battery and the
7   armed burglary charges; isn't that right?
8      A.      I don't recall the exact date.
9      Q.      So you were sentenced on the assault
10  and battery for 9 to 10 years at Cedar Junction
11  which was concurrent to the armed burglary
12  sentence 12 to 20 years at Cedar Junction; is
13  that what it was?
14     A.      I'm -- I think so.  Sounds right.
15     Q.      And you filed a motion for post
16  conviction relief; is that right?
17     A.      I think I filed several of them.
18     Q.      And that motion was denied in
19  February of 2005?
20     A.      I don't remember the date it was
21  denied.  I don't know which one you're talking
22  about.
23     Q.      You think you filed more than one
24  motion for post conviction relief.

170

1      A.      I know I did.
2      Q.      Are you confusing that with appeals
3   to the appeals court in the SJC?
4      A.      I could be, but I thought I had two
5   of them.  I thought I had two post conviction
6   releases.  You could be right.  I could be
7   mistaken on that.
8      Q.      Well, you filed a later one in 2016
9   or so, right?
10     A.      Post conviction release?
11     Q.      Yes.
12     A.      Yeah.  That's what -- I knew I filed
13  more than one on the same case.
14     Q.      But the one you filed in 2005 was
15  denied, right?
16     A.      Yes.
17     Q.      And then you applied to the appeals
18  court; is that right?
19     A.      Yes.
20     Q.      And the appeals court affirmed the
21  judgment and denied your post conviction relief
22  motion; is that right?
23     A.      If that's what it says, yes.  I
24  mean, I got denied all the way at that time.

171

1      Q.      So you're aware you also were denied
2   relief from Supreme Judicial Court --
3      A.      Yes.
4      Q.      -- and twice from the Federal Court?
5      A.      Yeah.  I don't remember how many
6   times I got denied, but yes.
7      Q.      You stated in Answers to
8   Interrogatories that real facts and
9   perpetrators of the assault were known to
10  Defendants and suppressed.  What facts
11  were known to Defendants and suppressed?
12     A.      Just the facts of the case.
13     Q.      What specifically?
14     A.      I mean, everything I argued in my
15  appeals.  Oh, God.  Um, identification didn't
16  match, the DNA didn't match, they never looked
17  for anybody else, just -- I don't know.
18  There's a lot of stuff.
19     Q.      What do you mean the identification
20  didn't match?  Isn't it true the witness
21  identified you as the perpetrator of the
22  assault and that's why you were arrested?
23     A.      She identified my photo.  But her
24  description did not match me.

172

1      Q.      How did it not --
2              MS. THOMPSON:  Nat, do you need a
3   quick break?
4              THE WITNESS:  Yes.
5              MS. THOMPSON:  Let's take a break.
6              (A brief recess was taken.)
7      Q.      (By Ms. Quinn)  Mr. Cosenza, before
8   we broke I had asked you what facts were known
9   to Defendants and suppressed and you mentioned
10  the identification.  What about the
11  identification was suppressed?
12     A.      You'd have to ask my lawyers that.
13     Q.      So now after taking a break and
14  talking to your lawyers you can't identify what
15  part of the identification you were alleging
16  was suppressed.
17     A.      I would refer to my lawyers for
18  that.
19     Q.      Okay.  And you also mentioned the
20  DNA in the shorts were suppressed.  What about
21  the DNA in the shorts?
22     A.      You would have to refer to my
23  lawyers for that.
24     Q.      Are you refusing to answer that

173

1 question?

2    A.    You would have to refer to my

3 attorneys.

4    Q.    I'm asking you that question. Are

5 you refusing to answer that question?

6    A.    My answer is you would have to refer

7 to my attorneys.

8    Q.    Well, isn't it true that the DNA and

9 the results of that DNA test on the shorts were

10 introduced at trial?

11    A.    You would have to refer to my

12 attorneys.

13    Q.    You don't recall anything about

14 that?

15    A.    You would have to refer to my

16 attorneys.

17    MS. QUINN:    Attorney Thompson, is it

18 your position that he's not answering those

19 questions that he -- that were asked prior to

20 the break and then you took a break and

21 discussed it with him and now you're -- he's

22 telling me that I need to refer to you?

23    MS. THOMPSON:    Well, you're putting

24 on the record we discussed it. Obviously

174

1 whatever we talked about on a break is a matter

2 of privilege. So he hasn't testified that we

3 discussed something and that's why he's

4 answering the way he is.

5    But let me -- I'm not sure if he's

6 asserting a privilege or not. Let me confer

7 briefly with him as to whether he's asserting a

8 privilege.

9    (A brief recess was taken.)

10    (Exhibit No. 11, Answers to

11 Interrogatories; so marked.)

12    Q.    (By Ms. Quinn) Have you

13 reconsidered your answer to the questions I

14 just asked?

15    A.    What was the questions?

16    Q.    Before you took a break I had asked

17 you what facts were known to Defendants and

18 suppressed as you indicated in your Answer to

19 Interrogatory. And you said the identification

20 didn't match, the DNA with regard to the

21 shorts. And I'd asked you then to follow up

22 what about the identification was known to

23 Defendants and suppressed.

24    A.    That question I will refer to my

175

1 attorneys.

2    Q.    And I'm still unclear as to whether

3 you're asserting an attorney-client privilege?

4    MS. THOMPSON:    I don't understand --

5 I mean, you can inquire of Mr. Cosenza. I

6 don't understand him to be asserting a

7 privilege. I think that's the answer he's

8 given. I'm not advising him to exercise a

9 privilege. I don't -- that's not how I

10 understand his answer, but you can inquire of

11 the witness.

12    Q.    (By Ms. Quinn) Are you asserting

13 some kind of privilege and refusing to answer

14 that question?

15    A.    That particular question as far as

16 what was suppressed or what was the misconduct

17 of the police I would refer to my attorneys.

18    Q.    Okay. I'm showing you what's been

19 marked as Exhibit 11. Do you recognize these

20 to be your Answers to Defendant's First Set of

21 Interrogatories?

22    A.    It looks like it.

23    Q.    And if you'll turn to the last page

24 in that package, there's a document entitled

176

1 "Verification"?

2    A.    Yep.

3    Q.    Is that your signature on that

4 verification?

5    A.    Looks like it.

6    Q.    Did you read this document before

7 signing that verification?

8    A.    I probably did, yes.

9    Q.    And did you understand that that

10 verification states under the penalty of

11 perjury, that the Answers to Interrogatories

12 are true and correct to the best of your

13 knowledge --

14    A.    Yes.

15    Q.    -- information and belief?

16    A.    Yes.

17    Q.    And that was signed on August 20th,

18 2019?

19    A.    Yes.

20    Q.    Did you meet with your attorneys in

21 person to go over these Answers to

22 Interrogatories before signing that document?

23    A.    I don't recall.

24    Q.    I'll refer you to interrogatory

177

1  number seven.  In your answer the second
2  sentence says, "A central allegation in this
3  lawsuit is that the real facts and perpetrators
4  of the assault on MH were known to Defendants
5  and were suppressed so that Plaintiff could not
6  learn them."
7          And I'm asking you what real facts
8  were known to Defendants and were suppressed.
9          MS. THOMPSON:  Objection.  You can
10  answer.
11      A.    Is this this last sentence right
12  here on the first page?  Is that where you're
13  starting?
14      Q.    (By Ms. Quinn)  So the stop of page
15  four says --
16      A.    Separate perpetrators of the
17  assault.
18      Q.    Yeah.  I started reading at the last
19  sentence on page three, "A central allegation
20  in this lawsuit..."  Do you see where that says
21  that?
22      A.    Yes.
23      Q.    And it continues on to page four.
24  And I'm wondering what this answer to

178

1  interrogatory refers to as far as facts that
2  were known to Defendants and were suppressed.
3      A.    Give me a second, I have to read it.
4          (The witness reviewed the
5  documents.)
6      A.    That, you would have to ask the
7  Defendants that.
8      Q.    Well, did you have something
9  specifically in mind when you're making this
10  allegation?
11      A.    Yeah.  I mean, everything about the
12  case.  I didn't do it; I wasn't there; I had
13  nothing to do with it.  So they know a lot more
14  than I do.
15      Q.    Well, I'm asking you specifically
16  what facts do you allege were known to
17  Defendants and suppressed?
18          MS. THOMPSON:  Objection.  You can
19  answer.
20      A.    As far as the facts that were
21  suppress- -- repeat that, please?
22      Q.    (By Ms. Quinn)  What facts were
23  known to Defendants and were suppressed as you
24  state in that sentence?

179

1      A.    Whatever they hid from us.
2      Q.    And what is that?
3      A.    You would have to ask them.
4  That's --
5      Q.    Do you have any specific knowledge
6  of facts that were known and suppressed?
7      A.    I know I didn't do this and I know
8  they didn't look for anybody else.  They closed
9  the case very, very quickly and did barely any
10  investigation into it.  And whatever they
11  learned and didn't disclose, I don't know.  But
12  I know there has to be something.
13      Q.    Okay.  Prior to your break you said
14  something --
15          THE WITNESS:  Oh, sorry.  I
16  apologize.  I'll shut that off.
17          (Interruption by phone.)
18          THE WITNESS:  Sorry about that.
19      Q.    (By Ms. Quinn)  Prior to the break
20  you stated that the DNA testing in the shorts
21  were suppressed.  What about the DNA testing in
22  the shorts were suppressed?
23          MS. THOMPSON:  Objection.  You can
24  answer.

180

1      A.    You would have to ask the Defendants
2  what they didn't disclose.
3      Q.    (By Ms. Quinn)  Well, isn't it true
4  the results that the -- of the DNA testing were
5  introduced at trial?
6      A.    Yes.
7      Q.    And, in fact, the shorts were an
8  exhibit at trial.
9      A.    Yes.
10      Q.    So on May 31st, 2016, the Superior
11  Court granted your second motion for a new
12  trial?
13      A.    I don't know the exact date.
14      Q.    Do you recall the date when the
15  Superior Court ordered you released on your own
16  recognizance?
17      A.    I don't remember the date.
18      Q.    Were you released from prison on the
19  date that that Superior Court order was
20  entered?
21      A.    I -- I know I was released on my
22  personal recognizance.  I don't remember the
23  date.
24      Q.    Do you know exactly how much time

181

1  you served before your release?
2      A.    From my arrest which I think you
3  stated it was August 2, '89, I don't know if
4  that's the exact date, but I'll refer to you on
5  that, from August 29th, 2016, (verbatim) till
6  what was the date you just said of my release?
7      Q.    So August 29th, 2000, right?
8      A.    That's when you said I was arrested.
9      Q.    Yeah.  You just said 2016.  But
10  2000, right?
11      A.    Oh, 2000, yes.  I apologize.
12      Q.    And then June 3rd, 2016, was the
13  date that the Court ordered you released on
14  your own recognizance.  And my question to you
15  was did you get, in fact, released on that
16  date?
17      A.    I don't recall if that's the -- I
18  know I was released.  I don't recall the date.
19  If that's what it states, then -- I don't
20  recall.
21      Q.    So you served 15 years, 9 months,
22  and 6 days?
23      A.    I know it was just under 16, I think
24  it was.  I don't -- I would have to do the

182

1  math.
2      Q.    And it appeared from a motion filed
3  in June of 2016 that you had filed to apply
4  jail credit to the sentence on the 2002
5  conviction of assault and battery on a
6  corrections officer?  What was your sentence
7  for that assault and battery on a corrections
8  officer?
9      A.    That was my on and after, I think.
10  Is that correct?
11      Q.    I'm sorry, what?
12      A.    Was that the on and after?  Like --
13  or they combined it?  Or I don't remember what
14  they did with it.
15      Q.    Do you not recall what your sentence
16  was?
17      A.    On -- I don't know if we're talking
18  about the same thing is what I'm saying.
19      Q.    Did you have other sentences issued
20  while you were incarcerated --
21      A.    That's what I was asking.  Are you
22  talking about the sentence of my on and after
23  while I was doing time?  If that's when you're
24  talking about?

183

1      Q.    Okay.
2      A.    Okay.  I think it was one to
3  one-and-a-half years, something like that.
4      Q.    Were you granted that motion to
5  apply jail credit?
6      A.    To the best of my knowledge, yes.
7      Q.    So that one to one-and-a-half years,
8  was that your only conviction resulting from
9  incidents while you were incarcerated?
10      A.    To the best of my knowledge, yes.
11      Q.    Do you allege that you have damages
12  in any way from your arrest and prosecution?
13      A.    Yes.
14      Q.    And what are those damages?
15      A.    Still unknown.  They -- it evolves.
16  I find new stuff out all the time.
17      Q.    How is it that you have damages that
18  you're still unknown -- that are still unknown?
19      A.    A lot of mental issues.
20      Q.    What mental issues do you claim are
21  as a result of this incident?
22      A.    I don't know proper terminologies of
23  things.  I just know I'm very messed up from
24  what happened to me.

184

1      Q.    You claim that you are messed up
2  from this incarceration for the 15 years?
3      A.    Yeah.  Mentally, yeah, I think I am,
4  yes.
5      Q.    Do you have an expert opinion that
6  says it's as a result of the incarceration for
7  15 years?
8      A.    I know when I was incarcerated I
9  seen a lot of, lot of mental health.  I was
10  diagnosed with a bunch of things in there due
11  to the results of what I was going through and
12  the excessive punishment and beatings I've been
13  through, through the correctional officers and
14  all the segregation time I did.  My mentality
15  changed drastically because of this.
16      Q.    What diagnosis resulted from your
17  incarceration?
18      A.    From when I seen mental health, you
19  mean?
20      Q.    What diagnoses, mental health
21  diagnoses -- you just said you were diagnosed
22  with a bunch of conditions.  Which ones do you
23  attribute to your incarceration?
24      A.    While I was incarcerated I seen

185

1 mental health.  You could refer to the records.
2 I don't recall exactly the diagnosis I had.
3 There was more than one, I know that.  There
4 were several actually, I think.  I know I
5 suffered severe depression.  I know I
6 contemplated suicide a lot.  I know I was
7 extremely high anxiety.  I know I was kind of
8 scared all the time just from the beatings I
9 was getting from the cops.  I'd hear a door
10 open, I'd be in bed sleeping and the door would
11 open, I don't care, I would jump out of bed
12 waiting for them to run in on me.  That
13 happened for years.
14        They used to run in my cell three
15 times a week for up to six years this happened.
16 Random times, not three times a week every
17 single week, but that did happen.  I got gassed
18 a lot even though I have asthma and legally
19 they ain't supposed to gas you.  I got gassed
20 for yelling out of my door.  The physical and
21 mental abuse I suffered while I was
22 incarcerated was -- it messed me up.
23        Q.    Were you diagnosed with any mental
24 health conditions prior to your incarceration

186

1 in August of 2000?
2        A.    No.  Not that I know of.
3        Q.    Weren't you, in fact, on suicide
4 watch at the Worcester County House of
5 Corrections as early as 1995?
6        A.    I think I did go on suicide watch
7 once.
8        Q.    What led to that suicide watch in
9 1995?
10        A.    I was just messing with the cops
11 basically.
12        Q.    So it wasn't actually that you were
13 suicidal in 1995?
14        A.    No.  Then I was not suicidal.  But I
15 did call for a suicide watch just to aggravate
16 the officers because they would have to sit
17 there and watch me the whole time.
18        Q.    Did you report being suicidal at any
19 other time during the times you were
20 incarcerated to corrections officers?
21        A.    Prior to being incarcerated?  Is
22 that what you said?
23        Q.    At any other time when you were
24 incarcerated.

187

1        A.    Which incarceration?
2        Q.    Any time you were incarcerated did
3 you report to corrections officers that you
4 were suicidal?
5        A.    I'm just trying to be clear.  Are
6 you talking about this time period or other
7 time periods or all of the time periods?
8        Q.    During all the times you were
9 incarcerated.
10        A.    I don't recall.  I don't think so,
11 but I don't recall.  That's not something you
12 really admit to.
13        Q.    Were you on suicide watch at a
14 correctional facility at any other point in
15 time besides 1995?
16        A.    I don't recall.
17        Q.    Did you ever try to harm yourself
18 while you were incarcerated at any point in
19 time?
20        A.    Define "Try" please.
21        Q.    Did you ever try to harm yourself
22 because of suicidal thoughts during the time
23 you were incarcerated?
24        A.    None that was reported.  I did

188

1 swallow a bunch of pills one time.
2        Q.    And when was that?
3        A.    While I was in segregation during
4 that six-year period when I was getting
5 tortured.
6        Q.    What six-year period?
7        A.    I don't know.  I don't know if it
8 was exactly six years, it's just -- I'm going
9 to say probably from 2004 to 2009, so maybe
10 around five-year period I guess.  I don't know.
11        Q.    Were you put on suicide watch
12 because of that incident?
13        A.    Never reported it.
14        Q.    Did you have to get medical
15 attention because of swallowing pills?
16        A.    No.  I don't know if I had to.  I
17 didn't.  Probably should have.
18        Q.    Did you ever have a medical
19 professional diagnose you with severe
20 depression?
21        A.    I don't recall what they diagnosed
22 me with.  I think they did, but I don't know.
23 I don't.
24        Q.    When did you first treat for severe

189

1  depression?
2      A.      When did I what?
3      Q.      When did you first seek treatment
4  for severe depression by a mental health
5  professional?
6      A.      I don't recall the first time I
7  started seeing them.
8      Q.      Were you prescribed any medications
9  as a result of depression?
10     A.      I was prescribed a lot of various
11 medications over the time.  I don't remember
12 what or what they were for or what they went
13 with.
14     Q.      Did you have any mental health
15 professional diagnose you with high anxiety?
16     A.      To the best of my knowledge, yes, I
17 think so.  I can't remember what they exactly
18 diagnosed me with.
19     Q.      And do you recall when you had that
20 diagnosis?
21     A.      No.  It would all be in my
22 Department of Corrections medical records.
23     Q.      Did you see any particular mental
24 health provider for anxiety or depression?

190

1      A.      What do you mean "particular"?
2      Q.      Is there one person or a select few
3  that you treated with for severe depression and
4  anxiety?
5      A.      It's prison.  You don't -- you see
6  whoever they give you.
7      Q.      Did you see mental health
8  professionals at every institution that you
9  stayed at during your incarceration during
10 your -- the time at issue?
11     A.      I don't recall.  I know I seen them
12 at Walpole a lot.
13     Q.      Did you see a particular person in
14 Walpole?
15     A.      It's prison.  Whoever they give you.
16 It's random.  People quit, people get fired,
17 people move on.
18     Q.      So the answer is no, then.
19     A.      I've seen random people.
20     Q.      And it's your allegation that you
21 received random beatings from correctional
22 officers?
23     A.      It's not my allegation.  It's a
24 fact.

191

1      Q.      Okay.  And that you spent many years
2  in solitary confinement?
3      A.      Many.
4      Q.      Wasn't that time spent in solitaire
5  confinement, though, as a result of your own
6  behavior?
7      A.      Yeah.  Due to the -- to this
8  incarceration, yeah; due to the false
9  accusations; due to going in prison for
10 allegedly raping somebody; due to -- it's
11 prison.  They don't treat those type of crimes
12 easily.  And if you got to deal with a lot of
13 stuff with the cops, with the inmates, you've
14 got to worry about getting stabbed, raped,
15 fights, people trying to get over on you,
16 taking advantage of you.  And I just wasn't
17 that type where I would let that happen.  And
18 every time it came up, I fought.  I fought my
19 ass off for everything I did.  I had a lot of
20 anger in me due to this.  I still do.
21     Q.      And in fact, you had over -- well,
22 in a transfer report from Souza Baranowski to
23 Norfolk, in August of 2013, that transfer
24 report said you at that time had had over 200

192

1  discipline reports?
2      A.      Probably.
3      Q.      How many total discipline reports
4  did you have during your incarceration?
5      A.      Who knows.  I've had so many, I lost
6  count.
7      Q.      And at that time in 2013 you had 12
8  reports for fights and assaults.  Did you have
9  more by the time you left?
10     A.      Is that against COs or against
11 inmates?
12     Q.      It said reports for fights or
13 assaults.
14     A.      I mean, I only got in a few fights
15 with other inmates while I was in there.  Every
16 one of my altercations were officers running
17 around telling me I'm a rapist or trying to get
18 me hurt or just talking down to me in certain
19 ways, certain situations.  They just have a
20 very good way of mentally torturing you in
21 there if they think you're one of them type of
22 people that have raped or done something to
23 somebody.  And I just never stood by it; I
24 never stood up to it.  I just didn't care.  I

193

1  didn't care. I wasn't letting anybody take
2  advantage of me and I wasn't -- like I said, I
3  had so much anger in me I would just fight and
4  that was it. I didn't care.
5      Q.    So it's your position that the
6  reports for assaults and fights were provoked
7  by conduct on the part of the corrections
8  officers?
9      A.    If the charges you're talking about,
10  the discipline reports you're talking about,
11  are against officers, yeah. Yeah. Every time
12  I got in an argument with officers it was
13  because they provoked me. And it happened a
14  lot.
15      Q.    Well, in fact in June of 2002, you
16  were actually -- that was the time you were up
17  on criminal charges for assaulting three
18  corrections officers; isn't that right?
19      A.    Uh-huh (affirmative response). Yes.
20  I don't remember the date, but I know what
21  you're talking about.
22      Q.    And did you plead guilty to that?
23      A.    I just got sentenced to 20 years for
24  something I didn't do. What did I care about

194

1  that charge?
2      Q.    So you did plead guilty to that
3  charge.
4      A.    Yeah. I just got sentenced to 20
5  years. What was another year at that point?
6  It didn't matter regardless of what the
7  incident -- I was cuffed and shackled at the
8  time. How can I assault anybody? I'm belly
9  chained, cuffed and shackled and I assaulted
10  three officers. They beat the crap out of me
11  that day and then they turned around and said I
12  assaulted them and I was chained down for eight
13  hours afterwards and then I got sentenced to 20
14  years. So what does it matter?
15      Q.    Well, you were sentenced for 12 to
16  20 years.
17      A.    20 years. I got sentenced for 20
18  years, yes.
19      Q.    Did you ever consider that you might
20  get out if you -- earlier on the lower end of
21  that if you --
22      A.    Nope.
23      Q.    -- if you had good behavior?
24      A.    No because in the state of

195

1  Massachusetts unless you admit your crime, you
2  ain't getting out no matter how good of an
3  inmate you are.
4      Q.    Well, in fact, you added time on to
5  your sentence with that assault on the three
6  corrections officers sentence, right?
7      A.    That was while I was awaiting trial.
8      Q.    And that was for one year to
9  one-and-a-half years.
10      A.    Yeah. Like I said, I just got
11  sentenced to 20 years, what's another year
12  going to matter? It doesn't matter at that
13  point.
14      Q.    Well, in one of the first incidents
15  that your discipline reports show is in January
16  of 2002 when you assaulted another inmate over
17  a week. Do you recall that incident?
18      A.    Probably did happen. I don't know.
19  What are you saying --
20      Q.    So it wasn't that you just assaulted
21  corrections officers, you assaulted other
22  inmates too.
23      A.    I told you I didn't take anybody's
24  stuff. I got in altercations with inmates, but

196

1  90 percent of them were with the officers. I
2  did get in altercations with the inmates.
3  Especially in county prison. I got in more in
4  county than I did up state because that was
5  when the charges were still going on.
6          And it's hard to explain prison
7  environment, prison mentality. It's a
8  different animal. It's -- in society you can
9  call somebody a punk or a bitch and it's not a
10  big deal. You do that in prison, you're going
11  to get stabbed, somebody's going to try to put
12  a bunch of holes in you and hurt you really bad
13  or kill you. That's just the fact of how
14  prison is.
15          And when I was awaiting trial,
16  people would call me a rapist or something and
17  I either have a choice of shutting up and not
18  doing nothing, let everybody in the prison take
19  advantage of me or come at me, take my food,
20  try to rape me or whatever, or as soon as
21  somebody says something like that, I got to
22  fight. I chose to fight.
23      Q.    Well, in August of 2015 you had a
24  serious assault on Department of Corrections

197

1 staff when you injured the hand of a
2 corrections officer and refused to provide your
3 tray through a cell door food slot. Is that a
4 result of what a corrections officer did to
5 you?
6     A.     Which incident was that again?
7     Q.     August of 2005.
8     A.     Yeah. But what happened again?
9     Q.     You injured the hand of a
10 corrections officer and refused to provide your
11 tray through the cell door food slot.
12     A.     That was in Norfolk, I think? Is
13 that correct? I'm trying to answer your
14 question. I'm trying to get it down so --
15     Q.     Right. And my question is, is that
16 a result of, do you allege, a reaction to
17 conduct by the Department of Corrections
18 officer?
19     A.     Well, if it's the incident I'm
20 thinking about and it's not -- it might not be
21 the one you're talking about because you don't
22 want to tell me which one you're talking about.
23 But if it's the incident I'm thinking of, there
24 was an incident in Norfolk when it was like

198

1 Norfolk has no ventilation system really in the
2 hole -- in the segregation, and it's all steel.
3 So when it's 98 degrees outside, it's over a
4 hundred degrees inside your cell.
5         So the officers used to do is they
6 used to leave our food slots open just to get
7 airflow because if the food slot -- even with
8 your window open -- with the windows open,
9 there's no airflow at all. So everything --
10 the heat just stays there. So they try to keep
11 everything cool. They used to open the food
12 slots when they changed shifts. The next shift
13 came in and without even saying anything just
14 starting shutting food slots and everybody on
15 the tear refused to shut their food slot. It
16 wasn't just me. There was numerous people
17 involved. And what I did is there's like a peg
18 kind of or basically a metal rod sitting on the
19 outside of the cell that you lift up to close
20 the slot. And it basically locks it. It sits
21 behind it like this (indicating).
22         What I did was I just tied it up
23 with a string so they couldn't lift it up. So
24 when they came to shut my food slot, he grabbed

199

1 it quick and yanked his hand and he cut his
2 hand on that yanking it and that's what
3 happened. And the officer tried to stab me
4 with a knife.
5     Q.     During that same incident?
6     A.     Yeah because he went to pull the
7 knife out to cut it -- and you're not supposed
8 to have a knife in the prison if you're a cop,
9 but he had one -- so he went to cut the string
10 and I just put my hand over the string. And he
11 kind of like went to poke me to scare me away,
12 which he succeeded, and he ended up cutting my
13 slot and shut it and moved on.
14     Q.     Well, in May of 2006 when you
15 trashed your tier and threw human feces, what
16 was that in reaction to?
17     A.     Who knows. Probably -- is that the
18 only time that happened? Because I think it
19 happened a couple of times.
20     Q.     A couple of times where you threw
21 human feces?
22     A.     I don't recall. I don't recall if
23 it was me that threw it or somebody else that
24 threw it or -- I don't recall, to be honest

200

1 with you. Segregation is completely different
2 than prison and prison's completely different
3 than society. Segregation is -- oh, God --
4 it's just basically everybody getting --
5 becoming bat shit crazy somehow. I don't know
6 how to explain it better than that and I
7 apologize for my terminology.
8         When you're locked up for a certain
9 amount of time, you start using your mental
10 capabilities we'll call it. And then you've
11 got the officers that work in segregation are
12 the officers that they don't want in population
13 because they start a lot of problems, so they
14 keep them in segregation. And all's they do is
15 basically poke the bear all day long. Say
16 something stupid to somebody all day long or do
17 something to somebody all day long until
18 everything boils over and now the whole place
19 is -- is ripping --
20     Q.     All right. So --
21     A.     I'm still answering -- is ripping
22 out or trashing the tier or fighting or
23 throwing things or whatever. And that just --
24 that's just an everyday -- it's basically an

201

1 everyday occurrence in the hole and you've got
2 to deal with that every single frigging day.
3 And I did it for years. And my mental capacity
4 was so messed up. I don't know half the shit I
5 did.
6         Q.    So you claim that your conditions
7 caused you to, in June of 2006, to verbally
8 assault a male nurse and threaten to rape his
9 wife?
10        A.    What? I probably did verbally abuse
11 a male nurse. But I don't know about
12 threatening to rape his wife.
13        Q.    How about the multiple times that
14 you spit on corrections officers?
15        A.    Yeah, I've done that a few times.
16        Q.    How about harassing a female nurse
17 and calling her a dirty skank whore --
18        A.    Yeah, probably did that a few times,
19 too.
20        Q.    -- and filthy C word?
21        A.    Yeah, probably done that several
22 times.
23        MS. THOMPSON: Just listen -- make
24 sure she can ask the whole question.

202

1         THE WITNESS: Okay. I apologize.
2 I'm going to say that for the record I
3 apologize to you, everybody here, the mental
4 capacity that I went through and now you're
5 rehashing it. I keep it suppressed as best I
6 can and these are the issues I'm talking about
7 that I developed from prison. I try not to
8 show them. I try to hide them. But all these
9 rehashing just brings back a lot. And if I go
10 overboard, I apologize to you. I do not mean
11 to.
12        Q.    (By Ms. Quinn) Well, but before you
13 went to prison, I mean, you had a litany of
14 assaults and, you know, certainly verbal
15 altercations, domestic disputes, incidents
16 where police had to respond that were certainly
17 before your incarceration for this offense;
18 isn't that right?
19        A.    You mean during my childhood?
20        Q.    We just went over all of them in
21 '91, '94, '95, '97 --
22        A.    Uh-huh (affirmative response).
23        Q.    -- '98 several, '99 there were
24 several. Isn't it true that you had problems

203

1 with verbally assaulting people, physically
2 assaulting people prior to your incarceration?
3         A.    I had a problem with people trying
4 to bully me.
5         Q.    So in every case that you were
6 charged with assault and battery and domestic
7 dispute disturbances, it was because of other
8 people's conduct and not your own?
9         A.    No, I wouldn't say that. Some
10 things were definitely probably me just being a
11 kid and being an idiot. But there was a lot of
12 times because I'm not -- I'm a short guy, I've
13 been a short kid my whole life and you know how
14 kids are. They like to try to bully people in
15 front of other people and I wasn't the person
16 that you could bully. And then when I end up
17 doing something, I got in trouble.
18        Q.    So all of your incidents where
19 police were called because of domestic
20 disturbance with Samantha Sorenson, that was
21 because you were being bullied?
22        A.    A lot of them domestic disturbance
23 calls were unfactual and nothing happened of
24 them. There was some that -- some issues that

204

1 did result in things because I got in
2 altercations with the officers. And some
3 things just because they have to believe one
4 story or the other.
5         Q.    And her ending up with bruises on
6 her arms and back and a split lip, that was the
7 result of her bullying?
8         A.    A lot of times she did them to
9 herself. How do I describe Samantha? She was
10 very -- she -- diagnosed for years ever since
11 she was a kid as manic depressive, bipolar, I
12 think schizophrenic. She was mentally
13 diagnosed with all these things and they showed
14 it a lot of times when she didn't take her
15 medications. And she didn't take them a lot of
16 times. And especially when she started doing
17 drugs they became -- oh, God -- a lot worse.
18        Q.    Well, you also had that behavior and
19 had a drug issue prior to your arrest, right?
20        A.    Had what behavior?
21        Q.    Well, certainly problems with
22 authority; isn't that true?
23        A.    I would say I probably did have
24 issues with authority my whole life, even as a

Case 4:18-cv-10936-TSH    Document 136    Filed 09/03/21    Page 52 of 62
Deposition of NATALE COSENZA taken on MARCH 23, 2021
Sheet 52

205

1 little child.
2     Q.    And did you have ADHD, a diagnosis,
3 when you were younger?
4     A.    Yes.
5     Q.    And did you take medication for
6 that?
7     A.    I don't -- I think I took Ritalin
8 for a couple years or something. I was very
9 young at that point. I never took them in my
10 teenage years that I recall. I think it was
11 just when I was an adolescent.
12     Q.    And what does your ADHD condition
13 cause -- how does that cause you to react to --
14         MS. THOMPSON:  Objection to form --
15 sorry. Objection. You can answer.
16     A.    I don't -- can you rephrase that,
17 please?
18     Q.    (By Ms. Quinn)  Does an ADHD
19 condition impact your reaction to events or
20 things around you?
21     A.    I would say it's more I couldn't sit
22 still and concentrate so I got in a lot of
23 trouble in school from that. And because of me
24 getting in trouble, it ended up escalating into

206

1 other things.
2     Q.    Did you also have an incident in
3 2009 of exposing yourself to someone else?
4     A.    That I don't recall. I don't think
5 so. I don't remember. No.
6     Q.    Did you drop your pants in front of
7 a corrections officer and threaten to pee on
8 his boots?
9     A.    Ahh, I do remember that incident.
10 That was during a strip search actually.
11     Q.    Okay. So you agree that you exposed
12 yourself?
13     A.    He told me to pull my pants down.
14 He was strip searching me. And he was being an
15 asshole and talking a lot of stuff, so I did
16 tell him "I'll pee on your boots." But I
17 didn't expose myself; he was doing --
18 conducting a strip search.
19     Q.    The Department of Corrections filed
20 a note that you had a height of five-three, a
21 weight of 150 and a build, medium. Was that
22 consistent throughout your incarceration on
23 this charge -- these charges?
24         MS. THOMPSON:  Objection. You can

207

1 answer.
2         THE WITNESS:  Sorry about that.
3     A.    My height never changed. What was
4 the other descriptions?
5     Q.    (By Ms. Quinn)  Weight 150, build
6 medium?
7     A.    My weight definitely changed.
8     Q.    How did your weight change?
9     A.    Well, I mean, I was lifting weights
10 every day, so it increased a lot.
11     Q.    What was your weight when you first
12 went in?
13     A.    I don't recall what it was when I
14 first went in. I think that was -- I think it
15 was that actually. I don't -- I don't -- I'm
16 not positive.
17     Q.    You think it was 150?
18     A.    I don't -- I think so. I don't
19 recall. 150 -- what did you say 158?
20     Q.    150.
21     A.    Oh. I don't know. Maybe.
22     Q.    Who were your approved visitors
23 during your incarceration?
24     A.    Who -- I don't know who was

208

1 approved. I know who came to see me.
2     Q.    Did you have to get people on a list
3 to be able to see you?
4     A.    I don't recall how it worked.
5     Q.    So who did come to see you while you
6 were incarcerated?
7     A.    My father, my mother, my daughters,
8 my father, my sister, my aunt, cousins, family.
9     Q.    Did Samantha Sorenson visit you?
10     A.    I don't think so. I don't recall.
11 I don't think she could because she had a
12 criminal record.
13     Q.    Did you file grievances while you
14 were incarcerated?
15     A.    Thousands probably. I'm not saying
16 I did file thousands, I'm just saying I filed a
17 lot.
18     Q.    Did you file for -- or file
19 grievances for classifications at Department of
20 Corrections facilities?
21     A.    I filed a lot of grievances. I
22 don't recall what they were all for. A lot of
23 them were because of the abuse and everything
24 else I was dealing with.

## 209

1    Q.    What programs did you attend while
2  you were incarcerated?
3    A.    Whatever they would allow me to
4  attend.  I don't recall exactly what they were
5  all called.  I know I did almost every program
6  Norfolk had to offer.
7    Q.    Did you get any certificates as a
8  result?
9    A.    I got a lot of certificates.
10    Q.    What certificates did you get?
11    A.    I don't recall.  It would be in my
12  DOC file.
13    Q.    Did you participate in a violence
14  reduction program?
15    A.    I'm sure I did.
16    Q.    Did you complete it?
17    A.    I don't recall.  I'm sure I did.
18    Q.    So who's Kerry Hazelhurst?
19    A.    A Defendant at -- or the detective,
20  I guess, as far as I know.
21    Q.    And what do you allege specifically
22  that he did in relation to this case?
23          MS. THOMPSON:  Objection.  You can
24  answer.

## 210

1    A.    Whatever's alleged in the Complaint.
2    Q.    (By Ms. Quinn) You don't -- you
3  can't tell me off the top of your head?
4    A.    It could involve -- I don't know all
5  the specifics.
6    Q.    And who is John Doherty?
7    A.    Another Defendant in this case.  I
8  think he's a detective.
9    Q.    And what do you allege that he did
10  in relation to this case?
11    A.    Whatever the allegations are in the
12  lawsuit.
13    Q.    You don't recall what those are?
14    A.    They evolve as they go.
15    Q.    They evolve as what goes?
16    A.    As you learn more things.
17    Q.    What have you learned during this
18  case?
19    A.    You would have to refer to my
20  attorney on that.
21    Q.    You don't have a memory of what
22  you've learned about John Doherty?
23    A.    I'll use my client privilege on that
24  one.

## 211

1    Q.    Okay.  How about TJ Coakley?  Who is
2  he?
3    A.    Another Defendant in the case.  I'm
4  not sure if he's a detective or not.  I think
5  he is, but...
6    Q.    What do you allege specifically that
7  he did in relation to this case?
8    A.    Whatever is alleged in the Complaint.
9    Q.    You can't testify specifically at
10  this point?
11    A.    They evolve as they go.
12    Q.    And who is Mark Richardson?
13    A.    Another Defendant in the case.  I'm
14  not exactly sure what his position is in the
15  police department.
16    Q.    And were you present for his
17  deposition the other day?
18    A.    I think I was.  I don't recall.
19    Q.    So what do you allege that he did in
20  relation to your case?
21    A.    Whatever is alleged in the Complaint
22  and whatever evolves.
23    Q.    And who is Allan Burns?
24    A.    I think he's another Defendant in

## 212

1  the case.
2    Q.    And what do you allege that he did
3  specifically in relation to your case?
4    A.    Whatever is alleged in the Complaint
5  and whatever evolves.
6          MS. QUINN:  Can I have this marked,
7  please?
8          (Exhibit No. 12, Second Amended
9  Complaint; so marked.)
10    Q.    I'm showing you what's been marked
11  as Exhibit 12.  Do you recognize this document?
12    A.    Yes.
13    Q.    And does this document help you
14  refresh your recollection as to what you allege
15  Allan Burnes did in relation to your case?
16    A.    Would you like me to read it so I
17  can refresh my memory maybe?
18    Q.    If you need to read it, go ahead.
19    A.    Okay.
20          (The witness reviewed the
21  documents.)
22    Q.    Mr. Cosenza, I'm going to ask you a
23  couple questions.  Have you ever read this
24  document before?

Case 4:18-cv-10936-TSH    Document 136    Filed 09/03/21    Page 54 of 62
Sheet 54
Deposition of NATALE COSENZA taken on MARCH 23, 2021

213

1    A.    When it was first filed -- what year
2  was this?
3          (The witness reviewed the
4  documents.)
5    Q.    The Second Amended Complaint was
6  filed on October 21st, 2020.
7    A.    Okay.  So probably around that time.
8  I think I -- actually, I think I just briefed
9  through it at that point.  I read the first
10 Complaint when it was first filed.
11   Q.    And you didn't review it in
12 preparation for your deposition today.
13   A.    No.
14   Q.    So can you state for me specifically
15 without reading the Complaint whether you have
16 any specific facts -- know of any specific
17 facts against these Defendants that form the
18 basis of your Complaints against them
19 specifically?
20         MS. THOMPSON:  If you can answer
21 this question without revealing information --
22 without revealing any communications you've had
23 with your attorneys, you can answer it.  But
24 don't reveal any attorney-client information

214

1  when answering that question.
2    A.    I honestly would have to refer to
3  the document.
4    Q.    (By Ms. Quinn)  Does that document
5  state anything specifically with regard to the
6  conduct of John Doherty that gives rise to the
7  allegations in your Complaint?
8    A.    I don't know.  I didn't finish
9  reviewing it.
10   Q.    So you'd have to finish that --
11 reading that document in order to determine
12 that?
13   A.    I think I'm only on page eight, so.
14   Q.    Okay.  Well, we're not going to wait
15 for to you do that.  So I'll move on.
16   A.    Okay.
17   Q.    Do you believe that you were charged
18 with a crime because police had some sort of
19 bad intent?
20         MS. THOMPSON:  Objection.  You can
21 answer.
22   A.    I mean, they had some motive.  I
23 don't know what their motive would be.
24   Q.    (By Ms. Quinn)  And how do you know

215

1  they had some motive?
2    A.    Because I didn't do it.
3    Q.    Do you have any information that
4  someone else did the crimes for which you were
5  charged?
6    A.    I have no clue because I wasn't --
7  had nothing -- I wasn't in the house, I wasn't
8  in the vicinity, I don't know anything about it
9  except for what I read in documents.
10   Q.    So there's no one else specifically
11 that you allege to have committed the offenses
12 against Melissa Horgan on August 14th, 2000?
13   A.    I don't know who could have done it.
14 Could have been anybody.
15   Q.    And did the shorts introduced as
16 evidence at trial belong to you?
17   A.    The ones that were introduced at
18 trial?
19   Q.    Right.
20   A.    Absolutely not.  You mean the ones
21 that had the DNA on it that didn't match me?
22   Q.    Once again, I'm asking the questions
23 and I'm not -- it's up to you to answer them.
24         Did you ever do illegal drugs in --

216

1  when your children were present?
2    A.    Not that I know of.  I might have
3  smoked pot when they were smaller, but never
4  did any drugs in front of them.  Might have
5  drank, but that's not illegal, so --
6    Q.    If we subpoenaed your DSS records,
7  is it your belief that there would be no
8  records of any other incidents prior to the DSS
9  visit that you already spoke about?
10   A.    I have no clue.
11   Q.    As far as you can recall, though,
12 DSS was only at your residence one time and
13 then not after that?
14   A.    I have no clue.
15   Q.    Well, what's your memory?
16   A.    I don't have one.  I don't recall.
17 I know I spoke with them.  I know they came to
18 my house.  I don't know how many times, I don't
19 know if it was more than once, more than twice,
20 I don't know.
21   Q.    When you were standing outside the
22 apartment complex in the parking lot with your
23 friend Mike, where was Mr. Payton's motorbike
24 parked?

217

1    A.    I think it was next to some type of
2  shed or something, if I recall correct.  It was
3  on the other side -- his parking lot
4  building -- I think it was on the other side of
5  his parking lot side, somewhere over there.  I
6  don't recall exactly where.
7    Q.    Was it in a parking space?
8    A.    I don't think so.  I think it was
9  off a little bit off of the parking lot, if I
10 recall.
11   Q.    If I show you Exhibit 1, can you
12 point out where you first -- where you saw the
13 motorbike on that day?
14   A.    Well, I don't know if this is -- is
15 this -- when's this picture from?  Was this
16 in --
17   Q.    Are you able to show on that
18 picture?
19   A.    I don't know if this is the same
20 graphic from back then or today is what I'm
21 saying.  I don't know if things are missing, I
22 don't -- so it would depend on what the -- when
23 this picture was taken, and it doesn't -- I
24 don't think it looks the same from when I

218

1  remember it, so I don't know if it's the same
2  picture.
3    Q.    Where were you standing with Mike
4  that day in the parking lot?
5    A.    In my parking lot.
6    Q.    And you're pointing to the parking
7  lot to the south of the building?
8    A.    I don't know if it's the south,
9  north, east, west.  I know it was behind -- in
10 my parking lot in my building.
11   Q.    And from where you were standing
12 with him then could you see the motorbike?
13   A.    Not greatly.  Like I said, I don't
14 know if this is the same picture back then, if
15 things have changed.  But I would have to say
16 it would have to be around this area somewhere
17 around here (indicating), because I had a good
18 visual to that area.  So I would say somewhere
19 around there.  But like I said, I don't know if
20 this is the same picture or things have
21 changed.
22   Q.    You're saying it was in the wooded
23 area behind --
24   A.    It was like just -- no, that's --

219

1  it's like the end of this -- it's like right
2  there just off the parking lot kind of.
3    Q.    Okay.  Can you put a B where you
4  think you saw it?
5    A.    I honestly don't feel comfortable
6  marking this because I'm not a hundred percent
7  sure.  So I want it on the record that I'm not
8  a hundred percent sure this is the exact spot,
9  but this is vaguely what I think was the area.
10 I think it was right around here (indicting).
11   Q.    And you've put a --
12   A.    An X.
13   Q.    Another X next to a shed?
14   A.    If they -- yeah.  Because I remember
15 it was near a shed.  But like I said, I don't
16 know if that's a new picture and that's a
17 different shed that was there before or if it
18 moved or -- I don't know.
19   Q.    Okay.  Was it locked up when you saw
20 it?
21   A.    I was too far away to determine
22 that.
23         MS. THOMPSON:  I was just looking at
24 it.  You need to see it --

220

1         THE WITNESS:  I'm just showing you
2  what I marked.  Right there.
3    Q.    (By Ms. Quinn)  I think you
4  testified that Robert Payton was running around
5  the complex telling people that you stole his
6  bike.  Other than your girlfriend, did anyone
7  else tell you that?
8    A.    Not that I know about, remember.  I
9  think it was only her.
10        THE WITNESS:  Can I stop for a drink
11 of water, please?
12        MS. QUINN:  Sure.
13        (A brief recess was taken.)
14        THE WITNESS:  Thank you.
15        MS. QUINN:  Uh-huh (affirmative
16 response).
17   Q.    (By Ms. Quinn)  Do you claim that
18 you suffered any sexual abuse or sexual assault
19 while you were incarcerated?
20   A.    No.
21   Q.    Were you prescribed Adderall in
22 prison?
23   A.    I think so.
24   Q.    And for what conditions?

221

1    A.    Anxiety, ADD. I don't recall which
2  it was.
3    Q.    Did you take Adderall and Wellbutrin
4  for your diagnosis of ADHD?
5    A.    It could have been.
6    Q.    You're not sure?
7    A.    I don't recall what I got prescribed
8  for what. I was on numerous medications.
9    Q.    Did you try --
10    A.    I mean, that's normally what they
11  prescribe you for those things, so --
12    Q.    Did you try Ritalin also?
13    A.    I think so. I don't remember. They
14  practically experimented with different drugs
15  to see which would work and which wouldn't.
16    Q.    Did you not like the side effects of
17  Ritalin?
18    A.    I don't recall.
19    Q.    Was Adderall better than Ritalin in
20  your opinion?
21    A.    I don't think it's as strong I
22  think. I don't know. I think just my body
23  handles it better, I guess. I don't recall.
24    Q.    In your appointment with the

222

1  psychiatrist do you recall -- let's see, this
2  is in September of 2010 -- acknowledging your
3  anger issues, that you get impulsive, when you
4  get mad you just lose it and you black out for
5  a couple of seconds? Do you recall saying
6  that?
7    A.    I don't -- I remember discussing
8  about my anger issues and things like that.
9  Because of what I was going through, I was
10  extremely angry and I couldn't control them. I
11  don't recall saying anything about being --
12  about blacking out. I honestly don't recall.
13    Q.    Have you ever blacked out because of
14  getting mad and losing it?
15    A.    Nah, I wouldn't say I blacked out.
16  I would say while I was incarcerated I'd get to
17  the point with everything that was going on and
18  everything I was going through, there was no
19  thought process or breath or anything from
20  starting to get angry to completely angry. It
21  just went from zero to a hundred quickly.
22    Q.    This quotes you as saying, "I
23  blacked out for a couple of seconds, for a good
24  10 to 20 seconds, and then I could come to."

223

1    A.    I don't know if -- I don't know if I
2  did say that. I don't recall. It was years
3  ago, but I know how I got. I think that's
4  basically what would happen, is I would go from
5  zero to a hundred and I wouldn't realize what I
6  was doing until, I don't know, a few seconds
7  later, once I was into doing what I was doing.
8    Q.    And did that happen to you prior to
9  August of 2000?
10    A.    Not that I recall. I've -- I don't
11  think so. I don't think it's ever happened
12  before prison.
13    Q.    Did you have impulsivity issues
14  prior to August of 2000?
15    A.    What do you define as "impulsivity"?
16    Q.    Are you able to answer my question
17  as I've asked it?
18    A.    I'm trying to answer your question.
19  I don't understand what you mean by
20  "impulsivity". I mean, am I a spirit of the
21  moment type person? Yeah. Do I make decisions
22  as far as like, Hey, I'm going to go on
23  vacation today, let's go. Do I plan things?
24  That's a sign of impulsivity, I guess, so

224

1  that's what I mean by I do not understand your
2  question.
3    Q.    Have you had anger issues -- did you
4  have anger issues prior to August of 2000?
5    A.    I think I had anger issues my whole
6  life. Just I think it comes with growing up
7  and being bullied my whole life. I just --
8  yeah. I don't know.
9    Q.    Do you claim that the Worcester
10  police caused you emotional distress?
11    THE WITNESS: Sorry.
12    A.    Because of this wrongful conviction
13  and everything I've been through because of
14  this, yeah, I do.
15    Q.    And did you seek any treatment or
16  counselling for that condition?
17    A.    A ton while -- the whole time I was
18  in -- I mean, not the whole time, but when I
19  was in prison.
20    Q.    Specifically for your emotional
21  distress from this incident?
22    A.    Specifically for everything I was
23  going through. Everything --
24    Q.    And was the only treatment or

225

1 counselling you received in prison?
2    A.    I did see a psychologist or
3 psychiatrist very briefly when I first got out
4 down the Cape when I got out.
5    Q.    And who did you see?
6    A.    I don't -- I don't recall who it
7 was.  Like I said, I think I only seen him a
8 couple times.  They basically said, you know,
9 my mentality changed by the time I seen her
10 because it was -- my family helped me a lot
11 with getting my head back together as far as
12 getting back into reality and dealing with
13 society versus dealing with prison.  If it
14 wasn't for them, I have no clue what -- where I
15 would be mentally.
16    Q.    It was a female doctor, though, you
17 saw on Cape Cod?
18    A.    I'm pretty sure it was.
19    Q.    What town?
20    A.    It was down the Cape.
21    Q.    What town on the Cape?
22    A.    I have no clue.
23    Q.    Do you have any --
24    A.    It might have been Hyannis or --

226

1    Q.    Do you have any records at home or
2 anywhere else that would help you refresh your
3 memory on that information?
4    A.    No.  This was, what, almost five
5 years ago?  Somewhere around there?
6    Q.    Have there been any other emotional
7 traumatic events that happened to you unrelated
8 to this incident since August of 2000?
9    A.    What do you mean by that?  I don't
10 understand your question.
11    Q.    Have you lost any loved ones for
12 instance?
13    A.    Yes.  Many.
14    Q.    Have you had any other emotional or
15 traumatic events other than the loss of the
16 loved ones you've already described?
17    A.    Can you give me some examples?
18    Q.    Are you able to answer my question
19 as I've asked it?  Have you had any other
20 emotional or traumatic events other than those
21 related to this incident and other than the
22 losses of loved ones you've already discussed?
23    A.    All right.  Well, so, let me say
24 this:  As far as related to this offense you

227

1 mean --
2    Q.    I said unrelated to this offense.
3    A.    Unrelated to this offense?  Some of
4 the losses that I've suffered I equate to
5 related to this offense because you put me in
6 prison for 16 years for a crime I didn't
7 commit.  I got tortured, I got suffered, I got
8 beaten.  I wanted to kill myself at times.  My
9 parents had to raise my kids.  My dad spent
10 every dime he had.  And literally two months
11 before -- no -- February, March, April, May
12 June -- four or five months before I got out my
13 dad was diagnosed with stage four liver cancer.
14 I had to sit there and watch him die for the
15 next year and a half and I have no memories of
16 being out of prison with him.  So, yeah, do I
17 equate that as being part of what has happened
18 to me and everything I've lost?  Yes, I do.
19    Q.    So the answer is no, that all the
20 other traumatic events you claim are related to
21 this incident, not unrelated to this incident?
22         MS. THOMPSON:  Objection.  You can
23 answer.
24    A.    Can you rephrase that question?

228

1    Q.    (By Ms. Quinn)  Well, my question
2 to you was are there any other emotional or
3 traumatic events that have happened to you
4 unrelated to this incident since August of
5 2000.
6    A.    Well, are you going by your version
7 of related or my version?  Because of
8 everything I've been through, I lost my family,
9 I lost raising my daughters, I lost the life I
10 had, I don't have no memories from 16 years
11 with my dad and except for watching him die of
12 liver cancer for a year and a half, I lost my
13 son-in-law, I lost my grandparents, I have no
14 memories with them for the past 16 years.  So
15 from me, my own version of related, yeah, it is
16 related.
17    Q.    Okay.  Did you -- you mentioned that
18 your dad had to expend some amount of money.
19 And what was that for?
20    A.    Expend some amount of money?  He
21 spent every dime he had raising my daughters,
22 coming to see me, paying the -- just the phone
23 bills alone are insane in prison, and I called
24 my kids every day.  Giving me money for

229

1  canteen, kids college, whatever kids need.
2  Just raising two girls for 16 years.  He died
3  with nothing.  He should have been in Florida.
4  But because of what your City did to me, I have
5  nothing.  The only thing I have from all of
6  this is you guys basically justifying it's okay
7  to do what you did to me.
8      Q.      And your prescription for Adderall
9  in prison was stopped at some point; is that
10 right?  Do you recall that?
11     A.      Yeah.  I stopped it.
12     Q.      Why did you stop it?
13     A.      I didn't like it.
14     Q.      At some point was it stopped by the
15 prison officials because you were hoarding the
16 medication?
17     A.      I don't recall.  I might have had
18 one or two pills that I didn't take.  I think
19 that was around the time that I was not liking
20 it.
21     Q.      Did you sell those pills in the
22 institution?
23     A.      Nope.
24     Q.      Did you have visits to the parole

230

1  board during your time of incarceration?
2      A.      I think I did see them.
3      Q.      I'm sorry, what?
4      A.      I think I did see them.
5      Q.      And when did you see parole?
6      A.      I don't recall the date.  I have no
7  clue.
8          THE WITNESS:  Can we take a break
9  real quick?
10         MS. THOMPSON:  Did you answer --
11         THE WITNESS:  Yeah, I just answered
12 it.
13         (A brief recess was taken.)
14     Q.      (By Ms. Quinn)  How many times did
15 you visit the parole board?
16     A.      I think twice.
17         THE WITNESS:  I don't know if you
18 want to re-ask that because they might not have
19 heard it.
20     Q.      (By Ms. Quinn)  And when did you
21 visit the parole board?
22     A.      I don't recall.
23     Q.      Did you -- at any point were you
24 denied both times parole?

231

1      A.      Yes, I was -- ahh, yeah.
2      Q.      How much additional time did you
3  receive --
4      A.      Excuse me one second.  I think -- I
5  don't recall if I seen them twice or three
6  times.  I don't recall.
7      Q.      Each time you visited them were you
8  denied parole?
9      A.      Yes, I was denied every time.
10     Q.      Did anyone attend and speak on your
11 behalf or against you at those hearings?
12     A.      I know there was a bunch of letters
13 submitted on my behalf.  I don't recall if -- I
14 don't recall if anybody spoke against.  I think
15 there might have been a letter against or -- I
16 don't recall.
17     Q.      And who submitted letters on your
18 behalf?
19     A.      Family members.
20     Q.      Which family members?
21     A.      I don't recall.  There was several.
22     Q.      It looked like from your Department
23 of Corrections records that you received
24 additional time because of violations and

232

1  behavior in prison.
2          On April 18th, 2007, you received
3  six additional months.  Do you recall that?
4      A.      I never received any -- you can't
5  add on time unless you go to court.  So I mean,
6  are you talking about have I lost good time or
7  something like that?
8      Q.      I don't know.  What does that
9  reference to?  Can you tell me?
10     A.      Well, you can't add on time.
11     Q.      Okay.  So besides the sentence that
12 you received for assaulting corrections
13 officers, did you receive any additional time
14 on any other -- as a result of any other
15 violations or behavior?
16     A.      No.
17     Q.      So the references in April of 2007
18 to six months; May of 2007 to four months; and
19 September of 2011 to ten months, what is that
20 reference to?  Do you know?
21     A.      I have no clue.  Like I said, if
22 it's disciplinary, if it's through the DOC,
23 it's probably loss of good time.  I mean,
24 that's the only thing they could do to you.

233

1    Q.    So what is "good time"?
2    A.    When you earn good time to make your
3  sentence shorter.
4    Q.    So would it cause you to be released
5  on the earlier end of the 12 to 20 rather than
6  the later?
7    A.    Yeah.  There is no later than the 12
8  to 20.  The 12 to 20 is -- well, counting the
9  one-and-a-half on and after, so it was
10 basically a 12 to 21 and a half because they
11 add the year to it.  Whatever that set date is,
12 the set date is you can decrease it, you can't
13 increase it unless you go to court.  I mean,
14 you should know that.
15   Q.    So if there's no violation of any
16 kind and your sentence was for 12 to 20 years,
17 is it possible to get released at the 12-year
18 mark then?
19   A.    For parole.
20   Q.    You would have to be paroled in
21 order to be released at 12?
22   A.    Only way to be released.  The bottom
23 number is a parole number.  That's why you
24 sentenced me to 20 years even though it was a

234

1  12 to 20-year sentence.  12 years is only for
2  parole.
3    Q.    And do you get a written decision
4  when you're denied parole?
5    A.    I don't recall.  Probably.
6    Q.    Do you recall what any of those
7  written decisions said if you received any?
8    A.    I don't recall.  I know I was
9  denied.  I know one of them I got really good
10 marks on it, but the other one I didn't.  So...
11   Q.    To your knowledge does the parole
12 board give you a basis for the denial?
13   A.    Yeah.  I don't recall what they
14 said, though.  I mean, I recall one of my
15 hearings basically being commended telling me
16 I've done everything they asked of me to do,
17 I've done every program, I think it was based
18 strictly on because I wouldn't admit my crime
19 that they were not going to give me parole.  It
20 could have been because of I didn't have enough
21 time in or enough time away from my
22 disciplinary issues because there was -- I
23 don't know -- after 2000 -- what year was it?
24   Q.    You're speculating on what that

235

1  decision said, though, you don't actually have
2  a memory?
3    A.    I'm telling you what I think is
4  going on, so --
5    Q.    That's your memory as to what it
6  said?
7    A.    I think it was verbal.
8    Q.    Okay.
9    A.    But I know they gave me a written
10 decision, too.  I don't remember what it said.
11   Q.    And when was that that you were
12 commended?
13   A.    I was commended?
14   Q.    Yes.  That's what you just testified
15 to, right?
16   A.    During my parole hearing.
17   Q.    And when was that?
18   A.    I don't -- I don't recall.
19   Q.    Was that the last time you appeared
20 before the parole board?
21   A.    No.  The last one was the worst.
22 The last one they didn't care about nothing.
23 They basically asked me walking in the door
24 what the hell am I doing here.  That was my

236

1  parole hearing.  There was no -- how do I
2  explain?
3          The first hearing I went to it
4  was -- they were actually trying to help
5  everybody and trying to communicate like,
6  Listen, you're doing good, you know, you need
7  more time or you need this, you know, you've
8  done all the programs and they -- and actually
9  because of my first parole hearing, that's the
10 reason why I got into the welding shop because
11 they basically gave the recommendation for me
12 to do welding.
13         My first parole hearing they told me
14 everything you've done, you know, you've done
15 all the programs, we can't -- there's nothing I
16 can recommend for you to do.  Is there anything
17 we can recommend for you to help you or
18 anything you want to do?  And I basically said,
19 Yeah, you could give me parole.  They said no.
20 Is there anything inside the institution?
21         And I told them my -- I've been
22 trying to get into the welding shop for a
23 couple years now because I'd like to learn a
24 trade so I could try to do something with my

237

1  life when I get out.  And they gave me the
2  recommendation.
3      Q.     Did you have any interest in welding
4  prior to being incarcerated?
5      A.     Yeah.  I worked for a welder at one
6  point.
7      Q.     When did you work for a welder?
8      A.     Before I did sprinkler fitting.  I
9  don't remember the years, but it was before I
10 did sprinkler fitting.
11     Q.     Was it after you dropped out of
12 school at 16?
13     A.     Yes.  I've always worked in some
14 type of construction.
15     Q.     Did you ever file a complaint with
16 any other governmental agency with regard to
17 your allegations other than the lawsuits
18 against the Commonwealth and this matter?
19     A.     Repeat that, please?
20     Q.     Did you ever file a complaint with
21 any other governmental agencies with regard to
22 your allegations other than the lawsuits
23 against the Commonwealth and this case?
24     A.     Other than the allegations in the

238

1  Complaint?
2      Q.     Right.
3      A.     To the best of my knowledge, no.
4      Q.     And have you spoken with any media
5  about this case?
6      A.     Yes.
7      Q.     Who did you speak to?
8      A.     I don't know.  Whoever was there.
9  You could Google it.
10     Q.     And when did you speak to the media?
11     A.     When I -- I think when we filed the
12 lawsuit.  I'm not sure exactly.
13     Q.     Are you referring to a press release
14 at that time?
15     A.     Yes.
16     Q.     Have you ever sought assistance from
17 the Worcester police on any other matter?
18     A.     What do you mean by that?  I don't
19 understand that.
20     Q.     Have you ever called them for
21 assistance with anything?
22     A.     What do you mean "assistance"?  I --
23 very confusing.  I'm sorry.
24     Q.     Not that you know of?

239

1      A.     I don't understand your question as
2  far as "assistance".  Did I ask them to come
3  help me move my house?  I mean, I don't
4  understand what you mean.
5      Q.     Okay.  Do you have any complaints
6  regarding the way you've been treated by the
7  Worcester Police Department other than the
8  incident in this suit?
9      A.     The incident in -- just the -- for
10 me personally, I mean, I've had issues with
11 police officers with, like I said, claiming
12 I've assaulted them when they just basically
13 jump on me or whatever.  But other than that,
14 no, I don't.
15          I have a lot of family members, I
16 have a lot of friends that are Worcester police
17 officers.  I actually have one of my cousins
18 right now that's -- works for the gang task
19 force that just got found out he got stage four
20 pancreatic cancer and it's fucking killing me,
21 to be honest with you.
22     Q.     And who's that?
23     A.     Iggy Garcia.
24     Q.     Okay.

240

1      A.     And he's a -- sorry.  He's a fucking
2  great guy for this to happen to him is...
3      Q.     He's your cousin?
4      A.     Yeah.  Well, he's married to my
5  cousin.
6      Q.     Okay.
7      A.     I've known him my whole life.  I
8  grew up with him.  But...
9          I honestly hope the Worcester Police
10 Department does something because I don't know
11 what they do for people, but... 46 years old.
12     Q.     Are you friends with any other
13 police officers?
14     A.     A lot.
15     Q.     Who?
16     A.     I got cousins that are Worcester
17 police officers.
18     Q.     And who's that?
19     A.     Albie Cosenza.  Albert Cosenza.
20     Q.     Okay.
21     A.     Robert Belsito.  I mean, I don't
22 know.  I know a lot of Worcester police
23 officers.  Some of them were neighbors.  I
24 mean, I don't know if I would have been --

241

1  classify them as friends or just acquaintances
2  or people that knew me growing up. Some people
3  I grew up with are friends of officers now.
4      Q.    Have you discussed this lawsuit with
5  any of the Worcester police officers that you
6  knew?
7      A.    Not in detail, just that I'm in the
8  middle of one. I don't want to bring them
9  involved in it.
10      Q.    Have they made any comments back to
11  you?
12      A.    Nope.
13      Q.    Have you talked to anyone else
14  within the City of Worcester about this lawsuit
15  other than with our office?
16      A.    Say that again?
17      Q.    Have you talked with anyone else
18  about this lawsuit within the City of
19  Worcester --
20      A.    Within the city? I mean, I live in
21  the city.
22      Q.    An agent or an employee of the City
23  of Worcester other than --
24      A.    Oh, no, I haven't.

242

1      Q.    -- the law office.
2      A.    I'm going to say this for the
3  record. I have a lot of respect for the police
4  departments, even with what I've been through.
5  Like I said, I have family members that are
6  officers; I have -- a lot of my dad's family
7  friends were police officers. I know a lot of
8  them. I just look at it as like there's bad
9  apples in everything and shit happens and it's
10  just fucked up what people get away with. But
11  it doesn't reflect on the entire department.
12  It shouldn't reflect on the entire department.
13      Q.    Are you aware of the photo array
14  that Sergeant Hazelhurst prepared after talking
15  with your father?
16      A.    I'm aware of it.
17      Q.    And how are you aware of it?
18      MS. THOMPSON: If you can answer
19  that question without revealing any
20  communications with your counsel, you can
21  answer the question. But don't reveal any
22  attorney-client information.
23      Q.    (By Ms. Quinn) Are you able to
24  testify without revealing attorney-client --

243

1      A.    No.
2      Q.    Did your father ever tell you at any
3  point in time that he had spoken with Worcester
4  police officers?
5      A.    I don't recall.
6      MS. QUINN: I have no further
7  questions. Do you have anything?
8      MS. THOMPSON: We'll reserve
9  signature.
10      MS. QUINN: Thank you for your time.
11      MS. THOMPSON: Thanks.
12      (The deposition was concluded at
13  4:48 p.m.)

244

1              ERRATA SHEET
2
3          In accordance with the rules of
procedure governing depositions, you are
entitled to read and correct your deposition.
4  Accordingly, please carefully read your
deposition and, on this errata sheet, make any
5  changes or corrections in form or substance to
your deposition that you feel should be made.
6  PLEASE DO NOT MARK THE TRANSCRIPT. After
completing this procedure, sign at the
7  conclusion of such changes/corrections (if any)
and return it in accordance with your
8  instructions.
9  PAGE LINE CHANGE        REASON
10  ____/ ____/ _____/ _____
11  ____/ ____/ _____/ _____
12  ____/ ____/ _____/ _____
13  ____/ ____/ _____/ _____
14  ____/ ____/ _____/ _____
15  ____/ ____/ _____/ _____
16  ____/ ____/ _____/ _____
17  ____/ ____/ _____/ _____
18  ____/ ____/ _____/ _____
19  ____/ ____/ _____/ _____
20  ____/ ____/ _____/ _____
21  ____/ ____/ _____/ _____
22  ____/ ____/ _____/ _____
23
24  DATE:        _____

Deposition of NATALE COSENZA taken on MARCH 23, 2021

245

1    Excerpt from Rule 30 (e):

2        Submission to Witness; Changes; Signing.
     When the testimony is fully transcribed, the
3    deposition shall be submitted to the witness
     for examination and shall be read to or by
4    him/her, unless such examination and reading
     are waived by the witness and by the parties.
5    Any changes in form or substance which the
     witness desires to make shall be entered upon
6    the deposition by the officer with a statement
     of the reasons given by the witness for making
7    them.  This procedure must be accomplished
     within 30 days of receipt of the transcript.

8        *****************************************

9

10       I have read the foregoing, and it is a true

11   transcript of the testimony given by me at the

12   taking of the subject deposition.

13

14

15

16                    _____
                          NATALE COSENZA

17

18

19

20

21       _____
22   DATE

23   CASE NAME:  Cosenza vs. City of Worcester et al
     DATE TAKEN:  March 23, 2021
24

246

1    COMMONWEALTH OF MASSACHUSETTS
     WORCESTER, SS.
2
             I, Julie A. Zaveloff, Registered
3    Professional Reporter and Notary Public in and
     for the Commonwealth of Massachusetts, do
4    certify that pursuant to appropriate notice of
     taking deposition, there came before me the
5    following-named person, to wit:  **NATALE
     COSENZA**, who was by me duly sworn; that he was
6    thereupon examined upon his oath and his
     examination reduced to writing by me; and that
7    the deposition is a true record of the
     testimony given by the witness.
8
             I FURTHER CERTIFY that I am neither
9    a relative nor employee of nor counsel for any
     of the parties, or a relative or employee of
10   such counsel or attorney, nor am I financially
     or otherwise interested either directly or
11   indirectly in the outcome of the action.

12           IN WITNESS WHEREOF, I have hereunto
     set my hand this 23rd day of April 2021.
13

14           _____
15           Julie A. Zaveloff, RPR
             and Notary Public
16

17   My Commission Expires:  May 20, 2022
18

19

20   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
21   DOES NOT APPLY TO ANY REPRODUCTION AND/OR
     DISTRIBUTION OF THE SAME IN ANY RESPECT UNLESS
22   UNDER THE DIRECT CONTROL AND/OR DIRECTION OF
     THE CERTIFYING REPORTER.
23
24