## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NATALE COSENZA )
)
VS. )
)
CITY OF WORCESTER, Mass, KERRY )
HAZELHURST, JOHN DOHERTY, T.J. )   C.A. 18-40936-TSH
COAKLEY, MARK RICHARDSON, ALLAN )
BURNES, DANIEL BENEDICT, BRIAN )
DONOHUE, ROBERT TURGEON, DAVID )
GRADY, DARLENE ROCHEFORD and )
AS-YET UNKNOWN WORCESTER POLICE )
OFFICERS )

DEPOSITION OF MELISSA A. HORGAN, taken at the request of the defendants pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure before Susan R. Kenney, a Notary Public in and for the Commonwealth of Massachusetts, on March 30th, 2021, via Zoom and audiovisual recording, commencing at 10:08 A.M.

BAY STATE REPORTING AGENCY
69 BRAEBURN LANE, ASHLAND, MA  01721
(508) 753-4121

## Page 2

A P P E A R A N C E S :

FOR THE PLAINTIFF:
LOEVY AND LOEVY
311 N. Aberdeen Street, 3rd Floor
Chicago, Illinois  60607
  BY:  GAYLE HORN, ESQ.
        IMANI FRANKLIN, ESQ.

FOR THE DEFENDANTS:
CITY OF WORCESTER LAW DEPARTMENT
455 Main Street, Room 301
Worcester, Massachusetts  01608
  BY:  WENDY L. QUINN, ESQ.
        KEVIN M. GOULD, ESQ.

FOR THE DEPONENT:
HEINLEIN, BEELER, MINGACE & HEINEMAN, P.C.
276 Union Avenue
Framingham, Massachusetts  01702
  BY:  CHRISTOPHER H. MINGACE, ESQ.

ALSO PRESENT:  PATRICK BLASKOPF, VIDEOGRAPHER

## Page 3

I N D E X

DEPONENT:  MELISSA A. HORGAN

PAGE
EXAMINATION BY MS. QUINN          5
EXAMINATION BY MS. HORN          83

EXHIBITS

NUMBER                                    PAGE
1    Photograph                          94
     Plaintiff 001511-001512

2    Photograph                          95
     Plaintiff 001515-001516

3    Photograph                          97
     Plaintiff 001517-001518

4    Photograph                          99
     Plaintiff 001519-001520

5    Intentionally left blank            --
     (no exhibit marked)

6    Incident report by Officer         113
     Benedict dated 8/14/00
     Cosenza 000200-000202

7    Incident report by Detective       147
     Hazelhurst dated 8/15/20
     Cosenza 000178-000180

8    Incident report by Detective       176
     Hazelhurst dated 2/20/01
     Cosenza 00175-000176

## Page 4

THE VIDEOGRAPHER:  We are now on the record.  The date today is March 30th, 2021 and the time is approximately 10:08 A.M.  This is the video recorded deposition of Melissa Horgan being taken in the matter of Natale Cosenza versus City of Worcester, et al.  Case number 18-40936-TSH.  This matter is being heard in the U. S. District Court for the District of Massachusetts.  The deposition is being held remotely.

My name is Patrick Blaskopf.  I am a legal videographer representing The Varallo Group.  The court reporter is Susan Kenney with Bay State Court Reporting.  At this time counsel will introduce themselves and the parties they represent and afterwards our court reporter will swear in the witness and then we can proceed.

Counsel?

MS. QUINN:  Good morning.  My name is Wendy Quinn.  I represent the defendants in this matter, the City of Worcester and the Worcester police officers who are named as defendants, and I'll be taking the deposition to start.

MR. GOULD:  Good morning.  Kevin Gould, also for the defendants.

Pl. Exhibit 3

5

1    MS. HORN:  Good morning.  Gayle Horn,
2  H-O-R-N, on behalf of the plaintiff.
3    MR. MINGACE:  And good morning.
4  Christopher Mingace on behalf of Melissa Horgan,
5  the deponent.
6    MELISSA A. HORGAN, having been
7  satisfactorily identified by the production of
8  her Massachusetts driver's license, and duly
9  sworn, was examined and testified as follows:
10  EXAMINATION BY MS. QUINN:
11    Q.  Good morning, Ms. Horgan.
12    A.  Good morning.
13    Q.  As you just heard, my name is Wendy
14  Quinn.  I represent the City of Worcester and the
15  Worcester police officers who are named as
16  defendants in this matter.
17    Would you please state your name for
18  the record?
19    A.  It's Melissa Horgan.
20    Q.  And, Ms. Horgan, what is your date of
21  birth?
22    A.  ████████
23    Q.  And may I ask, what is your age today?
24    A.  Oh, Lord, you'd have to ask me that.

6

1    Q.  Is it 58, if I do my math correctly?
2    A.  It will be.
3    Q.  Okay.  And your age at the time of the
4  incident that we're here for to talk about today
5  on August 14th, 2000, I believe --
6    A.  20; right?  2000, so that would be --
7    Q.  2000.  I think it was 36; is that?
8    A.  Thereabout.
9    Q.  Okay.  Have you ever been deposed
10  before in this situation where there's a court
11  reporter here taking down your testimony?
12    A.  No.
13    Q.  Okay.  Just to go over a few things
14  then, some ground rules and just the procedure
15  here today.
16    A.  Uh-huh.
17    Q.  Obviously, we have a court reporter
18  here who is taking down a written transcript.
19    A.  Okay.
20    Q.  And because this is remote, we'll have
21  to be very careful to not talk over each other,
22  so this is a situation where you will also have
23  to keep your responses verbal.  So I will ask a
24  question and you'll do your best to respond

7

1  without talking over me and with verbal responses
2  so you just can't shake or nod your head, and you
3  otherwise have to just articulate what your
4  response to that is.
5    If at any point you can't understand my
6  question or you can't hear me, please let me know
7  that.  Okay?
8    A.  Okay.
9    Q.  And if at any time you need to take a
10  break, please let me know that as well.
11    A.  I will.
12    Q.  I appreciate you taking the time out of
13  your day to do this with us today.  If at any
14  time you have any difficulties, please let us
15  know that, too.
16    If you, you know, have any problems
17  seeing or hearing us, I know this is a remote
18  deposition on video so it makes it a little more
19  difficult for that, but please let us know if
20  there are any issues.  Okay?
21    A.  I will.
22    Q.  Is there anything about giving your
23  testimony today that would prevent you from being
24  inaccurate about your testimony?

8

1    A.  No.
2    Q.  That would prevent you from being
3  accurate, I should say.
4    A.  No.
5    Q.  Okay.  Thank you.  Are you sufficiently
6  comfortable today?  I know this isn't a great
7  process but...
8    A.  Yes, fairly comfortable.
9    Q.  Okay.  Did you review any documents in
10  order to prepare for today?
11    A.  I did.
12    Q.  And which documents did you review?
13    A.  I reviewed my testimony.
14    Q.  And what testimony was that that you
15  reviewed?
16    A.  The testimony that I gave in, I believe
17  it was 2001, by the time it went to court.
18    Q.  Did you review your trial testimony or
19  did you review testimony from other hearings?
20    A.  No, just my trial.
21    Q.  Just your trial.  Okay.  And did you
22  look at any of the reports?
23    A.  My initial report, yes.
24    Q.  And was that a witness statement that

9

1  you gave to the detective?
2      **A.**  I guess, I am not really sure what that
3  means.
4      **Q.**  Was it a question and answer kind of --
5      **A.**  Yes.
6      **Q.**  -- format?  Okay.  Did you speak with
7  anyone other than your attorney to prepare for
8  today?
9      **A.**  No.
10      **Q.**  Were you contacted by anyone
11  representing the plaintiff, Natale Cosenza, in
12  this matter?
13      **A.**  No.
14      **Q.**  What is your current address?
15      **A.**  ████████████████████
16  ██████████████████████████.
17      **Q.**  Is that a single-family residence?
18      **A.**  It is.
19      **Q.**  How long have you resided there?
20      **A.**  Since 2007.
21      **Q.**  Are you currently employed?
22      **A.**  I am.
23      **Q.**  And where do you work?
24      **A.**  I work at Herb Chambers Toyota in

10

1  Auburn, Massachusetts.
2      **Q.**  And how long have you worked there?
3      **A.**  24 years.
4      **Q.**  Were you employed there in August of
5  2000?
6      **A.**  I was.  I am.
7      **Q.**  And what hours do you work there; at
8  present, I should say?
9      **A.**  Currently it's about 6:30 to 3:30.
10      **Q.**  And is that weekdays or do you work on
11  the weekends as well?
12      **A.**  That's Monday through Thursday.
13      **Q.**  And what hours did you typically work
14  in August of 2000?
15      **A.**  It probably was more like 8:00 to 4:00.
16      **Q.**  Was that Monday through Thursday as
17  well or did you have different days of the week?
18      **A.**  That was Monday through Friday at the
19  time.
20      **Q.**  And how far did you go in school?
21      **A.**  High school.
22      **Q.**  Where did you graduate from?
23      **A.**  North High School in Worcester.
24      **Q.**  And what was your address at the time

11

1  of the incident on August 14, 2000?
2      **A.**  It was -- it was on Grafton Street, it
3  was a condo.  I think it was 1197, the building
4  number.
5      **Q.**  And that was the Twin Oaks
6  Condominiums?
7      **A.**  That is correct.
8      **Q.**  And do you remember your unit number?
9      **A.**  Offhand, I don't.  I was on the fourth
10  floor, I know that.
11      **Q.**  Was it 63D?
12      MS. HORN:  Object to form.
13      **Q.**  Does that refresh your memory?
14      **A.**  It does but I can't recall.
15      **Q.**  Okay.  And how long did you live at
16  that unit on Grafton Street?
17      **A.**  A little over a year.
18      **Q.**  Do you recall when you moved in?
19      **A.**  I do.
20      **Q.**  And what month and year was that that
21  you moved in?
22      **A.**  Oh, gosh, it was -- I really don't
23  recall the exact time, I know it was warm-ish
24  out, you know, spring-ish, maybe.  I'm not really

12

1  sure.
2      **Q.**  And that would have been in 1999 then?
3      **A.**  Yes.
4      **Q.**  And you said that that unit was located
5  on the fourth floor of that building?
6      **A.**  That is correct.
7      **Q.**  Was it a two bedroom unit?
8      **A.**  It was.
9      **Q.**  And did you own that unit?
10      **A.**  I did not, I sublet.
11      **Q.**  And who did you sublet from?
12      **A.**  I don't know the owner's name, I don't
13  recall.
14      **Q.**  Okay.  So did you pay rent to the owner
15  then?
16      **A.**  I did.
17      **Q.**  Did you live in that unit with anyone?
18      **A.**  My niece and her daughter.
19      **Q.**  And what was your niece's name?
20      **A.**  Emily.
21      **Q.**  And what was Emily's last name?
22      **A.**  Banks.
23      **Q.**  Did she live with you the entire time
24  you lived in that condominium unit?

13

1   **A.** Yes.
2   **Q.** And how old was her daughter at the
3   time in August of 2000?
4   **A.** Oh, a year maybe.
5   **Q.** She was a baby?
6   **A.** Yes.
7   **Q.** Okay. And the building located at 1197
8   Grafton Street, where was that located within the
9   complex itself, if you're pulling into the drive
10  from Grafton Street?
11  **A.** It would be the first building on the
12  corner so at the intersection, the first
13  intersection, so it was right on the corner.
14  **Q.** Was there --
15  **A.** So when you walked -- when you drove
16  in, there was, like, an intersection, there was
17  parking on one side and then there was parking in
18  the back where we parked.
19  **Q.** Okay. So was it the second building in
20  on the left?
21  **A.** Yes.
22  **Q.** Okay. And were there balconies on both
23  sides of the building?
24  **A.** There was.

14

1   **Q.** And on one side was there a common
2   balcony through which you could gain access to
3   the units on that floor?
4   **A.** Yes.
5   **Q.** Do you know how many floors were in
6   that apartment building then?
7   **A.** There could have been five, I'm not --
8   I don't recall.
9   **Q.** Okay. Do you know how many apartments
10  on each floor?
11  **A.** Two.
12  **Q.** I'm sorry, what?
13  **A.** Two.
14  **Q.** So within the unit itself, was there a
15  balcony -- was there more than one balcony?
16  **A.** There were two balconies that looked
17  over the parking lot, one was the bedroom and the
18  living room.
19  **Q.** Okay. On one side was there a private
20  balcony?
21  **A.** There was a private balcony which we
22  accessed.
23  **Q.** Okay. And was that private balcony
24  connected to a room within that apartment?

15

1   **A.** No, that was on the outside of the
2   apartment.
3   **Q.** So how would you access that balcony,
4   that private balcony?
5   **A.** If I walked out my door and took a
6   left, that's where that balcony would be. So it
7   was outside the building -- outside the building.
8   Not outside the building but on -- inside the
9   building but it was a balcony that if you walked
10  out the door and went to the left, there was a
11  balcony there.
12  **Q.** Was there a slider door within your
13  unit to that private balcony?
14  **A.** No.
15  **Q.** Oh, okay. Was it out your -- the front
16  door to the building?
17  **A.** Correct.
18  **Q.** I mean, to your unit?
19  **A.** Yes.
20  **Q.** Okay. And was there also a balcony
21  that you accessed through a slider door within
22  your apartment building -- unit?
23  **A.** Yes, that was the living room and the
24  bedroom.

16

1   **Q.** And was that balcony accessible through
2   one of the bedrooms and the living room as well?
3   **A.** Correct.
4   **Q.** Okay. Where was the slider -- was it a
5   slider door to that balcony?
6   **A.** Yes.
7   **Q.** And where was that slider door located?
8   **A.** For which balcony?
9   **Q.** For the common access balcony.
10  **A.** There wasn't a slider, it was a door.
11  **Q.** Okay.
12  **A.** You'd walk out the front door and go to
13  the left and there was a balcony there, which two
14  units would share for storage.
15  **Q.** Okay. And could you -- once you were
16  on that common balcony, did it also have access
17  to other units on the floor?
18  **A.** No.
19  **Q.** Was there a staircase on either end of
20  that balcony?
21  **A.** No, just the center.
22  **Q.** I'm sorry?
23  **A.** Just in the center to go down to the
24  door at the bottom.

17

1    **Q.** To go down to another floor?

2    **A.** Yes.

3    **Q.** Okay. And so in your -- in your

4    bedroom, --

5    **A.** Yes?

6    **Q.** -- was there a window in your bedroom?

7    **A.** No, mine had the slider to the balcony.

8    **Q.** Okay. And that balcony that was

9    accessed through the slider in your bedroom, was

10   that a common balcony?

11   **A.** No.

12   **Q.** That was the private balcony?

13   **A.** Yes, that was just for the people in

14   the condo, in each condo section. So if I was in

15   my condo, then -- if I was in the living room,

16   there was a slider there; I could go out there

17   and there was a balcony there. In my bedroom was

18   another slider with a balcony there.

19   **Q.** And did Emily's bedroom have a window

20   in it?

21   **A.** It did.

22   **Q.** And what did that window open on to?

23   **A.** That would have been the enclosed

24   balcony that if you went out the front door and

18

1    took a left, so that was the common -- it was a

2    common balcony so you could store things there.

3    **Q.** Okay. And that was the balcony off

4    Emily's bedroom window that had access to other

5    floors of the building?

6    **A.** That is correct.

7    **Q.** And was there a transformer box beneath

8    the side of the building with the common

9    balconies on the first floor, on the ground?

10   **A.** I remember seeing something of that

11   nature but I really didn't pay attention when I

12   was coming up the stairs, you know, coming in and

13   going up the stairs, it wasn't --

14   **Q.** Okay.

15   **A.** -- something I would have looked at.

16   **Q.** So is it safe to say you never climbed

17   on top of a transformer box to get on a first

18   floor balcony?

19   **A.** No, I did not.

20   **Q.** Did you see anyone else ever get on top

21   of that transformer box to access a first floor

22   balcony?

23   **A.** I did not.

24   **Q.** Okay. So once a person was on that

19

1    first floor common balcony, was there a way to

2    get on to other floors of the building?

3    **A.** Yes.

4    **Q.** Typically would you access the unit of

5    the building at 1197 with a key?

6    **A.** Yes.

7    **Q.** Were the exterior doors of that

8    building typically locked?

9    **A.** Yes.

10   **Q.** Did you ever know them to be broken or

11   unlocked?

12   **A.** No.

13   **Q.** Did you have a separate key then for

14   the door to your apartment?

15   **A.** I did.

16   **Q.** Would visitors who come to the building

17   typically have to be buzzed in to get through the

18   exterior door?

19   **A.** Yes.

20   **Q.** And how would that work, was there a

21   phone on the ground level?

22   **A.** There was.

23   **Q.** And would that person be able to access

24   the apartment unit they wanted to reach through

20

1    that phone?

2    **A.** If I knew someone was coming over and I

3    asked who it was.

4    **Q.** Okay. And so then would you be able to

5    activate some sort of unlock function from that

6    phone from your unit to unlock --

7    **A.** Yes.

8    **Q.** -- that secure --

9    **A.** Yes.

10   **Q.** -- door?

11   **A.** Yes.

12   **Q.** All right. Did you have multiple

13   duplicate keys to your apartment?

14   **A.** Emily had a key, that was it.

15   **Q.** Okay. Did you know any of your

16   neighbors on your floor?

17   **A.** Not really, I never -- you know, maybe

18   in passing, say hi, that's it.

19   **Q.** Okay. In August of 2000, did you know

20   a man named Robert Payton?

21   **A.** That would have probably been my

22   neighbor on the other side.

23   **Q.** Did he live next door to you to the

24   left?

21

1    **A.**  Yes.

2    **Q.**  Did you know him at all or just to say

3  hi in passing, like you said?

4    **A.**  Just hi in passing.

5    **Q.**  Okay.  Were you ever in his unit?

6    **A.**  No.

7    **Q.**  Was he ever in your unit?

8    **A.**  No.

9    **Q.**  Do you recall, in the course of the

10  investigation to this incident, Sergeant -- or

11  Detective Hazelhurst -- asking you whether,

12  during the time you lived at the apartment, if

13  you had ever experienced problems with your

14  neighbors or with anyone?

15    **A.**  I don't recall but I never had a

16  problem with anybody there.

17    **Q.**  Do you recall what your response was to

18  that question when he asked it?

19    **A.**  I don't recall.

20    **Q.**  Do you recall giving some information

21  about a neighbor who had a dirt bike stolen?

22    **A.**  I did, yes, I do remember that.

23    **Q.**  And who was that neighbor who had a

24  dirt bike stolen?

22

1    **A.**  It would have been my neighbor to the

2  left.

3    **Q.**  And that would be Mr. Payton?

4    **A.**  Yes.

5    **Q.**  When did you learn that Mr. Payton had

6  had his dirt bike stolen?

7    **A.**  I don't remember.  I should say I don't

8  recall, I mean, but he -- I know he had asked us

9  if we had seen his dirt bike anywhere and I said,

10  I've never seen a dirt bike, I don't, you know,

11  not at all.

12    **Q.**  Oh, you don't remember seeing it at any

13  point?

14    **A.**  No.

15    **Q.**  And was it prior to the incident on

16  August 14th, 2000 that you heard about the dirt

17  bikes being stolen?

18    **A.**  I don't recall.

19    **Q.**  So when you told your -- or when you

20  told the investigator, Detective Hazelhurst, on

21  August 15th, 2000 that your neighbor had had his

22  dirt bike stolen, do you know at what point prior

23  to August 15th that you had learned that

24  information?

23

1    **A.**  I don't.

2    MS. HORN:  Object to form.  Sorry.

3  Object to form.

4    **Q.**  You can go ahead and answer if you

5  understand the question.

6    **A.**  I don't recall.

7    **Q.**  Okay.  Thank you.  What, if anything,

8  do you remember then about that dirt bike being

9  stolen?

10    **A.**  I don't recall, I don't -- I really

11  couldn't elaborate on that.

12    **Q.**  Do you recall what -- did you learn

13  that information from Mr. Payton himself?

14    **A.**  I did.

15    **Q.**  And what do you remember him telling

16  you?

17    **A.**  That he -- his dirt bike was stolen and

18  he wanted to know if we had seen it, and I never

19  saw it.

20    **Q.**  Okay.  Did you, at some point, hear

21  that Natale Cosenza was connected by Mr. Payton

22  to that dirt bike being stolen?

23    **A.**  I don't recall.

24    MS. HORN:  Object to form.

24

1    **Q.**  Did Mr. Payton ever tell you about any

2  interactions he had with Mr. Cosenza regarding

3  that dirt bike?

4    **A.**  I don't recall.

5    **Q.**  Do you recall telling Detective

6  Hazelhurst that Mr. Cosenza went to Mr. Payton's

7  apartment and said he knew where it was, that he

8  needed the money upfront because he was going to

9  rehab?  Do you recall that?

10    MS. HORN:  Object to form.

11    **Q.**  Do you recall anything about that?

12    MS. HORN:  Same objection.

13    **Q.**  You should go ahead and answer whenever

14  there's an objection.

15    MS. HORN:  Yeah, so sorry, I'm so

16  sorry.

17    **Q.**  Do you recall that Mr. Cosenza went to

18  Mr. Payton's unit and said he knew where the dirt

19  bike was but that he needed the money upfront

20  because he was going to rehab?

21    **A.**  I knew that somebody came up and had

22  some interaction with him, I don't know who that

23  was.

24    **Q.**  Okay.  And did you know that just

25

1 because Mr. Payton told you that or did you
2 somehow observe that?
3    **A.** No.
4       MS. HORN: Object to form.
5    **A.** He would have told me that, I
6 wouldn't...
7    **Q.** Do you remember Mr. Payton mentioning
8 the name Natale Cosenza to you at any point?
9    **A.** I don't recall.
10   **Q.** Did you also become aware that
11 Mr. Cosenza knocked on your apartment door at
12 some point?
13   **A.** I believe Emily had called me at work
14 and was a little nervous because someone was
15 knocking on our door. I was not at home.
16   **Q.** And was that prior to August 14th,
17 2000?
18   **A.** I don't recall.
19   **Q.** What did she say about that
20 interaction?
21   **A.** I really don't recall, I just know she
22 called me frantic at work and I just told her,
23 don't open the door.
24   **Q.** And why was she frantic when she

26

1 called?
2    **A.** Well, because she didn't buzz anyone
3 up.
4    **Q.** But there was someone knocking on the
5 door?
6    **A.** Correct.
7    **Q.** Does she know how that person gained
8 access to the apartment building?
9    **A.** No, I do not, I don't recall that she
10 told me.
11   **Q.** Did at some -- did she know who that
12 person was who was knocking on the door?
13   **A.** I don't recall that she did.
14   **Q.** Did she describe the person to you?
15   **A.** No.
16   **Q.** What, if anything, did she say about
17 that interaction?
18      MS. HORN: Object to form.
19   **Q.** You can go ahead and answer if you
20 understand.
21   **A.** It was -- she didn't have any
22 interaction with him.
23   **Q.** She just -- she knew that someone was
24 knocking on the door?

27

1    **A.** Yes, and she didn't open the door, she
2 didn't buzz anyone up.
3    **Q.** Did she say what he was asking or
4 saying, if anything?
5    **A.** I don't recall.
6    **Q.** Do you recall telling Detective
7 Hazelhurst that he was knocking on the door
8 asking for money?
9       MS. HORN: Object to form.
10   **Q.** Go ahead and answer.
11   **A.** I don't recall.
12   **Q.** Okay. Do you recall, when you gave
13 that statement to Detective Hazelhurst,
14 mentioning that it was Natale Cosenza asking for
15 money?
16      MS. HORN: Object to form and
17 foundation.
18   **Q.** Do you recall that?
19   **A.** I don't.
20   **Q.** Okay. Do you know at what point you
21 learned the name Natale Cosenza?
22   **A.** That was after I had picked out his
23 photo in a lineup, a photo array.
24   **Q.** And who told you that name?

28

1    **A.** Detective Hazelhurst, and I know there
2 was someone else with him and I don't remember
3 his name.
4    **Q.** You believe that he told you that name
5 after you picked the person out of the lineup?
6    **A.** That is correct.
7    **Q.** And what did Detective Hazelhurst say
8 to you?
9    **A.** He had me look at the photo array,
10 asked me to go over it carefully. I did. When I
11 came upon his face, I got really scared and I
12 picked it out.
13   **Q.** And then did Detective Hazelhurst tell
14 you the name of the person that you had picked
15 out?
16   **A.** I don't know if -- I don't recall if it
17 was that day or it was after that day.
18   **Q.** Okay. Do you know whether, when Emily
19 was speaking to you on the phone while you were
20 at work about the man knocking on the door,
21 whether she knew Mr. Cosenza's name?
22   **A.** I don't recall.
23   **Q.** Had you or your neighbors experienced
24 any problems -- any other problems with

29

1 Mr. Cosenza that you know of?
2         MS. HORN:  Object to form, foundation.
3 You can answer.
4     **A.**  I wouldn't have -- I don't recall and
5 no one had ever said anything to me as that -- as
6 that.
7         MS. QUINN:  Counsel, I should have
8 asked at the beginning of this, are you waiving
9 all objections except to the form of the question
10 until the time of trial?
11         MS. HORN:  Is that the standard
12 practice in the District of -- yes.
13         MS. QUINN:  Yes, the usual
14 stipulations?
15         MS. HORN:  Yes.
16         MS. QUINN:  Okay.  And you agree to
17 waive notary and signing?
18         MS. HORN:  Yes.
19         MS. QUINN:  Okay.  Thank you.
20         MR. MINGACE:  That would be my option
21 but, yes, we'll waive notary and signing.
22         MS. QUINN:  Okay.  Did the witness want
23 to review the transcript?
24         MR. MINGACE:  Yes, we'll review the

30

1 transcript but we'll waive notary and signing.
2         MS. QUINN:  Okay.  Thank you.
3         MS. HORN:  So the objection -- you're
4 saying that we don't waive any objections other
5 than form; correct?
6         MS. QUINN:  Right, waive all objections
7 except as to form until the time of trial.
8         MS. HORN:  Okay.
9         MS. QUINN:  Is that agreeable?
10         MS. HORN:  Yes, no, the way it was
11 phrased, I thought you meant we were waiving all
12 of our objections but you're saying -- I hear
13 what you're saying.
14         MS. QUINN:  Okay.
15     **Q.**  Ms. Horgan, I'm going to take you back
16 then to the day of Sunday, August 13th, 2000.  On
17 that day, you were living at 1197 Grafton Street
18 in that apartment unit; right?
19     **A.**  Correct.
20     **Q.**  And you were living in that unit with
21 your niece, Emily, and her infant daughter?
22     **A.**  Correct.
23     **Q.**  Do you know what time you went to bed
24 that night?

31

1     **A.**  It was late, I had been out, midnight
2 or so.
3     **Q.**  And where had you been out, do you
4 recall?
5     **A.**  I was at one of my other niece's
6 houses.
7     **Q.**  And which niece was that?
8     **A.**  I don't recall which.  I have a big
9 family, --
10     **Q.**  Okay.
11     **A.**  -- I don't recall.
12     **Q.**  Okay.  Do you recall having dinner
13 there?
14     **A.**  I don't.
15     **Q.**  And were you drinking any alcoholic
16 beverages?
17     **A.**  I don't recall but, you know, possibly.
18     **Q.**  Okay.  Did you drive yourself home
19 from --
20     **A.**  I did.
21     **Q.**  -- your niece's house?  Okay.  So safe
22 to say you didn't drink to excess that you
23 couldn't drive home then?
24     **A.**  No.

32

1     **Q.**  Okay.  And so did you consume any other
2 illegal substances that night, by any chance?
3     **A.**  No.
4     **Q.**  Okay.  Were you scheduled to go to work
5 the next morning, Monday morning?
6     **A.**  Yes.
7     **Q.**  Did you have a phone in your bedroom at
8 the time?
9     **A.**  I did.
10     **Q.**  Was that a landline?
11     **A.**  Yes.
12     **Q.**  Was there a phone in any other room of
13 the apartment?
14     **A.**  No.
15     **Q.**  At some point did you get up from bed?
16     **A.**  I did.
17     **Q.**  And what time was that?
18     **A.**  I don't recall.
19     **Q.**  Why did you get up?
20     **A.**  Thirsty.
21     **Q.**  Did you go to get a drink from
22 somewhere?
23     **A.**  The kitchen.
24     **Q.**  And did you notice anything when you

33

1  were walking back from the kitchen?
2      A.  I noticed rain and -- through Emily's
3  window.  I should have probably checked to see if
4  it was closed but I didn't and I just went to
5  bed.
6      Q.  Did you notice it was raining through
7  Emily's window, could you see through her window;
8  is that what you mean?
9      A.  Yes.
10     Q.  Okay.  And was that unusual for her --
11 for you to be able to see through her window at
12 nighttime?
13     A.  No.
14     Q.  Okay.
15     A.  It was clear.
16     Q.  Was she home in the apartment that
17 night?
18     A.  She wasn't.
19     Q.  And so the door to her bedroom was
20 open?
21     A.  Correct.
22     Q.  And you could see through the bedroom
23 then to the window?
24     A.  Yes.

34

1      Q.  What was -- what was Emily's bedroom
2  window like, do you recall?
3      A.  It was -- it slid, it was like a
4  sliding window.
5      Q.  Did it slide from side to side then
6  rather than up and down?
7      A.  Yes, side to side.
8      Q.  Okay.  Did it typically have a screen
9  on the outside of it?
10     A.  It did.
11     Q.  Did it have blinds of any kind?
12     A.  I don't recall.
13     Q.  Were -- at nighttime were -- was there
14 a window covering typically covering the
15 window --
16     A.  No.
17     Q.  -- when it was dark outside?
18     A.  No.
19     Q.  At some point did you realize the
20 window had been open that night?
21     A.  When I walked past it.
22     Q.  At that point when you had gotten the
23 drink from the kitchen?
24     A.  Correct.

35

1      Q.  And how did you realize that it was
2  open?
3      A.  You could see the rain through, the
4  rain was prevalent.
5      Q.  Could you hear the rain through it?
6      A.  Yes.
7      Q.  Was the screen actually off the window
8  at that point?
9      A.  I don't recall.
10     Q.  And on the other side of that --
11 through that window was the common balcony; is
12 that right?
13     A.  That's correct.
14     Q.  Was there any furniture on the common
15 balcony?
16     A.  I don't recall.
17     Q.  Do you recall having an outdoor chair
18 with white arms on that common balcony?
19         MS. HORN:  Object to form.
20     A.  I don't recall.
21     Q.  Was the window shut, when you went to
22 bed, in Emily's room?
23     A.  I don't recall.
24     Q.  Was the door to your apartment unit

36

1  shut and locked when you went to bed?
2      A.  Yes.
3      Q.  So when you walked past Emily's bedroom
4  and could see the rain outside, how was it that
5  you could see outside at, you know, in the middle
6  of the night?
7      A.  The parking lots are very well-lit.
8      Q.  And you could see light from the
9  parking lot then coming through Emily's bedroom
10 window?
11         MS. HORN:  Object to form, leading.
12     Q.  Go ahead and answer if you understand.
13     A.  I understand.  It -- I couldn't look
14 down on the parking lot but over that parking lot
15 area.
16     Q.  Okay.  So there was -- there was enough
17 light coming from that parking lot though that
18 you could tell that it was raining outside?
19     A.  Yes.
20         MS. HORN:  Object to form, leading.
21     Q.  Did you have any lights on inside the
22 apartment when you walked to the kitchen?
23     A.  I don't recall.
24     Q.  Could you still see where you were

37

1  going?

2    **A.**  Yes.

3    **Q.**  When you walked back to your bedroom,

4  could you see where you were going?

5    **A.**  Yes.

6    **Q.**  Did you have lights on at that point,

7  do you know?

8    **A.**  I don't recall.

9    **Q.**  And in your bedroom, you mentioned you

10  had a slider door in your bedroom?

11    **A.**  Yes.

12    **Q.**  And did that slider door also have a

13  covering of any kind?

14    **A.**  It did.

15    **Q.**  And what kind of a covering on that

16  door?

17    **A.**  It had blinds that were broken.

18    **Q.**  And what type of blinds, horizontal or

19  vertical?

20    **A.**  Vertical.

21    **Q.**  And how were they broken?

22    **A.**  At the bottom, the chain was broken.

23    **Q.**  And did that vertical blinds being

24  broken cause -- have any effect on the slats of

38

1  those verticals?

2    MS. HORN:  Object to form.

3    **A.**  Yes.

4    **Q.**  And what effect did it have?

5    **A.**  They didn't close all the way.

6    **Q.**  Was there light from the parking lot

7  coming through that vertical blind as well?

8    **A.**  Yes.

9    **Q.**  Could you see around your room at

10  nighttime without a light on?

11    **A.**  Yes.

12    **Q.**  And when you got back to your room

13  after waking up and getting a drink from the

14  kitchen, did you fall back asleep?

15    **A.**  I did.

16    **Q.**  And at some point did you wake up again

17  that night?

18    **A.**  I did, to take -- I brought a drink to

19  my bed and I took a sip of my drink.

20    **Q.**  And what time was that, do you know?

21    **A.**  I don't remember.

22    **Q.**  Was it typical for you to be thirsty in

23  the middle of the night at that time?

24    **A.**  Yes.

39

1    **Q.**  Okay.  Were you -- were you sick or

2  anything on that night that you know of?

3    **A.**  No.  No.

4    (Attorney Franklin has now joined the

5  deposition via Zoom.)

6    **Q.**  So when you woke up that second time,

7  did you notice anything then?

8    **A.**  I did.

9    **Q.**  What did you notice?

10    **A.**  A person sitting beside my bed.

11    **Q.**  And what was the position of that

12  person?

13    **A.**  They were seated on the floor next to

14  my bed.

15    **Q.**  And how far away was that person from

16  you when you first saw them?

17    **A.**  It was very -- it was close.

18    **Q.**  Did you notice anything about what that

19  person was wearing at that time?

20    **A.**  He had something on his head, he had on

21  a T-shirt and he was in underwear.

22    **Q.**  What was on his head?

23    **A.**  A covering of some sort.

24    **Q.**  Did that covering have a color?

40

1    **A.**  Dark.

2    **Q.**  Do you recall reporting that the thing

3  was white on his head?

4    MS. HORN:  Object to form, foundation.

5    **A.**  I don't, I don't recall.

6    **Q.**  Do you recall what color T-shirt the

7  man was wearing?

8    **A.**  I don't recall.

9    **Q.**  And was it a short-sleeve T-shirt or a

10  long-sleeve T-shirt?

11    **A.**  Short.

12    **Q.**  And you mentioned underwear as well?

13    **A.**  Correct.

14    **Q.**  Could you describe the underwear,

15  please?

16    **A.**  White, BVD.

17    **Q.**  Was it, like, brief underwear?

18    **A.**  Yes.

19    **Q.**  Okay.  And, I'm sorry, you said he was

20  sitting next to you in the bed?

21    **A.**  He was sitting on the floor next to the

22  bed.

23    **Q.**  Was -- how far was his head away from

24  yours?

41

1  **A.** Close.

2  **Q.** And how close would you describe it?

3  **A.** When I took -- went to go get that

4  second sip, I looked and I looked twice and I

5  said, who are you, because I never -- I didn't

6  know who that person was.

7  **Q.** And did he respond in any way?

8  **A.** Not a word.

9  **Q.** And what happened then?

10  **A.** I was beaten.

11  **Q.** How were you --

12  **A.** By an object.

13  **Q.** -- beaten?  Okay.

14  **A.** In the head.

15  **Q.** How would you describe this person,

16  what did he look like?

17  **A.** I'm not sure what you mean.

18  **Q.** Can you describe his stature?

19  **A.** Medium build.

20  **Q.** And how would you describe his height?

21  **A.** I don't know, I was laying down.

22  **Q.** Did you report to the police he was of

23  medium height?

24    MS. HORN:  Object to --

42

1  **A.** Yes.

2    MS. HORN:  -- form, foundation.  Sorry.

3  **Q.** And did you -- what would you estimate

4  would be medium height?

5  **A.** Oh, I don't know, five six to maybe

6  five -- I don't know, five six, five seven.

7  **Q.** And did you note anything about the

8  color of his hair?

9  **A.** Dark.

10  **Q.** Did you notice anything about the

11  length of his hair?

12  **A.** No.

13  **Q.** Could you still see some hair coming

14  from underneath the covering on his head?

15  **A.** Yes.

16  **Q.** And can you please describe how that

17  covering was placed on his head?

18  **A.** I really don't recall.

19  **Q.** It was situated in a way though that

20  you could see some of the hair coming out from

21  underneath it?

22  **A.** Yes.

23    MS. HORN:  Object to form.

24  **Q.** Do you recall whether he had any facial

43

1  hair?

2  **A.** I don't recall.

3  **Q.** Do you recall what color his eyes were?

4  **A.** Dark.

5  **Q.** Do you recall what his race was?

6  **A.** White.

7  **Q.** And his approximate age?

8  **A.** No.

9  **Q.** Did you report that he was in his 20s?

10    MS. HORN:  Object to form, foundation.

11  **A.** I don't recall.

12  **Q.** Did you have any problems seeing his

13  features that night?

14    MS. HORN:  Object to form.

15  **A.** No.

16  **Q.** Was there anything else you noticed

17  about his features?

18  **A.** I don't recall.

19  **Q.** When you asked him who he was, how far

20  away was his face from your face?

21  **A.** It was pretty close.

22  **Q.** Can you estimate in inches?

23  **A.** Within two inches.

24  **Q.** Did you ask him what he wanted?

44

1  **A.** I did.

2  **Q.** Did he have any response?

3  **A.** No.

4  **Q.** And when you asked him what he wanted

5  and who he was, were you looking at that man?

6  **A.** Yes.

7  **Q.** And after you said that, what happened

8  next?

9  **A.** I asked him to stop beating me for fear

10  that I would pass out.

11  **Q.** And what was his response?

12  **A.** Nothing.

13  **Q.** And what was he hitting you with?

14  **A.** It was a hard object.

15  **Q.** Do you know what type of object it was?

16  **A.** Not at the time.

17  **Q.** At some point did you become aware of

18  what the object was that hit you?

19  **A.** I did.

20  **Q.** And how did you become aware of that?

21  **A.** When the police showed up --

22  **Q.** And --

23  **A.** -- that next morning.

24  **Q.** And how did you become aware of the

45

1    object then?
2        **A.** They went into my bedroom and found an
3    object on the floor near my bed.
4        **Q.** And what object was that?
5        **A.** The rung of a chair.
6        **Q.** And was that --
7        **A.** A kitchen chair.
8        **Q.** Okay. A kitchen chair?
9        **A.** Uh-huh.
10       **Q.** And did you become -- did you see the
11   kitchen chair that a rung was missing from?
12       **A.** Yes.
13       **Q.** And where in your bedroom was that
14   found?
15       **A.** Next to my bed.
16       **Q.** So at some point you asked him to stop
17   hitting you?
18       **A.** I did.
19       **Q.** And where was he hitting you, what part
20   of your body?
21       **A.** My head.
22       **Q.** And what did you do then?
23       **A.** I was trying to protect my head with my
24   hands and he just kept hitting my --

46

1        **Q.** Did you --
2        **A.** Go ahead.
3        **Q.** I'm sorry, I interrupted. I didn't
4    realize you hadn't finished, go ahead.
5        **A.** And then he just kept -- he still just
6    kept hitting me.
7        **Q.** So you put your hands up, you said?
8        **A.** Uh-huh, uh-huh.
9        **Q.** And that's yes?
10       **A.** Yes. I'm sorry, yes.
11       **Q.** No problem. And so did you put your
12   hands up on top of your head?
13       **A.** I did, I put them -- I don't know if
14   you can see me --
15       **Q.** Yes.
16       **A.** -- but I put them like this because I
17   was being hit here.
18       **Q.** And you pointed to the left side of
19   your head?
20       **A.** Yes.
21       **Q.** And you put both of your hands up on
22   either side of your head?
23       **A.** Yes.
24       **Q.** So then did you get hit in your hands

47

1    as well?
2        **A.** I did.
3        **Q.** And where on your hands did you get
4    hit?
5        **A.** The top of my hands right -- knuckles,
6    finger area.
7        **Q.** How many times were you hit in total?
8        **A.** I don't recall.
9        **Q.** Were you hit more than five times?
10       MS. HORN: Object to form, calls for
11   speculation.
12       **Q.** Are you able to answer?
13       **A.** I don't recall.
14       **Q.** You were hit more than once; is that
15   fair to say?
16       **A.** Yes.
17       **Q.** Were you hit several times, in fact?
18       **A.** Yes.
19       MS. HORN: Object to form.
20       **Q.** Did you say anything else to him?
21       **A.** I told him if he stopped, he could take
22   whatever he wanted.
23       **Q.** And did he react to that statement?
24       **A.** He said nothing, and I told him he

48

1    could have anything he wanted.
2        **Q.** What happened next?
3        **A.** He got on my bed.
4        **Q.** How did he get on your bed?
5        **A.** At the -- near the foot of the bed, he
6    got on.
7        **Q.** And what were you thinking at this
8    point?
9        **A.** I was afraid to be raped.
10       **Q.** What did you do then?
11       **A.** I kicked him --
12       **Q.** Where did --
13       **A.** -- and I screamed. In the chest.
14       **Q.** You kicked him in the chest?
15       **A.** Several times and screamed several -- I
16   just kept screaming and kicking.
17       **Q.** And what part of him were you -- or
18   where were you looking at that point?
19       **A.** At him.
20       **Q.** And what part of him were you looking
21   at?
22       **A.** His face.
23       **Q.** What happened then?
24       **A.** He finally left after all the kicking

49

1  and screaming.
2      **Q.** He left the room?
3      **A.** Yes.
4      **Q.** What did you do?
5      **A.** I shut the door to my bedroom, put my
6  body against it and called the police.
7      **Q.** Did you call 9-1-1?
8      **A.** Yes.
9      **Q.** And was that from the landline in your
10 bedroom?
11     **A.** Yes.
12     **Q.** What did you say to the dispatcher?
13     **A.** That there was someone in my house and
14 I don't recall after that.
15     **Q.** Did you give a description of the man?
16     **A.** I don't recall.
17     **Q.** Do you recall telling the dispatcher
18 that it was a white male in his 20s wearing a
19 dark T-shirt and brief underwear?
20         MS. HORN:  Object to form.
21     **Q.** Do you recall that?
22     **A.** Yes.
23     **Q.** Do you recall anything else you said to
24 the dispatcher?

50

1      **A.** I don't.
2      **Q.** Did you describe the object on his head
3  as a white scarf at some point?
4      **A.** I don't recall.
5      **Q.** Did you come to realize at some point
6  that it was a white T-shirt?
7         MS. HORN:  Object to form.
8      **Q.** Do you recall reporting that it was a
9  white T-shirt?
10        MS. HORN:  Same objection.
11     **Q.** You can go ahead and answer if you
12 understand the question.
13     **A.** I don't recall when I gave the
14 description.
15     **Q.** Okay.  And do you recall what time it
16 was that you were calling police?
17     **A.** No, I don't.
18     **Q.** How long did it take for them to get
19 there, do you know?
20     **A.** I don't recall.
21     **Q.** Was the dispatcher --
22     **A.** I --
23     **Q.** Oops, sorry, you were saying something?
24     **A.** I don't think it was all that long.

51

1      **Q.** Okay.  Was the dispatcher on the phone
2  with you until they arrived?
3      **A.** Yes.
4      **Q.** And did they come to your unit door, --
5      **A.** Yes.
6      **Q.** -- the police?  Did you let them in to
7  your unit at that point?
8      **A.** Yes.
9      **Q.** Did you have to buzz them in from
10 downstairs?
11     **A.** Yes.
12     **Q.** Were you still afraid that your
13 attacker was in the apartment when police
14 arrived?
15     **A.** Yes.
16     **Q.** Did you have to walk to your -- to an
17 area of the apartment to activate that buzzer?
18     **A.** Yes.
19     **Q.** And where was that buzzer located
20 within your apartment?
21     **A.** Close to the door.
22     **Q.** Did you see the man at all in your
23 apartment when you walked there?
24     **A.** I just walked right to the door with

52

1  the dispatcher on the phone.
2      **Q.** Okay.  Did you talk to the officers
3  when they arrived to the apartment?
4      **A.** Yes.
5      **Q.** Do you know who you spoke with?
6      **A.** I don't.
7      **Q.** Do you recall the name Daniel Benedict?
8      **A.** I don't.
9      **Q.** Did you talk to one officer or did you
10 talk to multiple officers?
11     **A.** I don't recall.
12     **Q.** Did you provide a description to the
13 officer?
14     **A.** I don't recall what I said, I -- you
15 know.
16     **Q.** Did he ask you if you recognized the
17 attacker?
18     **A.** I don't recall.
19     **Q.** Did you describe the object you were
20 hit with?
21     **A.** I said it was hard.
22     **Q.** How long had police been there when
23 they showed you the rung of the chair?
24     **A.** I don't recall the length.

**53**

1  **Q.** Do you recall what the officer said who
2  showed you the rung?
3  **A.** That it was found beside my bed.
4  **Q.** And where were you located when he
5  showed you that object?
6  **A.** Kitchen.
7  **Q.** Were you sitting down?
8  **A.** At the table, yes.
9  **Q.** Were you speaking with any officer at
10  that time?
11  **A.** I don't recall.
12  **Q.** Okay. Did the officer ask you if you
13  had ever seen that rung in your bedroom before?
14  **A.** I don't recall but I know it wasn't.
15  **Q.** Okay. Did you find out at some point
16  how the man had gained access to your apartment
17  that night?
18  **A.** Emily's window.
19  **Q.** And how did you learn that?
20  **A.** That night with the officers.
21  **Q.** Was there one officer in particular who
22  told you?
23  **A.** I don't recall.
24  **Q.** And did you see Emily's window at that

**54**

1  point?
2  MS. HORN: Object to form. At what
3  point?
4  **Q.** When the officer told you.
5  **A.** I don't recall.
6  **Q.** While the police were there, did you
7  see -- did you notice anything about the screen
8  in Emily's bedroom window?
9  **A.** It wasn't there.
10  **Q.** Did you see where it was located?
11  **A.** I did not.
12  **Q.** But it was missing from the window?
13  **A.** Yes.
14  **Q.** And was that window in the same
15  position as it was when you had walked past it
16  that night?
17  **A.** Yes.
18  **Q.** Did paramedics arrive and examine you?
19  **A.** Yes.
20  **Q.** What time did they arrive, do you know?
21  **A.** Don't recall.
22  **Q.** And what did they say to you?
23  **A.** They wanted to take me to the hospital.
24  **Q.** Did you go with them to the hospital?

**55**

1  **A.** No, I went with my mother and my
2  stepfather.
3  **Q.** And how long were you at the hospital?
4  **A.** A few hours.
5  **Q.** Did the people at the hospital diagnose
6  you with injury?
7  **A.** Mild concussion and damage to my hands.
8  MS. HORN: Ms. Horgan, do you want to
9  take a break?
10  THE WITNESS: I do.
11  MS. QUINN: Okay. Sure, any time.
12  THE VIDEOGRAPHER: Okay. The time is
13  approximately 11:13 and we are off the record.
14  (Short recess taken.)
15  THE VIDEOGRAPHER: We are back on the
16  record. The time is approximately 11:25 A.M.
17  Counsel, you may proceed.
18  **Q.** Ms. Horgan, I think, just before we
19  took a break, you were discussing the injuries
20  that you were diagnosed with at the hospital and
21  you mentioned you had a mild concussion?
22  **A.** Yes.
23  **Q.** Did you also say something about your
24  hearing?

**56**

1  **A.** No, not my hearing but I, after that, I
2  had dizzy spells.
3  **Q.** And how long afterwards did you feel
4  the effects of the concussion?
5  **A.** About a year.
6  **Q.** And did you experience any other
7  symptoms besides dizziness?
8  **A.** No.
9  **Q.** Did you have any injuries to -- any
10  physical damage, wounds to your head?
11  **A.** There were bumps.
12  **Q.** And where were the bumps located?
13  **A.** On, like, my forehead and back.
14  **Q.** Was that on one particular side or
15  another?
16  **A.** My left side more.
17  **Q.** Was it actually on your right side or
18  is it your memory that it was on your left?
19  **A.** I don't recall. If I was laying in
20  bed, it would have been on my left side because I
21  slept on -- my bed faced out so it would have
22  been on my -- I don't recall which side.
23  **Q.** Okay. Did you have any injury to your
24  hands?

57

1    **A.** I do.

2    **Q.** And what kind of injury did you have on

3    your hands?

4    **A.** They were bruised, swollen; I have

5    permanent damage in my right hand.

6    **Q.** What damage do you have to your right

7    hand?

8    **A.** It will never -- I'll always have

9    like -- it's -- it will always be swollen and one

10   of my fingers doesn't lay straight.

11   **Q.** Okay. Sorry. Were any of your fingers

12   broken?

13   **A.** Nothing was broken.

14   **Q.** Did you actually have damage to your

15   fingernail?

16   **A.** One of my fingernails was broken off.

17   **Q.** And did you have damage to your rings?

18   **A.** I had to have a ring cut off my finger.

19   **Q.** And why did your ring have to get cut

20   off of your finger?

21   **A.** Because my hand was so swollen that it

22   was cutting off my circulation to my finger.

23   **Q.** And it was swollen because of the

24   injuries?

58

1    **A.** Yes.

2    **Q.** Did you have any injury to your arm and

3    your shoulder as well?

4    **A.** I did, I had bruising on my arms and

5    shoulders.

6    **Q.** And was that one particular arm?

7    **A.** I believe it was my left side. I don't

8    recall.

9    **Q.** Okay. And what kind of injuries, I'm

10   sorry, to your --

11   **A.** Bruising.

12   **Q.** Bruising. And were all of these

13   injuries that you have described due to the

14   attacker hitting you that night?

15   **A.** Yes.

16   **Q.** After the hospital, where did you go?

17   **A.** My mother's.

18   **Q.** Did she live in Worcester?

19   **A.** Yes.

20   **Q.** At some point were you able to

21   determine whether anything was missing from your

22   apartment?

23   **A.** I don't believe anything was missing

24   from my apartment.

59

1    **Q.** And when were you able to determine

2    that?

3    **A.** I don't recall when it was.

4    **Q.** Did you look around when police were

5    there to see if anything was missing?

6    **A.** I don't recall.

7    **Q.** When was the first time you spoke to

8    Emily after your -- after the attack?

9    **A.** I don't recall when it was but I know I

10   made -- or I had someone make a call telling her

11   not to go back to the apartment.

12   **Q.** Was she expected back on that 14th?

13   **A.** Yes.

14   **Q.** Do you recall who you had called?

15   **A.** I don't.

16   **Q.** Did she come to see you at your

17   mother's house?

18   **A.** I don't recall.

19   **Q.** And did you get a phone call from any

20   police officer that day?

21      MS. HORN: Object to form. What day?

22   **A.** I don't recall.

23   **Q.** Did someone from the Worcester Police

24   Department get in touch with you on August 15th,

60

1    the next day?

2    **A.** I don't recall.

3    **Q.** Do you recall police coming to visit

4    you on the 15th?

5    **A.** I really don't recall.

6    **Q.** On the 15th, did you end up going to

7    your niece's house?

8    **A.** I did.

9    **Q.** Did you spend the night of the 14th at

10   your -- into the 15th -- at your mother's house?

11   **A.** Not the whole day, I went to my niece's

12   house to stay.

13   **Q.** So the night of the 14th, you stayed at

14   your niece's house?

15   **A.** Yes.

16   **Q.** And so when you woke up on the 15th

17   then, you were still at your niece's house?

18   **A.** Correct.

19   **Q.** And did police call you at your niece's

20   house that morning of the 15th?

21   **A.** I don't recall but I know that they did

22   visit and I don't recall the day.

23   **Q.** Okay. Do you recall police talking to

24   you over the phone before they visited you?

61

1     A.   I don't recall.

2     Q.   But at some point you remember them

3     visiting you at your niece's house?

4     A.   Correct.

5     Q.   And who came to your niece's house from

6     the Worcester Police?

7     A.   It was Detective Hazelhurst and someone

8     else and I don't know -- I don't remember his

9     name.

10     Q.   Okay.  Had you talked to anyone else

11     from the Worcester Police Department between the

12     time officers were at your apartment on

13     Grafton Street and their arrival at your niece's

14     house?

15     A.   I don't recall.

16     Q.   And which niece were you staying with

17     the night of the 15th?

18     A.   Rebecca.

19     Q.   The 14th.  Okay.  What's Rebecca's last

20     name?

21     A.   Ritacco.

22     Q.   And in what town was her house located?

23     A.   West Boylston.

24     Q.   What time did Detective Hazelhurst and

62

1     the other officer arrive?

2     A.   I don't recall the time.

3     Q.   What did Detective Hazelhurst say to

4     you when he arrived?

5     A.   That he wanted me to look at pictures.

6     Q.   Did he talk -- did he talk to you about

7     the incident?

8     A.   I don't recall.

9     Q.   Did he ask you more questions about

10     your description of the attacker?

11     A.   I don't recall.

12     Q.   Did he come inside your niece's house

13     then?

14     A.   Yes.

15     Q.   And did you sit in a certain area of

16     the house while you spoke with him?

17     A.   The kitchen table.

18     Q.   And was the other police officer with

19     you when you spoke to Detective Hazelhurst?

20     A.   Yes.

21     Q.   Was there anyone else in the room while

22     you spoke to Detective Hazelhurst?

23     A.   My niece.

24     Q.   And that's your niece, Rebecca?

63

1     A.   Yes.

2     Q.   At some point then Detective Hazelhurst

3     showed you some photos?

4     A.   He did.

5     Q.   How long had he been there before he

6     showed you photos?

7     A.   I don't recall.

8     Q.   And what, if anything, did he say to

9     you before he showed you the photos?

10     A.   I don't recall his exact words.

11     Q.   Did he ask you to point out who you --

12     to look at the photos and see if you could see

13     who you saw that night?

14     MS. HORN:  Object to form, --

15     A.   Yes.

16     MS. HORN:  -- calls for speculation.

17     Q.   Do you remember exactly what he said to

18     you?

19     A.   That he was going to do a photo array

20     and to just take my time.

21     Q.   Did you look at the photos all at once?

22     A.   They were laid out all -- they were all

23     laid out on the table.

24     Q.   How many photos were there, do you

64

1     recall?

2     A.   I don't recall.  There was a -- there

3     was a few but I don't recall how many.

4     Q.   Were they in color or black and white?

5     A.   I don't recall.

6     Q.   Do you recall how they were arranged on

7     the kitchen table?

8     A.   Not in -- just laid out on the table.

9     Q.   Were there multiple rows of pictures?

10     A.   I don't recall.

11     Q.   Did he tell you any name of any

12     potential suspects before he showed you the

13     photos?

14     A.   I'm sorry?

15     Q.   Did he tell you the name of any

16     potential suspects before he showed you the

17     photos?

18     A.   No, no.

19     Q.   So what did you do then?

20     A.   Well, I shook and I became upset and I

21     just looked over the pictures.

22     Q.   At what point did you shake and become

23     upset?

24     A.   When I had to look at the pictures.

65

1    **Q.** Had you looked at a particular photo in
2  particular when you started --
3    **A.** Yes.
4    **Q.** -- to shake?
5    **A.** Uh-huh, yes, I did.
6    **Q.** And how many photos did you see before
7  you started to shake?
8    **A.** The photo that is the one that I picked
9  out.
10   **Q.** And the one that you picked out was the
11 photo of your attacker?
12   **A.** Yes.
13   **Q.** So what was your reaction to seeing
14 that photo?
15      MS. HORN:  Objection, asked and
16 answered.
17   **A.** I remember being extremely upset and
18 shaking.
19   **Q.** Did you say anything in response to
20 noticing that photo?
21   **A.** I don't recall.
22   **Q.** Did you do anything to indicate to
23 Detective Hazelhurst that that was the man that
24 you were identifying as your attacker?

66

1    **A.** I pointed to it.
2    **Q.** How confident were you that you had
3  identified the picture of the attacker?
4    **A.** Very.
5    **Q.** In reviewing the photos, did you
6  measure one photo against the other?
7    **A.** I looked at them all.
8    **Q.** And how long did you take to look at
9  the photos?
10   **A.** I don't recall.
11   **Q.** Did you look at each photo carefully?
12   **A.** Yes.
13   **Q.** And what were you thinking while you
14 looked at the photos?
15   **A.** That I -- I really don't recall what I
16 was thinking.
17   **Q.** Did the detectives tell you anything
18 about what would happen to the investigation if
19 you didn't pick someone out?
20   **A.** I don't recall.
21   **Q.** Did they say anything to make you feel
22 pressured to pick someone out?
23   **A.** No.
24   **Q.** Did your niece say anything to you

67

1  during this process?
2    **A.** No.
3    **Q.** Was she present when you were reviewing
4  the photos?
5    **A.** Yes.
6    **Q.** Did either of the detectives tell you
7  the name of the person you identified?
8    **A.** I don't recall.
9    **Q.** Did they say anything about the man you
10 identified being their suspect?
11   **A.** I don't recall.
12   **Q.** Did they say anything about the man you
13 identified living near you?
14   **A.** I don't recall.
15   **Q.** Did the detective indicate that he was
16 satisfied with who you picked out or comment in
17 any way on who you picked out?
18      MS. HORN:  Object to form.
19   **A.** I don't recall any kind of
20 conversation, I'm sorry.
21   **Q.** Did the detective who was with
22 Detective Hazelhurst ask you any questions while
23 he was there?
24   **A.** I don't recall.

68

1    **Q.** Do you recall him saying anything to
2  you?
3    **A.** No.
4    **Q.** When did you learn the name of the
5  person you identified?
6      MS. HORN:  Objection, asked and
7  answered.
8    **A.** I don't recall.
9    **Q.** Do you recall who told you --
10      MS. HORN:  Same objection.
11   **Q.** -- his name?
12   **A.** No, I don't recall.
13   **Q.** Were you asked then by the detectives
14 to come to the Worcester Police Department to
15 give a statement?
16   **A.** Yes.
17   **Q.** Do you know what time you got to the
18 police department?
19   **A.** I don't.
20   **Q.** Did you meet in a room with only
21 Detective Hazelhurst?
22      MS. HORN:  Object to form.
23   **A.** I don't recall.
24   **Q.** Did you bring anyone with you to the

69

1    police department?

2        **A.**  I don't recall.

3        **Q.**  Do you recall meeting in a room with

4    Detective Hazelhurst?

5        **A.**  I know I talked to him at the police

6    station but I don't recall if anyone was there.

7        **Q.**  Was he typing your statement up on a

8    computer while you talked?

9        **A.**  I don't recall.

10       **Q.**  Do you recall reviewing a written,

11   typed-up statement?

12       **A.**  What do you mean?

13       **Q.**  Do you recall Detective Hazelhurst

14   giving you a written statement with questions and

15   answers typed up that you reviewed?

16       **A.**  I don't recall.

17       **Q.**  Do you recall signing a statement?

18       **A.**  I do.

19       **Q.**  Did you read that statement before you

20   signed it?

21       **A.**  Yes.

22       **Q.**  And was that statement accurate --

23       **A.**  Yes.

24       **Q.**  -- as far as you -- how long did you

70

1    meet at the police department?

2        **A.**  I don't recall.

3        **Q.**  Do you recall whether you drove

4    yourself there?

5        **A.**  I don't recall but I don't see how I

6    could.

7        **Q.**  Were you still upset?

8        **A.**  Yes.

9        **Q.**  And prior to August 14th, 2000, had you

10   ever seen that man that had attacked you around

11   your complex at any point?

12       **A.**  No.

13       **Q.**  Had you ever seen him prior to August

14   14, 2000 anywhere else?

15       **A.**  No.

16       **Q.**  So the first time that you saw that man

17   who attacked you was in your room that night of

18   August 14th?

19       **A.**  Correct.

20       **Q.**  Do you recall at some point saying to

21   Detective Hazelhurst that the man's face was

22   familiar but you did not know him?

23       **A.**  I don't recall.

24       **Q.**  How was his face familiar to you, if at

71

1    all?

2        **A.**  I don't recall that I said that.

3        **Q.**  So as far as you know though, you had

4    not ever seen him prior to August 14th, 2000?

5        **A.**  Correct.

6        **Q.**  Do you recall telling officers when

7    they first arrived to your apartment on the 14th

8    that you did not recognize the man who attacked

9    you?

10       **A.**  I don't recall.

11       **Q.**  When did you next return to your

12   apartment after that night you were attacked?

13       **A.**  I don't recall the day or the date.

14       **Q.**  Do you recall who you were with when

15   you first returned?

16       **A.**  No.

17       **Q.**  Do you recall returning to your

18   apartment with Detective Hazelhurst and your

19   niece?

20       **A.**  Possible.

21       **Q.**  At some point did you collect clothes

22   from your apartment?

23       **A.**  I did.

24       **Q.**  Did you physically gather the clothes

72

1    from the floor of your room and put them in a

2    bag?

3        **A.**  I don't recall.

4        **Q.**  Do you think -- do you recall gathering

5    clothes at some point from your apartment?

6        **A.**  I don't recall.

7        **Q.**  Did anyone provide you with things from

8    your apartment at any point?

9            MS. HORN:  Object to form.

10       **A.**  I don't recall.

11       **Q.**  At some point did you realize that you

12   had a pair of black athletic shorts in those

13   clothes bag that were gathered from your bedroom

14   floor?

15       **A.**  Yes.

16       **Q.**  And those athletic shorts did not

17   belong to you?

18       **A.**  No.

19       **Q.**  When did you first realize that you had

20   those shorts?

21       **A.**  At my niece's house going through the

22   bag of clothes.

23       **Q.**  Do you know the date of that?

24       **A.**  I don't.

73

1    **Q.** Did you ask your niece's husband at
2    some point whether they were his?
3    **A.** I did.
4    **Q.** And what did he say?
5    **A.** They weren't.
6    **Q.** Did you have someone staying at your
7    apartment after August 14, 2000?
8    **A.** I did.
9    **Q.** And who was that?
10   **A.** My nephew.
11   **Q.** Who is your nephew?
12   **A.** Michael.
13   **Q.** Is that Michael O'Bryant?
14   **A.** Correct.
15   **Q.** And how long did he stay at your
16   apartment?
17   **A.** A couple weeks, maybe.
18   **Q.** And why did he stay at your apartment?
19   **A.** I had two cats.
20   **Q.** Was he taking care of them?
21   **A.** Yes.
22   **Q.** Did Emily ever stay at the apartment
23   again after the night of your assault?
24   **A.** No.

74

1    **Q.** Did you ever stay there again after
2    that night?
3    **A.** No.
4    **Q.** At some point did you move from that
5    apartment then?
6    **A.** I did.
7    **Q.** And when did you move from that
8    apartment?
9    **A.** I don't recall the date.
10   **Q.** Had you gone back to the apartment in
11   between the time of the assault and the time you
12   moved?
13   **A.** To take my furniture and the rest of my
14   belongings.
15   **Q.** Was that only on the date that you
16   moved though, that you collected your furniture,
17   or did you go at some point between those two
18   times?
19   **A.** I don't recall.
20   **Q.** When your nephew, Michael, was staying
21   at your apartment, where did he sleep?
22   **A.** On the couch.
23   **Q.** Did you ask Michael whether the shorts
24   belonged to him?

75

1    **A.** I did.
2    **Q.** And what did he say?
3    **A.** They did not.
4    **Q.** Did you ask anyone else if the shorts
5    belonged to them?
6    **A.** I did.
7    **Q.** And who else did you ask?
8    **A.** Emily's boyfriend.
9    **Q.** And who was that?
10   **A.** Rob Marnelse.
11   **Q.** Did they belong to Rob Marnelse?
12   **A.** No.
13   **Q.** Did the shorts belong to anyone else
14   you knew?
15   **A.** No.
16   **Q.** Did you contact Detective Hazelhurst
17   about the shorts at some point?
18   **A.** I did.
19   **Q.** Do you recall how much time had passed
20   between the time you found the shorts and the
21   time you called Detective Hazelhurst?
22   **A.** I don't.
23   **Q.** Do you recall Detective Hazelhurst
24   meeting you at work to --

76

1    **A.** Yes.
2    **Q.** And that was to collect the shorts?
3    **A.** Yes.
4    **Q.** What did you tell him about the shorts?
5    **A.** That I didn't know who they belonged to
6    and they didn't belong to anyone I knew.
7    **Q.** Did you tell him where you had found
8    them, too?
9    **A.** Yes.
10   **Q.** And where had you found them?
11   **A.** In the bag of clothes that I had at my
12   niece's house.
13   **Q.** And where were those clothes from?
14   **A.** My apartment.
15   **Q.** And were they from your bedroom in your
16   apartment?
17   **A.** Yes.
18   **Q.** And were they from anywhere in
19   particular within your bedroom in the apartment?
20   **A.** On the floor.
21   **Q.** Did Detective Hazelhurst pick up the
22   shorts from you at that point?
23   **A.** Yes.
24   **Q.** Did you ever hear that they were sent

77

1  for DNA testing?
2      **A.** No.
3      **Q.** Did you ever hear results of any DNA
4  testing?
5      **A.** No.
6      **Q.** Did Detective Hazelhurst contact you at
7  any other point about viewing a second photo
8  array?
9      **A.** Not that I remember.
10     **Q.** And you testified before the Grand Jury
11 on October 5th, 2000; is that right?
12     **A.** I don't recall the date.
13     **Q.** When you testified before the Grand
14 Jury, do you recall testifying about the photo
15 array?
16     **A.** I don't recall.
17     **Q.** Do you recall testifying at the Grand
18 Jury that you were confident in your
19 identification of the --
20     **A.** Yes.
21         MS. HORN:  Object to form.
22     **Q.** And you were confident about your
23 identification of your attacker?
24     **A.** Yes.

78

1         MS. HORN:  Same objection.
2      **Q.** And you testified at trial in the
3  criminal case against Mr. Cosenza; is that right?
4      **A.** Yes.
5      **Q.** And during your trial testimony, you
6  also identified Mr. Cosenza, the defendant, as
7  the person who attacked you on August 14, 2000;
8  is that right?
9      **A.** Yes.
10     **Q.** And were you confident in that
11 identification as well?
12     **A.** Yes.
13     **Q.** Were you present when the jury's
14 verdict was read?
15     **A.** Yes.
16     **Q.** And what was your reaction to that jury
17 verdict?
18     **A.** I don't recall exact but -- not sure.
19     **Q.** Were you confident that the jury's
20 verdict was correct?
21         MS. HORN:  Object to form.
22     **A.** Yes.
23     **Q.** Did you submit any victim impact
24 statement for Mr. Cosenza's sentencing in this

79

1  matter?
2      **A.** I did.
3      **Q.** What did it say?
4      **A.** That he didn't have any respect for
5  life.
6      **Q.** Did you feel that he deserved a lengthy
7  sentence?
8      **A.** Yes.
9      **Q.** Were you notified of any of
10 Mr. Cosenza's appearances before the parole
11 board?
12     **A.** No.
13     **Q.** Did you ever submit any statement or
14 speak before any of the parole board hearings?
15     **A.** No.
16     **Q.** Did you hear that Mr. Cosenza was
17 granted a new trial in 2016?
18     **A.** Yes.
19     **Q.** How did you hear that?
20     **A.** I was notified by the ADA's office.
21     **Q.** What was your reaction to hearing that
22 he was granted a new trial in 2016?
23     **A.** I just wanted to get on with my life, I
24 wanted nothing else to do with anything, and I

80

1  figured he served his time and that was it and I
2  just wanted to move on.
3      **Q.** Were you asked if you were willing to
4  testify at a second trial?
5      **A.** Yes.
6      **Q.** Were you willing to do so if you had
7  to?
8      **A.** If I was subpoenaed to, I would have
9  to, but no.
10     **Q.** Safe to say it was a very unpleasant
11 experience to testify?
12     **A.** Yes, yes.
13     **Q.** At some point did the District
14 Attorney's office notify you that they were going
15 to file nolle prosequi, discontinuing the
16 prosecution?
17     **A.** I don't recall exact what was said.
18     **Q.** What do you recall was said in general
19 to you, if anything?
20     **A.** I don't recall.
21     **Q.** Did you find out from them that they
22 weren't going to proceed with the second trial?
23     **A.** I don't recall.
24     **Q.** At some point did you find out about

81

1  Mr. Cosenza's civil lawsuit for money damages?
2  **A.** I did.
3  **Q.** And how did you find that out?
4  **A.** It was on TV.
5  **Q.** Was it during a press conference on the
6  civil suit?
7  **A.** Yes.
8  **Q.** What was your feeling about seeing that
9  on TV?
10  **A.** I was disgusted.
11  **Q.** And why were you disgusted?
12  **A.** Because I don't feel that someone
13  should be paid to ruin someone's life.
14  **Q.** And you consider your life ruined by
15  this --
16  **A.** Yes.
17  **Q.** -- assault? Can you please describe
18  any other aspects the assault had on you?
19  **A.** I'm very well aware of my surroundings;
20  when I'm home, every door and window is locked.
21  **Q.** And that still is how you feel today?
22  **A.** Yes.
23  **Q.** Has it made you feel unsafe then?
24  **A.** Yes.

82

1  **Q.** Have you had any other effects of the
2  assault?
3  **A.** Other than emotional and physical, no.
4  **Q.** What emotional effects have you had?
5  **A.** I'm scared every day of my life.
6  **Q.** Ms. Horgan, I am just going to take a
7  five-minute break. I think I'm close to being
8  done with my questions.
9  **A.** Okay.
10  **Q.** Okay. Give me a few minutes and I'll
11  get back on at five after twelve.
12  **A.** Okay.
13  **Q.** Okay. Thank you.
14  **A.** Yup.
15  THE VIDEOGRAPHER: Okay. The time is
16  approximately 11:59 and we are off the record.
17  (Short recess taken.)
18  THE VIDEOGRAPHER: We are back on the
19  record. The time is approximately 12:07 P.M.
20  Counsel, you may proceed.
21  MS. QUINN: Ms. Horgan, thank you for
22  allowing me a few minutes but I don't have any
23  further questions for you, although Mr. Cosenza's
24  attorney likely does. Thank you for your time.

83

1  THE WITNESS: Thank you.
2  EXAMINATION BY MS. HORN:
3  **Q.** Ms. Horgan, as I mentioned earlier at
4  the beginning of the deposition, my name is Gayle
5  Horn and I represent the plaintiff in this
6  matter.
7  I do have some questions for you, I'm
8  gonna try to not repeat what Ms. Quinn already
9  asked you, but before I get started, do you need
10  a break to eat lunch or anything like that?
11  **A.** No, I'd rather just keep going.
12  **Q.** Okay, sure. And if at any point you
13  need a break, whether to grab some food, the
14  restroom or just need to hit the pause button for
15  a minute, just let me know. Okay?
16  **A.** Okay. Thanks.
17  **Q.** Sure. Ms. Horgan, when is the last
18  time you spoke with your niece, Emily?
19  **A.** I haven't, actually, for a while.
20  **Q.** When you say a while, what do you mean
21  by that?
22  **A.** Probably about a month.
23  **Q.** Have you ever talked to your niece,
24  Emily, about this lawsuit?

84

1  **A.** No.
2  **Q.** Have you talked to her at all about the
3  fact that you had to give a deposition in this
4  case?
5  **A.** Yes, I did.
6  **Q.** And when did you have that conversation
7  with her?
8  **A.** Probably, I don't know, a couple weeks
9  ago, maybe; in a text, it wasn't a phone
10  conversation.
11  **Q.** And what did you say to her -- or what
12  did you text to her and what did she text back to
13  you?
14  **A.** She didn't -- she just said, good luck.
15  **Q.** Did she mention whether or not she was
16  going to have to give a deposition in this case?
17  **A.** She didn't mention it.
18  **Q.** And apart from -- when you talked to
19  her about a month ago, what did you talk to your
20  niece about?
21  **A.** Just usual things.
22  **Q.** And apart from the text a couple of
23  weeks ago about giving a deposition, have you had
24  any conversations with your niece in the past

85

1  year or so about your attack?

2    **A.**  No.

3    **Q.**  When is the last time you spoke with

4  your other niece, Rebecca Ritacco?

5    **A.**  I haven't spoken to her in a long time.

6    **Q.**  And when you say --

7    **A.**  In a long time, a couple years.

8    **Q.**  Do you know where she's living right

9  now?

10    **A.**  I do not.

11    **Q.**  Do you know what her phone number is?

12    **A.**  I do not.  I have no contact with her.

13    **Q.**  And I take it if you have no contact

14  with her, you haven't had any communications with

15  her about the attack in the past couple of years?

16    **A.**  No, nope, not at all.

17    **Q.**  Have you had -- I think you answered

18  this in the beginning and so I apologize, it

19  might be repetitious, but have you had any

20  conversations with any of the lawyers for the

21  defendants in this case?

22    **A.**  No.

23    **Q.**  Have you spoken to any of the police

24  officers who originally investigated your case

86

1  since this lawsuit was filed?

2    **A.**  No.

3    **Q.**  And have you spoken to any

4  investigators for the City of Worcester since the

5  lawsuit was filed?

6    **A.**  No.

7    **Q.**  I want to take you back to -- well, let

8  me ask you one more question about Rebecca.  Do

9  you have any way of getting in contact with

10  Rebecca?

11    **A.**  I don't.

12    **Q.**  Do you know if she's living in the

13  state of Massachusetts?

14    **A.**  I don't know that.

15    **Q.**  Okay.  Do you know if she's married?

16    **A.**  She is not.

17    **Q.**  Back in -- so I want to go to August of

18  2000.  When you were living at Grafton Street,

19  how many buildings made up the apartment complex?

20    **A.**  I don't know, I have no idea.

21    **Q.**  Would you ever see people in -- was

22  there sort of a common space for Twin Oaks

23  Condominiums, like a grassy area where people

24  might walk their dog or hang out?

87

1    **A.**  I don't recall, I know parking lots,

2  that's it.

3    **Q.**  Okay.  And I think you said you had one

4  neighbor on your floor?

5    **A.**  Yes.

6    **Q.**  Did you know your neighbor by name?

7    **A.**  No.

8    **Q.**  You never learned his name, Mr. Payton?

9    **A.**  No, nope.

10    **Q.**  And apart from the time where you said

11  he asked you about the dirt bike, did you ever

12  have any communications with Mr. Payton?

13    **A.**  No.

14    **Q.**  When did you learn Mr. Payton's name?

15    **A.**  I don't recall.

16    **Q.**  Did Detective Hazelhurst tell you his

17  name?

18    **A.**  I don't recall.

19    **Q.**  Is it possible that Detective

20  Hazelhurst told you his name?

21      MS. QUINN:  Objection.

22    **A.**  I don't recall.

23    **Q.**  And can you tell me everything you

24  remember about -- you said -- I think you

88

1  testified that Mr. Payton told you that his bike

2  had been stolen; correct?  His dirt bike, excuse

3  me.

4    **A.**  Correct.

5    **Q.**  Can you tell me everything you remember

6  about that conversation with Mr. Payton?

7    **A.**  Just asked if we had seen the bike and

8  I said no, and that it was stolen.

9    **Q.**  Anything else that he said to you or

10  you said to him during that conversation?

11    **A.**  No.

12    **Q.**  Did you have any other conversation

13  with Emily about the dirt bike being stolen?

14    **A.**  He may have; I didn't.

15    **Q.**  When you had that conversation with

16  Mr. Payton, was Emily present or was it just you

17  and Mr. Payton?

18    **A.**  I don't recall.

19    **Q.**  Was it outside on your common balcony

20  or where -- sorry, strike that.

21      Where did you have the conversation

22  with Mr. Payton?

23    **A.**  I don't recall.

24    **Q.**  And you -- I think you testified you

89

1    don't remember when you had that conversation
2    with Mr. Payton?
3        **A.** I don't recall.
4        **Q.** Did you ever see flyers up around Twin
5    Oaks about a stolen bike?
6        **A.** I don't recall.
7        **Q.** And I think you said you didn't -- you
8    had no knowledge that Mr. Cosenza was connected
9    in any way to the stolen bike; correct?
10       **A.** I don't recall that. I don't recall
11   any of the dirt bike thing.
12       **Q.** Did your apartment complex, did it ever
13   have meetings, were there ever meetings of the
14   tenants?
15       **A.** No.
16       **Q.** Did you ever hear about, like, gossip
17   about what was happening in the apartment
18   complex?
19       **A.** No.
20       **Q.** In 2000 you were living in this
21   apartment with Emily and her baby daughter;
22   correct?
23       **A.** Correct.
24       **Q.** Who would -- in sort of that summer of

90

1    2000, who would come to visit you at your
2    apartment?
3        **A.** Friends, relatives.
4        **Q.** Did any men ever come to visit you in
5    your apartment?
6        **A.** I have male friends.
7        **Q.** Would they stay overnight?
8        **A.** No, I don't recall.
9        **Q.** And did you have kind of an
10   understanding with Emily that you wouldn't have
11   men staying in your apartment overnight?
12       **A.** I don't recall.
13       **Q.** If you previously testified that you
14   had an understanding with Emily that men wouldn't
15   stay overnight in your apartment, do you have
16   reason to dispute that now?
17       MS. QUINN: Objection.
18       **A.** I don't recall the conversation.
19       **Q.** And my question was a little bit
20   different which is if you've previously testified
21   that you had an understanding with your niece
22   that men wouldn't come and stay in your
23   apartment, do you have any reason to dispute that
24   now?

91

1        MS. QUINN: Objection.
2        **A.** No.
3        **Q.** And I want to show you --
4        MS. HORN: Susan, am I able to share
5    screen?
6        THE COURT REPORTER: Yes.
7        MS. HORN: Okay, great.
8        **Q.** So I think you gave a description to
9    Ms. Quinn about how your apartment was set up.
10   There were two bedrooms; correct?
11       **A.** Correct.
12       **Q.** When you walked -- was there an
13   interior door, front door to your apartment, or
14   was it an exterior front door to your apartment?
15       **A.** I don't know what you mean.
16       **Q.** Well, you said that there was a common
17   balcony; correct?
18       **A.** Correct.
19       **Q.** And that you would access that balcony
20   through the front door?
21       **A.** Correct.
22       **Q.** Okay. And was that the only entrance
23   to your apartment?
24       **A.** Yes.

92

1        **Q.** Okay. And so that entrance was on the
2    outside of your apartment; correct?
3        **A.** No, my door --
4        **Q.** Okay.
5        **A.** -- was the only entrance.
6        **Q.** Was there an interior hallway that led
7    to the front door to your apartment?
8        **A.** There was a small hall.
9        **Q.** Okay. So when you -- I guess what I'm
10   trying to understand is from the -- if I'm
11   standing on the balcony, how do I get into your
12   apartment? The common balcony, that is.
13       **A.** You would have to go through a door.
14       **Q.** Were there two doors, so I would walk
15   through a door, there's an interior hallway and
16   then there's your door to your apartment?
17       **A.** I'm not sure what you're saying.
18       **Q.** Let me try to see if I can -- well,
19   what I guess what I'm trying to understand, and
20   maybe I can see if I can pull up a picture for
21   this, is if I were on the common balcony and I
22   wanted to --
23       **A.** Yes?
24       **Q.** -- walk into your apartment, --

93

1    **A.**  Yes?

2    **Q.**  -- was there one door, I would just be

3    able to walk in and out of your apartment from

4    the common balcony, or was there --

5    **A.**  No.  No.

6    **Q.**  Okay.  So I would walk -- go ahead,

7    sorry.

8    **A.**  The common -- that common balcony had

9    one door that led out to the hallway.

10   **Q.**  Okay.  And from the hallway, there were

11   two front doors, one to your apartment and one to

12   your neighbor's?

13   **A.**  Correct.

14   **Q.**  Thank you.  And when you walked into

15   your apartment from that front door, what room

16   did you walk into?

17   **A.**  It was a kitchen, living room

18   combination.

19   **Q.**  And did you have a kitchen table?

20   **A.**  Yes.

21   **Q.**  Okay.  And the kitchen table had how

22   many chairs around it back in August of 2000?

23   **A.**  I don't recall.

24   **Q.**  Were they -- they were wooden chairs?

94

1    **A.**  Yes.

2    **Q.**  And from the kitchen, living room, were

3    your bedrooms off of the kitchen, living room?

4    **A.**  Yes.

5        (Deposition Exhibit No. 1 Marked.)

6    **Q.**  And I want to show you what I have

7    marked as Exhibit 1, Plaintiff's Exhibit 1.  See

8    if I can make this happen.  Give me one second.

9    Hold on one second.

10       Just give me one second, I apologize.

11   Technical difficulties here.  Should work now.

12       All right.  I'm going to show you what

13   I marked as Plaintiff's Exhibit 1, which I think,

14   for the record, is Bates stamped Plaintiff

15   001511.  Is that a photograph of your bedroom as

16   it looked on August 14th, 2000?

17   **A.**  I don't recall but it looks like my

18   bedroom.

19   **Q.**  Okay.  And I want to -- let me see if I

20   can do this.  So on one side, as you're walking

21   in, you can see sort of vertical slats?  Do you

22   see those?

23   **A.**  Yeah.

24   **Q.**  Is that the slider and the vertical

95

1    blinds?

2    **A.**  Off my bedroom, you mean?

3    **Q.**  Correct.

4    **A.**  On the other side of my bed?

5    **Q.**  On the other side of your bed on sort

6    of the corner of the --

7    **A.**  Yes.

8    **Q.**  -- side of the picture?  So those would

9    be the vertical blinds looking out on to the --

10   that cover the slider and that look out on to the

11   parking lot; is that correct?

12   **A.**  That's correct.

13   **Q.**  Okay.  And the clothes that are

14   depicted on the floor, those were the clothes

15   that were on the floor as of August 14th, 2000;

16   correct?

17   **A.**  I don't recall.

18   **Q.**  If the police took this photograph on

19   August 14th, 2000, do you have any reason to

20   dispute that it accurately reflects the way your

21   apartment -- your --

22   **A.**  No.

23   **Q.**  -- bedroom looked?

24       (Deposition Exhibit No. 2 Marked.)

96

1    **Q.**  And then I'm going to try to share with

2    you what I've previously marked as Plaintiff's

3    Exhibit 2, which, for the record, is Bates

4    stamped Plaintiff 001515.  Is that a picture of

5    Emily's bedroom as it looked on August 14th,

6    2000?

7    **A.**  I guess.

8    **Q.**  Okay.  Well, if the police took this

9    photograph -- and, actually, I apologize, this is

10   actually two -- for the record, the Plaintiff's

11   Exhibit 2 is Plaintiff 001515 to Plaintiff

12   001516.

13       If the police took this photograph on

14   August 14th, 2000, you don't have any reason to

15   dispute that it accurately reflects what your --

16   what your niece's bedroom looked like on the

17   night of the attack; correct?

18   **A.**  No, right.

19       MS. QUINN:  Objection.

20   **Q.**  And that crib that's shown, that was

21   your niece's daughter's crib; is that correct?

22   **A.**  Correct.

23   **Q.**  And the window that's slightly ajar, is

24   that the window that goes to the outside balcony?

97

1    A.  Correct.

2    Q.  That common balcony that we talked
3  about earlier?

4    A.  Correct.

5    Q.  Okay.  And you can see that there are
6  some slats on the window, do you see those?

7    A.  I see them.

8    Q.  Okay.  And would this outside balcony
9  also go to the parking lot or is it the other
10  side of the building?

11    A.  That would only go out to the hallway.

12    Q.  Okay.  I want to show you one more.  So
13  does this refresh your recollection about whether
14  there was a window treatment on the window of
15  Emily's bedroom?

16    A.  No, but if it's there, then I guess it
17  is.

18       (Deposition Exhibit No. 3 Marked.)

19    Q.  Let me show you one last photograph.
20  All right.  I am showing you what has been marked
21  as Plaintiff's Exhibit 3, which, for the record,
22  is Plaintiff 001517 through 001518.  And is this
23  the common balcony?

24    A.  Yes.

98

1    Q.  Okay.  And would this -- are the two
2  windows -- what I'm trying -- what I guess I'm
3  trying to understand -- there's a screen that's
4  on the -- sort of angled on the ground.  Do you
5  see that?

6    A.  I see that.

7    Q.  Is that the screen that normally goes
8  over the window to Emily's bedroom, if you know?

9    A.  I can't recall, I would assume yes.

10    Q.  Okay.  You don't know, as you sit here,
11  one way or the other?

12    A.  If it's leaning against the window,
13  then it should have been on the window.

14    Q.  And is this the -- you said earlier
15  that you could use this balcony for storage.  Are
16  these some of the things that you stored out in
17  the balcony?

18    A.  I did not use that.

19    Q.  Do you know whether Mr. Payton used the
20  balcony for storage?

21    A.  I do not know.

22    Q.  Do you know whose bicycle this is in
23  the corner?

24    A.  I do not.

99

1    Q.  And looking sort of back into the
2  picture, is the door into your apartment, would
3  that be all the way at the back of the
4  photograph?

5    A.  I don't know where that picture was --
6  how it was taken.

7    Q.  Okay.  Do you know, looking at this
8  photograph, could you identify for me where the
9  -- or describe for me, I guess, is a better
10  question -- where the door to your apartment or
11  to that hallway that leads to your apartment
12  would be?

13    A.  It would be in the hallway.

14    Q.  So from this balcony, how would you get
15  to that hallway?

16    A.  Through the door.

17    Q.  And what I'm asking, I guess, is where
18  is the door?

19    A.  I don't know which angle that picture
20  was taken.

21       (Deposition Exhibit No. 4 Marked.)

22    Q.  Okay.  And one last photograph.  Is
23  this from the -- is this photograph -- I'm sorry,
24  I'm getting ahead of myself.  I'm marking it as

100

1  Plaintiff's Exhibit 4.  It's Bates stamped
2  Plaintiff 001519 to Plaintiff 001520.

3       Does this show sort of if you were
4  standing on the balcony looking in to Emily's
5  bedroom?

6    A.  Yes.

7    Q.  Okay.  And that's the window that is
8  slightly ajar?

9    A.  Yes.

10    Q.  I can stop sharing now.

11       Ms. Horgan, when you were being
12  attacked, there were no lights on in your
13  bedroom; correct?

14    A.  Correct.

15    Q.  And did you have a nightstand by your
16  bed?

17    A.  I did.

18    Q.  And is that where the drink was?

19    A.  Yes.

20    Q.  And you said that when you went to go
21  take a sip of the drink, you saw the person
22  either sitting or kneeling by your nightstand?

23    A.  Yes.

24    Q.  Okay.  Could you see what he was doing?

101

1    **A.** Sitting there.

2    **Q.** Okay. Was he taking off clothes?

3    **A.** I don't recall.

4    **Q.** And when he was hitting you, ma'am --

5    well, you said you covered your face to protect

6    your face?

7    **A.** Because my head was being hit so bad

8    that I did not want to pass out so I tried to

9    alleviate the hit on my head.

10   **Q.** Yeah, and you were doing that, you were

11   focusing on trying not to get hit; right?

12   **A.** Correct.

13   **Q.** Okay. And so to do that, you put your

14   hands, I think you described it as putting them

15   sort of on your head?

16   **A.** Correct.

17   **Q.** Okay. And when you put your hands on

18   your face, you couldn't exactly see who you were

19   looking at, right, you couldn't exactly see the

20   face of the attacker?

21   MS. QUINN: Objection.

22   **A.** I saw the face when I looked right

23   directly at him.

24   **Q.** Okay. And that was when he was

102

1    kneeling by your bed?

2    **A.** He was by my bed, I don't know if he

3    was kneeling --

4    **Q.** All right.

5    **A.** -- or sitting.

6    **Q.** Sorry, and I didn't mean to suggest

7    otherwise. But when he was sitting by your bed,

8    were you looking at the top of his head?

9    **A.** I looked right into his face because I

10   didn't know the person in my room and I asked who

11   he was and what was he doing in my room.

12   **Q.** Okay. And at that time was he facing

13   the wall or was he facing your bed?

14   **A.** My bed.

15   **Q.** Okay. And so after he started hitting

16   you and you were covering your hands to

17   protect your -- to protect your face, --

18   **A.** My head.

19   **Q.** -- my head -- your -- sorry.

20        When you were covering your hands to

21   protect your head, you couldn't exactly see the

22   perpetrator's face at that time; right?

23   MS. QUINN: Objection.

24   **A.** I don't recall.

103

1    **Q.** Okay. If you previously testified at

2    trial -- give me one second. If you previously

3    testified at trial --

4        MS. HORN: And this is page 111 from

5    her trial testimony, line seven through nine.

6    **Q.** -- when I put my hands to the face, I'm

7    sure I didn't exactly see his face, I had my

8    hands like this (indicating). You don't have any

9    reason to dispute that testimony, do you?

10   **A.** If it's what I said.

11   **Q.** Well, I'm reading from your testimony

12   page 111, line seven through nine. You don't

13   have any reason to dispute that testimony, do

14   you?

15   **A.** No.

16   **Q.** And I think what you said earlier was

17   your focus, at that point as he's hitting you, is

18   trying to not get hit on the face; correct?

19   **A.** I said I was protecting my head because

20   he was beating my head.

21   **Q.** Right. And I guess my question is just

22   a little bit different, I'm not trying to be

23   difficult, which is your focus at that time was

24   on trying to protect yourself; correct?

104

1    **A.** Correct.

2    **Q.** You weren't focused on the offender's

3    face, you were focused on trying to make sure --

4    or trying to protect yourself as best you could

5    from the blows to your head; correct?

6    **A.** Correct.

7    **Q.** At some point this -- you were able to

8    ward off the offender; correct?

9    **A.** Yes.

10   **Q.** Okay. And -- actually, let me ask you

11   one more question. When -- at some point you

12   told the offender -- I don't want to get -- what

13   did you say to the offender?

14   **A.** I told him if he stopped hitting me, he

15   could take anything he wanted.

16   **Q.** Okay. And at that point in time, he

17   stood up and he climbed on the bed; is that

18   right?

19   **A.** That is correct.

20   **Q.** Did he get all the way onto the bed, if

21   you recall?

22   **A.** I don't -- I believe he did but I don't

23   recall exact.

24   **Q.** And when he stood up to get on the bed,

105

1  you were able, at that point in time, to assess
2  how tall he was; is that right?
3      A.  No, I don't recall.
4      Q.  Okay.  Well, when you --
5      A.  I'm laying down, I can't tell how tall
6  or short somebody is, I can't recall, I can't.
7      Q.  Okay.  So at no point were you really
8  able to tell how tall the attacker was?
9      A.  I gave the best description that I
10  could, medium build, medium height.
11      Q.  And medium height, I think you
12  testified previously, you said around five six,
13  five seven?
14      A.  Correct.
15      Q.  And you were five four at the time?
16      A.  I'm still five four.
17      Q.  And so -- fair enough.  Sorry about
18  that.  And so you thought your attacker was
19  taller than you; correct?
20      A.  Well, like I said, I'm laying on the
21  bed, I really can't judge someone's body height,
22  the height of somebody.
23      Q.  And I'm not asking you for precise
24  measurements, I mean, just sort of as a general

106

1  matter, you thought he was taller than you;
2  right?
3          MS. QUINN:  Objection.
4      A.  If I said five six or five seven was
5  about medium so that's what I'm sticking with.
6      Q.  Sure, and so I guess -- and maybe I'm
7  asking a poorly-worded question so I apologize
8  for that but you thought that -- if you were five
9  four and you thought medium height was around
10  five six, five seven, you thought your attacker
11  was taller than you; correct?
12          MS. QUINN:  Objection.
13      A.  I don't recall.  I can't judge.  If
14  you're laying on the bed, you can't judge how
15  tall somebody is.
16      Q.  Okay.  But you said you gave your
17  best -- you gave your best judgment to Detective
18  Hazelhurst; right?
19      A.  Yes.
20      Q.  You were trying to help the police
21  catch the offender, right, you wanted to be as
22  precise as you could?
23      A.  Yes, as far as I could recall.
24      Q.  And so when -- and when you were asked

107

1  when Ms. Quinn asked you, you said you thought --
2  you told -- and you told Detective Hazelhurst
3  medium height; right?
4      A.  Yes.
5      Q.  Okay.  And when Ms. Quinn asked you
6  that, you said that medium height to you meant
7  about five six or five seven; right?
8      A.  Correct.
9      Q.  And you're only five four; correct?
10      A.  Correct.
11      Q.  So medium height is a little bit taller
12  than you; correct?
13      A.  Correct.
14      Q.  Okay.  And you also described the
15  person as medium build; correct?
16      A.  Correct.
17      Q.  Okay.  And at the time that this attack
18  happened to you, according to the hospital
19  records, you were 140 pounds.  Does that sound
20  about right?
21      A.  I don't recall what I weighed.
22      Q.  Okay.  Okay.  Would medium build be a
23  little bit bigger than you then?
24      A.  I told you, I was laying in bed, I have

108

1  no idea how to judge.  I was just concentrating
2  on not being beaten anymore and that's just it.
3      Q.  Okay.  And I understand that and we
4  talked about you were concentrating on not being
5  beaten and you were covering your head to try to
6  do that; right?
7      A.  Correct.
8      Q.  And what I am asking, just a little bit
9  differently, is when you said to Detective
10  Hazelhurst medium build, did you mean somebody a
11  little bit bigger than you; or bigger than you, I
12  mean, you were only 140 pounds?
13      A.  I don't know how to judge that.
14      Q.  Well, what did you mean by medium build
15  then?
16      A.  Medium build for who that person was,
17  he was medium build.  That's the best description
18  I could come out with.
19      Q.  Did you consider yourself medium build,
20  you were only 140 pounds at the time?
21      A.  No.
22      Q.  You would consider yourself thin?
23      A.  Yes.
24      Q.  Okay.  And so going back, at some point

109

1   the offender left and you -- you were able to
2   ward him off and you called 9-1-1; correct?
3       A.  Correct.
4       Q.  Okay.  And I know that this attack must
5   have felt like forever but it wasn't actually
6   very long sort of duration-wise, was it?
7       A.  I don't know, I don't recall, I
8   couldn't tell you.
9       Q.  You can't estimate how long it was?
10      A.  No.
11      Q.  Now, Ms. Quinn asked you some questions
12  about the 9-1-1 call that you made.
13      A.  Uh-huh.
14      Q.  You gave the 9-1-1 dispatcher some
15  information about the offender, correct, whatever
16  you could describe at the time?
17      A.  I don't recall.
18      Q.  Okay.  You don't recall the 9-1-1 call?
19      A.  No, I recall the 9-1-1 call, I don't
20  recall what was said.
21      Q.  Okay.  What do you recall about that
22  9-1-1 call, ma'am?
23      A.  I put my body against the door, I
24  dialed 9-1-1, I said someone was in my house,

110

1   that I was attacked.  That's all I can recall.
2       Q.  Okay.  You don't have any reason -- if
3   we have a tape, sorry, a tape of the 9-1-1 call,
4   you don't have any reason to dispute the contents
5   of it, do you?
6       A.  If I -- no.
7       Q.  You don't have any reason to dispute
8   what you said over the 9-1-1 call about the
9   offender; correct?
10      A.  Correct.
11      Q.  Okay.  And then if you described -- so
12  if you described the offender in the 9-1-1 call
13  as a white male, you don't have any reason, as
14  you sit here today, to dispute that that's what
15  you said; correct?
16      A.  Correct.
17      Q.  And if you described the offender in
18  the 9-1-1 call as wearing a T-shirt, no pants and
19  something around his head, you don't have any
20  reason to dispute that either, do you?
21      A.  No.
22      Q.  And if you described the offender in
23  the 9-1-1 call as someone unfamiliar, you don't
24  have a reason to dispute that, do you?

111

1       A.  I'm sorry, say that again?
2       Q.  Sure.  If you described the offender in
3   the 9-1-1 call as someone that you hadn't seen
4   before, you didn't recognize, you don't have a
5   reason to dispute that, do you?
6       A.  No.
7       Q.  And if you said in the 9-1-1 call that
8   you were unsure about whether or not the offender
9   had hair, you don't have reason to dispute that,
10  do you?
11      A.  No.
12      Q.  Okay.  Now, when the police officers
13  arrived on the scene, I think you said but I
14  don't want to put words in your mouth, you don't
15  have any recollection of speaking to them
16  about --
17      A.  I don't recall what was said.
18      Q.  You don't recall what was said.  Thank
19  you, I appreciate that clarification.
20          But if the police officers asked you
21  about -- for a description of the offender, you
22  would have tried to give the police as much
23  information as you could at the time; correct?
24      A.  Correct.

112

1          MS. QUINN:  Objection.
2       Q.  You would have tried to cooperate with
3   the police; right?
4       A.  I would answer questions.
5       Q.  Because you wanted the police to
6   ultimately catch the person who had attacked you;
7   right?
8       A.  Correct.
9       Q.  And you knew one way for the police to
10  catch the person who attacked you was to describe
11  the person for them; right?
12      A.  The best that I could, yes.
13      Q.  Absolutely.  And so you would have
14  described -- you understood it was important to
15  describe the person as best you could to the
16  officers who came to your apartment after the
17  attack; right?
18      A.  Correct.
19      Q.  You would have given them as much of a
20  description of that offender as you could; right?
21      A.  Correct.
22      Q.  Okay.  And you told Officer Benedict,
23  who was the responding officer, that the person
24  who did this to you was a white male; right?

113

1    **A.** Correct.

2    **Q.** You told him that he was wearing a dark

3    T-shirt; does that sound right?

4    **A.** I don't recall the color but I said a

5    T-shirt.

6    **Q.** Okay. Would it refresh your

7    recollection to look at a copy of Officer

8    Benedict's report?

9    **A.** If need be.

10    (Deposition Exhibit No. 6 Marked.)

11    **Q.** Okay. Why don't I share the screen

12    then and show that to you. Okay. Can you see

13    that or is it too hard to read? I can try -- I

14    think I made it too big. Sorry, hold on. All

15    right.

16    And just for the record, I have

17    pre-marked this exhibit as Plaintiff's Exhibit 6,

18    which, for the record, is Bates stamped Cosenza

19    200 through Cosenza 202, and I'm going to direct

20    your attention to the first page. Ms. Horgan,

21    are you able to read that --

22    **A.** A little bit.

23    **Q.** -- or is it too small? I can read it

24    to you. I know it's small and it's in

114

1    handwriting, and I'm going to start reading sort

2    of five lines down. It said: She observed a

3    white male wearing a dark T-shirt, a white shirt

4    around his head and white briefs. The male was

5    crouched down at the foot of her bed. Ms. Horgan

6    did not recognize the male.

7    Do you see where I read that?

8    **A.** Yes.

9    **Q.** Okay. Did I read that accurately?

10    **A.** Yes.

11    **Q.** Okay. And so would you agree that you

12    told Officer Benedict that the person who did

13    this to you was a white male; correct?

14    **A.** Correct.

15    **Q.** He was wearing a dark T-shirt; correct?

16    **A.** Correct.

17    **Q.** He had a white shirt around his head;

18    correct?

19    **A.** Correct.

20    **Q.** And white briefs; correct?

21    **A.** Correct.

22    **Q.** At that time you didn't give Officer

23    Benedict -- or you weren't able to give Officer

24    Benedict any information about the height of the

115

1    offender; correct?

2    **A.** Correct.

3    **Q.** You weren't able to give Officer

4    Benedict -- or you didn't give Officer -- you

5    didn't give Officer Benedict any information

6    about the weight of the offender; correct?

7    **A.** Correct.

8    **Q.** You didn't give Officer Benedict any

9    information about whether the offender had hair

10    or not; correct?

11    **A.** Correct.

12    **Q.** You didn't give Officer Benedict any

13    information about the offender's hair color;

14    correct?

15    **A.** Correct.

16    **Q.** You didn't give Officer Benedict any

17    information about whether the offender had facial

18    hair; correct?

19    **A.** Correct.

20    **Q.** And you didn't give Officer Benedict

21    any information about the offender's eye color;

22    correct?

23    **A.** Correct.

24    **Q.** Okay. Mostly you were able to give him

116

1    information -- oh, and you said again that it

2    was -- the person who did this was not someone

3    you recognized; correct?

4    **A.** That is correct.

5    **Q.** I am going to stop sharing.

6    Mostly what you were able to give

7    Officer Benedict was information about the

8    clothing that your attacker was wearing; correct?

9    **A.** Correct.

10    **Q.** Okay. And with regard to the T-shirt,

11    you said the person who attacked you was wearing

12    a dark-colored T-shirt. You couldn't make out

13    the color of that T-shirt, correct, couldn't see

14    that?

15    **A.** Correct.

16    **Q.** You don't know whether it was green or

17    blue or black or brown; correct?

18    **A.** Correct, --

19    **Q.** So you just --

20    **A.** -- I didn't have my glasses on.

21    **Q.** Sorry, excuse me?

22    **A.** I did not have my glasses on.

23    **Q.** So back in August of 2000, you wore

24    glasses?

117

1     **A.** Yes.

2     **Q.** Okay. And were you -- I always get

3  this confused. Were you nearsighted or

4  farsighted?

5     **A.** I have each, I'm both, one in one eye

6  and one in the other.

7     **Q.** Okay. And so when -- back in August of

8  2000, when would you wear your glasses?

9     **A.** Driving.

10    **Q.** Would you wear them when you were

11 reading, for example?

12    **A.** Yes.

13    **Q.** Okay. Would you wear them to work?

14    **A.** Yes.

15    **Q.** Okay. Would you wear them, like, if

16 you were cooking to see what you were doing?

17    **A.** A recipe?

18    **Q.** Yes, a recipe.

19    **A.** Yes.

20    **Q.** Okay. Would you wear them -- were

21 you -- strike that.

22        Do you know which eye was nearsighted

23 and which eye was farsighted?

24    **A.** I don't.

118

1     **Q.** Do you know what your prescription was?

2     **A.** No, I don't recall.

3     **Q.** Okay. But would you wear your glasses

4  pretty much all day?

5     **A.** I don't recall.

6     **Q.** Okay. But you would wear them both if

7  you needed to see things close up, right, like

8  reading?

9     **A.** It was mostly driving.

10    **Q.** Okay. But you just testified that you

11 would sometimes wear them -- or you --

12    **A.** Yes.

13    **Q.** -- would wear them when you read;

14 right?

15    **A.** Right.

16    **Q.** So you would wear them to see things

17 close up; correct?

18    **A.** Correct.

19    **Q.** And you would wear them to see things

20 far away; correct?

21    **A.** Correct.

22    **Q.** Because you had one eye that sort of

23 that had limitation -- you had different

24 limitations in your different eyes; correct?

119

1     **A.** Correct.

2     **Q.** Okay. And so because you weren't

3  wearing your glasses, you couldn't make out the

4  color of the T-shirt; is that what you're saying?

5     **A.** Correct.

6     **Q.** Okay. But it was also -- was it also

7  too dark to make out the color of the T-shirt?

8     **A.** You could see light in my house, in the

9  bedroom, because the blinds weren't completely

10 shut because they were broken.

11    **Q.** Okay. And I just want to share screen

12 for one more minute, going back to -- I just want

13 to make sure. When you talk about the blinds

14 were broken, you're talking about the blinds that

15 you can see in Plaintiff's Exhibit 1, correct,

16 those vertical blinds?

17    **A.** That is correct, but they were broken

18 at the bottom and it doesn't show the bottom.

19    **Q.** Okay. And so the blinds were broken at

20 the bottom through a chain; is that right?

21    **A.** That's correct.

22    **Q.** And I think your testimony, as a

23 result, they didn't lay perfectly flat?

24    **A.** Correct.

120

1     **Q.** But they did cover the window; correct?

2     **A.** Correct.

3     **Q.** Okay. And so what you -- I think your

4  testimony was that there was some light from the

5  parking lot that came through; --

6     **A.** Correct.

7     **Q.** -- is that correct? Okay. I want to

8  make sure I have it correct. And so it would

9  just be -- to the extent that any light was

10 coming through, it would be -- I mean, it

11 wouldn't be enough light to keep you awake;

12 right?

13    **A.** Correct.

14    **Q.** It would just be a --

15    **A.** I -- go ahead.

16    **Q.** No, no, no, you go ahead, please.

17    **A.** No, go ahead.

18    **Q.** And when you -- when this happened, you

19 were startled; right? You had woken up to grab a

20 drink because you were thirsty and you were

21 startled; right?

22    **A.** Correct.

23    **Q.** Okay. And you didn't have your glasses

24 on; right?

121

1      **A.** Correct.

2      **Q.** And you didn't put them on at any time

3  during the attack; correct?

4      **A.** Correct.

5      **Q.** And so when you were -- would you agree

6  with me that it takes some time for your eyes to

7  adjust to darkness?

8          MS. QUINN: Objection.

9      **Q.** When you woke up in the middle of the

10  night, at first it seems really, really dark and

11  then over some period of time your eyes adjust a

12  bit?

13          MS. QUINN: Objection.

14     **A.** Correct.

15     **Q.** Okay. And your best look at the

16  offender, I think as you said earlier, was when

17  you first saw him and you said, who are you or

18  what are you doing here; right?

19     **A.** That is correct.

20     **Q.** And that was when you first woke up and

21  were startled by this individual; correct?

22     **A.** Correct.

23     **Q.** Okay. The other -- the T-shirt that

24  the person was wearing, was it a long-sleeve

122

1  shirt or a short-sleeve shirt?

2      **A.** Short.

3      **Q.** Okay. And do you know how far down the

4  sleeves went?

5      **A.** I don't recall.

6      **Q.** Okay. And then there was something

7  covering the man's -- the attacker's head;

8  correct?

9      **A.** Correct.

10     **Q.** Okay. And I think you described it to

11  Officer Benedict as a white shirt around his

12  head?

13     **A.** I don't recall.

14     **Q.** Okay. Does that sound correct, that it

15  was a white shirt around the attacker's head?

16          MS. QUINN: Objection.

17     **A.** I don't recall. I know there was

18  something there, I don't recall.

19     **Q.** Okay. And the shirt that was --

20  whatever it was, the white thing covering your

21  attacker's head, it covered the top of the man's

22  forehead in the front; correct?

23     **A.** I don't recall.

24     **Q.** Okay. If you previously testified that

123

1  it covered the top of the man's forehead in the

2  front at the criminal trial, you don't have any

3  reason to dispute that that's accurate; correct?

4      **A.** Correct.

5      **Q.** And that's page 105, lines 22 through

6  24. And so the undershirt covered the top of the

7  man's forehead in the front and then it went down

8  over at least a portion of his ears; right?

9      **A.** I don't recall.

10     **Q.** Okay. If you testified, this is page

11  106, lines one through two: Question: And it

12  went down over at least a portion of his ears?

13  Answer: Correct.

14          If you testified to that, you don't

15  have any reason to dispute that that was

16  accurate; correct?

17     **A.** Correct.

18     **Q.** And then the shirt, or the object that

19  was on his head, went down the back of his head;

20  correct?

21     **A.** Correct.

22     **Q.** Okay. So basically the white shirt

23  covered his -- the entire sort of back side of

24  the attacker's head; correct?

124

1      **A.** I don't recall how far down it went.

2      **Q.** Okay. If you were asked this question

3  at trial, page 106, lines five through six:

4  Question: So basically it covered his entire

5  head? Answer: Basically.

6          You don't have any reason to dispute

7  that; right?

8      **A.** Correct.

9      **Q.** So if it went basically around his

10  entire head, how is it that you were able to tell

11  Detective Hazelhurst that the man had dark hair,

12  short to medium length?

13     **A.** I don't recall.

14     **Q.** Okay. Is it possible that you weren't

15  able to tell what the color of your attacker's

16  hair was?

17          MS. QUINN: Objection.

18     **A.** I don't recall.

19     **Q.** So is it possible that you didn't

20  actually know --

21          MR. MINGACE: Can we take a small break

22  because I think you're only giving her portions

23  of the deposition -- I mean, of the transcript

24  because, further on, it said that she could see a

125

1  little bit poking out of the hair so, I mean --
2        MS. HORN:  Well, I would appreciate it
3  if you didn't coach the witness.
4        MR. MINGACE:  I'm not coaching the
5  witness, I'm speaking actually directly to you.
6  I mean, if you're going to give her portions of
7  the transcript, show her the transcript, ask her
8  the questions; and don't show just a portion of
9  it like you did with the police report, show her
10 the whole police report.
11       MS. HORN:  I -- okay.  Let's go off the
12 record.  I'd like to have this conversation not
13 in front of the witness, I don't think that this
14 is appropriate at all, but let's go off the
15 record.
16       THE VIDEOGRAPHER:  Okay.  The time is
17 approximately 12:51 and we are off the record.
18
19       (The following colloquy was had without
20 the presence of the witness and off the
21 audiovisual recording.)
22       MS. HORN:  I don't think that I'm doing
23 anything inappropriate.  I am giving her exact
24 lines, I am giving you exact lines.  These are

126

1  statements she's made.  I am trying to either
2  refresh her recollection or see if she disputes
3  her testimony.
4        If you want to go back over it with her
5  or if you want to make an objection about
6  completeness, you can, but I don't think --
7  saying that I'm not showing her the entire -- I
8  mean, I just read to her page 106, lines one
9  through six, and then I asked her, how could she
10 see his hair?
11       MR. MINGACE:  But line seven says
12 around the edge -- excuse me, line ten.
13       MS. HORN:  Then she can answer that she
14 can see around the edge.
15       MR. MINGACE:  You can't show just a
16 portion of the statement to try to mislead her
17 into answering something that's favorable to
18 yourself, but I get that.
19       MS. HORN:  I'm not doing that.  I
20 literally --
21       MR. MINGACE:  Instead of showing her
22 the document and letting her read through it, you
23 stop at line six or seven:  But you still could
24 see his hair?  Yes.  Line eight.  What part of

127

1  his hair could you see?  Around the edge.
2        But you didn't -- you left that out for
3  some reason.
4        MS. HORN:  Okay.  Sir?
5        MR. MINGACE:  So it's just the small
6  things.  Gayle, I'm not -- look it, I would have
7  made objections earlier but when I saw, you know,
8  this is just the second time I saw that you
9  showed an exhibit and you didn't show the full
10 exhibit, which is what kind of got me up in my
11 ire.  And, I apologize, I probably got a little
12 too offensive on that, but the reality is on the
13 police report, you showed her one section but
14 then you asked her questions about color of the
15 hair, you know, height, eyes.  That report was
16 three or four pages long.
17       MS. HORN:  If she wants to read the
18 report, she can read the report.  I know that
19 this is a really difficult deposition for her; I
20 am trying to go as quickly as I can as a result
21 of that.
22       I will represent to you there is
23 nothing else in that report that is a description
24 of the offender, but if you want to take the time

128

1  for her to read the report, that's fine.
2        It was my understanding before she was
3  deposed today, that she, in fact, read her trial
4  testimony.  And I didn't ask her any misleading
5  questions.  I asked her -- I read her some
6  information about what she testified about where
7  the white shirt was, and then I asked her, how is
8  it that you were able to see his hair?
9        MR. MINGACE:  But the very next line --
10 so you -- it tells you exactly -- you could have
11 given her that information --
12       MS. HORN:  You could also give her
13 that.
14       MR. MINGACE:  -- as you're showing her
15 her transcript, because you're asking her to
16 recall back to -- I assume this was in 2001?
17       MS. HORN:  2002, but yes.
18       MR. MINGACE:  2002.  Quite a long time
19 ago to remember line by line what she said or
20 didn't say.  So as you and I both know, at
21 trial -- I mean, I have no stake in this game,
22 and I get it, you know, and I'm sure that the
23 prior statements are going to have some weight in
24 this somewhere in line.

129

1      As we go forward, I would appreciate,
2  if you're going to show her a document, such as a
3  police report, she's never seen that, that wasn't
4  provided to us, it wasn't provided to her so she
5  hasn't read it or seen it or known what this
6  particular Detective Benedict wrote so, I mean, I
7  would appreciate it that --
8      MS. HORN:  Sure.
9      MR. MINGACE:  -- if you're going to go
10 through documents that she hasn't seen, to show
11 her the whole document and give her some time to
12 actually look at it; and I know we don't have all
13 day.
14      And the second part is if there's a
15 deposition -- you know, the trial transcript has
16 your answer, or her answer, a couple lines down,
17 let her look at it.  It may not refresh her
18 recollection about what she's been talking about
19 up to this point anyway but at least give her the
20 opportunity to read it.
21      MS. HORN:  So, sir, just to be clear,
22 the report that -- you sent me this morning what
23 she had reviewed prior to it.  She had a typed
24 version of Benedict's report; I happen to have as

130

1  marked the written, handwritten version.  You can
2  go through it right now, there is literally
3  nothing else that describes the offender in that
4  report.
5      As to the testimony, I don't think I
6  was misleading her.  I simply asked her if her
7  testimony is true that the thing basically
8  covered his entire head, how is it that she was
9  able to identify the hair?  My understanding is
10 she read this testimony before her deposition.
11      But I agree, I don't want to waste
12 time, I know you have a court hearing coming up
13 and I would like to try to finish it because I
14 certainly don't want to bring her back.
15      MR. MINGACE:  Okay.
16      MS. HORN:  Okay.  Are we good?
17      MR. MINGACE:  We're good.
18      MS. HORN:  Okay.
19      (End of colloquy.)
20
21      (Short recess taken.)
22      THE VIDEOGRAPHER:  We are back on the
23 record.  The time is approximately 12:58.
24      Counsel, you may proceed.

131

1      MS. HORN:  Sure.
2      Q.  So thank you for your patience, by the
3  way, Ms. Horgan, I appreciate that.
4      My question to you previously was how
5  were you able to tell what the hair color was of
6  your attacker if there was a white something
7  basically covering his entire head?
8      MS. QUINN:  Objection.
9      A.  I don't recall.
10     Q.  Okay.  You previously --
11     A.  I don't recall.
12     Q.  Sure.  I didn't mean to interrupt you,
13 ma'am.  Is there anything more you wanted to add?
14     Are you speaking with me?
15     Q.  Sorry, yes, Ms. Horgan.  I'm sorry, I
16 thought I interrupted you and I certainly didn't
17 mean to so is there anything else you wanted to
18 add about --
19     A.  No.
20     Q.  Okay.  You previously testified at the
21 same trial that you could see -- the part of his
22 hair you could see was around the edge.  What did
23 you mean when you said, around the edge?
24     A.  Around the edge of what he had on his

132

1  head.
2      Q.  And my question, I guess, and maybe I
3  wasn't clear, is was it around the front part of
4  the attacker's face, was it around --
5      A.  On the side.
6      Q.  On the side?
7      A.  On the sides.
8      Q.  Was it -- now, you had previously
9  testified that the white, whatever it was,
10 covered at least a portion of his ears so what
11 part of the sides -- so where, I guess, can you
12 point to where you were able to see hair sticking
13 out?
14     A.  It would be right around this area, --
15     Q.  And just for the record --
16     A.  -- like on the sides.
17     Q.  So I know that we've got a --
18     A.  That's the side.
19     Q.  Okay.  I know we've got a videographer
20 but just so we have a clear record for the
21 stenographer, you're pointing to a little bit
22 above your eyebrows down to --
23     A.  Down to the side, yes.
24     Q.  -- right to the top of your ears; is

133

1 that a fair characterization?

2 **A.** Yes.

3 **Q.** Okay. Okay. And was the hair -- if

4 the white object was covering the forehead, I

5 guess, was the hair sticking out from under the

6 white object?

7 **A.** I don't recall. It's been a long time,

8 I don't recall.

9 **Q.** Okay. And I think you testified

10 previously that you can't remember if the

11 attacker had facial hair; right?

12    MS. QUINN: Objection.

13 **A.** I can't recall that.

14 **Q.** Okay. Do you remember anything -- you

15 told Officer Benedict that the briefs the

16 attacker was wearing were white. Do you remember

17 anything else about the underwear the suspect was

18 wearing?

19 **A.** I don't recall.

20 **Q.** Now, you went to the hospital, was it

21 your mom and your stepfather?

22 **A.** Yes.

23 **Q.** Okay. And did you have any

24 conversations with your mom and your stepfather

134

1 on the way to the hospital about what had

2 happened to you?

3 **A.** No.

4 **Q.** And after the hospital, you went back

5 to your mom's house for a bit?

6 **A.** Yes.

7 **Q.** Did you have any conversations with

8 your mom or your stepdad at that point?

9 **A.** No.

10 **Q.** And if you need to take a break at any

11 time, you can take a break. Okay? You do know

12 that?

13 **A.** Yup.

14 **Q.** Okay. Who was at your mom's house when

15 you got there, do you remember?

16 **A.** I don't recall.

17 **Q.** Was Emily there?

18 **A.** I don't recall.

19 **Q.** Was Rebecca there?

20 **A.** I don't recall.

21 **Q.** How did you decide to go stay at

22 Rebecca's house that night?

23 **A.** Because I just wasn't comfortable at my

24 mom's and stepfather's.

135

1 **Q.** Okay. Why weren't you comfortable at

2 your mom's house?

3 **A.** I don't recall, I just don't recall.

4 **Q.** Okay. But you were comfortable staying

5 at your niece's house?

6 **A.** Yes.

7 **Q.** Did you ever have a -- I know I think

8 earlier when Ms. Quinn was questioning you, you

9 said that either you called Emily or you had

10 someone call Emily to tell her, don't go back to

11 the apartment?

12 **A.** That's correct.

13 **Q.** Do you have any recollection of

14 speaking to Emily on the day of the 14th?

15 **A.** I don't recall.

16 **Q.** Okay. Did you and Emily ever sit down

17 together or talk together about who might have

18 wanted to do this?

19 **A.** I don't recall that.

20 **Q.** Was Emily working at the time; and by

21 at the time I mean in August of 2000?

22 **A.** Part time.

23 **Q.** Where was she working?

24 **A.** I don't recall that.

136

1 **Q.** Okay. And the father of her child, I

2 believe you said his name was Robert Marnelse?

3 **A.** Yes.

4 **Q.** Okay. Did I pronounce that correctly?

5 **A.** You did.

6 **Q.** Okay. And was Robert Marnelse working

7 at the time?

8 **A.** I don't recall.

9 **Q.** Okay. Now, on the 15th, Detective

10 Hazelhurst and another detective came to

11 Rebecca's house to do the photo array with you;

12 right?

13 **A.** I don't recall the time of day.

14 **Q.** Okay. If Detective Hazelhurst has

15 testified that it was August 15th, do you have

16 any reason to dispute that that's --

17 **A.** No.

18 **Q.** -- right? Okay. And did he -- did

19 Detective Hazelhurst ever ask you to come to the

20 police station to view photographs?

21 **A.** No.

22 **Q.** Okay.

23 **A.** Not that I recall.

24 **Q.** And when he called you to tell you that

137

1  he was going to come do a photo array, did he
2  tell you that they had a suspect?
3      **A.** I don't recall.
4      **Q.** Okay.  So it's possible he might have
5  told you that they had a suspect at that time?
6          MS. QUINN:  Objection.
7      **A.** I don't recall that and I don't believe
8  he would do that.
9      **Q.** Why don't you believe that he would do
10  that?
11      **A.** Because I don't think that someone
12  would want to sway anyone one way or another.
13      **Q.** Okay.  Did you know Detective
14  Hazelhurst before this --
15      **A.** No.
16      **Q.** -- attack happened?
17      **A.** No.
18      **Q.** And apart -- you had a number of
19  interactions with him during the criminal
20  investigation.  Did you stay in touch with him
21  after Mr. Cosenza was convicted?
22      **A.** I did not.
23      **Q.** Did you assume that they had a suspect
24  since they were coming to show you photographs?

138

1      **A.** I don't remember, don't recall.
2      **Q.** You don't know one way or the other;
3  correct?
4      **A.** No.
5      **Q.** Okay.  And at no point -- well, let me
6  ask you a better question.
7          Did Detective Hazelhurst ask you for an
8  additional -- for any, you know, more description
9  of who attacked you over the phone?
10      **A.** I don't recall.
11      **Q.** You don't recall him asking for any
12  additional information from you over the phone
13  about either the attack or the perpetrator;
14  correct?
15      **A.** Correct.
16      **Q.** And I think you testified that Rebecca
17  was with you during the array; correct?
18      **A.** Correct.
19      **Q.** Okay.  Was Emily also there?
20      **A.** I don't recall.
21      **Q.** Okay.  If Detective Hazelhurst
22  testified in 2001 that both of your nieces were
23  present, do you have a reason to dispute that one
24  way or the other?

139

1      **A.** I don't and I don't recall.
2      **Q.** You just don't recall one way or the
3  other; correct?
4      **A.** Correct.
5      **Q.** So it's possible Emily could have been
6  there, you just don't know one way or the other?
7      **A.** I don't recall her being there.
8      **Q.** Okay.  You don't recall her being
9  there; correct?
10      **A.** I don't recall, plain and simple, I
11  don't recall.
12      **Q.** Do you specifically recall Rebecca
13  being there?
14      **A.** I recall -- I don't recall who was
15  there, I do recall that I was at Rebecca's house
16  so naturally she was probably there because I was
17  staying there.
18      **Q.** That's fair.  So you don't recall who
19  between Emily or Rebecca or both were there, you
20  just know that it happened at Rebecca's house;
21  correct?
22      **A.** Correct.
23      **Q.** And the day after this happened, were
24  you still really upset?

140

1      **A.** Yes.
2      **Q.** I mean, I think you testified earlier
3  that you doubted you went to the police station
4  on your own because you were still pretty
5  traumatized; correct?
6      **A.** Correct, and my hands, it was hard to
7  drive so I don't think I would be able to drive.
8      **Q.** Okay.  And so in addition to not being
9  able to drive because your hands were injured in
10  the attack, you were also still really shaken up
11  by what had happened?
12      **A.** Correct.
13      **Q.** Okay.  And when Detective Hazelhurst
14  got to your house -- sorry, strike that.
15          When Detective Hazelhurst came to
16  Rebecca's house, he did the photo array with you
17  in the kitchen, right; I think that's what you
18  said?
19      **A.** Correct.
20      **Q.** Okay.  Did he -- were you in a separate
21  room while he was laying out the photographs?  Do
22  you remember?
23      **A.** I don't recall.
24      **Q.** And was it really hard for you to do

141

1  the photo array?  I mean, were you still really
2  upset about being attacked the night before?
3      A.  Yes.
4      Q.  Okay.  And you didn't want to look at
5  the photos, did you?
6      A.  No.
7      Q.  And even before you started looking at
8  the photos, you were really upset, weren't you?
9      A.  Correct.
10     Q.  You just wanted it to be over; right?
11     A.  What do you mean by that?
12     Q.  Well, you were scared to even look at
13  the photos; right?
14     A.  Correct.
15     Q.  And so even before Detective Hazelhurst
16  asked you to look at the photos, you were still
17  shaken up by what had happened the night before
18  because you were attacked?
19     A.  Correct.
20     Q.  And I think you testified that you
21  don't really remember the conversation you had
22  with Detective Hazelhurst that kind of surrounded
23  the photo array; is that fair to say?
24     A.  I don't remember.

142

1      Q.  So you don't remember if you spoke to
2  Detective Hazelhurst before you started looking
3  at the -- before he showed you the pictures;
4  correct?
5      A.  I don't -- I don't recall.
6      Q.  And you don't remember whether he told
7  you before you saw the pictures that they had a
8  suspect; right?
9      A.  I don't recall the conversation, I
10  don't recall.
11     Q.  And you've read your trial testimony
12  and that didn't refresh your recollection, did
13  it?
14     A.  I skimmed it, I didn't read the whole
15  thing, and I couldn't get through it because
16  reliving this is not easy.
17     Q.  And I'm really sorry and I do
18  apologize.  I'm trying to go as fast as I can.
19  And, like I said, if you need to take a break at
20  any time, I am more than happy to do that.  Okay?
21     A.  Okay.
22     Q.  Would you like to take a break now?
23     A.  No, I want to go.
24     Q.  Okay.  You don't remember whether

143

1  Detective Hazelhurst asked you to look at the
2  photos and see if anyone was familiar; correct?
3      A.  I don't recall the conversation.
4      Q.  Right.  And you don't recall whether or
5  not Hazelhurst said, see if you recognize anyone;
6  correct?
7      A.  I don't recall, it's been quite some
8  time.
9      Q.  And I understand that.  Detective
10  Hazelhurst never said to you anything about
11  whether the person who committed this crime may
12  or may not be in the photo array; correct?
13     A.  I can't recall.
14     Q.  And Detective Hazelhurst gave some
15  testimony at the motion to suppress the
16  identification, and I assume you haven't read
17  that testimony, have you?
18     A.  No.
19     Q.  Hazelhurst testifies -- testified that
20  he ordinarily tells a person viewing a photo
21  array, this is a quote, on page 1-70:  I always
22  try to impose on them the importance of picking
23  out somebody and let them know that if you say
24  this is the person, are you 100 percent sure?  Or

144

1  we need a positive identification for us to go
2  further.  If it's an iffy ID, it's no good to us.
3  End quote.
4          You have no reason to dispute that
5  Hazelhurst said that to you before you viewed the
6  array; correct?
7          MS. QUINN:  Objection.
8      A.  I don't recall.
9      Q.  All right.  And if you don't recall,
10  you don't have a basis to dispute that that's the
11  instructions that he gave you before you viewed
12  the array; correct?
13         MS. QUINN:  Objection.
14     A.  I don't -- I don't recall.
15     Q.  Right.  And my question is just a tiny
16  bit different which is, if you don't recall, you
17  don't have a basis to dispute Hazelhurst's
18  testimony that that's what he said to you before
19  you looked at these photographs; correct?
20         MS. QUINN:  Objection.
21     A.  I wouldn't know because I didn't see
22  that.
23     Q.  Okay.  And I understand that you didn't
24  see the testimony but what I'm trying to just ask

145

1  you something slightly different. Hazelhurst
2  testified that this is what he ordinarily says
3  before a witness views a photo identification
4  procedure. You don't have any reason to dispute
5  that this is, in fact, what Hazelhurst said to
6  you before you viewed the array in this case;
7  correct?
8          MS. QUINN: Objection.
9      **A.** I don't recall the conversation, I
10 don't know what his testimony was, I cannot speak
11 for him.
12     **Q.** Okay. When you -- when you identified
13 Mr. Cosenza's photographs, did Detective
14 Hazelhurst say anything to you?
15     **A.** I don't recall.
16     **Q.** Okay. Did your niece, Emily, say
17 anything to you?
18     **A.** I don't recall.
19     **Q.** Did your niece, Rebecca, say anything
20 to you?
21     **A.** I don't recall.
22     **Q.** Okay. Did the other officer who was
23 there with Detective Hazelhurst say anything to
24 you?

146

1      **A.** I don't recall.
2      **Q.** You testified, when Ms. Quinn asked
3  you, that Detective Hazelhurst gave you
4  Mr. Cosenza's name. Do you remember that
5  testimony?
6      **A.** I remember her saying something to that
7  effect.
8      **Q.** Okay. Did Hazelhurst also tell you
9  that Nat had previously been arrested?
10     **A.** I don't recall.
11     **Q.** Did he tell you that Nat lived nearby?
12     **A.** I don't recall.
13     **Q.** Okay. And did Hazelhurst ever ask
14 Emily if she recognized anyone in the photo
15 array?
16     **A.** I don't recall that.
17     **Q.** Did he ever ask Rebecca if she
18 recognized anyone in the photo array?
19     **A.** I don't recall.
20     **Q.** After you found out that you had
21 identified somebody who lived in the complex, did
22 you and Emily ever have a conversation about
23 that?
24     **A.** I don't recall a conversation.

147

1      **Q.** About how it was scary to have been
2  attacked by somebody who lived so close?
3      **A.** I don't recall a conversation.
4      **Q.** Was Detective Hazelhurst taking any
5  notes when he met with you at your house -- or at
6  Rebecca's house, excuse me?
7      **A.** I don't recall.
8      **Q.** And then later that afternoon you gave
9  a police statement; correct?
10     **A.** I don't recall.
11     **Q.** Fair enough. Fair enough, totally
12 fair.
13         (Deposition Exhibit No. 7 Marked.)
14     **Q.** And I am going to show you, and I don't
15 know if you have a printout of this, but it's
16 what's been marked as Plaintiff's Exhibit 7 and
17 it's your statement to Detective Hazelhurst and
18 it's Bates stamped Cosenza 178 to 180.
19         Do you have a printout of that or would
20 you -- I mean, I can share screen as well. Would
21 you rather I share the screen?
22     **A.** I don't know what you're referring to.
23     **Q.** Let me share the screen and see if that
24 helps. And I want to give you an opportunity to

148

1  read through this. So let me know when you want
2  me to scroll down.
3      **A.** (Witness reading document.)
4          Okay.
5      **Q.** You ready for me to scroll down?
6      **A.** Yup.
7      **Q.** Okay.
8      **A.** (Witness reading document.)
9          Okay.
10     **Q.** I can't remember where I stopped.
11     **A.** Top of the page, top of that second
12 page. Yes.
13     **Q.** Does that work?
14     **A.** Yeah.
15         (Witness reading document.)
16         Okay.
17         (Witness reading document.)
18         Okay.
19     **Q.** Have you had a chance to review it?
20     **A.** I just did, yes.
21     **Q.** Okay, great. And is that, on the last
22 page, I know it's a bit hard to see, but does
23 that look like your signature?
24     **A.** At the time, yes.

149

1    **Q.** Okay.

2    **A.** The best that I could write.

3    **Q.** Sure. Is everything that you just read

4 in here true and accurate to the best of your

5 recollection?

6    **A.** Yes.

7    **Q.** Is this verbatim what -- according to

8 this incident report, you spoke to Detective

9 Hazelhurst on August 15th at two P.M., 1400

10 hours; correct?

11    **A.** That's what it says.

12    **Q.** Is this verbatim what Detective

13 Hazelhurst asked you and what you said to him?

14    **A.** As far as I can remember, yes, of

15 course it would be.

16    **Q.** Okay. So he was typing on a computer

17 as he was talking to you?

18    **A.** I can't remember what he was typing on.

19    **Q.** Okay. And the reason I ask this is

20 sometimes police statements are summaries of what

21 a witness has said and sometimes they're verbatim

22 accounts of what a witness has said. So is this

23 a summary of what you told Detective Hazelhurst

24 or a verbatim account of what you told Detective

150

1 Hazelhurst?

2    **A.** Verbatim.

3    MS. QUINN: Objection to that.

4    **Q.** And in this statement, Detective

5 Hazelhurst asked you to describe the perpetrator.

6 Was this the first time Detective Hazelhurst had

7 asked you to describe the perpetrator?

8    **A.** I can't -- I can't remember.

9    **Q.** Okay. You don't remember whether he

10 asked you to describe the perpetrator when he

11 called you on the phone before he showed you the

12 photo array; correct?

13    **A.** Correct.

14    **Q.** You don't remember whether he asked you

15 to describe the perpetrator when you viewed the

16 photo array at your niece's house; correct?

17    **A.** Correct.

18    **Q.** Okay. And we've gone over the

19 description that you provided so I'm not going to

20 beat a dead horse but did Detective Hazelhurst

21 ever ask you to clarify what you meant by medium

22 height?

23    **A.** I don't recall.

24    **Q.** Okay. So, for example, with hair

151

1 length, you said he had dark hair, medium to

2 short length; correct?

3    **A.** Is that -- that's what I said.

4    **Q.** Okay.

5    MS. QUINN: Do you need to view another

6 portion of that statement?

7    THE WITNESS: Okay.

8    MS. QUINN: I'm asking, do you need to

9 view another portion of that statement?

10    THE WITNESS: Maybe above that.

11    MS. HORN: Okay.

12    **A.** (Witness reading document.)

13    I'm good.

14    Okay. So, for example, with regard to

15 height, you told Detective Hazelhurst that the

16 suspect had dark hair, medium to short length;

17 correct?

18    **A.** Correct.

19    **Q.** And so that was kind of a range of hair

20 length, right, medium to short length; right?

21    **A.** Correct.

22    **Q.** Did he -- did Detective Hazelhurst ever

23 ask you to give a range for what you -- for

24 medium height, did he ever ask you to clarify?

152

1    **A.** Not that I recall.

2    **Q.** And the same question with regard to

3 build, did Detective Hazelhurst ever ask you to

4 give a range for what you meant by medium build?

5    **A.** Not that I recall.

6    **Q.** When you went to the police station to

7 do this statement, did Detective Hazelhurst show

8 you any photographs again?

9    **A.** Not that I recall.

10    **Q.** Did he tell you anything about -- more

11 about Nat, Mr. Cosenza?

12    **A.** Not that I recall.

13    **Q.** And you will agree with me, by this

14 point you know Mr. Cosenza's name; correct?

15    **A.** I don't recall.

16    **Q.** Okay. Well, let's turn to page two of

17 your statement and the question is: During the

18 time that you have been living there, have you or

19 your neighbors experienced problems with anyone?

20    Do you see where I'm reading from?

21    **A.** Yup.

22    **Q.** Okay. And underneath it says: My

23 neighbor to my left had his dirt bike stolen and

24 he had offered a reward to get the bike back.

153

1    See where I'm reading from?
2    **A.** Yup, I've got to plug in because my
3 battery is running low.
4    **Q.** Okay. Take your time.
5    THE VIDEOGRAPHER: Counselor, I lost
6 the image. I don't know if you want to go off
7 the record or just wait?
8    MS. HORN: Sure. I think she's just
9 plugging in because I think her battery went low.
10 Let's see if, when she plugs in, it comes back.
11    THE VIDEOGRAPHER: Okay.
12    THE WITNESS: I'm going to have to -- I
13 have to move my --
14    MS. HORN: Let's go off the record.
15    THE VIDEOGRAPHER: Okay. The time is
16 approximately 1:25 and we're off the record.
17    (Short recess taken.)
18    THE VIDEOGRAPHER: We are back on the
19 record. The time is approximately 1:37 P.M.
20    Counsel, you may proceed.
21    MS. HORN: Thank you.
22    **Q.** Ms. Horgan, when you did the photo
23 array with Detective Hazelhurst, were you wearing
24 your glasses?

154

1    **A.** I don't recall.
2    **Q.** Okay. You don't remember one way or
3 the other?
4    **A.** Correct.
5    **Q.** When you testified at the motion to
6 suppress, were you wearing your glasses?
7    **A.** I don't recall. I don't see you, I
8 only see this printout.
9    **Q.** Sorry. I was trying to -- sorry about
10 that.
11    **A.** Okay. That's okay.
12    **Q.** And the same question for trial. When
13 you gave your trial testimony, were you wearing
14 your glasses?
15    **A.** I don't recall.
16    **Q.** Okay. I'm going to share screen again
17 so we can go back to your statement so you can
18 see exactly --
19    **A.** Uh-huh.
20    **Q.** -- where I'm reading from.
21    **A.** Okay.
22    **Q.** Can you see the document?
23    **A.** Yes.
24    **Q.** Okay, great. So before we broke, I was

155

1 asking you about some of the information in the
2 statement and specifically, if you look at kind
3 of the middle of the page, the long paragraph,
4 Detective Hazelhurst --
5    **A.** Yes.
6    **Q.** -- asked you -- yup, okay. So
7 Detective Hazelhurst asked you: During the time
8 that you have been living there, have you or your
9 neighbors experienced problems with anyone?
10    And you answered: My neighbor to my
11 left had his dirt bake stolen and he had offered
12 a reward to get the bike back.
13    Where did you get that --
14    **A.** Uh-huh.
15    **Q.** Where did you get that information
16 from?
17    **A.** About the dirt bike stolen?
18    **Q.** That there was a dirt bike stolen and
19 he had offered a reward.
20    **A.** My neighbor -- I had already said that
21 my neighbor had asked me if I had seen his dirt
22 bike because it was stolen and that's all I knew.
23    **Q.** Okay. Where did you get the
24 information from about the reward? It says he

156

1 offered a reward.
2    **A.** I don't recall. I don't recall.
3    **Q.** That's not information you got from
4 your neighbor; correct?
5    **A.** Correct.
6    **Q.** Okay. Somebody else gave you that
7 information?
8    **A.** Well, if you see, it says, who I
9 realized now, and that was at the time of my
10 statement.
11    **Q.** Sure, and I haven't quite gotten there
12 yet but I will. But what I'm just asking you
13 about is that first sentence that said: My
14 neighbor to my left had his dirt bike stolen and
15 he had offered a reward to get the bike back.
16    And you testified that Mr. Payton
17 didn't tell you he had offered a reward to get
18 the bike back so I am wondering, do you know who
19 told you that information?
20    MS. QUINN: Objection.
21    **A.** I don't recall who told me the
22 information.
23    **Q.** Okay. Then this next -- the next
24 sentence, excuse me, says: Another neighbor, who

157

1  I realize now was Natale Cosenza, went to my
2  neighbor's home and stated that he knew where the
3  bike was but needed the money upfront because he
4  was going to go to rehab.
5      Did I read that correctly?
6  **A.** That's what it says.
7  **Q.** Okay. Where -- who told you -- who
8  gave you Natale Cosenza's name? Or how did you
9  know -- you say, who I realize was now Natale
10 Cosenza. Who gave you that information that his
11 name was Natale --
12 **A.** I don't recall.
13 **Q.** -- Cosenza?
14 **A.** I don't recall.
15 **Q.** And do you know who told you that he
16 was a neighbor of yours?
17 **A.** I don't recall.
18 **Q.** Okay. Is it possible that Detective
19 Hazelhurst gave you Mr. Cosenza's name?
20 MS. QUINN: Objection.
21 **A.** I don't recall.
22 **Q.** Okay. Well, earlier when Ms. Quinn was
23 asking you questions, you testified that Mr. --
24 that you believed Detective Hazelhurst told you

158

1  Mr. Cosenza's name; correct?
2  **A.** Eventually I'm sure he did, --
3  **Q.** Okay. Well, --
4  **A.** -- but I don't recall when and where.
5  **Q.** And so you don't know how you got
6  Mr. Cosenza -- how you knew Mr. Cosenza's name as
7  of August 15th at two P.M.; correct?
8  **A.** Correct.
9  **Q.** Okay. Who told you that Mr. Cosenza
10 was your neighbor, how did you get that
11 information?
12 **A.** I don't recall.
13 **Q.** And how did you know that Mr. Cosenza
14 stated he knew where the bike was but needed the
15 money upfront because he was going to go to
16 rehab?
17 **A.** I don't recall.
18 **Q.** You don't know where you got that
19 information from?
20 **A.** I don't recall where I got the
21 information from.
22 **Q.** That wasn't information that your
23 neighbor gave to you; correct?
24 **A.** Correct.

159

1  **Q.** Okay. And that wasn't information that
2  Emily gave you to either, was it?
3  **A.** I don't recall that conversation with
4  Emily.
5  **Q.** You don't recall Emily knowing that
6  Mr. Cosenza knew where the bike was but needed
7  the money upfront because he was going to go to
8  rehab, do you?
9  **A.** I don't recall any conversation with
10 Emily regarding that.
11 **Q.** Okay. And apart from Emily and your
12 neighbor, is there anyone else who would have
13 known about the dirt bike being stolen?
14 MS. QUINN: Objection.
15 **Q.** That you know of.
16 **A.** No, I don't.
17 **Q.** Other than the police; correct?
18 **A.** Correct.
19 **Q.** Then it says: Another time this kid
20 (Cosenza) somehow entered the building and
21 knocked on our door asking for money.
22 Do you see where I read from?
23 **A.** Yes.
24 **Q.** Okay. Did you say Mr. Cosenza's -- you

160

1  said earlier this was a verbatim transcription of
2  what you told Mr. -- Detective Hazelhurst;
3  correct?
4  **A.** Correct.
5  **Q.** Okay. And so did you tell Detective
6  Hazelhurst that Cosenza was the one who entered
7  the building and knocked on our door asking for
8  money?
9  **A.** I said this kid --
10 **Q.** Okay.
11 **A.** -- somehow entered the building and
12 knocked on the door asking about -- about
13 whatever.
14 **Q.** Sure. You didn't know who that kid
15 was; correct?
16 **A.** I never seen him before except for in
17 my bedroom.
18 **Q.** Okay. Well, how did you know that it
19 was the same kid who was knocking on the door
20 asking for money as was the person who was in
21 your bedroom attacking you?
22 **A.** I don't recall.
23 **Q.** Did Detective Hazelhurst tell you that
24 that was the same person?

161

1   **A.** I don't recall.

2   **Q.** Okay. Well, did Detective Hazelhurst

3   put in -- you didn't put Cosenza's name in that

4   sentence, did you?

5   **A.** I don't recall.

6   **Q.** Well, when you speak, you don't

7   normally say, another time this kid, parentheses

8   Cosenza end parentheses, somehow entered the

9   building and knocked on our door asking for

10  money, correct, you don't speak like that, do

11  you?

12      MS. QUINN: Objection.

13  **A.** I don't -- I don't recall, it's been so

14  long.

15  **Q.** And I understand that, ma'am, I am just

16  trying to figure out how you got the name -- how

17  you identified Mr. Cosenza as being the one who

18  entered the building and knocked on your door

19  asking for money?

20  **A.** I don't recall where I found out or how

21  I found out or what was transpired, I don't

22  recall.

23  **Q.** Emily never told you it was Mr. Cosenza

24  who entered the building and knocked on the door

162

1   asking for money, did she?

2   **A.** I don't recall that conversation.

3   **Q.** Okay. Did Emily say she knew

4   Mr. Cosenza?

5   **A.** I don't -- I don't know that, I don't

6   know what Emily knows.

7   **Q.** Okay. Did Emily ever say to you, I

8   know -- when all of this was going on and

9   Mr. Cosenza was being criminally prosecuted, did

10  Emily tell you she knew Mr. Cosenza's name?

11  **A.** I don't recall that.

12  **Q.** Did Emily ever tell you she picked

13  Mr. Cosenza out of a photo array as the person

14  who knocked on your door asking for money?

15      MS. QUINN: Objection.

16  **A.** I don't recall that.

17  **Q.** And so is it possible that Detective

18  Hazelhurst is the person who told you that it was

19  Cosenza who entered the building and knocked on

20  your door asking for money?

21      MS. QUINN: Objection.

22  **A.** I don't recall the conversation.

23  **Q.** Okay. Well, I'm trying to figure out

24  if -- you didn't know Mr. Cosenza's name;

163

1   correct?

2   **A.** Correct.

3   **Q.** And you weren't there when the person

4   entered the building and knocked on your door

5   asking for money; correct?

6   **A.** Correct.

7   **Q.** And Emily didn't know Mr. Cosenza's

8   name; correct?

9   **A.** Correct.

10  **Q.** And had you had a conversation with

11  Emily about knocking on the door and asking for

12  money in between the time that you were attacked

13  and the time that you went to the police to give

14  this statement?

15  **A.** I don't recall that.

16  **Q.** And so the only other person who knew

17  of Mr. Cosenza's name or knew Mr. Cosenza could

18  have been the one entering the building and

19  knocking on your door asking for money was

20  Detective Hazelhurst; correct?

21      MS. QUINN: Objection.

22  **A.** I don't recall that.

23  **Q.** Okay. Well, you don't -- as you sit

24  here today, can you think of another person

164

1   besides Detective Hazelhurst who may have

2   provided you with Mr. Cosenza's name in

3   connection with your statement that another time

4   this kid somehow entered the building and knocked

5   on our door asking for money?

6       MS. QUINN: Objection.

7   **A.** I don't recall any conversation with

8   anyone regarding that.

9   **Q.** Okay. And I understand that, ma'am, I

10  am just saying, as you sit here today, can you

11  think of a person besides Detective Hazelhurst

12  who may have given you Mr. Cosenza's name in

13  connection with this sentence that Mr. Cosenza

14  somehow entered the building and knocked on your

15  door asking for money?

16      MS. QUINN: Objection.

17  **A.** At some point in time I'm sure he did

18  tell me but I don't remember the conversation,

19  when, where, how.

20  **Q.** The next sentence says: While he was

21  knocking on the door, Emily called me at work and

22  told me about it.

23      Do you see where I read that from?

24  **A.** Yes, I also stated that Emily had

165

1  called me in a panic because someone was knocking
2  on the door.
3      **Q.** Correct. And when she called you in a
4  panic telling you someone was knocking on the
5  door, she never told you it was Mr. Cosenza;
6  correct?
7      **A.** That is correct.
8      **Q.** Okay. And then the next sentence is:
9  I told her not to answer the door. Correct?
10     **A.** Correct.
11     **Q.** And that you testified earlier you told
12 Emily don't answer the door when she called you;
13 correct?
14     **A.** That is correct.
15     **Q.** And then it says: Emily never did
16 answer the door so he knocked on my neighbor's
17 door and evidently the neighbor told him to
18 leave. He then checked on Emily to see if she
19 was okay.
20         Do you see where I'm reading that from?
21     **A.** I see that.
22     **Q.** Where did you get that information
23 from?
24     **A.** I don't recall where I got that

166

1  information from.
2      **Q.** That's not information that your
3  neighbor gave you, is it?
4      **A.** I don't recall.
5      **Q.** Okay. You don't recall who gave you
6  that information; correct?
7      **A.** I don't recall the conversation from my
8  neighbor or anybody regarding that.
9      **Q.** Okay. I want to go back up a little
10 bit in your statement. At the very -- well, the
11 almost very top of the second page, the question
12 is: Was anything missing from your apartment?
13         And you answered: Nothing. My
14 pocketbook was still on the table with all of my
15 valuables still in it. My jewelry was still on
16 my bureau as well as my roommate's.
17         Do you see where I'm reading from?
18     **A.** Yup.
19     **Q.** Okay. And so you didn't find anything
20 missing from your apartment; correct?
21     **A.** Correct.
22     **Q.** No money taken; correct?
23     **A.** Correct.
24     **Q.** No jewelry taken; correct?

167

1      **A.** Correct.
2      **Q.** Where -- so you said that: My
3  pocketbook was still on the table with all my
4  valuables still in it. What table was it on?
5      **A.** Kitchen table.
6      **Q.** Okay. And that's the table with --
7  where the chairs were?
8      **A.** Correct.
9      **Q.** Okay. And was it -- would you have it
10 on a chair or -- no, it was on a table, sorry.
11 Dumb question.
12         And then you also said that your
13 jewelry was still on your bureau?
14     **A.** Correct.
15     **Q.** And was that in your bedroom?
16     **A.** It was my bureau so, yes, correct.
17     **Q.** Okay. And was that the -- was that
18 next to your -- well, here, let me share a
19 different photograph. Is your bureau the sort of
20 wooden piece of furniture that is kind of peeking
21 out of the left side of the photograph?
22     **A.** That is correct.
23     **Q.** Okay.
24         MS. HORN: And just for the record, I

168

1  was showing the witness Plaintiff's Exhibit 1.
2      **Q.** And was the jewelry on the bureau sort
3  of -- you know, if you walked into the room,
4  would you be able to see the jewelry?
5      **A.** I don't recall.
6      **Q.** Okay. And then you said: As well as
7  my roommate's. So was Emily's jewelry also in
8  her room?
9      **A.** I assume so, yes. It wouldn't be in
10 mine.
11     **Q.** Okay. Fair enough. And then a little
12 bit later down in the statement it says: Had you
13 seen the man prior to the attack?
14         The answer was: The face was familiar
15 but I did not know him.
16         Do you see where I'm reading from?
17     **A.** I see that.
18     **Q.** Where had you seen him -- where had you
19 seen the face before?
20     **A.** I don't recall.
21     **Q.** Okay. Previously, however, you had
22 indicated that you didn't recognize the person;
23 is that correct?
24     **A.** Possibly, I don't recall. I don't

169

1  recall that.

2     Q.  Okay.  I'll show you -- do you want --

3     A.  People can look familiar and, you know,

4  not even have an inkling of who they are.

5     Q.  Okay.  And so his face was familiar but

6  you didn't have an inkling of who he was; is that

7  fair?

8     A.  Yes.

9     Q.  And was it -- was his face familiar

10  from seeing him around the apartment complex?

11     A.  No.

12     Q.  You don't know where his face was

13  familiar from?

14     A.  As I had stated, faces can look the

15  same but that doesn't mean anything.  I don't

16  know him, I don't know his -- I didn't know him.

17     Q.  And you didn't know him but you would

18  agree that his face looked familiar to you when

19  you viewed it in the array?

20     A.  I don't recall, I don't --

21     Q.  Okay.

22     A.  I don't recall.  I can see what I said

23  but I don't recall.

24     Q.  You don't have any reason to dispute

170

1  what you said; correct?

2     A.  Correct.

3     Q.  That was closer in time to when this

4  all happened?

5     A.  Correct.

6     Q.  Going back to Plaintiff's Exhibit 1.

7  Well, actually, strike that, I already asked you

8  about this.

9        This is what your apartment looked like

10  on the day of the attack; correct?

11     A.  You asked, yes.

12     Q.  I am going to stop the share for one

13  second.

14        You went back to your apartment on

15  August 16th with Detective Hazelhurst and your

16  niece; correct?

17     A.  I don't recall the day, the time.

18     Q.  Okay.  If you previously testified that

19  it was a day or two after the attack, do you have

20  any reason to dispute that?

21     A.  No.

22     Q.  And if Hazelhurst testified that you

23  went -- or he went with you and Emily on August

24  16th, do you have any reason to dispute that?

171

1     A.  No.

2     Q.  Do you know who was there when you went

3  back to the apartment?

4     A.  I don't recall.

5     Q.  Do -- was Detective Hazelhurst there

6  with you?

7     A.  I don't recall.

8     Q.  Okay.

9     A.  I don't -- dates and times I don't

10  recall.

11     Q.  Sure.  And setting aside the date and

12  time, you do recall going back to your apartment

13  to pack up some clothes; correct?

14     A.  Yes, that is correct.

15     Q.  And when you went back to your

16  apartment to pack up some clothes, was Detective

17  Hazelhurst with you?

18     A.  It's possible, neither one of us would

19  want to go back in there alone.

20     Q.  Sure.  And so you might have called him

21  to ask him to come with you so you could get your

22  stuff because you didn't want to go by yourself?

23     A.  I don't recall that kind of a

24  conversation.

172

1     Q.  Okay.  Was Emily with you?

2     A.  That day?

3     Q.  When you -- sorry, sorry, when you went

4  back to go get -- to pack up some of your

5  clothes, was Emily with you?

6     A.  Well, yes, because she had to get her

7  clothes and her daughter's clothes and my battery

8  is gone.  (Inaudible due to connection.)

9        MS. HORN:  Let's go off the record for

10  a minute then.

11        THE VIDEOGRAPHER:  Okay.  The time is

12  approximately 1:55 and we're off the record.

13        (Short recess taken.)

14        THE VIDEOGRAPHER:  We are back on the

15  record.  The time is approximately 2:10 P.M.

16  Counsel, you may proceed.

17     Q.  Ms. Horgan, how long were you at the

18  Grafton Street apartment on August 16th, 2000

19  picking up your clothes?

20     A.  I don't recall the time, how long it

21  took.

22     Q.  Okay.  Do you recall what you did when

23  you were there?

24     A.  No, I don't recall.

173

1    **Q.** Did you -- I think you testified
2    earlier that you got clothes and you put them in
3    a -- from the bedroom floor and put them in a
4    bag?
5    **A.** Correct.
6    **Q.** Does that sound correct?
7    **A.** Yes.
8    **Q.** Okay. And so while you were at your
9    Grafton Street apartment on August 16th, 2000,
10   you picked up clothes from your bedroom floor and
11   put them in a duffle bag; is that correct?
12   **A.** Some kind of a bag, yes, I'm not quite
13   sure what it was.
14   **Q.** Okay. You don't have any recollection,
15   while you were in your apartment, of police
16   searching for evidence, do you?
17   **A.** No, I do not recall.
18   **Q.** Were you ever told that you couldn't go
19   back to the apartment between August 14th and
20   August 16th because, you know, the police were
21   still treating it as a crime scene?
22   **A.** I don't recall.
23   **Q.** When you went back, there wasn't any
24   evidence tape up; correct?

174

1    **A.** Not that I recalled seeing anything.
2    **Q.** And you didn't see the police officers
3    who came with you, or the police officer who came
4    with you, Detective Hazelhurst, he wasn't wearing
5    gloves, was he?
6    **A.** I can't recall.
7    **Q.** You don't recall -- you don't recall
8    him wearing gloves; correct?
9    **A.** I don't recall that whole thing, I just
10   don't recall.
11   **Q.** You don't recall the officers ever
12   going through your clothing, correct, with you?
13   **A.** I don't recall them, no.
14   **Q.** And you don't --
15   **A.** I believe we went in our bedrooms and
16   collected whatever.
17   **Q.** Okay. And the officers weren't
18   searching through the clothing to see if there
19   was evidence; correct?
20   **A.** Not that I recall them doing that.
21   **Q.** Okay. What did you do with the bag
22   after you collected it?
23   **A.** Brought it to my niece's house.
24   **Q.** Where were you staying in your niece's

175

1    house?
2    **A.** The downstairs bedroom, they had a
3    private bath.
4    **Q.** Okay. And you put the bag -- would the
5    bag have been put in the bedroom with you?
6    **A.** Yes.
7    **Q.** Okay. And was that one among multiple
8    bags that you had?
9    **A.** I don't recall.
10   **Q.** Some time after you collected the
11   clothes from your bedroom floor, you were going
12   through them to do laundry; is that correct?
13   **A.** That is correct.
14   **Q.** And that's when you found the shorts?
15   **A.** That is correct.
16   **Q.** Okay. And when you found them, you
17   called Hazelhurst because you thought they might
18   have something to do with the crime?
19   **A.** I checked with family members first
20   before I contacted him. I checked around to see
21   if it belonged to anybody and they didn't.
22   **Q.** And once you found out that they didn't
23   belong to anybody, why did you reach out to
24   Detective Hazelhurst?

176

1    **A.** Because I wasn't sure if that was
2    anything to do with what had happened to me in
3    the apartment.
4    **Q.** You thought that the shorts could have
5    had some connection to your attack; correct?
6    **A.** That is correct.
7    **Q.** And that made sense to you because your
8    attacker was only wearing underwear once you saw
9    him; right?
10   **A.** That is correct.
11   **Q.** And so presumably he could have taken
12   off those shorts in your apartment before you
13   woke up?
14   **A.** That is correct.
15   (Deposition Exhibit No. 8 Marked.)
16   **Q.** And I am going to show you what I've
17   marked as Plaintiff's Exhibit 8, which is your --
18   well, do you remember what the shorts looked like
19   before I show you your statement?
20   **A.** I believe they were like a basketball
21   type-of-short thing.
22   **Q.** And when you say you checked with your
23   family members to make sure they weren't theirs,
24   you checked with Rebecca; correct?

177

1    **A.** I checked with Rebecca; she called her
2    husband at work and he said, no, they weren't
3    his. I asked Emily if she wore them back from
4    Rob's house and she said no, so they weren't his.
5    And I asked Michael and he said that they weren't
6    his, and those were the only people that I would
7    know that would have those, or that were -- that
8    would be near my apartment with those.
9    **Q.** Got it. And do you know what size
10   shorts those were?
11   **A.** No idea.
12   **Q.** All right. Now I'm going to go ahead
13   and share my screen and show you Plaintiff's
14   Exhibit 8 and I'll give you a minute to read
15   through it.
16        MS. HORN: For the record, this is
17   Bates stamped Cosenza 175 to 176.
18   **Q.** So let me know, Ms. Horgan, when you
19   would like me to scroll down. Okay?
20   **A.** Okay.
21        (Witness reading document.)
22        Okay.
23   **Q.** Let me scroll down to the next -- just
24   let me know when you'd like me to scroll again.

178

1    Okay?
2    **A.** Sure.
3        (Witness reading document.)
4        Okay.
5    **Q.** Okay.
6    **A.** (Witness reading document.)
7        Okay.
8    **Q.** And just your signature?
9    **A.** Yes.
10   **Q.** Okay. So is this the statement that
11   you gave to Detective Hazelhurst about the shorts
12   that you found in your apartment?
13   **A.** Yes.
14   **Q.** And just to be clear, the shorts that
15   you found, you found in the same bag that you had
16   packed on August -- well, you packed a bag on
17   August 16th of clothes from your bedroom floor;
18   correct?
19   **A.** That is correct.
20   **Q.** And then you took that bag to your
21   niece's, niece Rebecca's home, and put it in the
22   bedroom that you were staying in there; correct?
23   **A.** That is correct.
24   **Q.** And then some time after you unpacked

179

1    that bag of clothing that you had collected from
2    your bedroom floor on August 16th and found the
3    shorts; correct?
4    **A.** Correct.
5    **Q.** And then you asked your family members
6    if those were their shorts and they all said no;
7    correct?
8    **A.** That is correct.
9    **Q.** And at that point in time you called
10   Detective Hazelhurst to tell him about the shorts
11   because you thought they might be connected to
12   your attack; correct?
13   **A.** That is correct.
14   **Q.** Did I get that chronology correct?
15   **A.** That is correct.
16   **Q.** Okay, great. Do you have any
17   recollection of giving this statement to
18   Detective Hazelhurst?
19   **A.** I did.
20   **Q.** Do you have any -- well, let me ask you
21   a better question.
22        You gave this statement to Detective
23   Hazelhurst on February 20th, 2001 at 10:30 A.M.;
24   correct?

180

1    **A.** Correct.
2    **Q.** And you gave it to him at the police
3    station; correct?
4    **A.** That is correct.
5    **Q.** Was anybody besides Detective
6    Hazelhurst and yourself present for the
7    statement?
8    **A.** Not that I recall.
9    **Q.** According to this statement, Detective
10   Hazelhurst met you at your workplace to retrieve
11   a pair of shorts; is that correct?
12   **A.** That is correct.
13   **Q.** And that was on September 13th, 2000;
14   is that correct?
15   **A.** I don't recall the date but, yes.
16   **Q.** Well, on the --
17   **A.** Yes.
18   **Q.** Fair enough.
19   **A.** Yes.
20   **Q.** Was September 13th the same day you
21   found the shorts?
22   **A.** It was earlier that day, yes, and I
23   made the phone calls before I got to work.
24   **Q.** So you called Detective Hazelhurst on

**181**

1 the same day that you found the shorts; correct?
2   **A.** I called him from work, correct.
3   **Q.** And at the time were you working at the
4 same place you're working now, Herb --
5   **A.** Yes, that is correct.
6   **Q.** And he called you into the police
7 station to give a statement about those shorts
8 five months later; right?
9   **A.** That is correct.
10   **Q.** And you're not aware of anyone -- well,
11 before -- before the incident, would there be --
12 would -- would men who are in your apartment have
13 had any reason to change clothing in your
14 bedroom?
15   **A.** No.
16   **Q.** Or to leave their shorts on your floor?
17   **A.** No.
18   **Q.** And I think you already testified that
19 no men would stay overnight; correct?
20   **A.** That's correct.
21   **Q.** And you're not aware of anyone who was
22 in your apartment between August 14th, when the
23 incident happened, and August 16th, when you
24 collected the shorts, other than the police;

**182**

1 correct?
2     MS. QUINN:  Objection.
3   **A.** I don't understand that.
4   **Q.** Let me break it down for you.  So the
5 incident happened on August 14th in the early
6 morning hours; correct?
7   **A.** That is correct.
8   **Q.** And after that time, neither you nor
9 Emily went back to the apartment until August
10 16th, when you went back with Detective
11 Hazelhurst; correct?
12   **A.** Correct.
13   **Q.** And in between August 14th and August
14 16th, nobody was at your apartment; correct?
15   **A.** To my knowledge, that's correct.
16   **Q.** And your nephew, Michael, he didn't
17 come stay at your apartment until some time after
18 the 16th; correct?
19   **A.** That is correct.
20   **Q.** And you moved out of the apartment
21 after you found the shorts; correct?
22   **A.** That is correct.
23   **Q.** When you went back to the police
24 station on February 20th, 2001 to give your

**183**

1 statement, did Detective Hazelhurst tell you that
2 they were trying to do lab tests on the shorts to
3 see if there was bodily fluid or skin cells on
4 them?
5   **A.** I don't recall, I'm sure he probably
6 said that he was going to have them tested.
7   **Q.** But you don't have a recollection that
8 he did; correct?
9   **A.** Not to the best of my knowledge, that
10 is correct, I can't recall.
11   **Q.** Did Detective Hazelhurst ever tell you
12 whether they had found sperm cells or bodily
13 fluids on the shorts?
14   **A.** I don't recall that.
15   **Q.** Did he ever tell you that they had
16 found a DNA profile on the shorts but it was not
17 Nat's?  I'm so sorry, let me ask that question
18 again.
19     Did Detective Hazelhurst ever tell you
20 that they found a DNA profile on the shorts but
21 it was not Mr. Cosenza's?
22   **A.** Yes.
23   **Q.** When did he tell you that?
24   **A.** I don't recall the time and date.

**184**

1   **Q.** Do you recall where you were when
2 Detective Hazelhurst told you that?
3   **A.** I couldn't tell you if I was at work or
4 if I was at Rebecca's, I couldn't tell you.
5   **Q.** Okay, sure.  And in between the time
6 that you gave this statement and the time that
7 you testified -- do you know -- do you recall
8 testifying at the motion to suppress?
9   **A.** I don't recall but I -- I really don't
10 recall.
11   **Q.** That's fair.  And I'll represent to you
12 that you testified once in 2001 at a motion to
13 suppress and once in 2002 at Mr. Cosenza's
14 criminal trial.
15   **A.** Yup.
16   **Q.** In between the time that you gave this
17 statement to Detective Hazelhurst and the time
18 that you testified at the motion to suppress, the
19 first time you testified, --
20   **A.** Yes.
21   **Q.** -- did you talk to Detective
22 Hazelhurst?
23   **A.** I don't recall.
24   **Q.** Do you recall whether you talked to

185

1  Detective Hazelhurst in between the time you gave
2  this statement and the time you testified at
3  Mr. Cosenza's criminal trial?
4      **A.** I don't recall having a conversation
5  with him in between those.
6      **Q.** At some point did Detective Hazelhurst
7  contact you and ask you to view a second photo
8  array?
9      **A.** I don't recall that.
10     **Q.** You refused to come to the police
11 station to view a second photo array?
12     **A.** I don't recall that.
13     **Q.** Is that the kind of thing that you
14 would do, refuse to view a photo array?
15         MS. QUINN:  Objection.
16     **A.** I don't recall.
17     **Q.** You don't have a recollection one way
18 or the other?
19     **A.** I don't recall refusing, I don't
20 recall.  I don't recall that -- I don't recall
21 any of that.
22         THE VIDEOGRAPHER:  I'm sorry,
23 Ms. Horgan, can you just lower your --
24         THE WITNESS:  Yeah, I had to put my

186

1  plug back in, it fell off.
2          THE VIDEOGRAPHER:  I understand.  Thank
3  you.
4      **Q.** And I'm almost done so thank you for
5  your patience.  Let me stop sharing.  Actually, I
6  think I forgot to ask you.  Did I ask you, is
7  this your signature on Plaintiff's --
8      **A.** You asked me that already and I said
9  yes.
10     **Q.** Okay, great.  I'm going to stop
11 sharing.
12         Is that the kind -- would you -- if
13 Detective Hazelhurst had called you and asked you
14 to view a second photo array, would you have
15 refused to do that?
16     **A.** I don't recall.
17         MS. QUINN:  Objection.
18     **Q.** And I know you don't recall but sort
19 of, if hypothetically speaking, Detective
20 Hazelhurst had called you in 2000, 2001 and asked
21 you to view a second photo array, would you have
22 refused to do that?
23         MS. QUINN:  Objection.
24     **A.** I don't recall that.

187

1      **Q.** Fine.  And I understand that you don't
2  recall that but I'm asking you a hypothetical.
3  Would you have refused?
4      **A.** I would never answer a hypothetical
5  question.
6      **Q.** Why wouldn't you answer a hypothetical
7  question?
8      **A.** Because I don't believe in hypothetical
9  questions.
10     **Q.** Before you testified at the motion
11 to -- well, before you testified at the Grand
12 Jury, did you have any conversations with
13 Detective Hazelhurst?
14     **A.** Not that I recall.
15     **Q.** Before you testified at the motion --
16 well, before you testified at the motion to
17 suppress in 2001, did you meet with the
18 prosecutor?
19     **A.** I'm sure I probably did but I don't
20 recall when or a time or day.
21     **Q.** Before you -- in between the time that
22 you gave your police statement about the incident
23 in August of 2000 to the time that you testified
24 at Mr. Cosenza's criminal trial, were you ever

188

1  shown photographs of Mr. Cosenza?
2      **A.** I don't know what -- I don't know what
3  you mean.
4      **Q.** Well, you said you are sure you must
5  have met with the prosecutor before you testified
6  at the motion to suppress; is that right?
7      **A.** I don't recall but I know that I met
8  with the prosecutor.  When it was, I don't know,
9  I don't know the -- I don't remember the
10 conversation either.
11     **Q.** And when you -- so you don't recall any
12 conversations that you had with the prosecutor;
13 correct?
14     **A.** That is correct.
15     **Q.** Do you recall the prosecutor, at any
16 time before you testified, either at the motion
17 to suppress or at trial, ever showing you a copy
18 of either your -- well, ever showing you a copy
19 of your August 15th, 2000 statement?
20     **A.** I don't recall that, that's too long
21 ago.
22     **Q.** And I'm just going to ask you the same
23 question, I understand the answer, but before you
24 testified at the motion to suppress in 2001 or

189

1  trial in 2002, did the prosecutor show you your
2  February 2001 statement about the shorts?
3      **A.** I don't recall but it's possible, I
4  just don't recall.
5      **Q.** I completely understand so just bear
6  with me. Before you testified at the motion to
7  suppress in 2001, did the prosecutor ever show
8  you a photograph of Mr. Cosenza?
9      **A.** Not that I recall.
10     **Q.** And before you testified at the trial
11 in June 2002, did the prosecutor ever show you a
12 photograph of Mr. Cosenza?
13     **A.** Not that I recall.
14     **Q.** Did the prosecutor ever explain to
15 you -- well, did he ever tell you what kinds of
16 questions he was going to ask you before you
17 testified?
18     **A.** I don't recall.
19     **Q.** Did the prosecutor explain to you where
20 everybody would be sitting in the courtroom?
21     **A.** I don't recall the -- you know, it's
22 too far -- too far gone now.
23     **Q.** Sure. Since the -- well, did Detective
24 Hazelhurst know that you wore glasses?

190

1      **A.** I don't recall that he did, I don't
2  recall that -- I don't recall.
3      **Q.** You don't recall either way; correct?
4      **A.** Either way.
5      **Q.** Since Mr. Cosenza's conviction has been
6  overturned, have you had any conversations other
7  than with your lawyer about the attack?
8      **A.** No.
9      **Q.** Have you -- since Mr. Cosenza's
10 conviction has been overturned, have you had any
11 conversations other than your lawyer about
12 Mr. Cosenza?
13     **A.** No.
14     **Q.** If you just give me two minutes, I
15 think I'm done but I just want to go over my
16 notes. Okay?
17     **A.** Okay.
18     MS. HORN: We can go off the record.
19     THE VIDEOGRAPHER: Okay. Thank you.
20 The time is approximately 2:30 and we are off the
21 record.
22     (Short recess taken.)
23     THE VIDEOGRAPHER: We are back on the
24 record. The time is approximately 2:32.

191

1      Counsel, you may proceed.
2      **Q.** I just have one last question for you,
3  Ms. Horgan. I am going to share screen for one
4  second.
5      You had an opportunity to review
6  Plaintiff's Exhibit 8; correct?
7      **A.** Yes.
8      **Q.** Do you have any recollection of
9  anything that either you said to Detective
10 Hazelhurst or Detective Hazelhurst said to you
11 that's not written down on Plaintiff's Exhibit 8?
12     **A.** No.
13     **Q.** And same question I asked for your
14 other statement, as far as you are aware, is this
15 a verbatim account of what he said to you and
16 what you said to him?
17     **A.** Yes.
18     MS. HORN: I don't have anything
19 further. Thank you.
20     MS. QUINN: Nothing further from me.
21 Thank you. Thank you, Ms. Horgan.
22     MS. HORN: Thank you for your time.
23     THE WITNESS: Thank you.
24     THE VIDEOGRAPHER: Okay. Off record

192

1  then? The time is approximately 2:33 and we are
2  off the record.
3      (The deposition then ended.)

195

ERRATA SHEET

In accordance with the rules of procedure governing depositions, you are entitled to read and correct your deposition. Accordingly, please carefully read your deposition and, on this errata sheet, make any changes or corrections in form or substance to your deposition that you feel should be made. PLEASE DO NOT MARK THE TRANSCRIPT. After completing this procedure, sign at the conclusion of such changes/corrections (if any) and return it in accordance with your instructions.

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |
| ___/ | ___/ | ___/ | _____ |

DATE: _____

MELISSA A. HORGAN

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

I, Susan R. Kenney, a Notary Public in and for the Commonwealth of Massachusetts, do certify that pursuant to appropriate notice of taking deposition, there came before me the following-named person, to wit: MELISSA A. HORGAN, who was by duly sworn; that she was thereupon examined upon her oath and her examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am not a relative or employee or counsel or attorney for any of the parties, or a relative or employee of such counsel or attorney, nor am I or otherwise interested in the outcome of the action.

Witness my hand this 9th day of April, 2021.

My Commission Expires _____

May 25th, 2023          Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same in any respect unless under the direct control and/or direction of the certifying reporter.

194

Excerpt from Rule 30 (e):

Submission to Witness; Changes; Signing. When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to or by him/her, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. This procedure must be accomplished within 30 days of receipt of the transcript.

*******************************************

I have read the foregoing, and it is a true transcript of the testimony given by me at the taking of the subject deposition.

_____

MELISSA A. HORGAN

_____

DATE

CASE NAME: Natale Cosenza vs. City of Worcester, Mass, Kerry Hazelhurst, John Doherty, T.J. Coakley, Mark Richardson, Allan Burnes, Daniel Benedict, Brian Donohue, Robert Turgeon, David Grady, Darlene Rocheford and As-Yet Unknown Worcester Police Officers

DATE TAKEN: March 30, 2021