**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————

| | |
|---|---|
| NATALE COSENZA, ) | |
| ) | **CIVIL ACTION** |
| Plaintiff, ) | **NO.  4:18-10936-TSH** |
| ) | |
| v. ) | |
| ) | |
| CITY OF WORCESTER, Massachusetts, ) | |
| KERRY HAZELHURST, JOHN ) | |
| DOHERTY, T.J. COAKLEY, MARK ) | |
| RICHARDSON, ALLAN BURNES, ) | |
| DANIEL BENEDICT, BRIAN DONOHUE, ) | |
| ROBERT TURGEON, DAVID GRADY, ) | |
| DARLENE ROCHEFORD, and AS-YET ) | |
| UNKNOWN WORCESTER POLICE ) | |
| OFFICERS, ) | |
| ) | |
| Defendants. ) | |

———————————————————————

## ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 125)

**November 4, 2021**

**HILLMAN, D.J.**

Natale Cosenza brings this § 1983 action against the City of Worcester (the "City") and numerous Worcester Police Department officers, alleging due process violations (Count I), malicious prosecution (Count II), and civil conspiracy (Count III).  Two decades ago, Cosenza was arrested, and ultimately convicted, of state charges stemming from an armed burglary.  He was sentenced to twelve to twenty years of incarceration.  The victim of the burglary had identified Cosenza as the perpetrator in a photo array.  In 2016, Cosenza was granted a new trial; a judge determined that because Cosenza was not allowed to introduce expert testimony on the reliability of eyewitness identifications at his trial, justice may not have been done.  Cosenza, released from

prison pending the new trial, filed a motion to suppress the identification, which was allowed.  The state then filed a nolle prosequi.

Cosenza argues that officers used an impermissibly suggestive identification procedure, which wrongfully implicated him in the crime.  Because it was not clearly established at the time of the alleged violation that the identification procedure was unconstitutional, the individual officers are entitled to qualified immunity.  Moreover, because the record does not permit a finding that the City was deliberately indifferent in its failure to train officers, the City cannot be held liable for the alleged violation.

Cosenza also asserts that officers suppressed evidence, fabricated evidence, prosecuted him without probable cause, and engaged in a civil conspiracy.  Viewing the facts in Cosenza's favor, a jury could find two of the officers liable for suppressing evidence, fabricating evidence, and engaging a civil conspiracy.  No jury, however, could find for Cosenza on the malicious prosecution claim, or for Cosenza on the other claims as to the other defendants.[1]  Accordingly, the defendants' motion for summary judgment is ***granted*** in part and ***denied*** in part.

## Background

The following facts are drawn from the record, viewed in Cosenza's favor.  *See Pippin v. Boulevard Motel Corp.*, 835 F.3d 180, 181 (1st Cir. 2016).

### *1. The Incident*

---

[1] Defendants Burnes, Turgeon, Benedict, Richardson, Coakley, Grady, Donahue, Rocheford, and Doherty argue that their tangential involvement in the investigation cannot support liability under § 1983.  Cosenza states that he is no longer pursuing claims against Burnes, Turgeon, Benedict, Richardson, and Coakley.  (*See* P Memo at 2 n.1).  Indeed, the record does not support liability for these five defendants.  *See Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006).  Accordingly, summary judgment on all claims for Burnes, Turgeon, Benedict, Richardson, and Coakley is granted.  The Court will also dismiss Cosenza's claims against the as-yet unknown Worcester police officers.  *See Figueroa v. Rivera*, 147 F.3d 77, 83 (1st Cir. 1998).

Around 4 A.M. on August 14, 2000, Melissa Horgan awoke in her Worcester apartment. Crouched beside her bed was a man wearing underwear, a dark t-shirt, and a white covering on his head. Horgan immediately asked the man who he was and what he was doing there. Without responding, the man proceeded to beat Horgan with a hard object. It was dark out, the lights were off, and Horgan was not wearing her glasses. Some light from the parking lot, however, may have been filtering in through the bottom of her blinds. Horgan put her hands up to her head to protect herself from the blows. She pled with the man to stop, telling him he could have whatever he wanted. The man stopped hitting her but began to climb onto her bed. Afraid, Horgan kicked the man repeatedly. He then fled.

Horgan immediately called 911. She told the operator that a white man in underwear, a t-shirt, and white handkerchief on his head had attacked her. She said she did not know who the man was and that she had never seen him before. When asked whether the man had hair, she responded no, or that she did not know.

## 2. The Response

Worcester Police Department ("WPD") officers soon arrived. One of the officers, Daniel Benedict, created an incident report. Horgan told Benedict that a white man, whom she did not recognize, wearing a dark t-shirt, a white shirt around his head, and white briefs had attacked her. Benedict determined that a window in Horgan's roommate's room, which was empty that night because her roommate was staying elsewhere, was the point of entry, as other access points were locked. Horgan's roommate was her niece, Emily Banks. Benedict noted that there was a partial print on the window. Benedict spoke with Horgan's next-door neighbor, Robert Payton, as officers canvassed the building. Payton told Benedict that he had not seen or heard anything that night, but that he was having problems with a man, Cosenza, who lived in a neighboring building.

3

According to Payton, Cosenza had been in Payton's building, knocking on several doors asking for money.  Payton believed that Cosenza had recently gotten into the building by jumping up onto a second-floor, shared balcony.  Benedict listed Cosenza as a suspect in his incident report.

### 3.  The Investigation

Darlene Rocheford from WPD's Bureau of Criminal Identification ("BCI") arrived at Horgan's apartment around 5 A.M. to take photographs and dust the scene for prints.  Relative to the window in Banks's room, Rocheford testified at trial that she processed the entire screen, which had been pulled off the window, as well as the windowsill.  She further testified that she "believe[d]" that she "most likely" processed the actual window.  She testified that she did not find any usable prints.

Officers found a wooden rung from a chair in Horgan's bedroom.  Horgan told Benedict that the rung was from one of her chairs but that she had never seen it in her bedroom.  Brian Donahue, one of the other officer's present, placed the rung in a bag for testing.  The rung was later tested for prints by David Grady of the BCI.  Grady processed the rung with a chemical called cyanoacrylate, which Grady described as "a fancy name for Super Glue," and then treated the rung with a magnetic powder.  No prints were uncovered.  About five weeks later, Grady discarded the rung, either because Donahue told him to or because Donahue never came to pick it up.  Grady did not photograph the rung before discarding it.

Later that morning, around 8 A.M., WPD Detective Kerry Hazelhurst was assigned the case.  He read Benedict's incident report and contacted Horgan to arrange a meeting.  Seeing that Cosenza was listed as a suspect in Benedict's incident report, Hazelhurst decided to prepare a photo array with a photograph of Cosenza for Horgan to view.  Hazelhurst pulled Cosenza's

"master card," a record of all contacts a person has with the WPD, for a recent photograph.[2] Hazelhurst also pulled eight photographs of men who had physical characteristics similar to Cosenza.

Horgan was staying with her niece, Rebecca Ritacco, following the attack.  Hazelhurst and his partner, Detective John Doherty, met with Horgan at Ritacco's house on the morning of August 15, 2000 to conduct the photo array.  Horgan's roommate, Banks, also was there.  Horgan was sitting at the kitchen table, visibly shaken from the attack.  Hazelhurst did not ask Horgan for a description of her attacker, or whether she was able to get a good look at her attacker, prior to showing her the array.  No one there remembers exactly what was said, but Hazelhust testified at the 2001 hearing on Cosenza's motion to suppress that he likely said and did the following:

> Usually what I do is I put the photo array out, I tell them to take their time, look at it carefully, make sure you're certain who you pick out.  I always try to impose on them the importance of picking out somebody and let them know that if you say this is the person are you a hundred per cent sure, or we need a positive identification for us to go further.  If it's an iffy I.D. it's no good to us.

Hazelhurst elaborated that "it will only work" if they "have a positive I.D;" unless it is a positive I.D., it is "not going to work in a court of law."  At the time, the City had no written policies, and provided no formal training to police officers, on how to conduct a photo array.

Hazelhurst laid out the nine photographs, one of which was Cosenza's, on the table. Horgan scanned them over.  When she reached Cosenza's photograph, she became hysterical and identified him as her attacker.  Taking her emotional reaction as a sign of confidence, Hazelhurst did not ask Horgan how confident she was in her identification.  After the identification, Hazelhurst

---

[2] Cosenza's master card lists what appears to be a rather lengthy criminal history.  Although the record is clear that Hazelhurst *printed* the master card for a photograph, it is unclear whether Hazelhurst *reviewed* the master card prior to conducting the array.

told Horgan Cosenza's name and that Cosenza lived near her.  Hazelhurst asked Horgan to come to the WPD station that afternoon to provide a formal statement.

In the meantime, Hazelhurst, Doherty, and two other officers, T.J. Coakley and Mark Richardson, went to Cosenza's apartment to look for Cosenza.  While they were there, Doherty noticed someone riding a bicycle.  Doherty identified the person as Cosenza.  Doherty testified at trial that the person was about twenty feet away, that Doherty yelled out that he was a police officer and wanted to talk to the person, and that the person looked back and sped away.  Coakley testified at his deposition in this case, however, that the person was 200 yards away, that he could not identify the person as Cosenza, and that it was not clear whether the person had even heard Doherty's command.  Coakley had grown up about 250 yards from Cosenza's family, but he had not seen Cosenza in over a decade, and he never had seen Cosenza as an adult.

That afternoon, at the station, Hazelhurst took Horgan's statement.  According to the statement, which Hazelhurst typed in question-and-answer format as he spoke with Horgan, Horgan stated that a man in brief underwear, a dark t-shirt, and a white t-shirt on his head had attacked her.  She also stated that the man was medium height and medium build, with dark medium-to-short length hair.  Cosenza had medium-to-short length hair in the photograph used in the array.  Cosenza is approximately five foot, three inches and, at least at the time, weighed around 125 pounds.  Horgan, who did not know Cosenza's name before the attack, also reported to Hazelhurst that a neighbor who she "realized now was Natale Cosenza" had gone to her next-door neighbor's door with information about the next-door neighbor's stolen motorcycle, asking for reward money.  She reported that another time, "this kid (Cosenza) somehow entered the building"

and knocked on her door when only Banks was home.[3]  Weeks earlier, when someone had knocked on Banks' door asking for money, Banks did not know who the person was.

### 4. The Shorts

Sometime that morning, Horgan's sister and mother went to Horgan's apartment to pick up personal items for Horgan while Horgan was staying with Ritacco.  Some of the items that Horgan's sister picked up had been on the floor of Horgan's bedroom.  She put the items in a bag.  The next day, on August 16, 2000, Horgan returned to her apartment with Banks, Hazelhurst, and Doherty.  Horgan picked up some clothes from her bedroom floor and put them in a bag.  Hazelhurst testified at trial that, while there, he looked for a pair of men's shorts or pants because the attacker had only been wearing underwear, but that he did not find any.  Horgan testified at her deposition, however, that she did not recall Hazelhurst looking around the apartment that day.  After picking up the clothes, Horgan continued to stay at Ritacco's house.

Beginning that week, Horgan's nephew, Michael O'Bryant, began staying at Horgan's apartment to take care of Horgan's cats.  Michael O'Bryant testified at trial that he "didn't touch" Horgan's room, and that clothes remained on the floor until Horgan came to pick them up approximately three weeks after he moved in.  A couple of weeks later, over the weekend of August 26, 2000, another nephew, Matthew O'Bryant, stayed at Horgan's apartment with two friends, and potentially a couple of others.

---

[3] The full except of the statement read: "My neighbor to my left had his dirt bike stolen and he had offered a reward to get the bike back.  Another neighbor who I realized now was Natale Cosenza, went to my neighbor['s] home and stated that he knew where the bike was but needed the money up front because he was going to go to rehab.  Another time this kid (Cosenza) somehow entered the building and knocked on our door asking for money.  While he was knocking on the door, Emily called me at work and told me about it.  I told her not to answer the door.  Emily never did answer the door so he knocked on my neighbor['s] door and evidently the neighbor told him to leave, [the neighbor] then checked on Emily to see if she was ok."

On September 13, 2000, Horgan was emptying a bag of clothes from her apartment to do laundry, when she found a pair of men's athletic shorts.  Not recognizing the shorts, she checked with her family to see if the shorts belonged to any of them.  They did not.  She then called Hazelhurst to alert him of the discovery.  Hazelhurst collected the shorts from Horgan that day.  Months later, on February 20, 2001, Hazelhurst took a statement from Horgan at the WPD station regarding the shorts.  Hazelhurst also sent the shorts to the state lab to be tested.  DNA identified from semen stains on the shorts did not match Cosenza.  Hazelhurst wrote an incident report about the shorts on September 17, 2001, over a year after the discovery.

### 5. The Conviction

Cosenza was charged with assault with intent to rape, assault and battery with a dangerous weapon, and burglary on August 16, 2000.  He was arrested on August 29, 2000.  He was indicted by a grand jury in state court on those charges on October 13, 2000.  Cosenza moved to suppress Horgan's identification from the photo array; a judge denied the motion, finding that the array and circumstances surrounding the array were not suggestive.

The Commonwealth relied heavily on Horgan's identification at Cosenza's jury trial.  (*See* Docket No. 133-48, Closing Arguments at 167-70).  The other evidence, which included Doherty's testimony that he saw Cosenza fleeing on his bicycle outside the apartment complex on August 15, 2000, was not strong.  *See Commonwealth v. Cosenza*, 844 N.E.2d 720, 2006 WL 871016, at *2 (Mass. App. Ct. 2006) (unpublished).  Cosenza maintained his innocence; his defense was that Horgan's identification was unreliable and that the shorts found in the bag of clothes taken from her apartment belonged to the real perpetrator.  (*See* Closing Arguments at 154-59).  As to the shorts, the Commonwealth argued that the shorts were left at the apartment by someone staying there after the attack, relying in part on Hazelhurst's testimony that he had searched the apartment

for men's shorts or pants, to no avail, when he was there on August 16, 2000.  (*See id.* at 173).

Cosenza was convicted of assault and battery with a dangerous weapon and armed burglary.  He

was sentenced to nine to ten years on the assault and battery charge concurrent with a twelve-to-

twenty-year sentence on the armed burglary charge.

*6.  The Relief*

Following his convictions, Cosenza moved for a new trial, arguing that his trial counsel

was ineffective for failing to contact and interview two of the guests who stayed at Horgan's

apartment following the attack, and that the trial judge had erred by failing to permit Cosenza to

introduce expert testimony on eyewitness identification; the motion was denied.  In 2006, the

Massachusetts Appeals Court affirmed Cosenza's convictions and the denial of his motion for a

new trial.  *See Cosenza*, 2006 WL 871016, at *1.  In 2015, Cosenza again moved for a new trial,

asserting that a 2013 report from the Study Group on Eyewitness Identification, convened by the

Justices of the Massachusetts Supreme Judicial Court ("SJC"), as well as recent decisions by the

SJC, suggested that expert testimony is necessary to aid a jury in understanding the reliability of

eyewitness identifications.  A judge granted the motion, concluding that because Cosenza was not

allowed to present expert testimony on the reliability of eyewitness identifications, justice may not

have been done at his trial.  On June 3, 2016, Cosenza filed a motion to be released pending further

proceedings; the motion was granted, and Cosenza was released from prison that day.  In advance

of the new trial, Cosenza moved to suppress Horgan's identification.  A judge, different than the

one who granted the new trial, granted the motion, reasoning that the array and identification

procedures were unnecessarily suggestive, and that admission of the identification would deprive

Cosenza of his due process rights under Article 12 of the Massachusetts Declaration of Rights.

Following that order, the Commonwealth filed a nolle prosequi on November 14, 2017, and the case was closed.

In May 2018, Cosenza filed the instant § 1983 action against the City and the WPD officers involved in his investigation.  The defendants now move for summary judgment.

## Legal Standard

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  An issue is "genuine" when a reasonable factfinder could resolve it in favor of the nonmoving party.  *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994).  A fact is "material" when it may affect the outcome of the suit.  *Id.*  When ruling on a motion for summary judgment, "the court must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Scanlon v. Dep't of Army*, 277 F.3d 598, 600 (1st Cir. 2002) (citation omitted).

## Discussion

Section 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory."  42 U.S.C. § 1983.  Cosenza brings three claims under § 1983: a claim for deprivation of due process (Count I), a claim for malicious prosecution (Count II), and a claim for civil conspiracy (Count III).[4]

*1. Due Process*

---

[4] The Court previously dismissed Cosenza's claim for failure to intervene (Count IV). (Docket No. 55).

10

Cosenza asserts three theories of liability on Count I.  He argues that the defendants violated his due process rights by using an unduly suggestive identification procedure, by suppressing and destroying evidence, and by fabricating evidence.  The Court takes each theory in turn.

### a.  Identification Theory

The defendants argue that summary judgment is warranted on the identification theory because the photo array was not impermissibly suggestive, and because there was no substantial likelihood of misidentification.[5]  They also argue that the individual defendants are entitled to qualified immunity, and that the City is not liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

### i.  Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v.*

---

[5] Cosenza argues that the state court decision on his 2017 motion to suppress precludes summary judgment on the identification theory.  In Massachusetts, the doctrine of issue preclusion prevents re-litigation of issues "actually litigated and determined" by a valid, final judgment.  *See Jarosz v. Palmer*, 766 N.E.2d 482, 487 (Mass. 2002).  The issue "actually litigated and determined" by the state court was whether the identification procedure violated the Massachusetts constitution.  The issue before this Court is whether the procedure violated the federal constitution.  Those questions are not the same.  *See Commonwealth v. Johnson*, 45 N.E.3d 83, 88 (Mass. 2016); *Commonwealth v. Walker*, 953 N.E.2d 195, 205 n. 13 (Mass. 2011).  Because the permissibility of the identification procedure under the federal constitution was not actually litigated and determined by the state court, the doctrine of issue preclusion does not apply.

*Callahan*, 555 U.S. 223, 231 (2009).  To determine whether a defendant is protected by qualified immunity, a court must decide: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation."  *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).  The Court need not decide these questions in order, *see Pearson*, 555 U.S. at 236, and may resolve the case exclusively at the second step, *see Eves v. LePage*, 927 F.3d 575, 584 (1st Cir. 2019).

The question whether a right was "clearly established" divides into two parts: "(1) 'the clarity of the law at the time of the alleged civil rights violation,' and (2) whether, given the facts of the particular case, 'a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights.'"  *Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (quoting *Maldonado*, 568 F.3d at 269) (alterations in original).  The "clearly established" inquiry does not require a case directly on point.  *See Gilk v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011).  The "contours of the right," however, "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  In short, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  *Maldonado*, 568 F.3d at 269.

Well before the photo array at issue here, the Supreme Court established that an "impermissibly suggestive" photo array giving rise to "a very substantial likelihood of irreparable misidentification" deprives a defendant of due process.  *See Simmons v. United States*, 390 U.S. 377, 384 (1968).  Thus, the law was clear at the time of the alleged violation that an unnecessarily suggestive photo array could violate a defendant's rights.  *See Manson v. Brathwaite*, 432 U.S. 98,

116 (1977); *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  This Court noted as much with respect to the defendants' motion to dismiss.

Whether the contours of that right were clearly defined, such that a reasonable officer would have understood that the identification procedure was impermissibly suggestive, requires further analysis.  Cosenza asserts that the identification procedure was impermissibly suggestive for a variety of reasons.  (*See* Pl. Mem. at 11-13).  First, Hazelhurst should not have conducted a photo array with Cosenza's photograph because Hazelhurst lacked evidence-based suspicion of Cosenza.  Second, the other photographs in the array were picked to match Cosenza's photograph, not Horgan's description of her attacker.  Third, Cosenza was the only person in the array whom Horgan previously may have seen.  Fourth, the array was conducted in the presence of Horgan's roommate, Banks.  Fifth, Hazelhurst did not tell Horgan that the perpetrator may or may not be in the array, that officers would continue their investigation regardless of whether an identification was made, and that the array could be used to clear the innocent.  Sixth, Hazelhurst instructed Horgan that he needed a positive identification "to go further."  Seventh, all photographs in the array were displayed simultaneously, rather than one-by-one.  Eighth, Hazelhurst did not preserve the array, document Horgan's level of certainty, or have Horgan sign an acknowledgment of which photograph she selected.  Finally, Hazelhurst confirmed Horgan's identification afterwards by telling her Cosenza's name and that Cosenza lived near her.

Several of these factors were not understood by courts as contributing to the suggestiveness of photo arrays until after Cosenza's conviction.  *See United States v. Ford*, 683 F.3d 761, 765 (7th Cir. 2012) (photos shown all at once); *United States v. Saunders*, 501 F.3d 384, 388 (4th Cir. 2007) (instruction that array may or may not contain suspect).  Others, alone, do not necessarily

render a procedure impermissibly suggestive. *See Guillick v. Perrin*, 669 F.2d 1, 4 (1st Cir. 1981) (not improper for police to base photo array on suspicion of defendant).

In disputing qualified immunity, Cosenza relies on *Simmons v. United States*, 390 U.S. 377 (1968). In *Simmons*, 390 U.S. at 382, officers showed witnesses six photographs of groups of people, several of which included the defendant. The Supreme Court cautioned that "improper employment of photographs by police *may sometimes* cause witnesses to err in identifying criminals." *Id.* at 383 (emphasis added). Even when correct procedures are used, the Court noted, "there is *some danger* that the witness may make an incorrect identification." *Id.* (emphasis added). That danger increases, the Court elaborated, "if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized." *Id.* The Court concluded that although the procedure used to identify the defendant fell "short of the ideal," in part because the defendant's image recurred in several of the photographs, the defendant's due process rights were not violated given the surrounding circumstances. *See id.* at 386 & n.6.

*Simmons* does not clearly establish that the identification procedure at issue here was impermissibly suggestive. Cosenza's photograph arguably was emphasized because Cosenza was the only person in the array whom Horgan previously may have seen. While troubling, the discussion in *Simmons* on emphasis of a particular photograph is in reference to the photograph itself -- that is, whether the photograph is dissimilar to the others, or whether the defendant's image recurs in several of the photographs. Other cases relied on by Cosenza share that focus. *See Foster v. California*, 394 U.S. 440, 443 (1969); *United States v. Lau*, 828 F.2d 871, 875-76 (1st Cir. 1987). *United States v. Wade*, 388 U.S. 218, 232 (1967), for its part, cautions against using filler

14

photographs of people known to the witness, such that the photograph of the suspect is only person the witness does *not* know. That did not happen here.

Three of the cases Cosenza cites in which officers were found not to be entitled to qualified immunity are distinguishable. In *Schand v. City of Springfield*, 380 F. Supp. 3d 106, 120 (D. Mass. 2019), officers showed a witness a Polaroid of the defendant and told the witness that the defendant had been arrested for the alleged murder. The officers then inserted the Polaroid into a photo array of mug shots, at which point the witness picked out the defendant as the shooter. *Id.* In *Gregory v. City of Louisville*, 444 F.3d 725, 733, 746 (6th Cir. 2006), officers employed a one-on-one show-up at a police station with a witness who previously had failed to pick out the defendant from an array. And in *Rojas v. Iannotto*, 2003 WL 169798, at *4 (S.D.N.Y Jan. 24, 2003), a witness identified the defendant when he was handcuffed, in police custody, and accompanied only by officers. Those procedures more clearly were established as impermissibly suggestive. *See United States v. de Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993); *Velez v. Schmer*, 724 F.2d 249, 251 (1st Cir. 1984). The fourth such case Cosenza cites, *Sanders v. City of Chicago*, 2016 WL 2866097 (N.D. Il. May 17, 2016), is unpersuasive on this point. There, the court reasoned only that "it has been clearly established since at least 1977 that a criminal defendant has a due process right not be subjected to unduly suggestive identifications that taint his criminal trial." *Id.* at *10. While true, more specificity is required. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The Court has not identified any case from before the alleged violation that clearly established the impermissibility of a photo array consisting of nine photographs of similar-looking people, even considering all the factors listed above. This is not a case where the impermissibility of the defendants' conduct was "so patently evident" that no particular case is needed to have put

a reasonable officer on notice of the conduct's unconstitutionality.[6]  *See Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 47 (1st Cir. 2016).  Because, at the time, it was not clearly established that the identification procedure at issue was impermissibly suggestive, such that a reasonable officer would know that Cosenza's due process rights would be violated when an identification resulting from that procedure was used against Cosenza at trial, the individual defendants are entitled to qualified immunity.  Summary judgment for the individual defendants on this theory is granted.

### iv.  Municipal Liability

"It is well established that municipalities may be sued under § 1983 only in limited circumstances."  *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002).  Under § 1983, a municipality may not be held vicariously liable for harm inflicted by the municipality's agents or employees; a municipality may be held liable only when the municipality itself inflicts injury, either through an official custom or policy, or by the municipality's failure to train or supervise its agents or employees.  *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011); *Monell*, 436 U.S. at 694.  Here, Cosenza maintains that the City is liable both for its express policies and for its failure to train and supervise its officers.[7]

To prevail, Cosenza must demonstrate that the municipality is responsible for the alleged violation.  *Young v. City of Providence*, 404 F.3d 4, 25-26 (1st Cir. 2005).  For his express policy

---

[6] Contrary to the record on the defendants' motion to dismiss, the record on summary judgment does not permit an inference that officers overtly suggested to Horgan that she pick out Cosenza.

[7] To the extent Cosenza's due process claim against the City also stems from alleged fabrication of evidence and suppression of evidence, the record does not support such claims.  There is no evidence that the City had an express policy that caused its officers to fabricate or suppress evidence; nor is there evidence that the City's failure to train its officers caused those alleged violations.  Summary judgment for the City on those theories of liability is granted.

theory, Cosenza must prove that an official policy or custom of the City *caused* his harm. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). The City must be the "moving force" behind the injury. *Id.* For his failure-to-train theory, Cosenza must prove not only that the City's failure to train its officers caused his harm, but also that the failure to train "amount[ed] to deliberate indifference to the rights of persons with whom the police come into contact." *Canton v. Harris*, 489 U.S. 378, 388 (1989). A showing of "deliberate indifference" requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty.*, 520 U.S. at 410. "A plaintiff typically must show a 'pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train.'" *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (quoting *Connick*, 563 U.S. at 62). "Alternatively, liability might be appropriate 'in a narrow range of circumstances where a violation . . . is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.'" *Justiniano v. Walker*, 986 F.3d 11, 21 (1st Cir. 2021) (quoting *Young*, 404 F.3d at 28) (internal quotations omitted).

Cosenza's express policy theory falters at this stage. According to Cosenza, the City had an express policy of not having a policy on how to conduct a photo array. Unlike in *Haley v. City of Boston*, 657 F.3d 39, 51-52 (1st Cir. 2011), where the plaintiff alleged an affirmative policy of nondisclosure, the alleged policy here is essentially a reframing of the failure-to-train theory, which requires a more stringent standard of fault, *see Connick*, 563 U.S. at 62.

As to Cosenza' failure-to-train theory, the City's Federal Rule of Civil Procedure 30(b)(6) representative testified at his deposition that the City did not have any policies on how to conduct a photo array and did not train its officers on how to conduct a photo array. The City had neither formal training nor on-the-job training. WPD officers were provided "very little guidance" beyond

being told to be careful to select photographs of people with similar characteristics, and generally, not say anything unnecessarily suggestive during the array. Hazelhurst, for his part, testified at his deposition that he did not believe that he had had any training on how conduct photo array. Instead, he learned from "watch[ing] the veteran guys work."

According to one of Cosenza's experts, nationally accepted standards for conducting photo arrays at the time included selecting filler photographs based on the witness' description; advising the witness that the suspect may or may not be among the photographs presented; assuring the witness that regardless of whether an identification is made, police will continue to investigate the incident; and asking the witness to state in her own words how certain she is of any identification. These practices, among others, were recommended by a 1999 report produced by the Department of Justice. Cosenza's expert opined that a problem with relying on on-the-job training, which is at most what Hazelhurst had, is that "if what is taught is contrary, incompatible with, or does not address nationally accepted standards of law enforcement practice, that manner of inappropriate conduct may be perpetuated. Such was the case with the Worcester Police Department in 2000."

As mentioned, a plaintiff typically must demonstrate a pattern of unconstitutional violations to make out a claim for municipal liability under a failure-to-train theory, *see Gray*, 917 F.3d at 14, and here, Cosenza has made no such showing. Cosenza nonetheless argues that a jury reasonably could find that municipal liability is appropriate. In *Canton*, 489 U.S. at 390 n.10, the Supreme Court noted that a city's arming its officers with firearms to arrest fleeing felons meant that the need to train officers in the constitutional limitations on the use of deadly force "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." In *Connick*, 563 U.S. at 64, the Supreme Court described *Canton* as hypothesizing a "narrow range" or "single-incident liability" for municipalities. The

18

Court then held that a municipality's failure to train prosecutors in their *Brady* obligations did not fall within that range. *Id.* Because attorneys are trained in the law prior to becoming attorneys, "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).

Following *Canton* and *Connick*, several courts have held that municipalities' failure to train police officers, who are not trained in the law, on their *Brady* obligations can lead to single-incident liability. *See Echavarria v. Roach*, 2021 WL 4480771, at *26 (D. Mass. Sept. 30, 2021); *Crews v. County of Nassau*, 996 F. Supp. 2d 186, 210 (E.D.N.Y. 2014). Cosenza argues that identification procedures, like *Brady* obligations, are at the core of criminal prosecutions, such that a failure to train officers on how to conduct photo arrays leads to the highly predictable consequence of tainted identifications corrupting criminal trials. Cosenza has not identified a case, however, and the Court is aware of none, that has extended *Canton*'s hypothesized single-incident liability to encompass training on identification procedures. Because municipal liability based on a single alleged violation is reserved for a "narrow range of circumstances," *Connick*, 563 U.S. at 63, not apparently applicable here, summary judgment for the City on this theory is granted, *see Gray*, 917 F.3d at 14; *Hill v. Walsh*, 884 F.3d 16, 24 (1st Cir. 2018).

### b.  Suppression Theory

The defendants argue that summary judgment is warranted on the suppression theory because Cosenza cannot prove that evidence was suppressed, or that a due process violation occurred.[8] Cosenza contends that Hazelhurst, Doherty, Rocheford, Donahue, and Grady withheld and destroyed exculpatory evidence.

---

[8] The defendants do not develop an argument on qualified immunity as to this theory.

*i.   Withheld Evidence*

A prosecutor who fails to disclose to a criminal defendant favorable and material evidence in the prosecutor's possession violates the defendant's due process rights, irrespective of whether the prosecutor acted in good or bad faith.  *See Drumgold v. Callahan*, 707 F.3d 28, 38 (1st Cir. 2013).   While this responsibility lies with the prosecutor, "law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to the defendant." *Id.* "Evidence is favorable to a defendant if it is either exculpatory or impeaching in nature." *Id.* Evidence is material if it "undermines confidence in the verdict," or by "any reasonable likelihood," could have "affected the judgment of the jury." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (citations omitted).   To prevail in a § 1983 action, a plaintiff also "must demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his conviction." *Drumgold*, 707 F.3d at 48; *see also Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997).   This "factual causation inquiry essentially replicates the materiality inquiry with a heightened burden of proof." *Drumgold*, 707 F.3d at 49.

Cosenza asserts that the defendants withheld three pieces of evidence: (1) that Cosenza did not flee from officers on a bicycle the day after the attack; (2) that officers provided Horgan with information about Cosenza to fabricate her statement following the photo array; and (3) that no officer at Horgan's apartment searched for clothing worn by the perpetrator.  As an initial matter, Cosenza's argument is premised on the assumption that a jury reasonably could find these facts as true, and that the information was not already disclosed.  A review of the record sorts reasonable inference from conjecture.

Doherty testified at trial that he observed Cosenza riding a bicycle the day after the attack. Doherty testified that he was about twenty feet away from Cosenza, and that when he called out

20

to Cosenza, Cosenza fled.  Cosenza suggests that this was a lie because Coakley, another officer at the scene, testified in his deposition that he could not identify the bicyclist, or whether the bicyclist was trying to evade the officers, because the bicyclist was 200 yards away.  Coakley did not testify that the bicyclist was *not* Cosenza, nor did he dispute that the bicyclist may have been trying to evade the officers.  Thus, the only real inconsistency between Coakley's and Doherty's testimony was the distance between the officers and the bicyclist.  *See LaFrenier v. Kinery*, 550 F.3d 166, 167-68 (1st Cir. 2008).  Nonetheless, a jury could believe Coakley over Doherty and find that the bicyclist was in fact 200 yards away from the officers.  This fact was not disclosed to Cosenza.

Horgan's statement described her attacker as having medium-to-short, dark hair; it also detailed incidents involving Cosenza and her neighbor, Payton, and her roommate, Banks.  First, it was disclosed -- in the statement itself -- that Horgan gave the statement after the photo array, and thus, after Horgan had seen a photograph of Cosenza with medium-to-short, dark hair.  Second, it was disclosed -- at the 2001 hearing on the motion to suppress -- that Hazelhurst "probably" told Horgan that Cosenza lived in a building next to hers, and that Hazelhurst "might have" told Horgan Cosenza's name.  What was not disclosed, and what the record suggests by reasonable inference actually happened, was that Hazelhurst told Horgan that Cosenza was the person who had been in her building asking for money.  While Horgan may have heard from Payton himself that his motorcycle had been stolen, and from Banks herself that someone had knocked on their door, a jury could infer that she would not have known that Cosenza was that person, prior to even knowing his name.  This specific piece of information -- the extent to which Hazelhurst told Horgan about Cosenza -- was not disclosed to Cosenza.

Hazelhurst testified at trial that when he went to Horgan's apartment on August 16, 2000, he was looking to see if anything was out of place, "especially a pair of men's shorts or pants." Only two pieces of evidence in the summary judgment record suggest, even remotely, that this was not true.  First, Hazelhurst failed to document, in a police report written on August 16, 2000, that he looked for shorts in Horgan's apartment.  This lack of documentation, however, was disclosed. Indeed, Cosenza's trial counsel used the lack of documentation to impeach Hazelhurst's testimony. Second, Horgan testified at her deposition that she did not recall officers searching for clothing at her apartment on August 16, 2000.  Horgan added, however, "I just don't recall that whole thing, I just don't recall."  Horgan's lack of memory about this specific visit to her apartment does not render Hazelhurst's testimony about the visit false.  Cosenza has pointed to nothing in the record not already disclosed that reasonably suggests -- beyond conjecture -- that Hazelhurst withheld information about looking for men's shorts at Horgan's apartment.

Thus, drawing all reasonable inferences in Cosenza's favor, a jury would be warranted in finding that Hazelhurst and Doherty withheld information about the distance between officers and the bicyclist on the day after the attack and the extent to which Hazelhurst shared information about Cosenza with Horgan following the photo array.  A jury would not be warranted in finding that Hazelhurst withheld information regarding looking for shorts at Horgan's apartment on August 16, 2000, as that argument rests on speculation and conjecture.  The information about the distance between the officers and the bicyclist is exculpatory because it could have been used to impeach Doherty's testimony that he identified the bicyclist as Cosenza.  Likewise, the information concerning what was provided to Horgan about Cosenza after the array is exculpatory because it could have been used to further demonstrate the unreliability of her identification, insofar as it tended to prove that her confidence in her selection was artificially inflated.

A jury also could find this information material. Testimony that Cosenza fled from officers the day after the attack was circumstantial evidence of Cosenza's guilt. *See United States v. Harris*, 660 F.3d 47, 52 (1st Cir. 2011). Horgan's identification of Cosenza, moreover, was the Commonwealth's center piece. The prosecutor highlighted both in his closing. A jury reasonably could conclude that this information, by "any reasonable likelihood," could have affected the judgment of the jury. *See Wearry*, 577 U.S. at 392.

To the extent the § 1983 causation standard on the suppression theory is essentially the materiality standard with a heightened burden of proof, *see Drumgold*, 707 F.3d at 49, Cosenza must prove that it is more likely than not that the information could have affected the judgment of the jury, or in other words, that it is more likely than not that the information undermines the confidence of his conviction, *see Wearry*, 577 U.S. at 392. Because the information about Horgan's statement tends to undermine the only direct evidence against Cosenza, and because Doherty's testimony about Cosenza fleeing, a piece of circumstantial evidence, was otherwise uncontradicted, it would not be unreasonable for a jury to find the causation standard met here. Thus, summary judgment as to Hazelhurst and Doherty on the suppression theory is denied.

### ii. Destroyed Evidence

A police officer who fails to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant" violates a criminal defendant's due process rights only if the officer acted in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *Olszewski v. Spencer*, 466 F.3d 47, 56 (1st Cir. 2006).

Cosenza maintains that Rocheford destroyed, or at least failed to preserve, a fingerprint that Benedict had found at the scene, and that Grady and Donahue destroyed the suspected weapon, the chair rung. Neither the fingerprint nor the chair rung was "apparently exculpatory," *Magraw*

*v. Roden*, 743 F.3d 1, 8 (1st Cir. 2014), and Cosenza does not argue otherwise.  Accordingly, to survive summary judgment, the record must support an inference that the fingerprint or rung were destroyed in bad faith.

Benedict, one of the first officers on the scene on the night of the attack, indicated that he found a partial print on the window believed to be the point of entry for the perpetrator.  Rocheford testified at trial that she had processed the scene for prints but did not find anything usable.  She further testified that she "most likely" processed the glass portion of the window.  At her deposition in this case, however, she conceded that she could not say with certainty whether she indeed processed the glass portion of the window.  Donahue picked up the chair rung from Horgan's apartment and brought it to Grady for processing.  Grady tested the rung for fingerprints, without success, by applying a superglue-like material and magnetic powder.  Grady discarded the rung five weeks later.  Grady's discarding of the rung, as well as his failure to photograph it, deviated from nationally accepted standards, including the usual practice of the WPD.

Even if Rocheford did not test the glass portion of the window for prints, and Grady, potentially at Donahue's direction, discarded the rung without photographing it, there is no evidence of bad faith.  *See United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015) ("The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith.").  Accordingly, summary judgment as to Rocheford, Grady, and Donahue on this theory is granted.

*c.  Fabrication Theory*

Cosenza's third due process theory is that the defendants fabricated evidence against him. While the defendants moved for summary judgment "on the entirety of Plaintiff's due process claim, Count I," the defendants did not specifically address the fabrication theory in their memorandum in support of summary judgment. For this reason, Cosenza asserts that summary judgment on the fabrication theory should be denied.

A party seeking summary judgment "bears the initial burden of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden may be "discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The core of Cosenza's fabrication theory is alleged in Paragraphs 79 and 80 of the Second Amendment Complaint. Those paragraphs, under the heading "Count I," allege that the defendants "fabricated and solicited evidence that they knew to be false, including but not limited to witness identifications, statements, and testimony that they knew to be false," and "produced a series of false and fraudulent reports and related documents." With respect to that theory of liability, the defendants did not "put the ball in play," *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990), by averring an absence of evidence.

The defendants do so only briefly in their reply memorandum, asserting that the three pieces of evidence Cosenza contends were fabricated in his opposition are mere allegations resting on unsupported speculation. As the preceding discussion on Cosenza's suppression theory makes clear, the Court is skeptical of the extent to which the record permits reasonable inferences that each of the alleged fabricated statements indeed was fabricated to the extent claimed. Nonetheless, the defendants' argument on the fabrication theory is forfeited for purposes of the pending motion. *See Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 349 (D. Mass.

2010).   The Court declines to grant summary judgment on this theory as to Hazelhurst and Doherty.[9]

### 3. *Malicious Prosecution*

Cosenza brings a § 1983 claim for malicious prosecution.   The defendants argue that Cosenza cannot prove the claim as a matter of law, and that they are entitled to qualified immunity.   In a § 1983 claim for malicious prosecution, a plaintiff must show that the defendant caused "a seizure of the plaintiff pursuant to legal process unsupported by probable cause," and that criminal proceedings terminated in the plaintiff's favor.   *See Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)).   The defendants maintain that Cosenza's seizure was supported by probable cause.   In response, Cosenza argues that probable cause was lacking because Horgan's identification was false and obtained by unduly suggestive procedures, and because other evidence was fabricated.

"Probable cause for an arrest exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators."   *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004).   Probable cause is measured "at the time of the arrest," *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009), and from the standpoint of an objectively reasonable officer, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003).   *See also Michigan v.*

---

[9] As mentioned, Rocheford, Grady, and Donahue argue that they are entitled to summary judgment on all claims given their tangential involvement in the investigation.   Cosenza does not specifically address their argument; instead, he implicates Rocheford, Grady, and Donahue directly only on the suppression theory, (Pl. Mem. at 23), and the conspiracy claim, (Pl. Mem. at 30).   As to the fabrication theory, he implicates only Hazelhurst and Doherty.   (Pl. Mem. at 21).   Discerning no evidence in the record to support liability for Rocheford, Grady, and Donahue on the fabrication theory, and given that their argument of tangential involvement applies to all claims, summary judgment as to Rocherford, Grady, and Donahue on the fabrication theory is granted.

*DeFillippo*, 443 U.S. 31, 37-38 (1979).  Qualified immunity attaches "'so long as the presence of probable cause is at least arguable.'"  *Abreu-Guzman v. Ford*, 241 F.3d 69, 73 (1st Cir. 2001) (quoting *Prokey v. Watkins*, 942 F.2d 67, 72 (1st Cir. 1991)).

"Probable cause can be based on a single identification from a credible eyewitness."  *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015); *see also Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 216 (D. Mass. 2001).  Even an allegedly unreliable identification may be "trustworthy enough that a reasonably prudent person would rely on it in forming a belief about the suspect's conduct."  *Robinson v. Cook*, 706 F.3d 25, 34 (1st Cir. 2013); *see also Goodwin v. Conway*, 836 F.3d 321, 329 (3d Cir. 2016).

Here, to recap the pertinent facts, drawing all reasonable inferences in Cosenza's favor: Hazlehurst created an array of nine photographs of similar-looking men.  Although Hazlehurst did not have independent, evidence-based suspicion of Cosenza, he included Cosenza's photograph in the array because Cosenza was listed as a suspect in Benedict's incident report.  Cosenza was the only individual pictured in the array who lived near Horgan.  Hazlehurst laid the array out on a table at Horgan's niece's house, while Banks, Horgan's roommate, was present.  Hazlehurst stressed the importance of picking someone out, explaining to Horgan that he needed a positive identification to go further, and that an "iffy" identification was no good.  Horgan, who was emotional to begin with, had a visible, distinct reaction to seeing Cosenza's photograph.  She identified him as her attacker.

Probable cause based on this identification, without more, was at least arguable.  *See Acosta*, 386 F.3d at 10 (uncorroborated testimony of a victim ordinarily can support a finding of probable cause).  Adding to the calculus, Benedict's incident report, which Hazlehurst reviewed, stated that Horgan's neighbor, Payton, believed that Cosenza had recently gained access to the

27

building by jumping onto the balcony from the first floor, and that Cosenza had been knocking on several doors in the building looking for money.  Although not much, a reasonably prudent person with this information, plus Horgan's identification, would be warranted in the belief that Cosenza likely committed the crime.  *See United States v. Winchenbach*, 197 F.3d 548, 556 (1st Cir. 1999) (officer's conclusion that probable cause exists need only be reasonable).

The existence of probable cause is amenable to summary judgment when the *material* facts are not in dispute.  *See Acosta*, 386 F.3d at 9; *see also Almeida v. Rose*, 55 F. Supp. 3d 200, 204 (D. Mass. 2014) (dismissal of § 1983 malicious prosecution claim appropriate due to victim's positive photo identification, despite other allegations).  Because, on these facts, no reasonable jury could find that probable cause was not at least arguable, entitling the officers to qualified immunity, summary judgment is warranted.[10]

### 4.  Conspiracy

Cosenza asserts a § 1983 claim for conspiracy.  The defendants argue that Cosenza has no reasonable expectation of proving this claim.  In response, Cosenza asserts that Hazelhurst, Doherty, Rocheford, Grady, and Donahue conspired against him by, among other things, suppressing and fabricating evidence to implicate him in the crime.[11]

---

[10] To the extent Cosenza still maintains that the City is liable for its officers' alleged malicious prosecution, and it does not appear that he does, (*see* Pl. Mem. at 37-40), the record does not support municipal liability in this way.  There is no evidence that the City had an express policy that caused it officers to effect seizures unsupported by probable cause; nor is there evidence that the City's failure to train its officers caused its officers to effect seizures unsupported by probable cause.  Summary judgment for the City on this claim is granted.

[11] Cosenza mentions Coakley as well, but elsewhere in his memorandum, Cosenza expressly states that he is not pursuing claims against Coakley.  In any event, due to Coakley's tangential involvement in the investigation, noted *supra*, summary judgment is granted in his favor.

A claim for civil conspiracy under § 1983 requires showing a "conspiratorial agreement" "to commit an unlawful act, or to commit a lawful act by unlawful means," *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020) (quoting *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008), and an "actual abridgment of some federally-secured right," *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001). To establish the agreement element of the conspiracy, a plaintiff must prove either the existence of a "single plan," or that "the parties decide[d] to act interdependently, each actor deciding to act only because he was aware that the others would act similarly." *Sánchez*, 872 F.3d at 12 (quoting *Aubin v. Fudala*, 782 F.3d 280, 286 (1st Cir. 1983)). "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof: more often than not such an agreement must be inferred from all the circumstances." *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988). Such inferences, however, must be based on more than speculation and conjecture. *Sánchez*, 972 F.3d at 12.

The Court already has concluded that a jury reasonably could find a *Brady* violation based on Hazelhurst and Doherty's failure to disclose the distance between officers and the bicyclist and the extent of information shared with Horgan after the array. Based on the surrounding circumstances, a jury also could infer an agreement between Hazelhurst and Doherty not to disclose this information. Doherty was with Hazelhurst when Hazelhurst conducted the array, and Hazelhurst was with Doherty when Doherty identified Cosenza as the bicyclist. Following Doherty's identification, moreover, Hazelhurst created a "wanted" poster describing Cosenza as having fled from the apartment complex upon seeing the police. A jury reasonably could infer from this evidence that Hazelhurst and Doherty planned to act in concert to implicate Cosenza in the crime by suppressing exculpatory, material information. Accordingly, summary judgment on Cosenza's conspiracy claim as to Hazelhurst and Doherty is denied.

Cosenza's argument that Rocheford, Grady, and Donahue joined in this agreement too, however, is based on speculation and conjecture.  Rocheford and Donahue's involvement in the investigation was limited to responding to the crime scene shortly after the attack.  Rocheford processed the scene for prints, without luck, even though Benedict had observed a partial print on what was thought to be the point of entry.  Donahue took the chair rung, the suspected assault weapon, from the apartment and brought it to Grady, who processed it for fingerprints and, some five weeks later, discarded it, potentially at Donahue's direction.  As discussed, these actions do not independently make out constitutional violations.  These actions also do not support an inference that Rocheford, Grady, and Donahue agreed to implicate Cosenza in the crime by fabricating or suppressing evidence.  Indeed, there is no indication in the record that Rocheford, Grady, and Donahue were even aware of the photo array, the incident with the bicyclist, or Horgan's statement.  Thus, summary judgment on this count as to Rocheford, Grady, and Donahue is granted.

## Conclusion

The defendants' motion for summary judgment (Docket No. 125) is **_granted_** with respect to defendants City of Worcester, Coakley, Richardson, Burnes, Benedict, Donahue, Turgeon, Grady, and Rochford on all claims.  The motion is **_granted_** with respect to defendants Hazelhurst and Doherty on Count I - Identification Theory and Count II.  The motion is **_denied_** with respect to defendants Hazelhurst and Doherty on Count I - Suppression Theory, Count I - Fabrication Theory, and Count III.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**